**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

PENNSYLVANIA CHIROPRACTIC ASSOCIATION,
NEW YORK CHIROPRACTIC COUNCIL, and
ASSOCIATION OF NEW JERSEY CHIROPRACTORS,
on their own behalf and in a representational capacity on
behalf of their members, and GREGORY T. KUHLMAN,
D.C, JAY KORSEN, D.C., IAN BARLOW, KENDALL
GEARHART, D.C., JEFFREY P. LERI, D.C., MICHELLE
M. ASKAR, D.C., MARK BARNARD, D.C., BARRY A.
WAHNER, D.C., JERRY CAPONE, D.C., ANTHONY
FAVA, D.C., DAVID R. BARBER, D.C., RYAN S. FORD,
D.C., LARRY MIGGINS, D.C., CASEY PAULSEN, D.C.,
and ANDREW RENO, D.C., on their own behalf and on
behalf of all others similarly situated,

                          Plaintiffs,

           -against-

BLUE CROSS BLUE SHIELD ASSOCIATION, BLUE
CROSS AND BLUE SHIELD OF RHODE ISLAND,
BLUE CROSS AND BLUE SHIELD OF ALABAMA,
ARKANSAS BLUE CROSS AND BLUE SHIELD, BLUE
SHIELD OF CALIFORNIA, BLUE CROSS AND BLUE
SHIELD OF FLORIDA, BLUE CROSS AND BLUE
SHIELD OF GEORGIA, HEALTH CARE SERVICES
CORPORATION, INDEPENDENCE BLUE CROSS,
BLUE CROSS AND BLUE SHIELD OF KANSAS,
CAREFIRST, INC., BLUE CROSS AND BLUE SHIELD
OF MASSACHUSETTS, BLUE CROSS AND BLUE
SHIELD OF MINNESOTA, BLUE CROSS AND BLUE
SHIELD OF KANSAS CITY, HORIZON BLUE CROSS
AND BLUE SHIELD OF NEW JERSEY, EXCELLUS
BLUE CROSS AND BLUE SHIELD, BLUE CROSS AND
BLUE SHIELD OF NORTH CAROLINA, HIGHMARK,
INC., BLUE CROSS AND BLUE SHIELD OF SOUTH
CAROLINA, BLUE CROSS AND BLUE SHIELD OF
TENNESSEE, PREMERA BLUE CROSS, THE
REGENCE GROUP, WELLMARK, INC., and
WELLPOINT, INC.,

                          Defendants.

**CLASS ACTION**
**COMPLAINT**

**JURY TRIAL FOR ALL**
**ISSUES SO TRIABLE**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

THE PLAINTIFFS.............................................................................................................12

    The Association Plaintiffs................................................................................................12

    The Individual Plaintiffs .................................................................................................15

THE DEFENDANTS.........................................................................................................18

JURISDICTION AND VENUE ........................................................................................26

THE EXPERIENCE OF PLAINTIFF KUHLMAN WITH BCBS
GROUP HEALTH PLANS ...............................................................................................27

THE EXPERIENCE OF PLAINTIFFS KORSEN AND BARLOW
WITH BCBS GROUP HEALTH PLANS.........................................................................34

    Forced Recoupment ........................................................................................................49

    BCBSRI's Connection to other BCBS Entities .............................................................51

    Self-Funded Plans...........................................................................................................52

    Defendant BCBSAL .......................................................................................................53

    The Defamation Lawsuit ................................................................................................54

THE EXPERIENCE OF PLAINTIFF GEARHART
WITH BCBS GROUP HEALTH PLANS.........................................................................55

THE EXPERIENCE OF PLAINTIFF LERI WITH
BCBS GROUP HEALTH PLANS ...................................................................................59

THE EXPERIENCE OF PLAINTIFF ASKAR
WITH BCBS GROUP HEALTH PLANS.........................................................................68

THE EXPERIENCE OF PLAINTIFF BARNARD
WITH BCBS GROUP HEALTH PLANS.........................................................................81

THE EXPERIENCE OF PLAINTIFF WAHNER
WITH BCBS GROUP HEALTH PLANS.........................................................................85

THE EXPERIENCE OF PLAINTIFF CAPONE
WITH BCBS GROUP HEALTH PLANS.........................................................................90

THE EXPERIENCE OF PLAINTIFF FAVA
WITH BCBS GROUP HEALTH PLANS ....................................................................92

THE EXPERIENCE OF PLAINTIFF BARBER
WITH BCBS GROUP HEALTH PLANS ....................................................................94

THE EXPERIENCE OF PLAINTIFF FORD
WITH BCBS GROUP HEALTH PLANS ....................................................................96

THE EXPERIENCE OF PLAINTIFF MIGGINS
WITH BCBS GROUP HEALTH PLANS ....................................................................98

THE EXPERIENCE OF PLAINTIFF PAULSEN
WITH BCBS GROUP HEALTH PLANS ..................................................................101

THE EXPERIENCE OF PLAINTIFF RENO
WITH BCBS GROUP HEALTH PLANS ..................................................................103

DEFENDANTS' ERISA VIOLATIONS ..................................................................111

DEFENDANTS' RICO VIOLATIONS ....................................................................117

    The Recoupment Enterprise ............................................................................117

    NHCAA ............................................................................................................119

    IBM and FAMS ...............................................................................................126

PREDICATE ACTS ..............................................................................................129

    Violations of 18 U.S.C. §§ 1341 and 1343 ....................................................129

PATTERN OF RACKETEERING ACTIVITY .......................................................130

RICO VIOLATIONS ..............................................................................................130

    18 U.S.C. § 1962(c) ........................................................................................130

CLASS DEFINITIONS ..........................................................................................131

COMMON CLASS CLAIMS, ISSUES AND DEFENSES FOR THE CLASS .......132

ADDITIONAL CLASS ACTION ALLEGATIONS ................................................133

COUNT I - CLAIM FOR BENEFITS UNDER GROUP PLANS
GOVERNED BY ERISA (on behalf of Plaintiffs and the ERISA Class) ..................134

COUNT II - FAILURE TO PROVIDE FULL & FAIR REVIEW
AS REQUIRED BY ERISA (on behalf of Plaintiffs and the ERISA Class) ..............136

COUNT III - VIOLATIONS OF RICO 18 U.S.C. § 1962(c)
(On Behalf of Plaintiffs and the RICO Class against the RICO Defendants) ............................137

COUNT IV - VIOLATIONS OF RICO 18 U.S.C. § 1962(c)
(on behalf of Plaintiffs and the members of the RICO Class
who are also members of the ERISA Class against the RICO Defendants)................................142

COUNT V - DECLARATORY AND INJUNCTIVE RELIEF
UNDER 18 U.S.C. § 1964(a)..........................................................................................................146

COUNT VI - EQUITABLE RELIEF ....................................................................................................147

JURY DEMAND ..................................................................................................................................150

Plaintiffs Pennsylvania Chiropractic Association ("PCA"), New York Chiropractic Council (the "Council"), and the Association of New Jersey Chiropractors ("ANJC") (collectively, the "Association Plaintiffs"), and Gregory T. Kuhlman, D.C. ("Kuhlman"), Jay Korsen, D.C. ("Korsen"), Ian Barlow ("Barlow"), Kendall Gearhart, D.C. ("Gearhart"), Jeffrey P. Leri, D.C ("Leri"), Michelle M. Askar, D.C. ("Askar"), Mark Barnard, D.C. ("Barnard"), Barry A. Wahner, D.C. ("Wahner"), Jerry Capone, D.C. ("Capone"), Anthony Fava ("Fava"), David R. Barber, D.C. ("Barber"), Ryan S. Ford, D.C. ("Ford"), Larry Miggins, D.C. ("Miggins"), Casey L. Paulsen ("Paulsen"), and Andrew Reno, D.C. ("Reno") (collectively, the "Individual Plaintiffs"), to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, for their Class Action Complaint (hereinafter "Complaint"), assert the following against Defendants Blue Cross Blue Shield Association, Blue Cross and Blue Shield of Rhode Island, Blue Cross and Blue Shield of Alabama, Arkansas Blue Cross and Blue Shield, Blue Shield of California, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Health Care Services Corporation, Blue Cross and Blue Shield of Kansas, CareFirst, Inc., Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of Kansas City, Horizon Blue Cross and Blue Shield of New Jersey, Excellus Blue Cross and Blue Shield, Blue Cross and Blue Shield of North Carolina, Highmark, Inc., Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Tennessee, Premera Blue Cross, the Regence Group, Wellmark, Inc., and Wellpoint, Inc. (collectively, "BCBS" or "Defendants").

## INTRODUCTION

1.      Through this action, the Association Plaintiffs, on behalf of themselves and in a representational capacity on behalf of their members, and the Individual Plaintiffs, on their own behalf and on behalf of all other similarly situated health care providers, challenge Defendants'

1

conduct as alleged herein which constitutes violations of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), and the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, *et seq.* ("RICO").

2.      The Association Plaintiffs are chiropractic associations that represent the interests of the chiropractic profession in general, and of their members in their respective states in particular, while the Individual Plaintiffs and the members of the putative Classes, as defined below, are health care providers who have provided health care services to members of health care plans insured or administered by Defendants ("BCBS Insureds"), and who have been paid by Defendants for providing such services through the issuance of benefits under the terms and conditions of the BCBS Insureds' health care plans. As alleged herein, Defendants engaged in concerted action to extort the Individual Plaintiffs and the Class members by (1) falsely accusing them of fraud or having obtained improper overpayments in the receipt of past benefit payments, when, instead, Defendants simply made retrospective adverse benefit determinations under ERISA based on arbitrary and capricious findings that the services in question are not services covered under the applicable health care plans; (2) demanding immediate recoupment of such past payments without giving Plaintiffs or Class members a proper opportunity for appeal or other due process considerations; and (3) withholding, without any basis or authority, benefit payments for current and future benefits otherwise payable to Plaintiffs and other Class members on behalf of new and unrelated BCBS Insureds as a means to force repayment of the fraudulently demanded recoupments. In short, based on false and invalid accusations of fraudulent or improper billing practices, Defendants act as prosecutor, judge, and jury as part of a scheme to steal millions of dollars from the Individual Plaintiffs and Class members.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

3.      Drs. Kuhlman, Korsen, Gearhart, Leri, Askar, Barnard, Wahner, Capone, Fava, Barber, Ford, Miggins, Paulsen and Reno are licensed chiropractors and Mr. Barlow is a licensed occupational therapist.

4.      During the Class Period, as defined below, Plaintiff Kuhlman was – and remains – a participant in a network of providers (known as "participating" or "Par" providers) pursuant to a contract he signed with Blue Cross and Blue Shield of Illinois ("BCBSIL"), an unincorporated division of Defendant Healthcare Services Corporation ("HCSC"). During most of the Class Period, Plaintiffs Korsen and Barlow signed a similar contract with Defendant Blue Shield and Blue Cross of Rhode Island ("BCBSRI"), Plaintiffs Leri and Askar signed similar contracts with Defendant Highmark, Inc., through its wholly-owned subsidiary Highmark Blue Shield ("Highmark"), Plaintiffs Barnard and Wahner signed a similar contract with Defendant Independence Blue Cross ("IBC"), Plaintiff Capone signed a similar contract with Blue Cross and Blue Shield of South Carolina ("BCBSSC"), Plaintiff Fava signed a similar contract with Defendant Horizon Blue Cross Blue Shield of New Jersey ("Horizon"), Plaintiffs Barber, Reno and Ford signed similar contracts with Defendant Wellpoint, Inc. ("Wellpoint"), operating under the name Anthem Blue Cross Blue Shield ("Anthem"), Plaintiff Miggins signed similar contracts with Defendant Premera Blue Cross ("Premera") and Defendant Regence Group, through its wholly-owned controlled subsidiary Regence Blue Shield ("Regence"), and Plaintiff Paulsen signed a similar contract with Defendant Blue Cross Blue Shield of Minnesota ("BCBSMN"). These Par contracts are referred to as Participating Provider Agreements ("PPAs"). As Par providers, the Individual Plaintiffs agreed to provide Covered Services to BCBS Insureds. Plaintiffs Kuhlman, Barlow, Leri, Askar, Barnard, Wahner, Capone, Fava, Barber, Ford, Miggins, Paulsen and Reno remain Par providers with the respective local BCBS Entity in the

3

states in which they operate. Plaintiffs Gearhart and Korsen are no longer participants in the BCBS networks operated in their states and are therefore known as a "non-participating," or "Non-Par," providers.

5.      Defendant Blue Cross and Blue Shield Association ("BCBSA"), a federation of BCBS Entities, licenses the use of the BCBS name. A "BCBS Entity" is a health care company that has a license from BCBSA to use the BCBS name, under the Primary Blue Cross and/or Blue Shield License Agreement or the Blue Cross and/or Blue Shield Controlled Affiliate License Agreement during the Class Period. As used herein, the term BCBS Entity refers to each of the named Defendants other than BCBSA. BCBS Entities work together, with the oversight and assistance of the BCBSA, to administer health care plans offered to BCBS Insureds nationwide.

6.      Throughout the Class Period, the Individual Plaintiffs provided health care services to BCBS Insureds. When the Individual Plaintiffs provided such services, they would as a matter of course obtain assignments from their patients which would authorize the Individual Plaintiffs to file claims for benefits with their local BCBS Entity under the terms and conditions of their patients' health care plans, regardless of whether the patient was insured under a plan insured or administered by their local BCBS Entity or some other BCBS Entity.

7.      Pursuant to the Individual Plaintiffs' PPAs, which are similar in form to each other and to the standard form contracts entered into by all Defendants with other health care providers, the Individual Plaintiffs agreed to provide health care services to BCBS Insureds for an agreed-upon discounted rate, in exchange for obtaining access to such Insureds not only of their local BCBS Entity, but of all BCBS Entities. The PPAs, however, limit the Individual Plaintiffs' reimbursement to "Covered Services," which is a term defined under the BCBS health

4

care plans governing the insurance provided to their patients as those health care services for which benefits are available. Thus, the Individual Plaintiffs' reimbursement for providing health care services to BCBS Insureds is dependent upon the terms and conditions of the BCBS health care plans.

8.      If the patient was insured under a health care plan insured or administered by BCBSIL (for Plaintiff Kuhlman), BCBSRI (for Plaintiffs Korsen and Barlow), Horizon (for Plaintiff Fava), Wellpoint (for Plaintiffs Gearhart, Barber, Ford and Reno), Highmark (for Plaintiffs Leri and Askar), IBC (for Plaintiffs Barnard and Wahner), BCBS-Minn (for Plaintiff Paulsen), Premera or Regence (for Plaintiff Miggins), or BCBSSC (for Plaintiff Capone), the applicable BCBS Entity would process a submitted claim by determining (1) whether the treatments at issue were Covered Services under the terms and conditions of the insured's health care plan, and (2) the amount of benefits to be paid for such services. If the BCBS Entity insured the plan (known as a "fully-insured" plan), it would pay the benefits from its own assets directly to Plaintiffs. If the BCBS Entity administered the plan for an employer that was responsible for paying the benefits (known as a "self-funded" plan), the BCBS Entity would authorize payment, which would come from the employer's assets, with the employer paying the BCBS Entity a fee for administering the plan.

9.      If the Individual Plaintiffs' patient was insured under a plan insured or administered by a BCBS Entity outside the state where the services were performed (*e.g.*, the patient was treated by a provider in Illinois, but the employer was headquartered elsewhere and a BCBS Entity in another state issued or administered the insurance), the local BCBS Entity (BCBSIL in this example) would act as the "Host Plan," while the BCBS Entity that actually insured or administered the health insurance plan at issue would serve as the "Home Plan."  As

the Host Plan, the local BCBS Entity would (1) allow the patient access to BCBS Par providers, (2) take and process the claim submitted to it by the Par provider, and (3) determine the amount of reimbursement and make the benefit payment directly to the provider, limiting the patient's financial responsibility for any covered services to a specified co-payment. The program establishing the process by which the BCBS Entities work together to ensure coverage for BCBS Insureds is known as the BlueCard program, which is implemented and overseen by BCBSA.

10.     While the local BCBS Entity, as the Host Plan, would take and process the benefit claim on behalf of the patient and the Par provider, it would only determine the amount of the benefit to be paid. The Home Plan, through which the relevant health insurance plan was actually issued, would be responsible for determining whether the services provided were Covered Services under the insured's health insurance plan and would make the decision whether to authorize the Host Plan to pay the benefits to the provider. The Home Plan would be financially responsible for paying the benefits, either from its own assets if a fully-insured plan was involved or from the assets of the employer if it was a self-funded plan. In addition, while the local BCBS Entity, as the Host Plan, would notify the Individual Plaintiffs or other local providers of the benefit determination, including the amount being paid to the provider and the amount owed by the BCBS Insured, the Home Plan would be responsible for preparing and disseminating an Explanation of Benefits ("EOB") form to the BCBS Insured, which would disclose the benefit determination to the Insured. Over many years, the Individual Plaintiffs submitted claims for reimbursement to their local BCBS Entities with respect to medically necessary services they provided to BCBS Insureds. In many cases the patients were subscribers to plans insured or administered by the local BCBS Entities, while in many other cases they were subscribers in plans insured or administered by other BCBS Entities, such that their local BCBS

Entity acted as the Host Plan and other BCBS Entities served as the Home Plan. In each case, the Individual Plaintiffs submitted claims for benefits on behalf of BCBS Insureds who were their patients directly to their local BCBS Entity.

11.    The vast majority of the BCBS Insureds on whose behalf the Individual Plaintiffs submitted claims, and were paid benefits, received their insurance from BCBS Entities as part of a private employee welfare benefit plan governed by ERISA. ERISA governs all such private employee welfare benefit plans, whether they are fully-insured or self-funded, and is estimated to include more than 170 million insureds nationwide. ERISA-exempt plans include those that are issued by governmental agencies or churches, or plans acquired by individuals and not through an employer.

12.    While a dispute between the Individual Plaintiffs or other Class members and a BCBS Entity with which they had a PPA over the *amount* to be paid for a service provided to BCBS Insureds would involve a contractual issue under the PPA, when the issue involves whether there was a "Covered Service" – such as whether a service was "investigational or experimental" or "medically necessary" – the dispute requires interpretation and application of the terms and conditions of the respective health care plans. Because in the latter situation the benefit payments to the Individual Plaintiffs were made based on a BCBS Entity's evaluation and assessment of the terms and conditions of ERISA plans -- including whether the claims were for Covered Services -- ERISA governs. Similarly, where a BCBS Entity elects to withhold payment of benefits on an otherwise valid claim and apply those monies to an alleged overpayment for a prior rendered service, the withholding of benefits constitutes an "adverse benefit determination" under ERISA, subjecting the BCBS Entity to ERISA's rules and regulations. Further, because the local BCBS Entity paid the benefits directly to the Plaintiffs

pursuant to assignments they received from BCBS Insureds, Plaintiffs are deemed to be beneficiaries under ERISA with standing to assert rights and protections under this statute.

13.    Each of the Individual Plaintiffs experienced similar problems with their local BCBS Entities. After years of providing services to BCBS Insureds, and receiving valid benefit payments, Plaintiffs were suddenly contacted by the BCBS Entity with which they are Par providers and informed that they had purportedly been overpaid for their services. Because the Insureds who were treated by the Individual Plaintiffs included many who were covered by health care plans insured or administered by BCBS Entities other than their local BCBS Entity, each of the health care plans issued by *all* of the defendant BCBS Entities had to have identical exclusions with regard to those services, since no distinction was ever made between BCBS Entities by the Blue Entity seeking repayment. Further, since the money that the local BCBS Entity was seeking to recoup included benefits that had been paid by all of the defendant BCBS Entities, for when they were acting as the Host Plan on behalf of the Individual Plaintiffs' patients, the local BCBS Entity was acting either on its own behalf or as the agent for the other defendant BCBS Entities in demanding such restitution.

14.    Following the initial repayment demands issued by their local BCBS Entity, the Individual Plaintiffs generally sought unsuccessfully to pursue appeals whereby they could demonstrate that the demands were improper and that the Individual Plaintiffs had received valid payments over the years for which they owed no restitution. However, the local BCBS Entity did not allow the Individual Plaintiffs to pursue such appeals, or effectively ignored them, and simply continued to demand payment. Thereafter, on a number of occasions, the local BCBS Entity immediately began to force the Individual Plaintiffs to repay the amounts they allegedly owed by withholding payments to which they were otherwise entitled for new claims they had

submitted on behalf of unrelated BCBS Insureds (or have threatened to do, as alleged herein). Thus, when the Individual Plaintiffs submitted claims for BCBS Insureds, the local BCBS Entity processed the claims, indicated that they are Covered Services for which benefits are due, and then withheld the amount from the Individual Plaintiffs as a so-called "Recoupment Installment." They did so without any legal authority or independent validation of their recoupment demands. To date, Defendants forcibly recouped or withheld thousands of dollars the Individual Plaintiffs would otherwise be entitled to receive pursuant to the terms and conditions of the applicable BCBS health care plans.

15.     Many of the forced recoupments by the local BCBS Entities related to treatments provided to BCBS Insureds in health care plans insured or administered by other BCBS Entities. Further, many of such forced recoupments related to self-funded plans. In such a case, the employer in the self-funded plan that is the Plan Sponsor (a term under ERISA that refers to the entity through which the insurance is offered) is informed that the claim was processed and determined to involve Covered Services, and that the benefit has therefore been paid to the provider. Upon information and belief, the Plan Sponsor is not informed that its funds are actually being taken by a BCBS Entity to cover an alleged debt arising from an unrelated BCBS Insured and an unrelated treatment from what could be many years in the past.

16.     The repayment demands by Individual Plaintiffs' local BCBS Entities, including their forced recoupments of new and unrelated funds that are otherwise due and owing to the Individual Plaintiffs, are part of a nationwide scheme engaged in by BCBSA and numerous BCBS Entities to extort funds from health care providers, including members of the Association Plaintiffs. The BCBSA has a National Anti-Fraud Department that "[p]rovides healthcare fraud management direction and support to the anti-fraud units employed by the 38 independent Blue

Plans," and, further, "[p]rovides services to the Blue Plans anti-fraud units in detecting, preventing, and investigating healthcare fraud, and recovering improper payments." In early July 2009, the BCBSA announced that its "National Anti-Fraud Department" had "recovered nearly $350 million as a result of anti-fraud investigations in 2008."

17.     While Defendants characterize their efforts as combating "fraud," in fact a substantial portion of their activities are designed to coerce payments from providers where there is no fraud, and, indeed, where there is no basis for recoupment at all. In particular, where Defendants seek repayment based on a finding that certain services were not Covered Services under the terms of its plans, such as is true for the Individual Plaintiffs, there is no valid basis for asserting fraud. Rather, BCBS is merely making an adverse benefit determination under ERISA, which requires compliance with strict standards established by that statute and its regulations, standards with which Defendants fail to comply.

18.     ERISA further applies to Defendants' actions in forcing recoupment. In such circumstances, the applicable BCBS Entity makes a determination that the treatment at issue is a Covered Service and the proper payment is identified. Rather than paying the benefit owed under the health care plan to the patient or the provider, however, the BCBS Entity withholds those funds and puts them, instead, in its own pocket. By doing so, the BCBS Entity has made a new adverse benefit determination under ERISA, and is thereby subject to the same ERISA requirements as any such adverse benefit determination.

19.     At a minimum, the BCBS Entities are required to issue revised EOBs to the patients whose services are at issue, with adequate disclosure of proper procedures for appealing such adverse benefit determinations. They further are required to provide, upon request of the BCBS Insureds or their authorized representatives, including the Individual Plaintiffs, copies of

all relevant plan materials, including summary plan descriptions ("SPDs"), relating to their adverse benefit determination, and offer a "full and fair review" of the decision. The BCBS Entities failed to do so, and, in so doing, violated ERISA and are precluded from seeking repayment. Further, the BCBS Entities cannot seek retroactive restitution from providers under ERISA since they violated the legal standard for obtaining equitable restitution under federal law.

20.     The purported basis upon which the BCBS Entities sought reimbursement, and their continued application of such policies with regard to ongoing and future health care services, is also flawed and without valid support. The BCBS Entities adopted new policies whereby they deem various chiropractic services are not Covered Services under the terms of their health care plans. As detailed herein, however, the procedures at issue are generally accepted services in the chiropractic community and are Covered Services under the BCBS ERISA plans.

21.     In addition to violating ERISA, Defendants' scheme to coerce repayments of previously paid benefits is part of a "Recoupment Enterprise," as defined below, whose conduct violates RICO. Plaintiffs bring claims under RICO against Defendants BCBSA, HCSC, BCBSRI, Highmark, IBC, BCBSSC, Wellpoint, Premera, Regence and BCBSMN (collectively, the "RICO Defendants").

22.     Based on information and belief, the Individual Plaintiffs are only 15 of numerous providers against whom Defendants made similar improper demands for repayment of previously paid benefits, including members of the Association Plaintiffs. Defendants' internal records will reflect the amount they have recovered from providers as a result of these efforts, as well as the amounts they have improperly denied as part of their effort to coerce payments. On

11

their own behalf and on behalf of all other providers who are similarly situated, all of the Plaintiffs seek injunctive and equitable relief under ERISA (against all Defendants), RICO (against the RICO Defendants) and common law, both to halt Defendants' practices of seeking restitution from providers in this fashion and to compel them to repay providers for the amounts they were coerced to pay as a result of Defendants' improper actions.

23.    Because Defendants' actions were improper and without a valid legal foundation, Plaintiffs seek in addition to the above injunctive relief (1) payment of treble damages by the RICO Defendants, as authorized by RICO; and (2) declaratory relief (a) that Defendants' recoupment constitute an adverse benefit determination under ERISA, (b) that Defendants made adverse benefits determinations in violation of ERISA requirements; and (c) to compel Defendants to find that the chiropractic and other health care services provided by Plaintiffs are Covered Services under its health care plans.

## THE PLAINTIFFS

### The Association Plaintiffs

24.    The Pennsylvania Chiropractic Association ("PCA"), with its headquarters located in Harrisburg, Pennsylvania, was established to represent the interests of the chiropractic profession in general and individual chiropractors in the State of Pennsylvania in particular. With more than 1,500 members, the PCA assists chiropractors with billing issues, problems with insurance companies, legal consultations and understanding the law. Its Mission Statement is as follows:

- To promote the highest quality of Chiropractic care.
- To eliminate barriers to patient access so that its members can compete effectively in the healthcare delivery system.
- To promote the art, science and philosophy of Chiropractic and to assure that only qualified Doctors of Chiropractic offer this service.
- To promote ongoing, state-of-the-art learning opportunities for our members and the public.

- ▪ To interact with decision makers so that Chiropractic treatment is widely known and understood by society.
- ▪ To function as an organization with the highest level of integrity and commitment to the public and the patients we serve.

The PCA brings this action on its own behalf and in the interests of its members, many of whom have suffered improper audits, repayment demands and recoupments as alleged herein from Defendants Highmark and IBC, among others.

25.    The New York Chiropractic Council (the "Council") is a chiropractic association based in Rosedale, New York. Its members consist of more than 600 chiropractors and chiropractic students residing in New York State. The Council's declared mission "is to direct people to the realization that healing comes from within; and that ultimately the promotion of health and wellness is superior to the treatment of disease."  Further, it has adopted the following purposes:

> The purpose of the Council is to promote the basic philosophy, science and art of chiropractic. The Council has been formed as well for the following reasons:
>
> To protect the welfare of its members to practice chiropractic without compromise, and with parity and respect;
>
> To protect the public's ability to receive chiropractic without prejudice, ridicule or financial penalty from any individual, group or profession;
>
> To conduct educational seminars, lectures and meetings within the profession and the public in accordance with our stated objectives;
>
> To keep chiropractic separate and distinct from all other professions;
>
> To foster interprofessional relations based upon mutual respect and a clear understanding of the basic Philosophy, Science and Art of Chiropractic.

The Council brings this action on its own behalf and in the interests of its members, many of whom have suffered improper audits, repayment demands and recoupments as alleged herein from Defendants Wellpoint (through its wholly-owned subsidiary Empire Blue Cross and Blue

Shield) and Excellus, among others.

26.    The Association of New Jersey Chiropractors ("ANJC") is a not-for-profit professional association whose membership consists exclusively of individuals licensed to practice chiropractic in the State of New Jersey. The ANJC was formed by the merger of six separate and distinct chiropractic professional organizations, including the New Jersey Chiropractic Society, into one single, unified, statewide voice. The mission of the ANJC is to embrace, protect, preserve, and promote the science, art, and philosophy of chiropractic in the State of New Jersey and the professional welfare of its approximately 1,500 members. Headquartered in Branchburg, New Jersey, the ANJC serves as the primary information resource regarding the benefits of chiropractic care and wellness in the State. Its primary goal is to advocate and represent the interests of New Jersey chiropractors and their patients in New Jersey, as it works toward improving the quality of life for the public and the more than one million patients seeing chiropractors throughout New Jersey on a regular basis. The ANJC brings this action on its own behalf and in the interests of its members, many of whom have suffered improper audits, repayment demands and recoupments as alleged herein from Defendant Horizon, among others.

27.    As part of their work, the Association Plaintiffs assist members who were subjected to improper or overzealous audits by insurance companies, seek to negotiate with insurers in an effort to advance the interests of chiropractors, and work with legislators and regulators with respect to chiropractic legislation and regulations.

28.    The Association Plaintiffs bring this action to obtain appropriate equitable and injunctive relief for their members in combating Defendants' abusive practices as detailed herein, and to obtain compensation for their expenditures in time and money assisting members

in dealing with such improper practices. The Association Plaintiffs have individual standing as they have been injured by Defendants' wrongful conduct as alleged herein. They have expended considerable time and resources helping their members deal with issues concerning Defendants' improper chiropractic post-payment audits and recoupment efforts, including their forced recoupment through improper withholding of unrelated payments to apply toward the alleged overpayments. The Association Plaintiffs also have associational standing on behalf of their members. In addition to the redress they seek for their own injury, and where their members are entitled to do so and the claims for relief stated herein otherwise permit, the Association Plaintiffs seek declaratory and injunctive relief necessary to protect the interests of their members.

### The Individual Plaintiffs

29.    Dr. Kuhlman is a chiropractic physician, licensed to practice in Illinois. His maintains his practice under the name Integrated Health, S.C., with a primary place of business at 1 South Virginia Street, Crystal Lake, Illinois 60014. Dr. Kuhlman is a Par provider with BCBSIL.

30.    Dr. Korsen is a chiropractic physician, licensed to practice in Rhode Island. He maintains his practice under the name Back to Health Chiropractic, with a primary place of business at 140 Point Judith Road, Suite 31, Narragansett, Rhode Island 02882. Dr. Korsen is currently a Non-Par provider, but during a portion of the Class Period he was a Par provider for BCBSRI.

31.    Mr. Barlow is a trained Occupational Therapist, licensed to practice in Rhode Island. He maintains his practice under the name Barlow Rehabilitation, with a principle place of business at 140 Point Judith Road, Suite A-13, Narragansett, Rhode Island 02882.  Mr. Barlow is a Par provider for BCBSRI.

15

32.     Dr. Gearhart is a chiropractic physician, licensed to practice in Ohio. He maintains his practice under the name Progressive Health & Rehabilitation Center, with a primary place of business at 4600 Smith Road, Cincinnati, Ohio 45212. Dr. Gearhart is a Non-Par provider with Defendant Wellpoint (operating in Ohio under the name Anthem).

33.     Dr. Leri is a chiropractic physician, licensed to practice in Pennsylvania. He practices at 843 Market Street, Meadville, Pennsylvania 16335. Dr. Leri is a Par provider with Defendant Highmark.

34.     Dr. Askar is a chiropractic physician, licensed to practice in Pennsylvania. She maintains her practice under the name InLine Chiropractic, with a primary place of business at 3468 Brodhead, Suite 9, Monaca, Pennsylvania 15061. Dr. Askar is a Par provider with Defendant Highmark.

35.     Dr. Barnard is a chiropractic physician, licensed to practice in Pennsylvania. He maintains his practice under the name HealthSource of Abington, Inc., with a primary place of business at 1422 Easton Road, Abington, Pennsylvania 19001. Dr. Barnard is a Par provider with Defendant IBC.

36.     Dr. Wahner is a chiropractic physician, licensed to practice in Pennsylvania. He practices at 4931 Wissahickon Avenue, Philadelphia, Pennsylvania 19144.  Dr. Wahner is a Par provider with Defendant IBC.

37.     Dr. Capone is a chiropractic physician, licensed to practice in South Carolina. He maintains his practice under the name First Choice Medical Wellness, with a primary place of business at 2525 Gentry Memorial Highway, Suite A, Pickens, South Carolina 29671. Dr. Capone is a Par provider with Defendant BCBSSC.

38.     Dr. Fava is a chiropractic physician, licensed to practice in New Jersey. He

16

maintains his practice under the name Advanced Center for Injury and Wellness Care, LLC, 508 Hamburg Turnpike, Suite 203, Wayne, New Jersey 07470. Dr. Fava is a Par provider with Defendant Horizon.

39.    Dr. Barber is a chiropractic physician, licensed to practice in Kentucky. He maintains his practice under the name Barber Chiropractic Center at 1087 Pasadena Drive, Suite 100, Lexington, Kentucky 40503. Dr. Barber is a Par provider with Defendant Wellpoint (operating in Kentucky under the name Anthem).

40.    Dr. Ford is a chiropractic physician, licensed to practice in Missouri. He maintains his practice under the name Ryan Ford Chiropractic at 1901 E. 32nd Street, Suite 5, Joplin, Missouri 64804. Dr. Ford is a Par provider with Defendant Wellpoint (operating in Missouri under the name Anthem).

41.    Dr. Miggins is a chiropractic physician, licensed to practice in Washington. He maintains his practice under the name HealthSource of Downtown Seattle, with a primary place of business at 10260 Hyla Avenue, N.E. Bainbridge Island, Washington 98110. Dr. Miggins is a Par provider with Defendants Premera and Regence.

42.    Dr. Paulsen is a chiropractic physician, licensed to practice in Minnesota. He maintains his practice under the name Healthsource Chiropractic and Progressive Rehab, with its principle place of business located at 4345 Nathan Lane North, Suite F, Plymouth, Minnesota 55442. Dr. Paulsen is a Par provider with Defendant BCBSMN.

43.    Dr. Reno is a chiropractic physician, licensed to practice in Virginia. He maintains his practice under the name HealthSource Chiropractic & Progressive Rehab, with a primary place of business at 3490 Plank Road, Suite 1, Fredericksburg, Virginia 22407. Dr. Reno is a Par provider with Defendant Wellpoint (operating in Virginia under the name Anthem).

44.    The Individual Plaintiffs obtain, as a matter of course, signed assignments from their patients who are BCBS Insureds, which give the Individual Plaintiffs the right to file claims directly with their local BCBS Entity for their services and to receive payment for providing Covered Services as defined under the terms and conditions of their patients' BCBS health care plans. Moreover, the Individual Plaintiffs' local BCBS Entity, acting on its own behalf and as agents of other BCBS Entities that serve as Host Plans, have accepted these assignments as being valid by dealing directly with the Individual Plaintiffs and paying them directly, such that they have waived their right to oppose the validity of the assignments or are otherwise estopped from asserting such objections. The Individual Plaintiffs have further been specifically authorized by various BCBS Insureds to represent them in pursuing this action. As a result, the Individual Plaintiffs have standing to pursue the ERISA claims asserted herein. The Individual Plaintiffs have also suffered injury to property in the form of denied benefits to which they are otherwise entitled as a direct result of Defendants' actions, such that the Individual Plaintiffs have standing to pursue the alleged RICO claims.

**THE DEFENDANTS**

45.    Defendant Blue Cross and Blue Shield Association (the "Association" or "BCBSA") is an Illinois corporation and the trade association for BCBS Entities. Its headquarters are located at 225 North Michigan Avenue, Chicago, IL 60601. The Association is owned and controlled by the BCBS Entities and is governed by a board of directors composed of BCBS Entity chief executive officers or BCBS Entity board members. The Association administers the BlueCard Program. Further, the BCBSA has established a National Anti-Fraud Department, the NAFD, which provides oversight, support and supervision over Special Investigation Units ("SIU") of each of the BCBS Entities that license the BCBS names.

46.    The various BCBS entities identified below receive a license from BCBSA to use

18

the BCBS name and logo, as well as the right to use the BlueCard program in the particular State or other service area dictated by the terms of the license agreement. They offer, insure, underwrite and administer commercial health benefits, including those of patients for whom the Plaintiffs have provided health care services, as detailed herein. BCBSA is based in this District, and Defendant Healthcare Services Corporation operates here through its unincorporated division, Blue Cross Blue Shield of Illinois.

47.    Defendant Health Care Services Corporation ("HCSC") is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, Illinois. HCSC offers managed care services in four separate states through four unincorporated divisions:  Blue Cross Blue Shield of Illinois, Blue Cross Blue Shield of Texas, Blue Cross Blue Shield of New Mexico, and Blue Cross Blue Shield of Oklahoma. It provides health care services to approximately three million BCBS Insureds in Texas, more than 3.6 million in Illinois, more than 230,000 in New Mexico, and more than 830,000 in Oklahoma. HCSC processed Plaintiff Kuhlman's claims, issued improper demands for repayment and, without legal basis or authority, withheld valid benefits to offset its alleged overpayments. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by HCSC.

48.    Defendant Blue Cross and Blue Shield of Rhode Island ("BCBSRI") is a Rhode Island corporation with its corporate headquarters located at 444 Westminster Street, Providence, Rhode Island. It provides health care services to more than 670,000 BCBS Insureds. BCBSRI has demanded recoupment from Plaintiffs Korsen and Barlow with regard to numerous of its insureds, as well as many who are insured under the health care plans of other BCBS Entities.

49.    Defendant Blue Cross and Blue Shield of Alabama ("BCBSAL") is an Alabama

corporation with its corporate headquarters located at 450 Riverchase Parkway East, Birmingham, Alabama. It provides health care services to approximately three million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSAL. Among other things, BCBSAL has falsely represented to a BCBS Insured that it has paid benefits to Plaintiff Korsen under its health care plan when, in fact, such benefits have been improperly recouped by Defendant BCBSRI.

50.　　Defendant Arkansas Blue Cross and Blue Shield ("BCBSAR") is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas. It provides health care services to over 400,000 BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSAR.

51.　　Defendant Blue Shield of California ("BSCA") is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, California. It provides health care coverage to approximately 3.4 million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSCA.

52.　　Defendant Blue Cross and Blue Shield of Florida ("BCBSFL") is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida. It provides health care services to approximately five million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSFL.

53.　　Defendant Blue Cross and Blue Shield of Georgia ("BCBSGA") is a Georgia

corporation with its corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia. It provides health care services to approximately two million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSGA.

54.     Defendant Blue Cross and Blue Shield of Kansas ("BCBSKS") is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas. It provides health care services to approximately 900,000 BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSKS.

55.     Defendant CareFirst, Inc. ("CareFirst") Blue Cross and Blue Shield ("CareFirst") is a Maryland corporation with its corporate headquarters located at 10455 Mill Run Circle, Owings, Maryland. Through its subsidiary CareFirst of Maryland, Inc., which operates as CareFirst Blue Cross and Blue Shield, CareFirst provides health care services to approximately 3.4 million BCBS Insureds in Maryland and Washington, D.C. area. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by CareFirst.

56.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") is a Massachusetts corporation with its corporate headquarters located at 100 Summer Street, Boston, Massachusetts. It provides health care services to approximately 2.5 million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSMA.

57.     Defendant Blue Cross and Blue Shield of Minnesota ("BCBS-MN") is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul,

Minnesota. It provides health care services to approximately three million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSMN.

58.    Defendant Blue Cross and Blue Shield of Kansas City ("BCBSKC") is a Missouri corporation with its corporate headquarters located at One Pershing Square, 2301 Main, Kansas City, Missouri. It provides health care services to approximately 880,000 BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSKC.

59.    Defendant Horizon Blue Cross and Blue Shield of New Jersey ("Horizon") is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey. It provides health care services to approximately two million BCBS Insureds. Horizon has demanded recoupment from numerous members of Plaintiff ANJC, as well as many who are insured under the health care plans of other BCBS Entities. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Horizon.

60.    Defendant Excellus Blue Cross and Blue Shield ("Excellus") is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York. It provides health care services to approximately two million BCBS Insureds primarily in upstate New York. Its BlueCross BlueShield operations were previously known as: BlueCross BlueShield of Central New York, BlueCross BlueShield of the Rochester Area, and BlueCross BlueShield of Utica-Watertown. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Excellus.

61.    Defendant Blue Cross and Blue Shield of North Carolina ("BCBSNC") is a North

Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina. It provides health care services to approximately 3.7 million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSNC.

62.     Defendant Highmark, Inc. ("Highmark") is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, Pennsylvania. Through several health care subsidiaries, it provides health care services to approximately 4.8 million BCBS Insureds. Its subsidiaries include Highmark Blue Shield, which provides health insurance in 21 counties of central Pennsylvania and the Lehigh Valley and, through joint operating agreements with Blue Cross of Northeastern Pennsylvania and Independence Blue Cross, in northeastern and southeastern Pennsylvania; Highmark Blue Cross Blue Shield, which provides health insurance throughout the 29 counties of western Pennsylvania; Mountain State Blue Cross & Blue Shield, which provides health insurance in West Virginia; Keystone Health Plan West, which provides health insurance in western Pennsylvania; and Highmark Health Insurance Company, which provides Medicare coverage in West Virginia. Highmark has engaged in numerous post-payment audits and recouped funds improperly from Plaintiffs Leri and Askar, as well as many other members of Plaintiff PCA. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Highmark.

63.     Defendant Independence Blue Cross ("IBC") is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania. Directly and through various subsidiaries and affiliates, including but not limited to AmeriHealth, it provides health care services to approximately 3.4 million BCBS Insureds. IBC engaged in

numerous post-payment audits and recouped funds improperly from many members of Plaintiff PCA, including Plaintiff Wahner. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by IBC.

64.     Defendant Blue Cross and Blue Shield of South Carolina ("BCBSSC") is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Dr., Columbia, South Carolina. It provides health care services to approximately one million BCBS Insureds. BCBSSC engaged in numerous post-payment audits and recouped funds improperly from Plaintiff Capone and many other providers. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSSC.

65.     Defendant Blue Cross and Blue Shield of Tennessee ("BCBSTN") is a Tennessee corporation with its corporate headquarters located at 801 Pine Street, Chattanooga, Tennessee. It provides health care services to approximately two million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by BCBSTN.

66.     Defendant Premera Blue Cross ("Premera") is a Washington corporation with its corporate headquarters located at 7001 220th Street, S.W., Building 1, Mountlake Terrace, Washington 98043. It provides health care services to approximately 1.7 million BCBS Insureds, operating as Premera Blue Cross in Washington, Premera Blue Cross Blue Shield of Alaska, LifeWise Health Plan of Arizona and LifeWise Health Plan of Oregon. Premera engaged in post-payment audits and has improperly demanded repayments from Plaintiff Miggins and many other providers. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Premera.

67.    Defendant Regence Group ("Regence") is an Oregon corporation with its corporate headquarters located at 200 Southwest Market Street, Portland, Oregon 97201. It provides health care services to more than three million BCBS Insureds, operating as Regence Blue Shield of Idaho, Regence Blue Cross Blue Shield of Oregon, Regence Blue Cross Blue Shield of Utah and Regence Blue Shield in Washington. Regence engaged in numerous post-payment audits and has improperly recouped payments from Plaintiff Miggins and many other providers. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Regence.

68.    Defendant Wellmark, Inc. ("Wellmark") is an Iowa corporation with its corporate headquarters located at 636 Grand Avenue, Des Moines, Iowa. Doing business through its subsidiaries Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Blue Cross and Blue Shield of South Dakota, it provides health care services to more than two million BCBS Insureds. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Wellmark.

69.    Defendant Wellpoint, Inc. ("Wellpoint") is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana. It was formed when WellPoint Health Networks Inc. and Anthem, Inc. merged in 2004. On information and belief, Wellpoint is the nation's largest health benefits company, with approximately 35 million members in its affiliated health plans. As a licensee of BCBSA, Wellpoint insures or administers plans as the Blue Cross licensee for California; the Blue Cross and Blue Shield licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as the Blue Cross Blue Shield licensees in 10 New York City metropolitan and surrounding counties, operating as Empire Blue

Cross Blue Shield, and as the Blue Cross or Blue Cross Blue Shield licensee in selected upstate counties only), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), and Wisconsin. A number of WellPoint's health plans operate under the name of Anthem Blue Cross and Blue Shield. Wellpoint or its affiliates pursued post-payment audits and improper recoupments of members of the Council and other New York-based health care providers, as well as from Plaintiff Gearhart, Barber, Ford and Reno and numerous other providers in the many states in which Wellpoint operates. Further, the recoupment demands of BCBSRI and other BCBS Entities include BCBS Insureds whose health insurance is insured or administered by Wellpoint.

70.    "BCBS" is a brand name used for products and services provided by one or more of the BCBS group of subsidiaries that offer, underwrite, or administer benefits. When used in this Complaint, "BCBS" includes all BCBS subsidiaries owned and controlled by any of the named Defendants whose activities are interrelated and intertwined with them. Due to the manner in which they function, all of the Defendants are functional ERISA fiduciaries and, as such, they must comply with fiduciary standards. Moreover, in making coverage determinations relating to their BCBS Insureds, the BCBS Entities must comply with the terms and conditions of the applicable health care plans and otherwise must comply with ERISA and its underlying regulations. In the Complaint, "BCBS" refers to all named Defendants and all predecessors, successors and subsidiaries to which these allegations pertain.

## JURISDICTION AND VENUE

71.    Defendants' actions in administering employer sponsored health care plans, including determining reimbursement for providers who perform health care services to BCBS Insureds pursuant to the terms and conditions of the health care plans, are governed by ERISA, 29 U.S.C. § 1001, *et seq.* Plaintiffs assert subject matter jurisdiction for their ERISA and RICO

claims under 28 U.S.C. § 1331 (federal question jurisdiction), 29 U.S.C. § 1132(e) (ERISA), and 18 U.S.C. §§ 1965(b) and (d) (RICO).

72.    Venue is appropriate in this District for Plaintiffs' claims under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (i) BCBSA is based here, (ii) one of the defendant BCBS Entities, HCSC is based and transacts business here, (iii) one of the Individual Plaintiffs, Dr. Kuhlman, resides and practices in Illinois and has been injured here; and (iv) other BCBS Entities obtain services for their insured members in Illinois.

## THE EXPERIENCE OF PLAINTIFF KUHLMAN WITH BCBS GROUP HEALTH PLANS

73.    Since 2000, Dr. Kuhlman has been a member of the BCBSIL network of providers, pursuant to which he has agreed to accept BCBSIL's "Usual and Customary Fee allowance" for services provided in exchange for gaining access to BCBS Insureds. Under the terms of the Mutual Participating Provider Agreement between Illinois Providers and Blue Cross Blue Shield of Illinois, signed on October 25, 2000, Dr. Kuhlman and BCBSIL (defined as "the Plan") agreed as follows:

> The Plan agrees to pay, on a timely basis, the Participating Provider directly for covered services rendered to a Plan Insured. The amount of payment will be based on the Plan's determination of the Usual and Customary Fee for such covered service reduced by any deductible or co-payment amount for which the Plan Insured is responsible. The Participating Provider agrees to bill only the Plan and not the Plan Insured for any service covered under the contract except that the Participating Provider may bill the Plan Insured for services not covered under the Contract and for any deductible or coinsurance amount payable under the Contract up to the Plan's Usual and Customary Fee determination.

74.    On the same day, Dr. Kuhlman also entered into a PPO Plus Addendum to the Mutual Participation Agreement Between Providers and BCBSIL. According to this Addendum:

> The purpose of this Agreement is to assure predictable and predetermined levels of coverage and reimbursement for services rendered by a PPO Plus Provider to persons entitled to receive benefits under PPO Plus programs offered and

administered by the Plan, its subsidiaries or other PPO programs offered and administered by other Blue Cross Blue Shield Plans and their subsidiaries ("Covered Person") in accordance with the Covered Person's applicable health care benefit contract.

In order to accomplish the above goals, the PPO Plus Provider and the Plan agree as follows:

* * * *

4. The PPO Plus Provider agrees to bill the Plan in a timely manner and in a method acceptable to the Plan for payment prior to charging the Covered Person for any deductible or coinsurance amount. The Plan agrees to pay the PPO Plus Provider directly, on a timely basis, for Covered Services rendered to a Covered Person as described in the Covered Person's applicable health care contract. The amount of payment to the PPO Plus Provider will be listed on the PPO Plus Schedule of Maximum Allowance or the PPO Plus Provider's fee, whichever is less. The PPO Plus Provider agrees to bill only the Plan and not the Covered Person for any services covered under the Covered Person's contract, except that the PPO Plus Provider may bill a Covered Person for services not covered under the contract and any copayment payable under the contracts at any time. Subsequent to receipt of payment from the Plan, the PPO Plus Provider may bill a Covered Person for any deductible or coinsurance amount payable under the contract.

75.     As is self-evident from the clear and unambiguous language of the PPA entered into between Dr. Kuhlman and BCBSRI, the extent to which BCBSRI is obligated to pay Dr. Kuhlman for services provided to BCBS Insureds is conditioned on the definition of Covered Services in the respective health care plans issued by BCBS Entities to the BCBS Insureds. While the amount to be paid Dr. Kuhlman for providing Covered Services is determined under the PPA, whether or not there is a Covered Service that will require payment can only be determined by applying the terms and conditions of the BCBS health care plans applicable to each patient for whom Dr. Kuhlman submits claims.

76.     As a matter of course, Dr. Kuhlman has his patients, including BCBS Insureds, sign documents which authorize both the assignment of benefits to Dr. Kuhlman, as well the right for him to bring ERISA claims relating to the services he provides his patients. This form

28

states as follows:

LEGAL ASSIGNMENT OF BENEFITS AND
RELEASE OF MEDICAL AND PLAN DOCUMENTS

     In considering the amount of medical expenses to be incurred, I, the undersigned, have insurance and/or employee health care benefits coverage with the above captioned, and hereby assign and convey directly to <u>Integrated Health, S.C.</u> all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services rendered from such doctor and clinic. I clearly understand and agree that all of the services rendered to me are charged directly to me and that I am personally responsible for all payments. I understand that if I suspend or terminate my care, any fees for professional services rendered to me will be immediately due and payable.  . . . I hereby authorize any plan administrator or fiduciary, insurer and my attorney to release to such doctor and clinic any and all plan documents, insurance policy and/or settlement information upon written request from such doctor and clinic in order to claim such medical benefits, reimbursement or any applicable remedies. I authorize the use of this signature on all my insurance and/or employee health benefits claim submissions.

     I hereby convey to the above named doctor and clinic to the full extent permissible under law and under any applicable insurance policies and/or employee health care plan any claim, chose in action, or other right I may have to such insurance and/or employee health care plan with respect to medical expenses incurred as a result of the medical services I received from named doctor and clinic and to the extent permissible under law to claim such medical benefits, reimbursement and any applicable remedies. Further, in response to any reasonable request for cooperation, cooperate with such doctor and clinic in any attempts by such doctor and clinic to pursue such claim, chose in right against my insurer and/or employee health care plan, including, if necessary, bring suit with such doctor against such insurers and/or employee health care plan in my name.

     In further authorize the staff to perform such services as deemed necessary by the physician to diagnose and treat my condition(s). I understand that I am fully responsible for all charges which may include legal fees, collection fees or other expenses incurred by provider in collecting my account.

     This assignment will remain in effect until revoked by me in writing. A photocopy of this assignment will be considered as valid as the original. I have read and fully understand this agreement.

77.    Pursuant to the clear and unambiguous terms of this assignment, Dr. Kuhlman has

standing to pursue this action for benefits under ERISA.

78.    For more than eight years after becoming a BCBS Par provider, Dr. Kuhlman

29

provided quality services to BCBS Insureds and received payments for providing Covered Services under the terms of his patients BCBS plans. Without prior notice, on or around November 21, 2008, Dr. Kuhlman suddenly received more than 100 letters from the Refund Recovery Unit of BCBSIL stating that he had been overpaid for particular BCBS Insureds and demanding immediate repayment. In explaining the demand, each letter stated:

> Blue Cross and Blue Shield is committed to providing quality service. This commitment includes periodically reviewing claims payments that were previously made. Occasionally, an error is brought to our attention or is discovered during our review. In reviewing the claims for this patient, we found that an overpayment was made to you.
>
> Your claim was processed with the incorrect fee schedule/allowed amount.
>
> The correct benefit payment for the services that this patient received is $0.00 [each letter stated that $0 was the "correct benefit payment"]. However, on 10/29/07 [different dates in each letter], under check [check number provided], a payment of $902.70 [the reported amounts vary] was issued to you. We regret that this error was made, and we request that you send the overpayment of $283.50 [the requested amount varies] to us.
>
> To ensure that you are credited properly for the refund, please complete the attached form and mail it along with your check made payable to Blue Cross and Blue Shield in the enclosed postage-paid envelope. We appreciate your cooperation.

79.    Other than the assertion in the various letters that the claim "was processed with the incorrect fee schedule/allowed amount," no further details were provided, including what services were at issue, the CPT Code (a unique five-digit number for each health care procedure that was performed, developed by the American Medical Association), what the correct fee schedule/allowed amount was and how the so-called error had been made. After the signature line on the letter, it simply stated that "[f]or more information on how this overpayment was determined and calculated, please call the telephone number on the back of the ID card" of the patient. It also added: "As the provider, you have the right to appeal this refund request. Appeals

must be submitted in writing, within 45 days following the receipt of this letter."  However,

without even knowing what service was at issue it was impossible for Dr. Kuhlman to respond to

BCBSIL's demand or to undertake an effective appeal, particularly when more than 100 separate

letters had been mailed, each containing its own unique repayment demand.

      80.    Dr. Kuhlman subsequently retained counsel who wrote the Refund Recovery Unit

of BCBSIL by letter dated December 24, 2008 in an effort to appeal all of the refund demands.

In it, his counsel stated:

> . . . My clients are objecting to the refund demands in the approximately one
> hundred letters that you forwarded.
>
> The undersigned has called your office for an explanation and my clients have
> called for an explanation. The explanations are so vague that my clients are not
> able to properly appeal per the BlueCross BlueShield Provider Agreement. My
> client was told that certain, unspecified injections were inappropriately priced.
> That is, the second injection in a bilateral injection should have been paid at fifty
> percent (50%) of the first injection.
>
> However, many of the requested refunds are not for bilateral injections. <u>At the
> very least, we need to know the dates of service and the CPT Codes for which you
> are requesting reimbursement for each and every patient.</u> Otherwise, we cannot
> fairly respond to your demand for reimbursement. (Underlining in original.)

      81.    The letter then identified a number of the health care plans for which refunds had

been requested, relating to self-funded plans issued on behalf of various unions, and concluded

by stating:

> In order for us to properly appeal, we will need the Fee Schedules for all of the
> listed Plans. Please be advised that <u>my clients hereby specifically do not authorize
> any funds being taken, which are dedicated to other patients as we would like the
> opportunity to object to this refund demand.</u> (Underlining in original.)

      82.    BCBSIL failed to respond to Dr. Kuhlman's appeal letter from his counsel, other

than to send a single page handwritten fax which listed seven CPT Codes and the prices for each,

but without further explanation, including any information relating to specific dates of service or

other data relating to the repayment demands. Dr. Kuhlman's counsel followed her first letter

with a follow-up, dated January 23, 2009, noting that she had written thirty days previously, and

requested a response. She further reiterated that "my clients hereby specifically do not authorize

any funds being taken, which are dedicated to other patients as we would like the opportunity to

object to this refund demand."

83.    BCBSIL continued to ignore Dr. Kuhlman's effort to appeal, prompting his

counsel to set yet another letter, dated March 26, 2009, stating:

> The undersigned wrote to you two (2) months ago as a follow-up to our letter
> dated December 24, 2008. We are writing to advise you that my client would like
> to appeal your numerous reimbursement demands. We specifically advised you
> that Dr. Kuhlman does not authorize your holding back funds from other patients'
> compensation. This is not fair when you have failed or refused to provide a claim
> by claim explanation of what was erroneously paid or any of the union Fee
> Schedules.
>
> We have asked for a coherent explanation of your demand for reimbursement as
> well as other documents, which you have failed to provide. We hereby repeat that
> request, again. BlueCross BlueShield of Illinois owes a duty of cooperation under
> the Provider Agreement just as my client does. Kindly, respond to my December
> 24, 2008 letter. I am enclosing additional copies of my letters and ask that you
> respond to the undersigned regarding the matter. As I have stated, in order to us to
> properly appeal, we will need the requested information.
>
> My clients hereby specifically do not authorize any funds being taken, which are
> dedicated to other patients, as we would like the opportunity to object to these
> refund demands. (Emphasis in original.)

84.    Instead of responding to Dr. Kuhlman's appeal requests, BCBSIL proceeded to

withhold payments that would otherwise have been paid to him for providing new and ongoing

Covered Services to BCBS Insureds. In response to Dr. Kuhlman's requests for information to

assist in his appeal of the repayment demands, BCBSIL sent him, instead, a Provider Claim

Summary dated March 25, 2009, which summarized the total amount of "Recoupments Taken,"

based on a list of services for which BCBSIL claimed it had overpaid Dr. Kuhlman for some 83

services he had provided to BCBS Insureds in 2007.

85.     The list detailed claims Dr. Kuhlman had submitted for 136 services he had provided to some 55 BCBS Insureds ranging from July 2008 through March 2009. In each case, BCBSIL reported the date of service, the procedure code, the amount billed and the amount paid, identified as "Amount Paid to Provider for this Claim."  Following that list of accepted claims, BCBSIL included a list of some 83 separate services from June 2007 through March 2008 in which it reported the "Recoupments Taken."  The recoupment list identified the name of the patients, the claim number, the date of service, the amount recouped and the reasons, which in each case was specified as "Incorrect fee/Allowed Amt."  At no time did BCBSIL provide any further explanation to justify its contention that Dr. Kuhlman had been overpaid.

86.     In total, this document reported that Dr. Kuhlman had billed a total of $58,963.00 during the July 2008 through March 2009 period, for which the "Amount Paid to Provider" for such Covered Services purportedly totaled $21,928.00. This is the amount to which Dr. Kuhlman was entitled under ERISA for providing Covered Services to BCBS Insureds. Then, however, BCBSIL reported that the total "Recoupment Amount" was $10,057.50. BCBSIL therefore withheld this amount and paid Dr. Kuhlman only $11,870.59. This amount was taken from funds that were otherwise due to Dr. Kuhlman for claims he had filed with respect to new and unrelated services over which BCBSIL had no dispute with payment.

87.     At no time did BCBSIL consider Dr. Kuhlman's effort to appeal its retroactive adverse benefit determinations, or otherwise provide a full and fair review of its coverage determinations relating to his services. Nor did it provide any appeal process relating to its adverse benefit determinations in withholding or recouping payments to apply toward the alleged overpayments. Litigation is therefore the only remedy available to him. As a result, Dr. Kuhlman

has exhausted any administrative remedies that would otherwise be required under ERISA, such appeals should be "deemed exhaustion" under ERISA, or such appeals should be found to be futile.

## THE EXPERIENCE OF PLAINTIFFS KORSEN
## AND BARLOW WITH BCBS GROUP HEALTH PLANS

88.    Since at least 2003, Plaintiffs Korsen and Barlow have been members of the BCBSRI network of providers, pursuant to which they agreed to accept reduced fees for providing health care services to BCBS members. Pursuant to virtually identical form PPAs entered into between Plaintiffs Korsen and Barlow and BCBSRI, the obligation between the parties is tied directly to the health care plans BCBSRI and other BCBS entities enter into with their members.

89.    In the Whereas clause, the PPA states that BCBSRI (defined in the PPA as the "Corporation") and Plaintiffs Korsen and Barlow "desire to enter into an agreement for the provision of services to subscribers of the Corporation and their eligible dependents (hereinafter collectively referred to as 'Subscribers') on the terms and conditions set forth herein." The first section of the PPA is then titled "Covered Services," and states:

> The Provider[s] agree[] to provide the Subscribers with those services which are (i) medically necessary . . . and (vi) described as "covered services" in accordance with the respective agreements from time to time in effect between the Corporation and its subscribers (hereinafter referred to as "Covered Services"). The term "Subscribers" as employed in this Agreement is deemed to include Subscribers of the Corporation, including individuals enrolled in health benefit plans for which the Corporation administers health care coverage, as well as subscribers of all Blue Cross & Blue Shield Plans nationally.

90.    The second section of the PPA, entitled "Compensation," further specifies:

> A. The Provider[s] shall bill the Corporation for Covered Services rendered to Subscribers in accordance with their respective contracts from time to time in effect between the Corporation and its Subscribers (hereinafter collectively referred to as the "Subscriber Contracts").

34

B.  The Provider[s] agree[] to accept, as payment in full, from the Corporation for services rendered under the applicable Subscriber Contract, the fees or payments determined by the Corporation and shall abide by and be subject to such terms and conditions with respect thereto as set forth in the applicable Subscriber Contract.

C.  The Corporation shall reimburse the Provider directly for medically necessary Covered Services in an amount equal to the lesser of the Provider's charge or "Our Allowance," as that term is defined in the applicable Subscriber Contract, subject to any applicable copayments and/or deductible, and subject to all rules, regulations, policies and amendments thereto which are communicated to the Provider. The Provider may bill the subscriber directly only for any applicable copayments and/or deductible in accordance with the applicable Subscriber Contract.

D.  Services determined by the Corporation not to be medically necessary shall not be reimbursed by the Corporation or charged to the Subscriber, except when such non-medically necessary services are rendered to the Subscriber at the Subscriber's request after it has been explained to the Subscriber that the services may not be medically necessary and may not be reimbursed in whole or in part by the Corporation and the Subscriber has agreed in writing prior to the provision of services to continue treatment with the Provider at the Subscriber's own expense.

E.  Whenever payments have been made by the Corporation to the Provider in excess of the amount owed pursuant to and in accordance with the terms of this Agreement or for services that have been determined by the Corporation to have been medically inappropriate, the Corporation shall have the right to recover such payments. The Corporation shall notify the Provider in advance of any right of payment recovery and all efforts will be made to reach a mutually agreeable settlement.

F.  The Provider hereby agrees and warrants that in no event, including, but not limited to, non-payment by the Corporation, the Corporation's insolvency or breach of this Agreement, shall the Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Subscribers or persons acting on their behalf for Covered Services listed in the Subscriber Contracts. This Section II.F shall not prohibit (i) the collection of supplemental charges or copayments expressly permitted in any agreement entered into between the Corporation and a Subscriber, employer or a third party pursuant to which benefits are provided to Subscribers, or (ii) the collection of charges where the Corporation has determined that the level of care provided to a Subscriber is not medically necessary and the Subscriber has been notified in accordance with Section II.D hereof. . . .

35

91.     Section IV of the PPA, entitled "Administrative," states that "[c]laims for Covered Services shall be submitted by the Provider on a claim form approved by the Corporation or electronically . . . ."  The PPA then, under Section VII, entitled "Dispute Resolution," outlines certain dispute mechanisms relating to circumstances in which a provider's claims have "been denied, in whole or in part."

92.     As is evident from the express terms and conditions of the PPA, the determination of what claims Plaintiffs Korsen and Barlow may submit for reimbursement, and whether they are "Covered Services," are tied in directly with the health care plans issued by BCBSRI or other BCBS Entities to the BCBS Insureds. In particular, the PPA itself does not have a separate definition of Covered Services. To determine whether a submitted claim relates to a "Covered Service," the PPA expressly requires referral to the terms and conditions of the health care plans. As a result, any dispute relating to whether Plaintiffs Korsen and Barlow have provided, and are entitled to be reimbursed for, Covered Services, arises directly under such health care plans, thereby implicating ERISA.

93.     As a matter of course, Plaintiffs Korsen and Barlow obtain written assignments from their patients, including BCBS Insureds, which assign any claims for benefits otherwise payable under the health insurance plans governing the patients' health care services to Plaintiffs Korsen and Barlow. Further, these forms confirm the patients' understanding that they remain liable and may be billed for non-Covered Services under their health care plans. Pursuant to these assignments, Plaintiffs Korsen and Barlow have standing to pursue these claims for benefits under ERISA.

94.     Plaintiffs Korsen and Barlow have been providing Covered Services to BCBS Members for a number of years. During the bulk of that time, BCBS has recognized that the

services they provided were valid and appropriate, and reimbursed them based on their usual,

customary and reasonable rates, pursuant to the terms and conditions of its health care plans.

95.    In January 2009, BCBSRI contacted Dr. Korsen to request an "on site PPO audit"

of his operations. After requesting additional information to prepare for the audit, as well as an

agenda to be discussed, BCBSRI sent a letter to Dr. Korsen dated January 27, 2009, stating:

> [T]his visit is not a full file audit review and only one record may be requested to
> look at. What this means is that administratively, there is no preparation work
> needed on your part. . . . [Y]ou had requested an agenda to prepare for our visit.
> Normally, if our visit involved reviewing a number of records we would
> definitely provide you with an agenda listing all of the files along with ample time
> to pull them. To accommodate your request for an agenda, this visit involves a
> discussion with Ian Barlow and yourself regarding your day to day operations,
> billing practices and a walk through of your facility. Normally these visits only
> take about an hour. . . .

96.    Dr. Korsen responded to BCBSRI request by a letter dated January 27, 2009

agreeing to fully cooperate with the visit. In addition, he stated: "In order to assist you in this

quality initiative, we will videotape your visit for quality assurance and training purposes. Please

indicate if you have any objection to this taping. As we indicated previously we are fully

dedicated to the PPO audit, and as a result, we will have an attorney on-site to better assist you in

this quality initiative."

97.    By letter dated February 12, 2009, BCBSRI reiterated that it was not pursuing a

formal audit, and stated that it did not agree to having the meeting taped:

> Per our legal department we will not agree to the videotaping of our visit. Also,
> the type of visit that we are attempting to schedule seems highly unusual for an
> attorney to be present. If having your attorney present is what you prefer, then a
> BCBSRI attorney will also need to be present during the visit.
>
> As stated in our correspondence dated January 27, 2009, this visit is not a formal
> audit and would take approximately one hour with no administrative preparation
> needed. These visits are a normal part of our procedures and are frequently
> conducted throughout the provider community.

98.    In a subsequent letter relating to scheduling the visit, dated February 16, 2009, BCBSRI offered an alternative to videotaping, stating: "We understand that the purpose of the videotaping is that you wanted to accurately and objectively capture any recommendations for quality improvement, so in lieu of videotaping we will commit to put in writing any such recommendations." BCBSRI further reiterated its view that the meeting was "not so formal to require" an agenda, referring back to the summary of the meeting's purpose presented in its January 27, 2009 letter, adding that "at this point there is no (or one) file of patients that we are looking at." The letter then stated that the individuals attending the meeting would include Brian Wolf, Senior Medical Director, and Ken Sciarra, Investigations Coordinator (and the drafter of all of the correspondence), as well as Russell Marsella, Assistant General Counsel, to the extent Plaintiffs intended to have counsel present.

99.    The actual meeting between Dr. Korsen and BCBSRI was held in Dr. Korsen's Office on March 11, 2009. During the meeting, Dr. Korsen gave the BCBSRI representatives a tour of the facilities and explained what equipment they used for providing services to their patients. Questions were raised during the meeting as to what equipment Plaintiffs Korsen and Barlow used for providing mechanical traction, for which it billed CPT Code 97012.

100.    CPT Code 97012, which is part of the American Medical Association's Code Procedural Terminology used by providers to bill for particular health care services, defines "traction, mechanical," as follows:

> The force used to create a degree of tension of soft tissues and/or to allow for separation between joint surfaces. The degree of traction is controlled through the amount of force (pounds) allowed, duration (time), and angle of pull (degrees) using mechanical means. Terms often used in describing pelvic/cervical traction are intermittent or static (describing the length of time traction is applied), or auto traction (use of the body's own weight to create the force).

101.    Mr. Wolf, BCBSRI's Senior Medical Director, conceded during the meeting that

he was not qualified to determine if the equipment satisfied the requirements for mechanical traction and stated that documentation from the manufacturers related to that issue would suffice.

102.    By letter dated March 13, 2009, Dr. Korsen sent materials relating to the two pieces of equipment at issue to Mr. Sciarra, as a follow up to the meeting. First, Dr. Korsen provided a brochure relating to the Intermittent Segmental Traction Table manufactured by Thomas Tables, the Heritage 10, which was used in his office for mechanical traction. The brochure highlighted the use of 8 rollers gliding up and down a 24-inch track to provided "motorized intermittent segmental traction."

103.    Second, Dr. Korsen provided a letter dated March 12, 2009 from Omega Massage, the manufacturer of the Omega Montage chair he also used to provide mechanical traction. The letter stated:

> **Description of Traction as applied with an Omega Massage Chair.**
>
> Mechanical traction is defined as the application of a mechanical force to the body in a way that separates or attempts to separate the joint surfaces and elongate the surrounding soft tissues.
>
> Spinal Traction is used to distract joint surfaces and stretch soft tissues. Joint distraction is defined as the separation of two articular surfaces perpendicular to the plane of articulation.
>
> Traction applied to the spine or Spinal Traction as performed by the Omega Montage Chair is as follows:
>
> The Omega Montage chair uses supine segmentation traction. This is a 3-point bending method for spinal traction. It causes tensile stresses in the anterior spinal region directly above the roller. The subject is supine and the rollers push up vertically against the spine. The body weight on each side of the roller (cranial or caudal) is pulling the spine by gravity and the subject's weight towards the surface of the earth, while the rollers push upward in between.
>
> The force of the traction is affected by the subject's body weight and the angle of the chair back. The angle of pull is dependent on the angle of the chair back. The time duration can be varied from 15 to 30 minutes with the time remote.

104.    Following the March 11, 2009 meeting, and without reviewing any medical records or pursuing any further investigation, BCBSRI sent its final conclusions to Plaintiffs Korsen and Barlow by letter dated April 20, 2009 ("4/20/09 Letter"). Despite having repeatedly reassured Plaintiffs that the meeting was informal, did not require any form of agenda, and did not need the presence of counsel, BCBSRI concluded its analysis by demanding that Plaintiffs Korsen and Barlow provide immediate restitution in the form of more than $400,000 based on its findings. As BCBSRI explained:

> While on site [on March 11, 2009] you provided us with initial information on the Omega Massage Chair that is used at your facility. We also received from you on March 12, 2009 additional faxed information on the Omega Massage Chair and the Thomas Tables which you state is also used for rendering mechanical traction. This information was forwarded on to both our medical advisers for review. The result of their review is that both the Omega Massage Chair and the Thomas Tables do not render traction. Although the manufacturers may label this "intermittent segmental traction," medically, it is not traction.
>
> Our findings have identified that the correct reporting for these services would be the use of CPT code 97039 (Unlisted Modality). However, this service is not medically necessary as there is a lack of published peer-reviewed literature to support its efficacy. The use of CPT code 97012 (Application Traction, Mechanical) is considered an intentional misrepresentation of the service. As a result, BCBSRI has identified an overpayment in the amount of $412,951.93. This amount represents services of mechanical traction rendered from March 2003 through April 2009. A breakdown of the overpayment is highlighted in red within the enclosed spreadsheet.
>
> Please respond within 10 days from receipt of this letter to discuss repayment options. If you have any further questions regarding this matter, you may contact me [Kenneth A. Sciarra, Investigations Coordinator, Special Investigations Unit] at 401-459-1411 or Dr. Brian Wolf at 401-459-1609.

105.    The attachment to the letter contained a list of each and every time Dr. Korsen (either for his own services or those provided by Mr. Barlow while an employee) had billed CPT Code 97012 over the prior six years, applicable to 1,561 patients in nearly that many separate health care plans, making a finding that none of those services were "medically necessary" because of a "lack of published peer-reviewed literature to support its efficacy."   Because

Plaintiffs billed 97012 for mechanical traction for both the intermittent segmental traction table and the Omega Montage Chair, BCBSRI had no basis, without further inquiry, for determining which tool had been used. Nevertheless, it demanded all of the funds back -- finding that neither service was covered -- and without offering any appeal rights whatsoever.

106.    BCBSRI's determination that Plaintiffs were not entitled to be reimbursed for the services for which it had billed 97012, based on its conclusions that those services were "not covered" or otherwise were "not medically necessary," required application of the terms and conditions of the health care plans of its subscribers. Given that BCBSRI's demand was based on a finding that the treatments provided by Plaintiffs Korsen and Barlow were not Covered Services, the health care plans governing the insurance of the patients need to be evaluated, as the PPA itself incorporates the plan Certificates into the agreement.

107.    Following the receipt of the 4/20/09 Letter, Plaintiffs Korsen and Barlow filed a series of appeal letters to BCBSRI, as well as to the designated plan administrators of a number of self-funded plans, seeking to appeal the adverse benefit determination reached by BCBSRI. This effort was rejected outright by BCBSRI by letter dated May 21, 2009, in which it stated:

> Blue Cross & Blue Shield of Rhode Island (BCBSRI) is in receipt of the May 4, 2009 letter from Dr. Korsen and Mr. Barlow. While a large portion of the letter revolves around the concept of benefit denials, and goes so far as to state that "[c]learly, your sole reason for denial was plan or policy 'non-covered'" (page 19), I would like to point out that the dispute at hand is not about whether a benefit is covered or not, it is that the claims submitted do not properly represent the services rendered. Similarly, the letter repeatedly refers to these recovery efforts as stemming from negative medical necessity determinations. BCBSRI is not seeking recoupment of any of these funds due to a medical necessity determination. While the April 20, 2009 letter to Dr. Korsen did reference as an aside that the service that was actually rendered is not medically necessary, the central point is that this matter is a recoupment of the billing for CPT code 97012, as the services rendered do not fall under the proper description of that code.

108.    These representations made by BCBSRI are false and misleading.

Notwithstanding BCBSRI's blatant and ultimately futile effort to avoid the application of ERISA by denying that the basis for its recoupment demand was based on a determination that the services provided by Plaintiffs Korsen and Barlow were "not covered" under its health care plans, that is exactly what it was. Plaintiffs Korsen and Barlow provided health care services to their patients through the use of the Thomas Intermittent Segmental Traction Table and the Omega Montage Chair, for which they billed CPT Code 97012 as mechanical traction. BCBSRI's recoupment demand was based on the conclusion that its Subscribers' health care did not "cover" those services.

109.    While BCBSRI attempts to argue that the issue is proper billing, based on its assertion that Plaintiffs Korsen and Barlow should not have used CPT Code 97012, it is wrong. Both the Thomas Intermittent Traction Table and the Omega Massage have FDA clearance to provide mechanical traction, and are certified by their manufacturers as doing so.  Thus, BCBSRI's representation that it should not be required to pay for those services under 97012 is incorrect. They are Covered Services under the BCBS plans and, therefore, Plaintiffs Korsen and Barlow are entitled to be paid.

110.    Even assuming that BCBSRI was correct that CPT Code 97012 was the wrong billing code (which it is not), that does not create a basis for its recoupment demand. For example, BCBSRI states in its 4/20/09 letter that the "correct reporting for these services would be the use of CPT code 97039 (Unlisted Modality)." Thus, at most, BCBSRI would be obligated to reimburse Plaintiffs under that Code. Yet, BCBSRI holds that *no* reimbursement is valid, because it deems those services not to be covered under its health care plans.

111.    In asserting that no coverage was justified, BCBSRI states in its 4/20/09 Letter, after citing to CPT code 97039 as the proper billing code for these services, that the services

42

"[are] not medically necessary as there is a lack of published peer-reviewed literature to support

its efficacy." Yet, in its May 21, 2009 letter denying the appeal of the recoupment demand by

Plaintiffs Korsen and Barlow, BCBSRI falsely asserts that it "is not seeking recoupment of any

of these funds due to a medical necessity determination," but because the services purportedly

"do not fall under the proper designation of that code." Yet, again, assuming 97039 was the

proper billing code, BCBSRI would still be required to reimburse Plaintiffs Korsen and Barlow

for providing the services unless they were deemed to be not Covered Services. BCBSRI's

denial is frivolous and asserted solely in an effort to avoid its responsibility under ERISA.

112.    Notably, "medical necessity," as applied by BCBSRI in its 4/20/09 Letter, is a

term derived from and based on its health care contracts pursuant to which BCBS Members

receive insurance. Moreover, while BCBSRI asserts that it made a medical necessity decision, it

did not review medical records or otherwise examine any evidence concerning whether the

patients of Plaintiffs Korsen and Barlow in fact needed or benefited from the services they were

provided. Instead, BCBSRI reached a blanket conclusion that, in any and all cases, the use of the

Thomas Intermittent Traction Table and the Omega Montage Chair was not a Covered Service

because there was inadequate evidence "to support its efficacy."

113.    Despite any purported billing issue over the use of the Thomas Intermittent

Segmental Traction Table and the Omega Montage Chair, BCBSRI had no legal basis for

denying coverage for those services if they were Covered Services under the health care plans of

BCBS Members. If they were Covered Services under those ERISA plans, then BCBSRI would

have no basis for demanding recoupment of previously paid benefits, regardless of whether

Plaintiffs Korsen and Barlow may have used an incorrect CPT Code in billing for them.

114.    In denying the application of ERISA to its recoupment demand, while rejecting

the appeals of Plaintiffs Korsen and Barlow, BCBSRI stated in its May 21, 2009 letter:

> [A] good portion of the letter references ERISA. Whereas ERISA appeal rights are available to the beneficiary of an ERISA policy, and this recoupment will not negatively impact the BCBSRI members, I do not see where Dr. Korsen has the authority to act on the BCBSRI member's behalf.

115.    BCBSRI's conclusions are, again, wrong both legally and factually. As standard policy, Plaintiffs obtained signed assignments from each of the BCBS Members for whom they provided health care services. Those assignments expressly authorized them to bring any actions necessary to obtain benefits under the BCBS Members' health care plans, or otherwise to enforce rights under ERISA. As such, Plaintiffs Korsen and Barlow have full legal standing to assert claims under ERISA for the benefits being denied by BCBSRI. Pursuant to their valid assignments, these Plaintiffs are ERISA beneficiaries. Further, notwithstanding BCBSRI's assertion that "this recoupment will not negatively impact the BCBSRI members," that too is false, as Plaintiffs Korsen and Barlow are entitled to balance bill their patients for any amounts deemed by BCBSRI not to be medically necessary or otherwise not to be Covered Services.

116.    BCBSRI ended its May 21, 2009 denial letter by threatening Plaintiffs Korsen and Barlow with even further injury, stating: "Further note that in addition to BCBSRI's demand for the repayment of $412,951.93 as detailed in the April 20, 2009 letter to Dr. Korsen, BCBSRI further demands that Dr. Korsen reimburse members for any copayments, coinsurance and/or deductibles collected in connection with these services, which total $98,677.85." Not only is this demand improper and extortionate, but it highlights the connection between the BCBSRI recoupment demand and ERISA, in that the "copayments, coinsurance and/or deductibles" referenced in the letter arise solely from BCBS health care plans, the vast majority of which are governed by ERISA.

117.    Under ERISA and its accompanying regulations, an adverse benefit determination

is defined as any determination that results in a payment below 100% of billed charges, after taking into account deductibles and co-insurance. In this case, BCBSRI made a retroactive adverse benefit determination by denying coverage for services provided by Plaintiffs. It cannot do so without complying with ERISA's specific requirements.

118.    Although BCBS was obligated to do so, with regard to each of its revised benefit determinations cited to in its April 20, 2009 Letter, BCBS failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiffs. Among other things, Defendants denied claims in a manner that was inconsistent with or unauthorized by the terms of the BCBS Insureds' plan documents, including the Certificates of Coverage ("COC") and the SPDs, as well as by failing to disclose the basis for their determinations, their methodology and other critical information relating to their benefit denials, including Plaintiffs' right to appeal Defendants' retroactive adverse benefit determinations.

119.    The law and implementing regulations set forth minimum standards for claim procedures, appeals and disclosures to BCBS Insureds and their providers. In engaging in the conduct described herein, including use of improper, invalid and undisclosed policies relating to chiropractic services, issuing revised benefit denials with proper explanations or disclosing administrative appeal or grievance procedures, baseless threats regarding overpayments and referrals to collection agencies, and other systematic benefit reductions without disclosure or authority under the plans, Defendants failed to comply with ERISA, its regulations and federal common law.

120.    By virtue, *inter alia*, of Defendants' numerous procedural and substantive violations, any appeals by the Individual Plaintiffs and the Class relating to Defendants' revised

benefit determinations as described herein should be deemed exhausted or excused under ERISA and its underlying regulation, as provided in 29 C.F.R. § 2560.503-1(l).

121.    Plaintiffs' failed appeals, as alleged hereinafter, further show the futility of exhausting appeals to Defendants. Exhaustion of internal appeals under ERISA should, therefore, be deemed to be futile.

122.    Aside from its procedural infirmities, Defendants' retroactive adverse benefit determinations as reported in BCBSRI's 4/20/09 Letter were invalid, arbitrary and capricious under ERISA, and should be reversed.

123.    When appropriate to do so, Plaintiffs Korsen and Barlow use a Thomas Intermittent Segmental Traction Table or an Omega Montage Chair to provide services for their patients. BCBSRI was aware of their use of these devices and paid them for a lengthy period of time, thereby waiving any argument now that they were not covered.

124.    Treatments with an Intermittent Segmental Traction Table are also generally accepted chiropractic and occupational therapy services and cannot reasonably be denied based on the experimental and investigational exclusion or other exclusions in BCBS health care plans. It is a service that is recognized directly in the CPT, which has code 97012, "Application for a modality to one or more areas, traction, mechanical."   As explained by the American Chiropractic Association:

> CPT code 97012 . . . is intended to identify a procedure that creates a force to allow for separation between joint surfaces. The degree of traction is controlled through the amount of force (pounds or Newtons) allowed, duration (time) and angle of pull (degree) using mechanical means. Therefore code 97012 would be an appropriate code to report for various types of mechanical traction devices (e.g., computerized/motorized) including vertebral axial decompression.

125.    The use of an Intersegmental Traction Table as a "mechanical traction device" under CPT Code 97012 falls squarely within this analysis. Further, it is particularly accepted as

part of customary and chiropractic care. Indeed, 15 years ago this was acknowledged by the

Eastern District of New York. In *Introna v. Allstate Ins. Co.*, 850 F. Supp. 161 (E.D.N.Y. 1993),

a chiropractor brought an action against Allstate Insurance Company, seeking reimbursement for

a variety of chiropractic services under New York State's No-Fault automobile insurance law.

The question was whether the services were deemed to be normal and customary services that

would be subject to the No-Fault limitation on fees for chiropractic "treatment and modalities,"

or were, instead, unusual procedures that could be entitled to separate payments. The court held:

> [T]he Court finds inescapable the conclusion that the bulk of the procedures for
> which the plaintiffs seek additional recovery are, as a matter of law, "normal and
> customary procedures and treatments offered by chiropractors and are, therefore,
> deemed included under the charges set forth in the Chiropractic Fee Schedule for
> Office Visits." *Tucciarone v. Progressive Ins. Co.*, No. 91-1981 (November 19,
> 1992, pp. 6-7 (Sup. Ct. Schenectady Co. 1992). The Court reaches this
> determination only after giving careful consideration to the evidence submitted by
> the parties and bearing in mind the purposes underlying the No-Fault Law and the
> clear language of the statute.
>
> For instance, the law is clear that fees for intersegmental traction treatments and
> spinal manipulation, two of the services at issue here, are included within the
> scheduled fee for office visits. *See Tucciarone, supra* at p.6. . . . The only
> reasonable inference that can be drawn from the evidence presented before the
> Court is that the services listed above lie squarely within the range of normal and
> customary "treatments and modalities" contemplated by the No-Fault fee
> schedule.

*Id.*, at 165.

126.    The holding in the *Introna* case involved reimbursement under the No-Fault

statute, an issue unrelated to plaintiffs' claims in this action. But what is critical is that the Court

affirmatively held that "intersegmental traction treatments . . . lie squarely within the range of

normal and customary [chiropractic] 'treatments and modalities' . . ." As a result, there is no

basis for BCBSRI's decision not to cover such services when provided by use of an intermittent

segmental traction table that provides intersegmental traction.

127.    This conclusion is further reinforced by the fact that intermittent segmental traction tables are generally in use and billed by chiropractors for providing mechanical traction. In a website for one chiropractic office based in Pennsylvania, for example, the Thomas Heritage 10 table used by Plaintiffs is specifically identified as a means to provide mechanical traction:

> **Mechanical Traction.** Thomas Heritage 10 and D.C. Roller Traction table provide intersegmental traction to the cervical, thoracic and lumbar spine in order to increase spinal mobility and assist in decreasing spinal related pain.

128.    As quoted above from the manufacturer's letter, the Omega Montage Chair similarly provides mechanical traction. Significantly, the Omega company sells numerous versions of massage chairs for which it does not represent that mechanical traction is provided. The Montage Chair used by Plaintiffs is the only device sold by Omega which it specifically identifies as providing mechanical traction as a result of its unique design.

129.    Defendants' adverse benefit determinations concerning the use of the Thomas Intermittent Segmental Traction Table and the Omega Montage Chair have no basis in fact, and are arbitrary and capricious. Moreover, in making its decision, Defendants failed to give Plaintiffs Korsen and Barlow an opportunity to appeal the adverse benefit determination, and they did not consider the available evidence supporting the conclusion that these devices are properly billed as mechanical traction under 97012, and therefore are Covered Services under BCBS health care plans.

### Plaintiffs Korsen and Barlow's Exhaustion of Administrative Remedies

130.    In issuing its 4/20/09 Letter, Defendants were reporting on a revised benefit determination whereby they had now elected – after the fact – to deny benefits that had previously been approved. Under ERISA, Defendants cannot legitimately require restitution for prior payments.

48

131.     Further, to the extent Defendants have issued a new claim denial, it is obligated under ERISA to satisfy various regulatory requirements, including by providing appropriate grievance procedures which are adequately disclosed. Because Defendants failed to comply with these requirements, exhaustion of any administrative remedies are deemed exhausted and Plaintiffs Korsen and Barlow are entitled to bring this action for relief.

132.     Notwithstanding the fact that Defendants had improperly failed to disclose any administrative remedies, Plaintiffs Korsen and Barlow made an exhaustive effort to appeal Defendants' decision, but to no avail. As a result, they have exhausted any appeals they otherwise had, or such appeals would be futile.

### Forced Recoupment

133.     In light of Defendants' indefensible actions, Plaintiff Korsen informed BCBSRI, by letter dated April 22, 2009, that he was exercising his rights under the PPA to terminate his relationship as an in-network provider with BCBSRI. In response, BCBSRI sent a letter to Dr. Korsen, dated May 4, 2009, in which it stated:   "This communication is to advise you that payments on your remittances going forward will be applied toward the restitution identified in our letter to you dated April 20, 2009."

134.     Similarly, BCBSRI sent a letter to Mr. Barlow, dated May 6, 2009, making a similar statement. Because Mr. Barlow had merely been an employee of Dr. Korsen at Back to Health Chiropractic, and therefore did not submit any bills himself, BCBSRI had to make clear that it intended to force recoupment for any claims filed under his own taxpayer identification number:

> We are in receipt of your letter dated April 22, 2009 informing Blue Cross and Blue Shield of Rhode Island of your termination as a participating provider for Back to Health Chiropractic (Tax ID# 22-3814148) and Jay S. Korsen. You will be receiving further information on the termination process from the Provider Relations area shortly.

This communication is to advise you that payments made to Ian D. Barlow,
OT/Barlow Rehabilitation, Inc. (Tax ID# 20-5047303) on remittances going
forward will be applied toward the restitution identified in our letter to you dated
April 20, 2009.

135.    Without providing any further means to appeal, or otherwise taking steps to

obtain a judicial finding that Plaintiffs Korsen and Barlow had been paid improperly, BCBSRI

began immediately to recoup all payments that Plaintiffs were otherwise entitled to receive for

any ongoing services to BCBS Insureds. The Insureds themselves, however, were misled into

believing that Plaintiffs were being paid. For example, after one BCBS Insured received

chiropractic services from Dr. Korsen on May 5, 2009 and again on May 20, 2009, the patient

received EOBs from BCBSRI dated June 11, 2009 reflecting the fact that all services were

covered, that the billed amount was fully allowed and that, other than the co-pay (which was the

obligation of the patient), the remainder represented "our payment." Thus, as far as the patient

knew, BCBSRI had paid Dr. Korsen in full for his bills. In a separate document submitted to Dr.

Korsen, however, BCBSRI included the same information but then identified the amount which

was owed as part of a "recoupment installment," which was then applied to the purported debt

that Dr. Korsen owed BCBSRI as detailed in the 4/20/09 letter. This represents only one of

numerous examples where BCBSRI withheld payments from Dr. Korsen as part of its practice of

forced recoupment.

136.    Mr. Barlow was similarly adversely affected by BCBSRI's conduct. For each of

the services he provided to BCBS Insureds, BCBSRI indicated that his services were Covered

Services under its health care plans, and that it was paying benefits, even though it was

withholding all such payments to apply to its forced recoupment. This is so even though Mr.

Barlow had only been a paid employee when the original bills were submitted, such that

50

BCBSRI has no basis for challenging his current and future payments. BCBSRI continued to recoup payments from Mr. Barlow, billing on behalf of Barlow Rehabilitation, even though the only dispute over payment relates to Plaintiff Korsen, Mr. Barlow's former employer. In total, Plaintiffs Korsen and Barlow have lost thousands of dollars to date due to BCBSRI's forced recoupment practices.

### BCBSRI's Connection to other BCBS Entities

137.    As a licensee of the BCBSA, and a member of the BlueCard program, BCBSRI is obligated not only to process claims submitted by BCBSRI Insured, but also any claims submitted by members of any other BCBS entity. When a Member from another BCBS Entity submits a claim, BCBSRI processes it, and the funds ultimately are paid by the BCBS Entity through which the insurance is provided. In such a situation, BCBSRI acts as the agent of the other BCBS Entity. The same is true for the Individual Plaintiffs' other local BCBS Entities, when operating pursuant to the BlueCard program.

138.    In its 4/20/09 Letter to Plaintiffs, BCBSRI based its recoupment demand on services that had been provided by Plaintiffs to 1,561 patients over the past six years. The vast majority of these patients are members of ERISA plans. The spreadsheet provided by BCBSRI to support its claim identifies each subscriber by name, ID number, date of service, CPT Code (in each case 97012, which was the basis for the recoupment demand) and the total amount paid for which BCBSRI demanded repayment. In general, each ID number for a BCBSRI Member consists of 13 numbers. However, for any patient who was insured by a BCBS Entity other than BCBSRI, the ID number included three letters after the numbers. These three additional letters represent the other BCBS Entity.

139.    While numerous patients for whom BCBSRI sought recoupment are insured under health care plans insured or administered by BCBSRI, many are insured or administered

by other BCBS Entities. In particular, BCBSRI demanded recoupment for patients who are insured through health care plans administered by BCBS entities located in 23 states (counting Rhode Island), including Alabama, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Iowa, Kansas, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee and Texas. Because BCBSRI is acting as the agent of the BCBS Entity in each of those states for purposes of seeking recoupment, and is violating ERISA in doing so, each of those BCBS Entities is also an appropriate Defendant in this action.

140.    In addition to those states for which an adverse benefit determination was made, along with the invalid recoupment demand, BCBSRI forcibly recouped payments relating to health care plans in at least 14 states (counting Rhode Island), including Alabama, California, Colorado, Connecticut, Florida, Illinois, Maryland, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania and Texas. Because the forced recoupment of benefits that are owed to Plaintiffs are in violation of ERISA, each of the BCBS Entities operating in those states (most of which are also in the states identified above) is similarly an appropriate Defendant in this action.

### Self-Funded Plans

141.    As detailed above, BCBS Entities provide insurance for both fully-insured and self-funded plans. For fully-insured plans, the applicable BCBS Entity pays the actual benefits from its own assets, while for self-funded plans, the employer pays the benefits. As a result, if there is a valid claim that benefits were improperly paid, such that recoupment is appropriate, the money should be repaid to the employer for self-funded plans.

142.    Based on information and belief, Defendants did not repay the employers in self-funded plans. As just one example, two of the patients for whose treatment BCBSRI demanded

recoupment are insured in a self-funded plan administered by HCSC through their employer, National Elevator Union. After Dr. Korsen complained to National Elevator Union concerning BCBSRI's recoupment demand, National Elevator Union sent Dr. Korsen an email on June 17, 2009 stating:  "I can confirm that our office has not requested a refund of any payments on behalf of our Participants to you."  The company's representative further stated orally to Dr. Korsen that it had received no payments from any BCBS Entity based on recoupments from Plaintiffs or other providers. Defendants retained for themselves funds that, even if properly recouped (which they are not), belong to the self-funded plans. Thus, BCBSRI has cheated both Plaintiffs Korsen and Barlow as well as the self-funded plans whose benefits for their own Insureds are converted by BCBSRI into its own assets.

### Defendant BCBSAL

143.    One specific example of how other BCBS Entities have misled their BCBS Insureds concerning payments to Dr. Korsen is with Defendant BCBSAL. In an EOB dated May 27, 2009, BCBSAL informed its BCBS Insured that Dr. Korsen had charged $46 for services provided the Insured on May 14, 2009, the entire amount of which was deemed to be "Eligible Charges" under the plan. After specifying that the Insured's copayment for the service was $20, it then specified that the "Total Paid to Provider" was $26. Thus, BCBSAL affirmatively represented to the Insured that it had upheld the claim as valid under the plan and that it had actually paid Dr. Korsen his share of the benefits. Because this involved a self-funded plan, that also means that BCBSAL had informed the plan sponsor that was responsible for the payment that the benefit was authorized, and it made the payment.

144.    BCBSAL's representations to the Insured and the self-funded plan sponsor were false and misleading. In fact, BCBSRI withheld the entire $26, such that Dr. Korsen was never paid that amount. This is reflected in a "Blue Shield Settlement" form dated May 29, 2009,

provided by BCBSRI to Dr. Korsen, which identified a number of claims for which the "Reimbursement Amount" was identified. The total amount of benefits which had been authorized equaled $942, including the $26 authorized for the BCBSAL Insured detailed above. However, BCBSRI also specified that the entire $942, including the $26 from BCBSAL, had been withheld as part of a "Recoupment Installment." As a result, Dr. Korsen was not paid this amount in direct contradiction of the representation made by BCBSAL to its Insured.

145. An additional significant fact relating to BCBSAL's actions is that, in issuing its EOB for the May 14, 2009 service to its Insured, BCBSAL had falsely represented that its service was "physical therapy" when, in fact, it was for chiropractic services. Under the Insured's health care plan, physical therapy has a $20 deductible, which meant that the self-funded plan was responsible for paying the remaining $26 in benefits, an amount which BCBSRI subsequently took improperly as its own assets rather than paying Dr. Korsen. In contrast, the Insured's plan had a $40 deductible for chiropractic services. Had BCBSAL properly processed the claim, the Insured would have owed $40 to Dr. Korsen, while the self-funded plan would have only had to pay $6. Had this been done, BCBSRI would not have been able to withhold the extra $20 from the self-funded plan.

## The Defamation Lawsuit

146. When confronted with Defendants' misconduct, including their actions stealing benefits to which Plaintiffs were otherwise entitled through the forced recoupment practice, Dr. Korsen contacted the FBI. Dr. Korsen further contacted the media to air his grievance over Defendants' actions.

147. On June 17, 2009, one day after a local news show aired Dr. Korsen's interview, BCBSRI brought a frivolous lawsuit in the Superior Court of the State of Rhode Island. BCBSRI sought compensatory damages of at least $400,0000 for Plaintiffs' alleged breach of their PPAs

and fraud, based on the assertion that they had been improperly reimbursed for providing mechanical traction, when "they have not provided mechanical traction but have only placed the patient either on a massage table or in a massage chair." BCBSRI further accused Dr. Korsen of defamation for his statements to the press challenging its recoupment practices.

148.    On July 1, 2009, BCBSRI filed an Amended Complaint in the Rhode Island Superior Court. The Amended Complaint added a new count against Dr. Korsen in which it claimed that he had disparaged BCBSRI "to employers, business entities, labor organizations, and governmental subdivisions for the provision of services related to health care and health care plans."

149.    BCBSRI had no legal or factual basis for bringing this state court action against Plaintiffs Korsen and Barlow. It did so as part of its scheme to intimidate and extort improper payments, and to discourage other providers from challenging Defendants' practices. In addition, in the Amended Complaint, BCBSRI sought to enjoin Dr. Korsen from exercising his right under ERISA to file appeals with the designated Plan Administrators of the health care plans at issue.

150.    The lawsuit filed against Plaintiffs Korsen and Barlow by BCBSRI has no basis, as all of the state law claims are preempted by ERISA, which governs the pending dispute over whether Plaintiffs Korsen and Barlow have been properly paid benefits for Covered Services under the BCBS health care plans. BCBSRI violated ERISA in filing the action by punishing Plaintiffs Korsen and Barlow for exercising their ERISA rights.

### THE EXPERIENCE OF PLAINTIFF GEARHART WITH BCBS GROUP HEALTH PLANS

151.    Plaintiff Gearhart is a Non-Par provider with Defendant Wellpoint (operating under the name Anthem), the BCBS Entity that processes any insurance claims submitted by or on behalf of BCBS Insureds in Ohio. For a number of years Dr. Gearhart provided Covered

Services to BCBS Insureds, for which he submitted claims to Anthem to be processed. Dr. Gearhart is the Clinical Director for Progressive Health & Rehabilitation, which includes both chiropractors and physical therapists. The physical therapists with whom Dr. Gearhart works are Par providers in the Anthem network.

152.    As a matter of policy, Dr. Gearhart obtains signed assignments from his patients, including those insured under BCBS plans. Pursuant to those assignments, the patients agree that Dr. Gearhart may submit claims for reimbursement directly to Anthem for reimbursement, and Anthem, as a matter of course, has accepted such assignments and has paid him directly for his services under the terms and conditions of the Anthem health care policies which govern his patients' insurance. As a result, Dr. Gearhart has standing under ERISA to pursue benefits when BCBSSC has made an adverse benefit determination. Further, as a matter of policy, Dr. Gearhart obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Anthem.

153.    As a Non-Par provider, Dr. Gearhart has not agreed to comply with any of Anthem's internal policies or guidelines with regard to billing practices. He must comply only with generally accepted practices within the chiropractic profession, and, pursuant to his assignments, he has standing to sue to enforce the terms and conditions of the Anthem or other BCBS policies that govern his patients' plans.

154.    On or around December 2006, Anthem contacted Dr. Gearhart to inform him that it was conducting an audit of the services he had performed over time on behalf of BCBS Insureds. Dr. Gearhart subsequently provided various patient records, as requested by Anthem, and engaged in a series of communications concerning issues that arose as a result. In early 2007, Anthem reported that, based on its review, Dr. Gearhart had purportedly been overpaid by a total

of $11,464.78, Anthem stated Dr. Gearhart was now legally required to repay. Anthem also stated that if he did not repay that sum, Anthem would withhold future payments to Progressive that were attributable to BCBS Insureds.

155.    According to Anthem, Dr. Gearhart owed money for three types of services. First, Anthem demanded a return of $4,193.28 for when he billed CPT Code 97012, Mechanical Traction. Dr. Gearhart billed this code when he provided decompression therapy, using an FDA-approved Lorex Decompression Table, and had been paid a total of $3,687.50. In addition, Dr. Gearhart had received a total of $505.44 for the use of an Intersegmental Traction Table for which he also properly billed as Mechanical Traction. Anthem claimed that Dr. Gearhart should not have billed 97012 for decompression (even though the Lorex table was FDA-approved for mechanical traction), but 97039 for an Unlisted Modality, and that this was not a Covered Service under his plans. It further claimed that the traction table was only done in conjunction with decompression and was therefore also not covered.

156.    Second, Anthem claimed that Dr. Gearhart owed a total of 1,486.25, which he had been paid for providing Laser therapy, for which he billed CPT Code 97026. Dr. Gearhart properly billed for this service, using a Cold Laser to apply photon energy to stimulate cell activity. Anthem claimed, however, that laser treatments had to include heat to be Covered Services.

157.    Third, Anthem demanded a return of $5,782.25 for neuromuscular re-education, CPT Code 97112, claiming that this was part of the non-covered decompression services. This notwithstanding the fact that this code was never billed for decompression and the use of the service was properly documented to reflect the provision of a specialized form of stimulation that specifically reeducates muscles and increases strength.

57

158.    Anthem failed to notify Dr. Gearhart properly of his appeal rights under ERISA, and failed to offer a full and fair review of its decision. Dr. Gearhart retained counsel to appeal Anthem's repayment demands, explaining, among other things that decompression is a valid service that provides effective treatment to his patients, and that he properly performed and billed for Laser therapy and neuromuscular re-education. As of April 6, 2007, Anthem informed Dr. Gearhart, through his counsel, that all levels of appeals had been exhausted and he owed the money as demanded.

159.    Anthem's determination that the services provided by Dr. Gearhart had been improperly paid because they were not Covered Services represents an adverse benefit determination under ERISA. Anthem failed to comply with ERISA's regulatory requirements for dealing with an adverse benefit determination, and had no valid basis or legal right to recoup money from him. Its actions were in clear violation of ERISA.

160.    Anthem informed Dr. Gearhart that if he did not settle its claims against him, it would simply withhold future payments to him and others in his practice, including the Par physical therapists. Facing the prospect of having all of the money taken from him directly, and then having to pay counsel to try to combat Anthem's improper actions (at a cost which likely would far exceed his damages in any event), Dr. Gearhart had no choice but to resolve the dispute. He agreed to pay Anthem a reduced amount so that it would cease further actions against him.

161.    Dr. Gearhart's agreement to pay Anthem was coerced by its threat to forcibly recoup the entire amount it had demanded. Further, the agreement is invalid as it arose as part of Anthem's actions which were in direct violation of its obligations under ERISA. Dr. Gearhart is therefore seeking to rescind his agreement and compel Anthem to return the funds it had paid

him.

## THE EXPERIENCE OF PLAINTIFF LERI
##  WITH BCBS GROUP HEALTH PLANS

162.    Plaintiff Leri is a Par provider with Defendant Highmark, and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims to Highmark to be processed.

163.    As a matter of course, Dr. Leri has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to Highmark and receive benefits directly. As a result, Dr. Leri has standing under ERISA to pursue benefits when Highmark has made an adverse benefit determination. Further, as a matter of policy, Dr. Leri obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Highmark.

164.    On December 20, 2005, Thomas P. Brennan, Jr., of Highmark's Special Investigations Unit, sent a letter to Dr. Leri stating that Highmark was "conducting a review of claims submitted for payment to Highmark" for a number of patients identified in an attached list. The letter emphasized the connection between the audit and the terms of those patients' health care plans by stating:

> Per the Subscribers' Agreement, each Subscriber agrees that any person or entity having information relating to an illness or injury for which benefits are claimed under this Agreement may furnish to Highmark, upon its request, any information (including copies of records) relating to the illness or injury.

165.    In the letter, Highmark further clarified that it wished to see "a complete copy of the patient's file," adding that "[s]ince the review will involve examination of the records to determine appropriateness of services billed, utilization patterns, etc., we will fully utilize all documentation, even from outside the review period that could assist us with our determination." Highmark requested the records to be provided within the next ten days.

166.    After providing the various records requested, Dr. Leri received a copy of an unsigned letter dated February 28, 2006 to Highmark from an unnamed individual who purportedly had been "asked to perform a utilization review on the medical and billing records" of Dr. Leri. The letter identified various potential issues relating to Dr. Leri's billing, but provided no details that would have permitted Dr. Leri to verify or follow up on the conclusions reached.

167.    By letter dated August 14, 2006, Highmark's Brennan sent another letter to Dr. Leri concerning the review conducted for the time period of January 1, 2003 through December 31, 2005. In the letter, Mr. Brennan highlighted that a central issue in the audit was the extent to which the treatments at issue were Covered Services under Highmark's subscriber agreements:

> As a Participating Provider with Highmark, you are aware of and possess a copy of our "Regulations for Participating Providers." These Regulations provide that "[t]he determination as to whether any services performed by a participating provider for a Highmark member are covered by a Highmark Agreement and the amount of payment for such services shall be made by Highmark."

168.    The letter subsequently summarized the conclusions reached by "an external consultant" based on a review of the medical records. This consisted of merely repeating the general claims listed in the unsigned, single-page letter Dr. Leri had received, dated February 28, 2006. Without further explanation as to the impact of each of the identified issues, Mr. Brennan then stated that "Highmark has determined that you were overpaid $97,700.44," adding that Dr. Leri "must promptly refund this amount to Highmark." Dr. Leri was given three options for payment:  "1. Remittance of the entire refund; 2. Installment Payments; 3. Offset against future Highmark Payments."

169.    Highmark's retroactive determination to deny claims totaling more than $97,000 constitute an adverse benefit determination under ERISA. Yet, in making its repayment demand,

Highmark failed to provide any of the disclosures required by ERISA, including details concerning even the most central issues such as which patients and which claims were involved, and why.

170.    Highmark further failed to disclose Dr. Leri's right to obtain a full and fair review of the adverse benefit determination. Instead it simply referred to a Medical Review Committee ("MRC") that would consider any grievance, stating:

> You do have the right to have this matter considered by the Medical Review Committee for consideration at the next available meeting, prior to your repayment. Highmark operates under the provisions of Act 271 of 1972 (40 PA C.S.A. Section 6301 et seq.). Section 6324(c) of the Act requires that all matters, disputes or controversies relating to professional health services rendered by health service providers, or any questions involving professional ethics, shall be considered and determined only by health service providers selected in a manner prescribed in the By-Law of the professional health service corporation involved. Please contact Patricia Burns if you wish to have this matter considered by the Medical Review Committee.

171.    This notice as well as the MRC itself fails to comply with the strict rules and regulations under ERISA for providing a full and fair review of an adverse benefit determination. By failing to disclose to Dr. Leri his rights under ERISA, including his right to seek judicial review of an adverse decision, Highmark's representations were false and misleading.

172.    After a meeting with Mr. Brennan and Ms. Burns on October 4, 2006, Dr. Leri responded in detail to Highmark's demands by letter dated October 10, 2006. He went through all of his records in great detail to confirm what had been asserted in the unidentified claim review from Highmark. Being extremely conservative to identify all possible areas where there might arguably have been overpayments, using the general objections identified by Highmark, Dr. Leri concluded that, at most, the alleged overpayments totaled only $8,623.50. He therefore asked to "be presented with the methodology and protocol of how the $97,700 was determined and also the list of total Blue Shield patients treated from 1/1/03-12/31/05 so we may examine

the billing and treatments performed." All of this information is required under ERISA when an adverse benefit determination is issued.

173.    Highmark responded to Dr. Leri by letter dated October 30, 2006, in which it provided a CD Rom identifying all BCBS Insureds Dr. Leri had treated during the review period, as well as "documentation that provides the methodology used for the [Statistically Valid Random Sampling Methodology] sampling and refund calculations." The attachment then showed Highmark's calculations. It had reviewed records where there was a total amount paid of $6,890.35, and Highmark concluded (without details as to how) that $2,782.12, or 40.37704 percent of the total, had been overpaid,. Highmark then applied this percentage to the total amount of $241,970.28 paid to Dr. Leri during the time period, and extrapolated its repayment demand of $97,700.44. So not only did Highmark base its repayment demand on generalized claims of billing problems without providing any details, but it extrapolated from the unidentified consultant's review of less than 3% of Dr. Leri's billings. These practices are inherently unreasonable and a violation of ERISA requirements for making adverse benefit determinations. Notably, while Highmark provided a list of Dr. Leri's patients, it did not identify which services were being denied and for what reason.

174.    The same unidentified consultant wrote a letter to Highmark dated January 27, 2007 to respond to Dr. Leri's October 10, 2006 letter. In it, he began by highlighting Highmark's medical necessity policy, establishing that this was at the heart of Highmark's recoupment demand:

> Highmark defines medical necessity as a need for a particular item or service for the diagnosis or treatment of a condition, illness, disease, or injury. The need for the item or service must be documented in the patient's record. Medical necessary services are:  Appropriate for the symptoms and diagnosis or treatment of condition, illness, disease or injury . . .

Because a denial of services based on not being medically necessary is a key example of an adverse benefit determination, it is clear from the analysis undertaken by Highmark that ERISA applied to Highmark's recoupment demand.

175.    The consultant then identified certain issues in his original analysis which had not been a basis for him to "deny services."  He further pointed out that certain records, while useful, did not "show[] the improvements in patient range of motion, orthopedic and neurological findings and functional gains as the treatment progresses," revealing that a key part of his analysis was that certain treatments – which were not identified – were maintenance, an exclusion under the health care plans, and thereby, once again, part of a denial of benefits under ERISA. Finally, the consultant discussed the use of the chiropractic manipulation treatment codes, stating that the documentation did not support the billing of a separate evaluation and management ("E&M") service. While he noted that he approved certain E&M billings "[w]hen the notes supported a separate e/m service," Dr. Leri was never informed which services had been approved and which ones denied, or the reasons, making any appeal impossible.

176.    By letter dated February 27, 2007, Mr. Brennan wrote Dr. Leri in response to his October 6, 2006 "rebuttal" and simply quoted the entire letter. He then concluded:  "Based on the consultant's notes, there are no changes to the determination as previously mentioned in our August 14, 2006 request which is attached."  This demonstrates that Highmark refused to consider the merits of Dr. Leri's appeal, other than to rely exclusively on the same unidentified consultant that had made the original analysis.

177.    By letter dated March 30, 2007, Dr. Leri wrote in response to the February 27, 2007 denial, in order "to clarify my position on my treatment protocol in regards to chart notes and hence determination of medical necessity to my patients."  Aside from explaining how his

notes did support the treatment provided, he explained the lack of basis of Highmark's conclusions, pointing out that the vast majority of his patients were seen for only a few sessions, with the average number of visits per patient over a three year period only being 4.3. As Dr. Leri stated: "To state there was no evidence of medical necessity on a utilization rate of 4.3 office visits per 3 years is amazing."

178.    By letter to Highmark dated July 10, 2007, the unidentified consultant once again responded to Dr. Leri, refusing to alter his overall conclusions except for one particular patient, and once again failing to provide any details concerning the specifics of his conclusions for the vast majority of patients and visits. Dr. Brennan again relied exclusively on the consultant in a letter to Dr. Leri dated July 30, 2007, merely quoting the consultant's letter and, "[b]ased on the consultant's notes," upheld the entire recoupment demand except for a small reduction for the one patient. He thereupon demanded repayment of $93,971.36, and repeated the options on how to pay from his original demand letter dated August 14, 2006, again referring to the only other option, the MRC.

179.    Following the receipt of this last letter, it was clear to Dr. Leri that he had little choice. Highmark refused to give consideration to the substance of his appeals and continued to reiterate the alleged overpayments, without providing any specific case-by-case analysis of which treatments were being denied and why, making an effective appeal impossible. Dr. Leri therefore retained counsel to represent him, who, by letter dated August 7, 2007, confirmed his request to go before the MRC. Although the MRC did not provide an effective appeal process, as required under ERISA, Dr. Leri had no other choice, since the only alternative was to pay Highmark outright or have his funds withheld from future benefit payments.

180.    By letter dated October 5, 2007, Mr. Brennan wrote Dr. Leri's counsel on behalf

of Highmark to confirm that the case would be reviewed by the MRC, after giving him one more opportunity to agree to pay instead. After repeating the summary of the role of the MRC, Mr. Brennan stated that it "currently consists of ten (10) doctors of medicine, one (1) doctor of osteopathy, one (1) doctor of chiropractic medicine, one (1) physical therapist and two (2) consumer representatives." Other than the fact that there was a single chiropractor out of the 15 members of the MRC, no other information was provided as to how many of the MRC members actually had training or knowledge in chiropractic care or understood the documentation needed to support treatment and subsequent billing.

181.    After Dr. Leri's counsel wrote Highmark requesting additional information before he could proceed before the MRC, Mr. Brennan responded by letter dated November 9, 2007. He refused to provide any further information, stating that Dr. Leri already had what he needed, which included (1) the patients' names, (2) the three short letters from the consultant, and (3) the summary of the statistical methodology upon which the extrapolations were based for the repayment demand. This, however, failed to provide the necessary information to allow an effective appeal, given that Dr. Leri was not provided any case-by-case detail of which services for which patients were denied, and for what reason.

182.    To assist in his defense of the unfair accusations being made by Highmark, Dr. Leri retained a chiropractic billing consultant, Michael Miscoe, to review his records in detail and provide a comprehensive report for submission to the MRC. By letter dated January 8, 2008, Dr. Leri's counsel submitted Miscoe's 67-page report to the MRC, along with a detailed 24-page letter brief in support of his position. Among many other points made in the letter, counsel pointed out that "[t]he Highmark consultant provided no contractually based or medical policy based justification to support many of the consultant's coding decisions," highlighted the

detailed analysis of Dr. Leri's own consultant – a certified professional coder and certified health care compliance consultant – who had evaluated "each and every one of the services rendered by Dr. Leri," and explained why Highmark's "statistical extrapolation is completely undermined and legally invalid . . ."  With regard to the extrapolation, Dr. Leri's counsel further stated that "the decision-making component in particular and E/M guidelines in general are so disparate, subjective and controversial that statistical extrapolation will never be sustained."   Finally, Dr. Leri's counsel demanded that his due process rights be protected at the MRC hearing, including, but not limited to, that an independent decision-maker resolve the issue; that the burden of proof be on Highmark as to why a recoupment demand is appropriate; that Dr. Leri be provided with all documents relied upon by Highmark in making its decision, including unredacted documents exchanged between Highmark and its consultant; that the identity and qualifications of the consultant or other individuals with decision-making authority be revealed; and that the compensation or other evidence of potential conflicts relating to the decision-makers be disclosed.

183.    By letter dated March 17, 2008, Highmark responded to the 24-page letter and the 67-page consultant report submitted by Dr. Leri's counsel with a 2-1/2 page letter from Mr. Brennan which simply quoted an analysis provided by an unidentified "Chiropractic Peer Consultant."   Although it was not expressly stated, this was clearly the same consultant who had been involved from the beginning, as it stated that Mr. Miscoe had "three problems with my opinions as they relate to the refund request by Highmark . . ."  The consultant refuted Mr. Miscoe's detailed analysis as to why Dr. Leri's documentation concerning the medical necessity of the E&M charges by asserting that "[i]n the cases I denied the office visits, these above and beyond components [which are required for a separate billing] were not documentation," adding

that "[m]y opinions are not changed by Mr. Miscoe's comments."  As he did every time before, the consultant failed to provide even a single example of the problems with the documentation, let alone a case-by-case analysis, in sharp contrast with the detailed, specific analysis of Mr. Miscoe.

184.    With regard to manual therapy, 97140, the consultant simply stated:

Highmark policy says that code 97140 is an inherent part of a manipulation and is not eligible for separate payment when reported on the same day as a manipulation, unless it is performed on a separate body region and is documented. I do not agree with Mr. Miscoe's opinion that if manual therapy includes trigger point therapy or soft tissue manipulation, then it is allowed to be performed on the same region as the manipulation. My opinion has not changed.

The consultant similarly cited Mr. Miscoe's analysis of the billing for CMT services, and merely asserted he disagreed, stating that this, too, did not change his opinion.

185.    Significantly, not only did the consultant again fail to prepare a case-by-case analysis to justify his benefit denials, but he also failed to cite any support for his documentation theories or why he disagreed with Mr. Miscoe's detailed and well-documented analysis.

186.    After repeating these comments, Mr. Brennan stated that he provided the information to the MRC. Thus, the only information available to the MRC was the detailed legal and factual analysis provided by Dr. Leri's counsel and the series of short and simplistic letters from the unidentified consultant, with no case-by-case analysis of why the consultant concluded that the benefits should have been denied or why extrapolation from less than 3% of Dr. Leri's records to all of his services was appropriate.

187.    By letter dated March 26, 2008, Highmark wrote Dr. Leri's counsel to explain what would happen at the hearing. In the letter, Highmark confirmed that the membership of the MRC would include ten doctors of medicine, one doctor of osteopathy, one physical therapist, two consumer representatives and only one doctor of chiropractic.

188.    The MRC hearing was held on May 20, 2008. Notwithstanding the clear and substantial evidence submitted by Dr. Leri's counsel and Mr. Miscoe, the MRC upheld the recoupment demand. By letter dated May 20, 2008, Highmark confirmed its decision that Dr. Leri "be requested to refund $93,971.36 and if he refuses to comply, future payments be withheld until the full amount is recovered."  After inviting Dr. Leri to choose one of several methods of repayment, the letter stated:  "If an acceptable method of repayment cannot be agreed upon thirty (30) days from the date of notification of the adjusted refund, monies will be deducted from future Highmark Blue Shield payments until the full amount of the refund has been recovered."

189.    Following the decision, Dr. Leri had little choice. If he did not agree to pay, and tried to fight the order, Highmark would merely withhold his future payments. Given the substantial portion of Dr. Leri's business that was represented by BCBS Insureds, this was not a financially viable option. Dr. Leri therefore agreed to settle the dispute by paying a discounted amount. The precise details of the settlement are subject to a confidentiality agreement that Highmark placed in the agreement.

190.    Highmark's recoupment demand and subsequent actions to compel Dr. Leri to pay back a substantial portion of those funds is improper and should be reversed. Highmark violated its clear and specific obligations under ERISA, and used its ability to withhold Dr. Leri's funds to pressure him into paying funds that were not properly due.

### THE EXPERIENCE OF PLAINTIFF ASKAR WITH BCBS GROUP HEALTH PLANS

191.    Plaintiff Askar is a Par provider with Defendant Highmark, and for a number of years provided Covered Services to BCBS Insureds for which she submitted claims to Highmark to be processed.

192.    As a matter of course, Dr. Askar has her BCBS patients sign a legal assignment of benefits to her, such that she is able to submit claims for reimbursement directly to Highmark and receive benefits directly. As a result, Dr. Askar has standing under ERISA to pursue benefits when Askar has made an adverse benefit determination. Further, as a matter of policy, Dr Askar obtains written confirmation from her patients that they remain liable to her for any amounts of her bills that are not covered or otherwise reimbursed by Highmark.

193.    By letter dated January 11, 2006, Mr. Brennan of Highmark's SIU, notified Dr. Askar that Highmark was conducting "a review of claims submitted to Highmark from your office," and asked that she produce a group of patient files within 10 days. Dr. Askar subsequently produced a number of files for Highmark's review.

194.    By letter dated September 21, 2006, Raymond DiBello, Highmark's Director of Provider Accounting & Claims Review, wrote Dr. Askar to inform her that she had been identified as a potential outlier, stating:

> Enclosed with this letter is a report that includes a statistical analysis of the procedure codes your practice reported more frequently than your peer group. An explanation of the analysis has also been included to assist you in understanding the report.

195.    Highmark did not ask for more patient records, but suggested that Dr. Askar provide information concerning why her practice pattern might be different from other chiropractors. It implicitly threatened that if she did not come down, she might be audited further:

> Each time you receive this report it increases the likelihood of a more detailed practice pattern review by Highmark as to your claim billing practices. Therefore, it is to your advantage to carefully review the enclosed report and provide input regarding your practice pattern and why it may be different than that of your peers.

196.    The attached "Explanation of Statistical Report" identified two procedure codes

for which Dr. Askar was identified as having a utilization pattern in excess of her peer group. For CPT Code 97535, Self-Care/Home Management Training, it reported that she had submitted claims for 148 services, compared to the "Norm" of 87. For CPT Code 98941, Chiropractic Manipulative Service; Spinal, Three to Four, it reported that she had submitted 1,948 claims compared to the Norm of 1,590.

197.    Dr. Askar did not receive any further response from Highmark relating to its 2006 audit for more than a year. By letter dated January 11, 2008, Mr. Brennan of Highmark's SIU wrote Dr. Askar to inform her that Highmark was "conducting a review of claims submitted for payment to Highmark from your office," adding that "[t]his letter is being sent to advise you that the review is ongoing and as a result a refund may be requested upon completion."

198.    By letter dated June 18, 2008, Mr. Brennan wrote to Dr. Askar to report the results of the audit, which covered the time period January 1, 2003 through December 31, 2005, the time period identified in the original audit which had begun in 2006. The letter was virtually identical in form to a similar letter that Mr. Brennan had submitted to Dr. Leri, including the reference to the subscriber contracts that served as the basis for the audit:

> As a Participating Provider with Highmark, you are aware of and possess a copy of our "Regulations for Participating Providers." These Regulations provide that "[t]he determination as to whether any services performed by a participating provider for a Highmark member are covered by a Highmark Agreement and the amount of payment for such services shall be made by Highmark."

199.    The Regulations attached to the letter repeatedly reiterated that the purpose of Par providers was to provide Covered Services to BCBS Insureds, as defined under the BCBS health care plans. They stated, among other things, that "Participating providers of Blue Shield must participate in all Blue Shield programs under which they provide covered services . . ."; "All claim forms for covered services performed for Blue Shield members shall be submitted as soon

as possible, but in no event later than one year after the date of performance . . . [and] [c]harges for services rejected as being over the time limit shall not be collected from the member"; "The determination as to whether any covered service meets accepted standards of practice in the community shall be made by Blue Shield in consultation with providers engaged in active clinical practice [and] [f]ees for covered services deemed not to meet accepted standards of practice shall not be collected from the member"; "The determination as to whether any covered service is medically necessary shall be made by Blue Shield in consultation with providers engaged in active clinical practice . . ."; and "A determination as to whether any services performed by a participating provider for a Blue Shield member are covered by a Blue Shield Agreement and the amount of payment for such services shall be made by Blue Shield."

200.    Significantly, the Regulations specify that "[a] participating provider may, at all times, bill a Blue Shield member for non-covered services," and that "[f]ees for covered services deemed not medically necessary shall not be collected from the member, unless the member requests the service(s), and the participating provider informs the member of her or her financial responsibility . . ."  As a result, when Highmark makes retroactive determinations that services were not Covered Services or medically necessary, providers may bill the members.

201.    While the Highmark Regulations specify that "an amount in excess of the amount determined by Blue Shield to be payable to the provider with respect to services performed to the members . . . shall be returned promptly to Blue Shield, or to the member, as the case may be," such a policy does not provide for procedures for determining when such "excess" payments are made that are inconsistent or in conflict with ERISA. Where obligations under this provision violate ERISA, ERISA preempts such a provision.

202.    Similarly, the Regulations specify that a Review Committee shall resolve disputes

with providers, and that "[i]f such disputes involve overpayments which have not been returned to Blue Shield within thirty (30) calendar days of notification of a Review Committee determination, claim payments otherwise due to the participating provider will be subject to withholding and the assessment of interest on the unpaid balance," such a policy does not allow for procedures to be in place for determining when such "overpayments" are made, or how to collect for such overpayments, which are inconsistent or in conflict with ERISA. To the extent obligations under this provision violate ERISA, ERISA preempts such a provision.

203.    While the Regulations state that "[a] participating provider may seek judicial review of an unfavorable Review Committee decision to the extent permitted by Pennsylvania law," this is preempted by ERISA where it is intended to preclude a subscriber or his authorized representative, including his provider, from pursuing all available remedies under ERISA, including seeking review of adverse benefit determinations in federal court.

204.    Highmark's June 18, 2008 letter reported that Highmark's SIU had forwarded the 33 medical records submitted by Dr. Askar from the 2006 audit to a "Chiropractic Peer Consultant" who used an excel spreadsheet to "record[] my opinion regarding the medical necessity of the service [and] whether the most appropriate code was chosen based on the clinical documentation . . ."  This establishes that medical necessity, a central element of the patients' health care policies, served as the primary basis for the subsequent recoupment demand.

205.    The letter proceeded to quote at length the analysis of the consultant, stating that documentation purportedly did not always justify the billing code used. In one example, the consultant noted that Dr. Askar frequently billed CPT Code 98941 for providing spinal manipulation for 3-4 regions of the spine, with the consultant denying that bill by downcoding to 98940 to represent manipulation of 1-2 regions. The consultant did not contest that Dr. Askar

was performing these services as billed, but, rather, challenged its medical necessity, stating:

> The main issue in altering to the more appropriate 98940 is the actual necessity of performing CMT to 3 regions of the spine every visit. Justifying the 98941 code requires that there be subjective and objective data supporting the necessity of CMT to 3-4 regions. There will then be a resultant diagnoses to support the treatment of 3-4 regions of the spine. In most cases, the patients only had a complaint to one or 2 spinal regions, examination findings to 1-2 spinal regions and 2 corresponding diagnoses, yet the provider performed manipulation to 3 regions of the spine. The records did not include clear information pertaining to the rationale of treating 3 regions of the spine, where there were only 1-2 regions of complaint. Therefore, in most instances, the 98940 was the most correct code and was supported by the data supplied by this provider.

206. Significantly, because the reason for this retroactive denial and recoupment demand was based on the determination that the services were not medically necessary, it is self-evident that it represents an adverse benefit determination under ERISA. In addition, because Highmark failed to provide a case-by-case analysis of the records so that Dr. Askar could determine precisely which patients were being identified as having received services that were not medically necessary, she was not in a position to meaningfully appeal the determination.

207. An additional substantive part of the consultant's report related to maintenance care, an exclusion sometimes included in health care plans to specify that services will not be covered when the care only maintains a condition rather than improves it. As the consultant reported:

> A portion of the services were deemed to be considered maintenance. Maintenance care, as defined by Highmark Policy Y-7 is:
>
> *Manipulation performed repetitively to maintain a level of function are not eligible for reimbursement. A participating, preferred, or network provider can bill the member for the denied services. A maintenance program consists of activities that preserve the patient's present level of function and prevent regression of that function. . . .*
>
> . . . For a select number of patients, there was no apparent symptomatic or functional progress noted after an adequate trial course of care. Thus, the treatment after the reasonable trial coursed was determined to be maintenance.

208.    As this policy from Highmark states, the question of whether the treatment is "maintenance" care is a coverage issue. Maintenance care is not a "Covered Service," and the provider is therefore able to bill the subscriber for denied services based on the maintenance exclusion. This means that the retroactive denial of benefits based on the maintenance care exclusion clearly represents an adverse benefit determination, subject to ERISA, with which Highmark failed to comply. Further, Highmark again failed to identify which patients and which services were deemed to be maintenance, making an effective appeal impossible.

209.    The applicability of ERISA to Highmark's determinations is further confirmed by Highmark's own policies. Its Medical Policy Bulletin Y-9, for example, summarizes the "Limitations of Coverage" for manipulation services, setting forth the limits on maintenance care:  "Manipulation performed repetitively to maintain a level of function is not eligible for reimbursement. A participating, preferred or network provider can bill the member for the denied service."  Further, the Policy proceeds to emphasize that whether a manipulation service is covered is subject to the terms of the BCBS Insured's health care policy:  "Coverage for manipulation of the spine is determined according to individual or group customer benefits. Participating, preferred and network providers can bill the member for denied services that exceed the member's benefit limitation."

210.    Based solely on the consultant's report, Highmark issued a recoupment demand, stating:

> After review, Highmark has determined that you were overpaid $9,936.07 for services reviewed from January 1, 2005 through December 31, 2005. . . . Therefore, in accordance with the Regulations, you must promptly refund this amount to Highmark.

211.    The letter then provided the same instructions as Highmark had also given Dr.

Leri, offering three choices for repayment, including "Offset against future Highmark Payments," or "hav[ing] this matter considered by the [MRC]."

212.    By letter dated July 11, 2008, Dr. Askar submitted a letter formally appealing Highmark's adverse benefit determinations as reflected in its June 18, 2008 letter, and formally requesting reconsideration. She also asked for various disclosures relating to Highmark's actions, including a full copy of the consultant's report, along with his professional credentials to serve as a utilization reviewer of chiropractic claims.

213.    By letter to Mr. Brennan dated July 18, 2008, Dr. Askar submitted a detailed ERISA appeal to Highmark challenging its recoupment demand. She also requested, among other things, production of various documents required under ERISA, including all policies and other documents considered by Highmark in making its determination. By letter dated December 2, 2008, some five months later, Mr. Brennan responded. Without acknowledging ERISA, or Highmark's obligation to comply with its requirements, Mr. Brennan attached copies of Dr. Askar's provider agreements with Highmark for its PPO plans, and Keystone Health Plan West ("KHPW"), a Highmark subsidiary, for its HMO plans, along with the provider Regulations it had already sent, and the consultant letter that it quoted from in the original June 18 letter. Mr. Brennan refused to provide the name or qualifications of the consultant who had made the adverse benefit determinations, and further failed to provide case-by-case details concerning which treatments had been denied for which patients, and why.  In addition, Mr. Brennan failed to identify the provision of each of the patients' health care plans that justified the denial of benefits, contrary to ERISA.

214.    In a separate letter dated December 2, 2008, Highmark explained Dr. Askar's "right to appeal" at the MRC Meeting, which was scheduled for May 3, 2009. Highmark did not

acknowledge that the MRC appeal was not in compliance with ERISA requirements. Highmark

then reiterated what had been in its June 18, 2008 letter in terms of the repayment options and its

summary of the MRC.

215.    By letter dated February 5, 2009, Dr. Askar submitted a second level appeal under

ERISA, reiterating that Highmark had failed to comply with numerous ERISA requirements and

requesting additional documents relating to its adverse benefit determination. Mr. Brennan

responded to Dr. Askar's appeal by letter dated March 10, 2009. In this letter, he confirmed

Highmark's position that ERISA did not apply:

> **Request for Summary Plan Description (SPD) and plan annual report, 5500
> form for the calendar year 2005-2008:**  Because these are contractual matters
> governed by Pennsylvania statute which are required to be decided by the [MRC],
> Highmark is not obligated to provide these documents. Summary Plan Documents
> may be obtained from the patients and the Highmark plan annual report is
> available online through Highmark's website. ERISA 5500 forms cannot be
> provided because your appeal must be heard before the Medical Review
> Committee.
>
> **Appropriateness of Level II appeal:**  In cases where payment has been made
> and the member has incurred no denial of care or financial liability (other than the
> required cost sharing), there is no "adverse benefit determination" that would give
> rise to an ERISA appeal right under the U.S. Department of Labor Claims
> Procedure Rule (29 CFR 2560.503-1). Your dispute does not arise from the denial
> of any claim or the challenge of any of your patients to Highmark's calculation of
> cost sharing amounts. Rather, it arises from obligations under your provider
> contract (e.g., obligations to report services accurately, comply with Highmark
> medical policy, and refund overpayments to Highmark). These are contractual
> matters governed by Pennsylvania statute which are required to be decided by the
> [MRC].

216.    Highmark's    letter    was    false    and    misleading,    containing    numerous

misrepresentations concerning the scope of ERISA, its application to Dr. Askar's appeals and

Highmark's obligations under federal law. First, Highmark incorrectly asserted that ERISA was

inapplicable because Dr. Askar's appeal "must be heard before the [MRC]."  In fact, ERISA is

directly    applicable    to    Highmark's    recoupment    demand,    which    is    an    adverse    benefit

determination under ERISA. Second, the BCBS member is not required to incur a "denial of care or financial liability" for there to be an adverse benefit determination under ERISA. ERISA defines "adverse benefit determination" solely as occurring when there is reduction in benefits below billed charges, including based on medical necessity determinations. Third, BCBS members have, in fact, incurred "financial liability" as a result of Highmark's recoupment demand. Among other things, Highmark expressly based its recoupment demand on findings that certain treatments were not Covered Services, were not medically necessary and were maintenance care. When Highmark denies benefits for any of these reasons, Dr. Askar is permitted to bill her patients for the unpaid balance of her charges, thereby creating the financial liability Highmark claims to be required for ERISA to apply. Fourth, contrary to Highmark's assertion, Dr. Askar's dispute with Highmark arises *directly* "from the denial of [numerous] claims," such that ERISA is directly implicated. The existence of a contract between Dr. Askar and Highmark does not alter the conclusion that ERISA applies when adverse benefit determinations are made, as is true here.

217.    By letter dated March 2, 2009, Mr. Brennan sent Dr. Askar another letter informing her that the MRC Hearing was set for May 5, 2009 (rather than May 3), and stating that if she wished to have her KHPW claims heard before the MRC she needed to sign an agreement which was enclosed.

218.    The attached "Dispute Resolution Agreement" was presented as being between Dr. Askar and KHPW. In the "Recitals" section, it stated that "Highmark has a Medical Review Committee ('MRC') (as required by 40 Pa.C.S. § 6324(c)) to render final and binding decisions as to disputes between Highmark and health service doctors," but that "the MRC does not statutorily govern disputes between KHPW and health service doctors."  Further, the agreement

stated that, "in lieu of commencing litigation to resolve the KHPW claims of Provider included within this Dispute, KHPW and Provider desire to also submit the KHPW claims of Provider included within the Dispute to the MRC, the decision of which shall be final and binding upon KHPW and Provider as well as non-appealable by either KHPW or Provider just as such decision as to the Highmark claims included within the Dispute are final and binding upon, and non-appealable by, Highmark and Provider."

219.    The statements in the proposed Dispute Resolution Agreement were false and misleading. Among other things, the MRC determination with regard to Highmark were not "final and binding" between Highmark and Dr. Askar, and, further, were not "non-appealable." Rather, the dispute between the parties was governed by ERISA, which establishes clear guidelines for appeals, including the right to pursue judicial review of any final adverse benefit determination. Parties may not "opt out" of ERISA appellate rights.

220.    Dr. Askar refused to sign the Dispute Resolution Agreement. Dr. Askar believed that doing so would have compelled her to waive her statutory rights under ERISA. Among other things, the proposed Agreement would have given full authority to the MRC to make final adjudication of Dr. Askar's dispute, as well as required her to waive her statutory right to pursue review in court, as provided by ERISA.

221.    By letter dated April 22, 2009, Mr. Brennan informed Dr. Askar that even though she had not agreed to have the KHPW claims addressed before the MRC, Highmark was nevertheless going to apply its decision to those claims, stating:

> This letter is to inform you that Special Investigations has removed all (KHPW) claims and will be presenting the revised amount of $5,016.10 for determination at the May 5, 2009 (MRC) meeting. Be advised that the Medical Review Committee's decision will then be applied to the entire $9,936.07 refund, which includes (KHPW) members not presented before the Committee.

222.    Thus, Highmark required the MRC to decide the KHPW appeal, notwithstanding that it had already acknowledged in the Dispute Resolution Agreement that, under the law, "the MRC does not statutorily govern disputes between KHPW and health service doctors."

223.    The letter further informed Dr. Askar that the MRC would consist of eleven doctors of medicine, one doctor of osteopathy, one physical therapist, two consumer representatives, and only two doctors of chiropractic. Thus, the majority of the decision-makers at the MRC would not be chiropractors and there was no basis for believing the MRC members were trained or experienced in evaluating chiropractic care or knowledgeable about appropriate chiropractic documentation.

224.    Because Highmark refused to acknowledge its obligations under ERISA, failed to provide proper due process protections, and falsely represented that the MRC would be final and binding, with no appeal rights, Dr. Askar elected not to attend the MRC hearing. Its determinations are void and without effect, as they are directly contrary to and inconsistent with Highmark's obligations under ERISA.

225.    By letter dated May 14, 2009, Highmark informed Dr. Askar that the MRC had upheld the total recoupment demand for Highmark, such that she was requested "to refund $5,056.10 and if it refuses to comply, future payments be withheld until the full amount is recovered."

226.    Dr. Askar wrote a letter to Highmark dated May 19, 2009 reiterating her objection to the MRC hearing and Highmark's blatant violation of its ERISA obligations. In response, Mr. Brennan replied with a renewed rejection of her position. First, he confirmed that Highmark was upholding the demand to repay KHPW even without having the MRC consider the appeal, and would combine it with the amount she purportedly owed Highmark, stating:

[KHPW] determined that you had received $4,879.97 in overpayments from KHPW. Since claims of KHPW members are not subject to the Highmark Medical Review Committee, KHPW deferred recovery of the KHPW overpayments pending the decision of the Highmark Medical Review Committee on identical issues concerning claims which you submitted to Highmark for reimbursement.

As a result, you owe an aggregate $9,936.07 in overpayments back to Highmark and KHPW. . . . To the extent there are no arrangements made within thirty (30) days, Highmark and KHPW reserves its rights to offset future claims payments otherwise owed to you until such time that the overpayment amounts have been fully recovered.

227.    In the letter, Mr. Brennan further confirmed on behalf of Highmark its rejection of

the application of ERISA to its conduct, stating:

As has been reiterated to you previously, since Highmark and KHPW members are held harmless and have no individual liability resulting from determinations made in connection with the review of claims submitted by your practice, you have no legal standing to assert any ERISA appeal rights on behalf of such members. Any dispute to overpayments received by you on previously submitted claims is purely a contractual matter.

As explained above, these representations are wrong factually and legally, and are thereby false

and misleading.

228.    As of August 2009, Highmark has begun to withhold funds for new claims Dr.

Askar submitted for new and unrelated patients and their treatments. Dr. Askar submits her

claims on a daily basis to Highmark, and it processes her claims and deposits funds into her

account on each Monday. For the week of July 27, 2009, Dr. Askar's billings to Highmark

totaled $3,482, and for the week of August 3, 2009, she billed a total of $4,217.00. Based on

usual practice, she would have expected to receive approximately $2,000 for the first week and

$2,500 for the second. Instead, Highmark deposited only $200 into her account for the first week

and $0 in the second. Upon calling customer service, Dr. Askar was informed that her proceeds

were being withheld by Highmark.

229.    By letter dated August 31, 2009, Highmark informed Dr. Askar that she continued to owe $3,764.82, based on its prior "refund request." It then asked her to "remit your payment within 10 days," adding that "[f]ailure to respond will require us to take further collection actions."

230.    Dr. Askar brings this action to enjoin Highmark from withholding further proceeds, and to return the funds it withheld, with interest, and treble damages under RICO. She also seeks appropriate equitable relief to compel Highmark to comply with its obligations under ERISA.

## THE EXPERIENCE OF PLAINTIFF BARNARD
## WITH BCBS GROUP HEALTH PLANS

231.    Plaintiff Barnard is a Par provider with Defendant IBC, and for a number of years provided Covered Services to BCBS Insureds, for which he submitted claims to IBC to be processed.

232.    As a matter of course, Dr. Barnard has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to IBC and receive benefits directly. As a result, Dr. Barnard has standing under ERISA to pursue benefits when IBC has made an adverse benefit determination. Further, as a matter of policy, Dr. Barnard obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by IBC.

233.    In January 2007, IBC informed Dr. Barnard that it was conducting an audit of his practice and requested the medical records for 25 BCBS Insureds. In response, Dr. Barnard forwarded all available charts on February 5, 2007.

234.    Dr. Barnard heard nothing further from IBC until Joseph Capone, an IBC investigator, made an unannounced visit to Dr. Barnard's office on October 28, 2007, at which

point he began to interrogate his staff during office hours and in front of patients. On October 27, 2007, Dr. Bernard wrote a letter to IBC, sent by certified mail, objecting to the manner in which the visit had been conducted, and when this was not responded to, Dr. Barnard sent a second letter dated November 16, 2007.

235.    While Dr. Barnard got no response from Mr. Capone, he did receive a letter from Shirley Frakes, Senior Medical Director, dated December 18, 2007, asking for medical records relating to two BCBS Insureds who had been treated by Dr. Barnard in November 2007. After asking for an extension of time in which to respond, Dr. Barnard sent the requested medical records to IBC on January 29, 2008. In this letter, Dr. Barnard included the following request:

> [A]s per any review of a doctor of chiropractic records in Pennsylvania, I am sure you are aware that the review must be done only by a doctor of chiropractic that is active in practice. Please provide me with a copy of the DC review. Should you choose to disregard PA law, please provide me with a list of all members on the medical review committee, the training manual used for review purposes, conflict of interest statement, certification of medical license or credentials including URAC license. Finally, I have enclosed an SPD request, which should be forwarded to the plan administrator.

236.    IBC did not respond to Dr. Barnard's January 29, 2008 letter. Instead, he received requests for additional medical records, followed by a series of denials of coverage for the original two patients, stating: "Medical necessity was not met for this service." Thereafter, Dr. Barnard sent a second certified letter dated June 18, 2008, requesting the following information:

> I am again requesting the following for these patients on all reviewed treatments and denied dates of treatment this year:
> o       a copy of the DC Review of my records, or names of all members on the medical review committee and their review,
> o       the training manual used for review purposes,
> o       conflict of interest statement,
> o       certification of medical/chiropractic license or credentials including URAC license,
> o       a copy of the patient's SPD.

237.    After receiving no response and following still more requests for medical records

and more denials of coverage for treatments provided to the same patients, Dr. Barnard sent another certified letter to IBC, dated August 21, 2008, reiterating his request for the underlying information relating to its denial of benefits.

238.    IBC continued to ignore Dr. Barnard's appeals and requests for information supporting its denial of coverage for his patients. Then, in mid-2009, IBC suddenly started withholding funds from benefits to which Dr. Barnard was otherwise entitled based on its assertion that it had overpaid him in the past for other, unrelated patients. As just one example, IBC sent Dr. Barnard a 47-page EOB dated August 13, 2009, which provided a "Payment Summary" relating to claims he had submitted for providing services to BCBS Insureds. The cover page provided a summary in which it reported that the "Net Claim Amount" for the period in question totaled $912.08, that it had withheld the entire amount, as reflected under the heading "Monies Due Amount Taken," such that the "Total Amount Disbursed" was zero. IBC provided no explanation or justification for its withholding of funds due and payable to Dr. Barnard under the terms and conditions of the BCBS health care plans covering his patients.

239.    The next 22 pages of the EOB consisted of a list of claims that had been submitted by Dr. Barnard on behalf of a number of BCBS Insureds for services provided from April through July 2009. In total, the document reported that Dr. Barnard had billed $5,400 for his services, of which $4,340.00 was deemed to be the "allowed amount." Of that amount, IBC found that $4,340.32 was not-covered and $567.24 was the co-payment, such that the member was responsible for $3,428.24. Then, IBC reported that the remainder, $912.08, was the "Amount Paid" to Dr. Barnard. This amount reflected the benefits which IBC deemed to be due and owing under the terms and conditions of its health care plans.

240.    Following this list was a document entitled: "Statement:  Monies Due Open

Items, Balances, Transactions." This document lists a number of services which had been provided in April 2009 and paid by IBC which served as the basis for the recoupment. The document identifies the patient, the date of service and the purported "money due to company." No explanation is provided, however, other than "claim reprocessed under a new claim number."

241.     Finally, the remaining pages of the EOB consist of a document entitled "AR Detail," which again lists the claims for which IBC is taking a recoupment. Each service is identified with the amount billed, the allowed amount and the "amount paid" to Dr. Barnard, but with a negative sign to indicate it is an account receivable that he purportedly owes IBC. Two explanation codes are give: B55 for "This represents a reversal of a previously processed claim," and BA1 for "Adjustment: This claim was reprocessed under a new claim number." Again, there is no further explanation to justify the recoupment demand, and no identification of either the basis for the retroactive denial of care or an offer of a full and fair review of IBC's adverse benefit determination.

242.     The August 13, 2009 EOB is only one of a number of examples where IBC has made retroactive determinations reversing previously paid benefit decisions. In a 22-page EOB dated August 20, 2008, for example, the same information is provided, with a summary detail that shows the "Net Claim Amount" to be $1,101.04, with $413.92 identified as "Monies Due Amount Taken," so that the total amount disbursed was only $687.12. Thus, while that $413.92 was authorized by IBC as valid benefits under its BCBS Insureds' health care plans, it nevertheless elected to withhold that sum, such that Dr. Barnard was not paid in full for the benefits to which he was entitled. A similar 29-page EOB dated July 2, 2009 was also received by Dr. Barnard which identified an additional $348 that had been withheld from a total amount of valid benefits of $1,187 that was in fact owed by IBC to Dr. Barnard.

243.    These decisions constitute adverse benefit determinations under ERISA, thereby requiring compliance with ERISA rules and regulations. Similarly, each time IBC withheld money from an approved benefit as an offset against a prior alleged overpayment, that, too, constituted an adverse benefit determination under ERISA. IBC utterly failed to comply with its duties and obligations under ERISA, such that its repayment demands and forced recoupments are invalid and should be rescinded and reversed.

244.    In seeking to understand what IBC was doing, Dr. Barnard contacted IBC to inquire and to protest its actions. He was informed telephonically that IBC had determined that a recoupment should be taken with regard to certain patients because, purportedly, precertifications were required under the terms of the applicable health care plans, and had not been obtained. In fact, however, Dr. Barnard had obtained the necessary precertifications, but, in clear violation of ERISA, he was not even given an option to appeal and demonstrate that fact. Moreover, given that the retroactive benefit denial was based on terms of the patients' health care contracts, there can be no dispute that ERISA applies, and was violated due to IBC's blatant failure to comply with statutory and regulatory requirements

### THE EXPERIENCE OF PLAINTIFF WAHNER
### WITH BCBS GROUP HEALTH PLANS

245.    Plaintiff Wahner is a Par provider with Defendant IBC, and for a number of years provided Covered Services to BCBS Insureds, for which he submitted claims to IBC to be processed.

246.    As a matter of course, Dr. Wahner has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to IBC and receive benefits directly. As a result, Dr. Wahner has standing under ERISA to pursue benefits when IBC has made an adverse benefit determination. Further, as a matter of policy, Dr. Wahner

obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by IBC.

247.    By letter dated December 2, 2008, IBC informed Dr. Wahner that it had overpaid him by $5,110.89, and demanded repayment, stating:

> During the last 18 months, we have issued letters regarding erroneous overpayments that our records show were made to you for physical medicine and rehabilitation services included in the HMO Short Term Rehabilitation Therapy Capitation Program. In our communication in August 2007, we indicated that we were temporarily suspending recovery activities given the number of inquiries regarding this overpayment recovery.
>
> At this time, inquiries have been adequately resolved, and we will resume recovery of those overpayments.

248.    In the letter, IBC then gave Dr. Wahner four options:  (1) "Offset the amount of the erroneous overpayments against future remittances, beginning on January 9, 2009 until the full overpayment is satisfied"; (2) withholding payments over a 10-month period; (3) repaying the amount in a lump sum by January 15, 2009; or (4) paying $511.09 each month for 10 months. If Dr. Wahner did not contact IBC with his "payment selection" within 30 days, it stated that it would "begin retracting payments from your daily remittances until the balance is satisfied."  IBC provided no appeal rights to Dr. Wahner relating to its repayment demand and its intent to forcibly recoup the amount from future payments otherwise due and owing to him.

249.    This December 2008 letter was the first time Dr. Wahner had been notified of any repayment demand from IBC. After contacting IBC to inquire, and disputing its right to seek repayment so long after the original claims had been paid, he subsequently received copies of earlier correspondence which IBC claimed to have sent, but which Dr. Wahner had never received.

250.    First, IBC produced a letter dated February 16, 2007, which apparently was

addressed to a number of providers but had not been received by Dr. Wahner, which stated:

> We may have erroneously reimbursed some providers for certain HMO physical medicine and rehabilitation services included in the HMO Short Term Rehabilitation Therapy Capitation Program resulting in overpayments. We are making the necessary changes and these services will no longer erroneously reimburse as of March 1, 2007. Please find a brief summary about the program below.
>
> Keystone Health Plan East ["KHPE"] and Keystone 65 products include a capitated physical therapy program. Only providers who offer a full range of physical therapy services may participate in the program. The proper procedure is for the participating PCP to designate a provider participating in the program who performs a full range of physical therapy services for his or her HMO member. That provider is then paid for the capitated services. These capitated services are not eligible for separate payment to non-capitated providers.

251.    As detailed in the letter, IBC's program set certain limits in its HMO plans whereby only physical therapy provided by providers who were authorized and capitated were Covered Services. Since Dr. Wahner was a non-capitated provider, his services were therefore apparently not Covered Services. Dr. Wahner, however, did not have the obligation to review and evaluate his patient's plans to determine whether his services were covered. Indeed, prior to performing services to BCBS Insureds – including the physiotherapy services at issue in IBC's letter – Dr. Wahner contacted KHPE and received confirmation that they were covered. This was confirmed when he submitted claims to IBC or KHPE, which would be paid. Dr. Wahner therefore fulfilled all of his responsibilities by treating patients who came to him and filing proper claims. To the extent his patients' BCBS plans did not cover his services, IBC should have determined that upon evaluation of the claims, and Dr. Wahner cannot be held responsible after providing proper services and receiving reimbursements for those services. If IBC were to be permitted to retroactively deny benefits, and recoup payments, Dr. Wahner would be entitled to bill his patients for the unpaid portion of his bill for treatments that were deemed not to be Covered Services.

252.    Because the error raised by IBC was based on its own misinterpretation of its plan documents while determining Covered Services, its conclusion that various services had been improperly paid represents an ERISA adverse benefit determination. IBC's decision was not based on anything in Dr. Wahner's contract, but solely on the terms of the patients' health care contracts, which purportedly excluded coverage for physical therapy to capitated Par providers. To the extent IBC identified a problem and wished to issue a retroactive adverse benefit determination, it therefore was obligated to comply with the terms and conditions ERISA and its accompanying regulations, which it did not do.

253.    Second, IBC produced a letter dated August 3, 2007, which IBC had apparently also addressed to a number of providers yet was never been received by Dr. Wahner, which stated:

> The overpayments were for physical medicine and rehabilitation services included in the HMO Short Term Rehabilitation Therapy Capitation Program. As a result of a review of services provided by your practice, we have identified overpayments made to your practice. We are sorry for these errors, and we have made changes to prevent them in the future.

254.    According to IBC's attached summary of Dr. Wahner's billing, it concluded that the total overpayment due to IBC's error was $8,762 (a number that was subsequently reduced in the December 2008 letter). IBC stated that it was offering him several options for repayment, including having payments withheld over a 19 month period, paying a lump sum or working out a monthly repayment plan. IBC further stated that if it did not hear back from Dr. Wahner by September 10, 2007, "we will begin adjusting the claims against your remittances."

255.    Third, IBC produced a letter dated August 21, 2007, which Dr. Wahner again had not received previously, in which IBC reported that it had received "a number of inquiries regarding our overpayment documentation" with regard to the physical therapy capitation

program. As a result, it stated that it was "temporarily suspending our recovery activities until further notice while we look into questions that have been raised."

256.    After Dr. Wahner received the December 2, 2008 letter concerning the repayment demand, he strenuously objected to IBC's collection efforts, including by writing his objections to IBC and filing a grievance with the Pennsylvania Insurance Department, but to no avail. IBC refused to consider his appeal and would only agree to negotiate different means to repay the funds it alleged he owed.

257.    In his effort to appeal, Dr. Wahner informed IBC that he intended to bill his patients for the services that were deemed not to be Covered Services. In response, IBC sent him a letter dated March 12, 2009, which stated:

> . . . I would like to advise you that balance billing your members for these services is prohibited by your participation contract. As we've indicated before, the services are covered under the members' HMO Short Term Rehabilitation Therapy Capitation Program; and the services are not eligible for separate reimbursement to a provider other than the capitated site. A waiver from a member to receive non-covered services from a provider and be billed directly from the same is only applicable for non-covered services.

IBC then followed this up by repeating its demand that he agree to repay the funds, and stated that it would begin withholding funds if Dr. Wahner did not reach an agreement with IBC by March 20, 2009.

258.    Dr. Wahner subsequently wrote IBC to file a formal appeal to its adverse benefit determination that his prior physical therapy services to various BCBS Insureds were not being covered. IBC denied the appeal by letter dated May 12, 2009, providing the following rationale:

> The decision to uphold the recovery efforts initiated by Independence Blue Cross have been determined based on the guidelines set forth in the HMO Short Term Rehabilitation Therapy Capitated Program. The procedure codes contained within this dispute (97012, 97026, 97110, 97124, and 97140) are listed as capitated rehabilitation therapy codes as described in medical policy 00.03.03c. Therefore, the aforementioned procedure codes are not eligible for reimbursement when

submitted by a provider type that does not meet capitation criteria. Additionally, this decision is supported by the communication distributed to the provider community advising of our intended recovery effort due to Independence Blue Cross erroneously remitting payment for the impacted procedure codes.

259.    Dr. Wahner followed this up with another letter appealing IBC's recoupment demand, arguing that IBC had waited too long to seek repayment and could no longer pursue any claims against him. IBC, however, has ignored that appeal as well and refused to drop its recoupment demand.

260.    While Dr. Wahner pursued appeals of the recoupment demands, IBC did not give them serious consideration and failed to comply with requirements under ERISA for providing full and fair review. Because the adverse benefit decision reached by IBC was based on terms and conditions in its health care plans – which purportedly only allowed physical therapy from captivated providers to be Covered Services – it had to comply with ERISA's notice requirements, which included specifying which plan terms applied and making available the relevant plan documents. Without making available such information to Dr. Wahner, he was not in a position to challenge IBS's determination that he had been overpaid.

261.    Even if IBC were correct that he had been overpaid for treatments that were not Covered Services when provided by him as a non-capitated provider, it can only seek reimbursement under ERISA through equitable restitution. But equitable restitution is limited to circumstances in which IBC would be able trace the specific funds that had been overpaid so as to compel a return of them. IBC was unable to comply with those requirements such that it had no legal entitlement to withhold unrelated funds to offset against the amount alleged to be overpaid.

## THE EXPERIENCE OF PLAINTIFF CAPONE WITH BCBS GROUP HEALTH PLANS

262.    Plaintiff Capone is a Par provider with Defendant BCBSSC, and for a number of

years has provided Covered Services to BCBS Insureds, for which he submitted claims to BCBSSC to be processed.

263.    As a matter of course, Dr. Capone has his BCBS patients sign a legal assignment of benefits to him, so that he is able to submit claims for reimbursement directly to BCBSSC and receive benefits directly. As a result, Dr. Capone has standing under ERISA to pursue benefits when BCBSSC has made an adverse benefit determination. Further, as a matter of policy, Dr. Capone obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by BCBSSC.

264.    In 2007, BCBSSC informed Dr. Capone that it was undertaking an audit of his practice. After reviewing various medical records, it concluded that he owed a substantial sum of money back for having provided treatments that were not Covered Services, and began to withhold payments applicable to unrelated claims he submitted on behalf of BCBS Insureds.

265.    Dr. Capone hired counsel to appeal the improper withholds, and the repayment demand, after which BCBSSC agreed to return the funds and stop recoupment until the appeal had been completed. Dr. Capone has not received further word on the appeal.

266.    On August 12, 2009, Dr. Capone received a letter from "State Group Refunds" of BCBSSC. It stated that on February 12, 2007 (or two-1/2 years before), BCBSSC has "sent a payment to you . . . in error," and therefore "request[e]d a refund of $104.00 for the reason(s) stated below."  The purported reason was then stated as follows:

> A POST-PAY REVIEW OF THESE SERVICES REVEALED THAT THEY
> WERE NOT MEDICALLY NECESSARY.

267.    This retroactive denial of benefits based on medical necessity is an adverse benefit determination under ERISA. Yet, BCBSSC failed to provide any of the mandatory disclosures required under ERISA for such a determination, and offered no appeal or other

means to obtain a full and fair review of the decision. Instead, BCBSSC merely stated:

> If we have not heard from you within 21 days, we will deduct this amount from future payments to you and/or send it to our collections agency. Please send this amount, along with a copy of this letter to [BCBSSC, Columbia, SC.]

268.    The demand for repayment, and the threat to simply withhold future payments from unrelated claims, is improper and a violation of ERISA. Because Dr. Capone was given no appeal rights, the exhaustion of an ERISA appeal should be excused or there should be a finding of deemed exhaustion under ERISA regulations.

### THE EXPERIENCE OF PLAINTIFF FAVA
### WITH BCBS GROUP HEALTH PLANS

269.    Plaintiff Fava is a Par provider with Defendant Horizon, and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims to Horizon to be processed.

270.    As a matter of course, Dr. Fava has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to Fava and receive benefits directly. As a result, Dr. Fava has standing under ERISA to pursue benefits when Horizon has made an adverse benefit determination. Further, as a matter of policy, Dr. Fava obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Horizon.

271.    One of the services provided by Dr. Fava to various BCBS Insureds is spinal manipulation under anesthesia ("MUA"), when such a service is medically necessary and appropriate. Horizon has regularly paid benefits to Dr. Fava, finding that the treatments are Covered Services under the terms and conditions of its subscribers' health care policies.

272.    Recently, Horizon altered its policy and determined that MUA is not a Covered Service. In making this decision, Horizon applied polices adopted and disseminated to BCBS

Entities by Defendant BCBSA. Based on a retroactive determination that MUA is "experimental and investigational," and thereby excluded from coverage under its health care policies, Horizon concluded that the benefits it has previously paid to Dr. Fava should be returned. Rather than explaining its conclusion and demanding repayment, however, Horizon simply withholds payments from new and unrelated benefits otherwise owed to Dr. Fava and applies them toward the amount that it deems to have been overpaid. In doing so, Horizon fails to provide any appeal rights or other means to challenge its adverse benefit determinations.

273.   For example, in an "Account Receivable" form dated July 25, 2009, Horizon informed Dr. Fava that an MUA service he had provided on June 26, 2007 -- more than two years earlier -- for which he received $1,125 in benefit payments, was "adjusted because the service(s) rendered was ineligible under your contract."  This was false and misleading because Dr. Fava's contract does not deny coverage for MUA, but authorizes the payment of benefits for Covered Services provided to BCBS Insureds, with the basis for the "adjustment" being Horizon's determination that MUA was "experimental and investigational" under the terms and conditions of the patients' health care plans.

274.   After identifying the purported overpayment, Horizon then listed 19 separate services provided by Dr. Fava to unrelated BCBS Insureds in June and July 2009, for which benefits totaling $760.11 were otherwise due, and indicated that it was withholding this entire amount to apply toward the overpayment as an "Account Receivable."  Horizon then deducted this amount from the alleged overpayment of $1,125 and stated that Dr. Fava continued to owe $364.89.

275.   In a follow-up Account Receivable statement dated August 7, 2009, Horizon listed the same original services from 2007. It then identified a number of benefits that were

being withheld for other BCBS Insureds for unrelated services, so that the total $1,125 was forcibly recouped.

276.    Similarly, in an Account Receivable statement dated August 8, 2009, Horizon identified that $306.51 it had paid in benefits to Dr. Fava for services provided to a BCBS Insured on June 13, 2008, was overpaid for the same alleged reason. It then identified seven unrelated services provided to various BCBS Insureds in April and July 2009, and indicated that it had "taken" this amount to apply toward the alleged overpayment.

277.    In making its retroactive determinations that previously paid benefits were for treatments that were not Covered Services, Horizon made adverse benefit determinations under ERISA. Similarly, in withholding benefits from new and unrelated services provided to unrelated BCBS Insureds, Horizon was also making adverse benefit determinations under ERISA.

278.    Horizon violated ERISA under both scenarios by, *inter alia*, failing to provide proper disclosure relating to the basis for its determination or to make available the underlying policies upon which its determination was based, and by not permitting Dr. Fava to appeal or otherwise obtain a full and fair review of its holdings. As a result of its ERISA violations, Horizon's adverse benefit determinations are invalid, arbitrary and capricious and should be rescinded and reversed.

279.    Horizon has further violated ERISA by holding that spinal MUA is not a Covered Service because it is investigational or experimental. Such a decision is arbitrary and capricious given that spinal MUA is a proper and acceptable health care service that Dr. Fava and other health care providers may offer when medically necessary and appropriate for insureds.

**THE EXPERIENCE OF PLAINTIFF BARBER
WITH BCBS GROUP HEALTH PLANS**

280.    Plaintiff Barber is a Par provider with Defendant Wellpoint (operating under the

94

name Anthem), and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims to Anthem to be processed.

281.    As a matter of course, Dr. Barber has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to Anthem and receive benefits directly. As a result, Dr. Barber has standing under ERISA to pursue benefits when Anthem has made an adverse benefit determination. Further, as a matter of policy, Dr. Barber obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Anthem.

282.    Beginning in 2008, Dr. Barber provided various services to a BCBS Insured for which he submitted claims for reimbursement to Anthem. Prior to providing services, Dr. Barber obtains confirmation from Anthem that they are covered. He particularly obtains confirmation of coverage when he intends to prescribe a leg brace for the patient. Dr. Barber subsequently received payments from Anthem for these services totaling $465.18.

283.    In early 2009, Anthem informed Dr. Barber that it had determined after the fact that the leg brace he had prescribed was not a Covered Service under the patient's health care policy and, as a result, it demanded a return of the benefits payment. This request was made notwithstanding that Anthem had precertified the benefit. By notification dated February 5, 2009, Anthem sent Dr. Barber a "Recoupment Notification," which informed Dr. Barber that it had withheld a total of $228.42 from new claims for reimbursement to apply toward the alleged overpayment, leaving an "outstanding negative balance" of $236.68, against which future withhelds would be taken.

284.    Because the overpayment demand was based on Anthem's determination that the treatment was not a Covered Service, the decision constituted an adverse benefit determination

under ERISA. Yet, Anthem made its adverse benefit determination and demanded the repayment without any of the disclosures or appeal rights required under ERISA. Further, Anthem withheld funds from valid claims again with no disclosure of the ERISA-required appeal rights. Anthem's actions are therefore in violation of its ERISA obligations.

285.    In January 2008, Dr. Barber provided various services to another BCBS Insured and submitted his claims to Anthem for reimbursement. Anthem subsequently processed the claims and paid benefits to Dr. Barber under the patient's health care policy totaling $701.36.

286.    In mid-2008, over a year later, Anthem contacted Dr. Barber's office to inform him that the patient had purportedly had other coverage which was primary to Anthem's such that Anthem should not have been responsible for the payment. It therefore demanded that Dr. Barber repay the money he had received. Because the issue was unrelated to Dr. Barber's Par provider contract with Anthem, but with a coordination of benefits ("COB") issue under the patient's policy, Anthem's decision constituted an adverse benefit determination under ERISA that required interpretation of plan terms.

287.    On June 18, 2009, Anthem sent Dr. Barber written confirmation that it had withheld the $701.36 from amounts that he was otherwise owed to apply toward the alleged overpayment for the patient based on the COB issue. Dr. Barber has had no further contact with the patient and has no ability to obtain reimbursement from her for the amount that Anthem has taken from him. Anthem implemented its recoupment without providing any appeals or any disclosures as required by ERISA. The recoupment is also a violation of Anthem's ERISA obligations.

### THE EXPERIENCE OF PLAINTIFF FORD WITH BCBS GROUP HEALTH PLANS

288.    Plaintiff Ford is a Par provider with Defendant Wellpoint (operating under the

name "Anthem"), and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims to Wellpoint to be processed.

289.    As a matter of course, Dr. Ford has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to Anthem and receive benefits directly. As a result, Dr. Ford has standing under ERISA to pursue benefits when Anthem has made an adverse benefit determination. Further, as a matter of policy, Dr. Ford obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Anthem.

290.    By letter dated August 7, 2009, Dr. Ford received a letter from a "Recovery Specialist" at Anthem who notified him that an "overpayment" of $319.00 purportedly exists for services provided to a patient almost a year before, on August 27, 2008. According to the letter, Anthem "found that this patient's policy was cancelled at the time these services were rendered and no reimbursement was due."

291.    Prior to providing these services and submitting claims to Anthem, Dr. Ford had contacted Anthem to confirm coverage for the services. He provided those services which Anthem is now denying only after he had verified coverage.

292.    By concluding that the patient's policy had been cancelled, such that the treatments were not Covered Services, Anthem made an adverse benefit determination under ERISA. However, it violated its duties and obligations under ERISA by failing, *inter alia*, to provide proper disclosure or explanation for the retroactive denial of benefits and for imposing on Dr. Ford liability due to an error made by Anthem with regard to the coverage for its member.

293.    The letter demanded that Dr. Ford send a check for $319 within 30 days, adding that "[i]f we do not receive a response within 30 days, we will initiate the recoupment process

and deduct the overpayment from future remittances."

294.    The letter stated further that Dr. Ford had a "right to appeal the above decision," by sending a letter within 30 days requesting an appeal along with "any supporting documentation." This disclosure fails to satisfy ERISA requirements and, moreover, an appeal in these circumstances is futile in any event. Dr. Ford has no documentation relating to the cancellation of the patient's policy by Anthem. The only relevant facts are already known to Anthem: Dr. Ford had provided services to a BCBS Insured a year previously and Anthem had verified coverage both in advance and thereafter by paying benefits for the services. Only a year later did Anthem apparently discover that the policy had been cancelled. There is no legal basis for imposing liability now on Dr. Ford in those circumstances.

295.    Since a year earlier, when the claim was submitted, Anthem had verified coverage and paid the benefit, it should not now be allowed to reverse its decision and force Dr. Ford to repay that amount. Indeed, under Dr. Ford's Par contract with Anthem he must submit any claims for benefits within 180 days, or they will be denied. Anthem certainly should not be allowed unlimited time to reverse prior decisions and unilaterally withhold funds. Nor should Dr. Ford be required to go through the process of appealing such a decision, when demanding repayment and withhold funds is forcing equitable restitution against Dr. Ford in violation of ERISA.

### THE EXPERIENCE OF PLAINTIFF MIGGINS WITH BCBS GROUP HEALTH PLANS

296.    Plaintiff Miggins is a Par provider with Defendants Premera and Regence, and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims either to Premera or Regence to be processed.

297.    As a matter of course, Dr. Miggins has his BCBS patients sign a legal assignment

of benefits to him, such that he is able to submit claims for reimbursement directly to Premera or Regence and receive benefits directly. As a result, Dr. Miggins has standing under ERISA to pursue benefits when Premera or Regence have made an adverse benefit determination. Further, as a matter of policy, Dr. Miggins obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Premera or Regence.

298.    From March 13, 2008 through June 3, 2008, Dr. Miggins provided health care services to a patient who was insured under a health care plan issued or administered by Defendant Premera. Prior to performing the services, Dr. Miggins obtain precertification from Premera, which confirmed that it was her primary coverage, with Medicare providing secondary coverage. Based on that precertification, Dr. Miggins or others working in his practice provided services to the patient, submitted a claim for reimbursement, and received payments. In total, Dr. Miggins received $312.65 in payments from Premera for this patient.

299.    By letter dated August 5, 2009, Dr. Miggins was notified by Calypso, a subsidiary of Premera that purported to provide "financial recovery services on behalf of its clients." It reported that Dr. Miggins had been overpaid $312.65 for the payments he had received for the patient listed above and demanded repayment of the total amount.

300.    In an attached form entitled "Overpayment Details," Calypso explained its repayment demand as follows:

> This overpayment recovery request concerns an SEIU Local 775 ("SEIU") member who is a Medicare beneficiary and who is also covered by a "small employer" as defined by federal Medicare Secondary Payer laws. Several years ago SEIU requested that Medicare pay primary for this member. Premera Blue Cross continued to pay primary until Medicare recently approved the SEIU's request. That means Medicare should be the primary payor for the member listed above on the claims recovered by this overpayment recovery request. Consistent with Medicare requirements, we believe you should have sufficient time to

resubmit the claim(s) to Medicare for reimbursement under the basic time limits for filing claims under 42 C.F.R. §424.44. Please submit your claim to Medicare Part B . . . **** PLEASE NOTE A CHECK IS REQUIRED TO RESOLVE, NO VOUCHER DEDUCTION WILL OCCUR ****

301.    Notwithstanding the statement that no deduction would be taken to reflect the purported "overpayment," the notice from Calypso stated that "[w]ithin 60 days of this notice, this amount will be offset against future payments."

302.    At the time that Dr. Miggins provided services to the Premera patient, it confirmed that it was the primary insurer, not Medicare. Further, as evidence from Premera's own explanation contained in its repayment demand, the agreement with Medicare to have it serve as primary payer for the patient only was reached after the services provided by Dr. Miggins. As a result, there is no basis for Premera to deny its liability or to demand repayment under the terms of the health care plan governing his patient.

303.    By claiming that the patient was not covered under her health care plan, because it was not the primary insurer, Premera was making an adverse benefit determination under ERISA. Yet, when it issued a retroactive denial of benefits based on the purported agreement with Medicare, it failed to provide proper disclosure or to offer a full and fair review of its decision. As a result, Premera has acted in violation of ERISA and cannot make its repayment demand or offset the alleged overpayment against future payments.

304.    By notice dated July 27, 2009, Regence submitted to Dr. Miggins a form dated July 29, 2009, entitled "Claims Pending Investigation." The form related to a BCBS Insured whom Dr. Miggins had treated from December 9, 2008 through March 3, 2009. Upon completion of treatment, the patient had an outstanding balance to Dr. Miggins, with a balance due from Regence for which he filed a claim for payment. After communications with Regence relating to certain modifiers, Dr. Miggins submitted corrected claims on May 29, 2009, which

were paid in full by Regence. As of July 2009, however, Regence informed Dr. Miggins that it was "autodeducting" various amounts, totaling $50.40, for these services. Regence provided no explanation for the forced recoupment of benefits other than to state: "Corrected Claim – refund amt." This is just one example of numerous times Regence has withheld payments for valid claims without explanation or justification.

305.    Because Regence is threatening to or has withheld payments otherwise due for valid claims as a result of purported overpayments for prior claims, Regence has made adverse benefit determinations under ERISA. It did so without providing any appeals or any of the disclosure required by ERISA, and is therefore not entitled to demand or take recoupments. Further, such recoupments would constitute forced restitution which is impermissible under ERISA, given that Regence is unable to trace or identify the specific assets it is now seeking.

## THE EXPERIENCE OF PLAINTIFF PAULSEN WITH BCBS GROUP HEALTH PLANS

306.    Plaintiff Paulsen is a Par provider with Defendant BCBSMN, and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims to BCBSMN to be processed.

307.    As a matter of course, Dr. Paulsen has his BCBS patients sign a legal assignment of benefits to him, such that he is able to submit claims for reimbursement directly to BCBSMN and receive benefits directly. As a result, Dr. Paulsen has standing under ERISA to pursue benefits when BCBSMN has made an adverse benefit determination. Further, as a matter of policy, Dr. Paulsen obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by BCBSMN.

308.    Dr. Paulsen submits his claims with respect to services he provides to BCBS Insureds to BCBSMN on a regular basis. Every week, BCBSMN deposits payments to which Dr.

Paulsen is entitled into an account and forwards to him a Statement of Provider Claims Paid ("Claims Statement") to reflect how much he receives for each submitted claim.

309.    Frequently, when BCBSMN submits its Claims Statement, it withholds an amount as a recoupment, but without any advance warning, explanation for reasons or opportunity to appeal such withholds. Thereafter, BCBSMN provides an "Accounts Receivable Recoupment Report" ("Recoupment Report") that details the amount that it unilaterally withheld from Dr. Paulsen. By withholding such amounts, and thereby not paying in full the submitted claims, BCBSMN made an adverse benefit determination under ERISA. It has thus violated its duties and obligations under ERISA by failing, *inter alia*, to provider proper disclosure or explanation for the retroactive denial of benefits or to offer a full and fair review of its decision.

310.    For one BCBS Insured, for example, BCBSMN submitted to Dr. Paulsen a Claims Statement followed by a Recoupment Report dated June 15, 2009, which reflected that, in total, BCBSMN had "Recovered" a total of $1,133.60, meaning that it had withheld that amount from benefits to which Dr. Paulsen was otherwise entitled. The services had been provided from March 18, 2009 through April 22, 2009. For another BCBS Insured, BCBSMN submitted a Claims Statement followed by a Recoupment Report dated March 2, 2009, for services provided from July 14, 2008 through October 22, 2008, in which it reported that it had recouped a total of $214.98 from the amount Dr. Paulsen otherwise was owed. For a third BCBS Insured, BCBSMN submitted a Claims Statement followed by a Recoupment Report dated June 1, 2009, for services provided on March, 9, 2009, in which it reported that it had recouped a total of $61.45 from the amount Dr. Paulsen otherwise was owed. In all three cases, BCBSMN provided no explanation as to why it had recouped the funds, and offered no appeal remedy or other option for learning more about why it had taken the money.

311.     With regard to the first two patients, Dr. Paulsen learned from telephone calls and correspondence to BCBSMN that it had recouped the money because the conditions that were being treated had occurred as a result of injuries at work. As a result, BCBSMN concluded that Workers' Compensation should have covered the services, not the BCBS health insurance policy. This means that BCBSMN had made a retroactive adverse benefit determination based on its conclusion that the treatments were not Covered Services, thereby requiring compliance with ERISA.

312.     Significantly, the fact that the treatments were for work-related injuries was reflected in the original claims submitted to BCBSMN by Dr. Paulsen, such that it was aware of this issue at the time it made its initial payments. More importantly, Dr. Paulsen only submitted the claims to BCBSMN after he had verified that there was no longer coverage available from Workers' Compensation, so that payment under the health care plan was entirely appropriate.

313.     For the third patient, Dr. Paulsen has not yet learned why BCBSMN recouped the funds. He only knows that $61.45 had been withheld by BCBSMN.

314.     BCBSMN's actions, in withholding funds as a "Recoupment" for some purported prior overpayment, are in direct violation of ERISA. BCBSMN failed to comply with ERISA regulations in making its adverse benefit determinations, and it has no legal authority to forcibly take restitution from Dr. Paulsen for benefits he properly received for services to BCBS Insureds.

### THE EXPERIENCE OF PLAINTIFF RENO
### WITH BCBS GROUP HEALTH PLANS

315.     Plaintiff Reno is a Par provider with Defendant Wellpoint (under the name Anthem), and for a number of years has provided Covered Services to BCBS Insureds, for which he submitted claims to Wellpoint to be processed.

316.     As a matter of course, Dr. Reno has his BCBS patients sign a legal assignment of

benefits to him, such that he is able to submit claims for reimbursement directly to Wellpoint and receive benefits directly. As a result, Dr. Reno has standing under ERISA to pursue benefits when Wellpoint has made an adverse benefit determination. Further, as a matter of policy, Dr. Reno obtains written confirmation from his patients that they remain liable to him for any amounts of his bills that are not covered or otherwise reimbursed by Wellpoint.

317.    In July 2006, Anthem notified Dr. Reno that it was conducting a "Post Payment Review" of his practice and requested that he produce the medical records for 24 of his BCBS Insured patients, covering the period of time between January 2, 2004 and April 19, 2006. He complied in full with that request.

318.    By letter dated March 13, 2007 ("3/13/07 Letter"), Dr. Reno received from Anthem's SIU unit the result of its audit, in which it concluded that Dr. Reno had been overpaid by approximately $110,000, and demanded immediate repayment. For the total period in question, Anthem reported that Dr. Reno had billed a total of $475,978.10 and been paid benefits totaling $201,515.35. The basis for Anthem's demand was a combination of the purported lack of coverage for the services at issue and alleged inadequacies in document or billing errors. In particular, the letter stated:

> Based on this audit, it was determined that a substantial amount of claims were paid in error.
>
> o    **170 claims had no documentation for the service billed.**
> A majority of cases in which there is no documentation for the service billed is related to the billing of CPT 97139. This code is an unlisted therapeutic procedure and requires a description of the service documented in your records. If the service is not documented, it cannot be billed.
>
> o    **54 services were not covered.**
> Vax-D services [spinal decompression] are not covered. These services were submitted with an incorrect CPT code of 97350. This code is intended to be used for a therapeutic activity with direct patient contact by the provider, which does not appropriately describe the Vax-D mechanical traction services which appear

to have been provided to the patients. Vax-D has a specific CPT code of S9090. Vax-D and similar mechanical traction devices are considered investigational/not medically necessary by Anthem Blue Cross and Blue Shield.

      o      **4 services billed exceeded the level of service rendered.**
A few Evaluation and Management ["E&M"] CPT Codes were billed at a higher level of service than the level of service documented in the patient record.

      o      **133 incorrect CPT codes were used.**
The incorrect CPT codes used, in most claims reviewed, reference the billing of CPT code 97112 (therapeutic procedure, neuromuscular reeducation of movement) when the documentation in the patient's records indicates the appropriate services to bill is CPT 97140 (manual therapy).

319.    After explaining the rationale for its conclusion of billing and coverage "errors," Anthem described the basis for its repayment demand, based on an extrapolation from the review of the medical records for the 24 patients, stating:

> Based on the consultant's audit we recalculated the payments on the claims involved to reflect the amount you would have been paid had the claims been billed correctly. . . . Please note from the audit summary that in 361 instances, the consultant indicated that the service billed was inappropriate based on the service that was documented in the records. Of the $18,727.85 originally paid for the claims in the sample, this audit indicates that $8,307.76 should be allowed and $10,420.99 denied. This is a denial rate of $110, 833.44.

> During the audit period you were paid a total of $201,515.35; applying the 55% denial rate to this amount results in an estimated overpayment of $110,833.44.

320.    Based on the numbers provided by Anthem, it had evaluated approximately 9% of the amount of claims submitted by Dr. Reno ($18,727.85/$201,515.35). It had then extrapolated that amount which the unidentified "consultant" determined should have been denied to the entire amount Dr. Reno had been paid, leading to the final alleged overpayment.

321.    Anthem then demanded immediate payment of the alleged overpayment, without offering any appeal process or means to challenge the audit decision, stating:

> I hope that the information provided herein is helpful to you in understanding the guidelines we must follow in administering our policies. Please assist us in correcting the overpayment made to you. As noted above, through extrapolation,

we have estimated the overpayment to be about $110,000. We will accept a
payment of this amount as a means to close this audit and have provided a
postage-paid envelope for your refund. Alternatively, if you would like to discuss
this matter, please call me at [number provided]/  In either event, please make
efforts to resolve this matter by April 6, 2007.

322.    Having received a repayment demand for $110,000, with no opportunity to pursue

a formal appeal and less than 30 days to "resolve" the matter, Dr. Reno had no alternative but to

engage counsel and try to negotiate a resolution of the issue, notwithstanding his dispute over the

alleged overpayment. Dr. Reno therefore retained counsel at an hourly rate, with an initial fee

deposit of $5,000 to respond to Anthem's charges, and further retained a chiropractic coding

expert, John F. Schmidt, D.C., FIAMA, of dcSeminars from Dallas, Texas, to examine in detail

Dr. Reno's records and Anthem's audit conclusions.

323.    By letter dated July 20, 2007, Dr. Schmidt reported to Dr. Reno on his

conclusions. After having evaluated the 3/13/07 Letter, interviewed Dr. Reno, "review[ed]

various medical records, including fee slips, travel cards, patient intake forms and exam records,

explanation of benefits, Physical Medicine Reimbursement Guidelines from Anthem and their

audit review," Dr. Schmidt concluded that "I cannot find a single instance of inappropriate

billing for any one procedure that has been billed by your office."  With regard to Anthem's

claim that spinal decompression was not a covered service, Dr. Schmidt added that he was

"unclear as to the date that Anthem required that you bill HCPCS code S9090 for

decompression," finding that "it is not inappropriate to utilize the 97350 CPT code for

decompression."

324.    With regard to Anthem's claim that Dr. Reno did not have adequate

documentation to bill CPT Code 97139 on 170 claims, Dr. Schmidt concluded that, "[i]n

reviewing your daily notes, the procedures were clearly identified and the CPT codes were

correctly converted," adding that "I do not see that any of the audited codes were billed inappropriately."

325. With regard to Anthem's allegation that 54 services were not covered because they involved decompression, and that, in any event, Dr. Reno had improperly billed CPT Code 97530 rather than S9090, Dr. Schmidt concluded:

> Anthem has a history of reviewing and creating policy for decompression services since 2003. When decompression was determined experimental remains unclear to me. You will need to get a clear answer from Anthem on this issue. With regard to the issue of proper billing for decompression services, there are many varied positions with Blue Cross Blue Shield nationwide, which has caused much confusion. For example, Blue Cross Blue Shield of Minnesota recommends the use of numerous codes, including 97139, the unlisted procedure code for therapeutic procedures which requires direct contact. Other sources recommend the 97530, the therapeutic procedure code. This is based on the fact that this code requires "dynamic activity." Decompression could certainly be considered a dynamic activity. Due to the lack of a specific CPT code for decompression and many insurance recommendations to "use the code that most accurately represents the service or procedure provided," providers such as yourself are left to use a CPT code that they believe best represents the services provided. In sum, I do not believe that the use of CPT 97350 code is egregious or inappropriate. The only other code I would recommend is the 97139 code, a code recommended by BCBS themselves.

326. With regard to Anthem's claim that Dr. Reno did not have proper documentation for four E&M codes he billed, Dr. Schmidt concluded that, "[a]fter reviewing your records, I do not believe that CPT code 99204 was improperly billed at all." Rather, Dr. Schmidt found that Dr. Reno's records "clearly demonstrate a comprehensive history and exam, as well as medical decision making of moderate complexity," as required for such an E&M billing, such that he found that "[t]he proper code for this level of service is 99204, the code that you billed." Dr. Schmidt further noted that he had "no idea what basis Anthem's consultant auditor utilized in making their determination."

327. With regard to Anthem's claim that Dr. Reno had improperly billed Code 97112

rather than 97140 on 133 occasions, Dr. Schmidt also disagreed with that conclusion, stating:

> [M]any CPT codes include services that are similar in nature but ultimately there is a discriminating difference between the usages based on what the provider is attempting to achieve. In this case, you explained that you were providing motion and manual techniques to improve neuromuscular function that had been lost. One could certainly use the 97140 CPT code for this therapy and combine it with 97110 for increasing range of motion. However, considering what you were trying to achieve, the code that "most accurately" represents the service provided by you would be code that was billed, namely 97112.

328.    Dr. Reno's counsel submitted a copy of Dr. Schmidt's report to Anthem by letter dated July 23, 2007. In addition to relying on Dr. Schmidt's conclusions that Dr. Reno had billed appropriately and there was no overpayment from Anthem, the letter further evaluated Anthem's policies with regard to decompression, and demonstrated that whether or not it was a covered service depended on the terms and conditions of the patient's health care plans, stating:

> I have read Anthem's Policy # SURG.00008, underline effective on July2, 2007, which concludes that Anthem generally views these devices as "investigational/not medically necessary." . . .
>
> Although I assume that spinal decompression services are resolved as an uncovered service in most instances for dates of service after the effective date of the policy (that is, July 2, 2007), the policy itself now seems to point out that coverage for the service is not underline always denied by Anthem. Policy # SURG.00008 notes on page 3 that:
>
>> The following codes [CPT 97039, HCPCS S9090] for treatments and procedures applicable to this policy are excluded below for informational purposes. Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement policy. *Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member*. [Emphasis added.]

As Anthem's policy therefore makes clear, whether or not decompression or other services are covered is not dependent on its internal policies, but ultimately on the terms and conditions of the health care plans governing the patient at issue.

329.     While Anthem's repayment demand was based in part on its conclusion that decompression was not a covered service (regardless of how it was billed), Dr. Reno's counsel discussed in his July 23, 2007 letter the fact that, after 5/13/07 Letter demanding repayment was issued, Anthem actually paid for a number of decompression visits. For example, after Dr. Reno billed decompression for two services dated after the period of time covered by the audit, using S9090, Anthem paid those claims. Further, an Anthem service representative recommended to Dr. Reno's staff that he resubmit "corrected" claims for the decompression services that Anthem denied in its 5/13/07 Letter. This raised a substantial inconsistency between Anthem's repayment demand based, in part, on its determination that decompression was not a Covered Service, and the subsequent information provided by Anthem to Dr. Reno to submit his claims under a different code in order to be covered.

330.     Notwithstanding the clear evidence provided by Dr. Schmidt supporting all of Dr. Reno's billing practices, and denying the basis for any alleged overpayment, Anthem continued to press Dr. Reno to settle the repayment demand. His ability to combat this pressure was exacerbated by the fact that he was having to pay counsel on an hourly basis to fight the improper charges, without any viable appeal process available, and that Anthem had indicated that, in the absence of a settlement, it would simply withhold the money from future payments. He therefore had little alternative but to settle.

331.     By letter dated January 3, 2008, Dr. Reno proposed a settlement with Anthem. Focusing on the fact that Anthem claimed that he should refund it $31,257.48 for billing a non-covered service with respect to decompression, Dr. Reno pointed out that CareFirst Blue Cross and Blue Shield, a BCBS Entity for which Anthem was providing claims processing services, was, in fact, paying for decompression at a rate of $185 (with $15 of the $200 bill applied to the

co-pay). Applying this number to the total amount Anthem claimed to have been overpaid, and assuming that if Dr. Reno resubmitted his claims they would be paid at that rate, Anthem would have paid $21,877.65 for the decompression services, leaving only $9,349.83 as part of an alleged overpayment. Dr. Reno therefore offered to pay that amount to settle the entire issue.

332.    Anthem rejected Dr. Reno's offer and continued to press for a higher settlement amount. Around this time, Dr. Reno learned that his counsel had previously done work for Anthem, creating what he believed to be a conflict of interest. He was not in a position, however, to pay for yet another attorney and so he finally agreed to pay Anthem $25,284.48 to settle its repayment demand.

333.    On May 8, 2008, Dr. Reno signed a Promissory Note with Confession of Judgment whereby he agreed to pay Anthem $25,284.48, payable in 24 monthly installments of $1,011.38 each, beginning on May 1, 2008 and ending on May 1, 2010. Notably, the Promissory Note did not include any release or other language that could be deemed to preclude Dr. Reno from taking legal action against Anthem relating to the repayment demand.

334.    Following his agreement to pay Anthem in order to settlement the repayment demand, Dr. Reno commenced entering into agreements with his patients to provide decompression on a cash basis, something he was permitted to do since it was not deemed to be a Covered Service. Thereafter, however, Anthem has determined that it will deem the treatment to be a Covered Service, but is paying only $10 per treatment. By doing so, Anthem seeks to prevent Dr. Reno from balance billing his patients for the unpaid portion of the bill, while making it economically infeasible for him to continue to provide this efficacious treatment to his patients.

335.    Anthem's repayment demand as specified in its 5/13/07 Letter constituted an

110

adverse benefit determination under ERISA. Among other things, the decompression treatments were denied as not being Covered Services under the terms and conditions of the patients' health care plans. Further, Anthem's own policy concerning coverage for decompression, as quoted above, makes clear that the coverage is not determined based on Anthem's internal policies, but on the terms and conditions of the health care plans. As a result, a denial of coverage is clearly an adverse benefit determination which requires application of ERISA's rules and regulations.

336.    Anthem blatantly breached its ERISA obligations by, among other things, making its 5/13/07 adverse benefit determination without providing proper disclosures or making available the patients' plan documents to justify its conclusions, and without offering or providing a means to obtain a full and fair review of its coverage decision. By failing to offer the proper due process protections under ERISA, Anthem forced Dr. Reno to agree to pay it more than $25,000, when such a payment was not owed and, under ERISA, could not have been collected by Anthem. Dr. Reno therefore seeks to (1) reverse his agreement and be reimbursed the amount he has paid under his coerced Promissory Note, (2) compel Anthem to withdraw its repayment demand, (3) enjoin Anthem from denying coverage for decompression under the terms and conditions of its health care plans, and (4) pay a proper amount in benefits for such services.

### **DEFENDANTS' ERISA VIOLATIONS**

337.    As companies that issue, insure and administer the employee benefit plans through which a number of the Individual Plaintiffs' patients received their insurance, the BCBS Entities are subject to ERISA, and its governing regulations. Further, due to the role the BCBS Entities played in administering the health care plans that insured the patients of the Individual Plaintiffs in this matter, including making coverage and benefit decisions and deciding appeals, BCBS acted as a fiduciary under ERISA. Under ERISA, the BCBS Entities cannot deny

coverage for such services unless their applicable health care plans expressly include an exclusion specifying that such services are not covered benefits.

338.    Under ERISA, the BCBS Entities are required, among other things, to comply with the terms and conditions of their health care plans; to accord their Members or their providers an opportunity to obtain a "full and fair review" of any denied or reduced reimbursements; and to make appropriate and non-misleading disclosures to Members or their providers. Such disclosures include accurately setting forth plan terms; explaining the specific reasons why a claim is denied and the internal rules and evidence that underlie such determinations; disclosing the basis for their interpretation of plan terms; and providing appropriate data and documentation concerning its coverage decisions.

339.    In offering and administering its health care plans, the BCBS Entities further assume the role of "Plan Administrator," as that term is defined under ERISA, in that they interpret and apply the plan terms, make all coverage decisions, and provide for payment to members and/or their providers. As the acting Plan Administrator, the BCBS Entities also assume various obligations specified under ERISA. These obligations include providing their members with an SPD, a document designed to describe in layperson's language the material terms, conditions and limitations of the health care plan. The full details of the plan, which are summarized in the SPD, are contained in the Evidence of Coverage ("EOC") that governs each member's health care plan.

340.    The BCBS Entities are obligated under ERISA to make their coverage determinations in a manner consistent with the disclosures contained in the SPD. To the extent there is a disparity or conflict between the SPD and the EOC, the SPD governs, so long as the member benefits from the application of the SPD. If the employer, rather than one of the BCBS

Entities, is deemed to be the Plan Administrator, the BCBS Entity remains responsible for ensuring that the SPD complies with the law under its duties as a co-fiduciary as provided in ERISA, 29 U.S.C. § 1105, even if the employer prepares or disseminates the SPD.

341.    The BCBS Entities violated ERISA and breached their fiduciary duties by failing to disclose the reimbursement rules they used to reduce members' benefits, by making retroactive benefit claim denials without proper disclosure or following required procedures, by seeking to impose new policies after-the-fact in an effort to compel payments by providers, by improperly excluding benefits for safe and effective chiropractic or occupational therapy services based on an incorrect determination that they were experimental and investigational, by improperly recouping benefits rightfully paid to Plaintiffs, and by failing to fulfill their obligations of good faith, due care and loyalty.

342.    With respect to all their health care plans, the BCBS Entities are obligated to their members and their providers to provide specific health care benefits and reimbursements. As detailed herein, the BCBS Entities have breached, and continue to breach, their obligations to the Individual Plaintiffs and the Class, and in so doing have violated ERISA.

343.    The connection between the post-payment audits at issue here and the BCBS Insureds is highlighted by the fact that the Individual Plaintiffs are entitled to balance bill their patients for the benefits that are being forcibly recouped by their local BCBS Entities. Pursuant to the terms and conditions of the PPA which the Individual Plaintiffs entered into with the local BCBS Entity, they are permitted to bill or charge their BCBS Members when the BCBS Entity has determined a service not to be medically necessary and "when such non-medically necessary services are rendered to the Subscriber at the Subscriber's request after it has been explained to the Subscriber that the services may not be medically necessary and may not be reimbursed in

whole or in part by [BCBS] and the Subscriber has agreed in writing prior to the provision of services to continue treatment with the Physician at the Subscriber's own expense."

344. The standard practice of the Individual Plaintiffs is to have each of the patients sign an assignments of benefits form pursuant to which the Individual Plaintiffs are authorized to file claims with and receipt payments directly from Defendants, and to pursue actions against them, if necessary, to ensure receipt of such payments. Further, the Individual Plaintiffs' standard practice is to have each patient sign an acknowledgment in advance of the receipt of any health care services that the patient is liable and will pay for the cost of any services that are not covered and paid for by the BCBS Entities. From these forms, it is clear that the patients are informed of the procedure involved and that they would be responsible for the unpaid portions of the bill.

345. In light of the terms of the PPA, and the releases signed by the Individual Plaintiffs' patients, there is no question that Defendants were fully aware that their efforts to obtain recoupment of previously paid benefits to the Individual Plaintiffs would have a direct, adverse impact on BCBS Insureds, who would now be liable for the unpaid portion of the bill. Thus, Defendants also knew that their efforts to obtain a recoupment from the Individual Plaintiffs represented after-the-fact adverse benefit determinations.

346. Under ERISA, the term "adverse benefit determination" is defined as follows:

The term "adverse benefit determination" means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

114

347.    As the definition makes clear, BCBS's new policies as applied to the Individual Plaintiffs constitute "adverse benefit determinations" under ERISA. The requests for recoupment are based on BCBS's determination that the services at issue were not "covered," and the forced recoupment or withholding of authorized benefits constitute "reductions" in benefits or "a failure to provide or make payments (in whole or in part) for a benefit," thereby satisfying the requirement for an adverse benefit determination.

348.    ERISA further establishes what steps must be followed once an "adverse benefit determination" is reached, including the following:

> [T]he plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. . . . The notification shall set forth, in a manner calculated to be understood by the claimant – (i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review . . . (29 CFR 2560.503-1(g)).

349.    In addition, ERISA requires that each claimant be given "a reasonable opportunity to appeal an adverse benefit determination" and to receive a "full and fair review of the claim," (29 CFR 2560.503-1(h)(1)), all within clear and explicit timing requirements.

350.    Defendants utterly failed and continue to fail to comply with any of the ERISA requirements. After making benefit determinations for the Individual Plaintiffs, pursuant to which they found that the specific health care services at issue were Covered Benefits of their health care plans and subsequently paid benefits to the providers, Defendants reversed their coverage decisions. They subsequently informed the Individual Plaintiffs that they now were determining that those same services were no longer deemed to be Covered Services and

demanded that the providers repay them.

351.    Defendants' actions represent an after-the-fact adverse benefit determination under ERISA that would have the effect of creating new liabilities for the members to the providers. Yet, Defendants failed to inform BCBS Insureds of their actions, including by failing to provide necessary disclosures or documentation required under ERISA either to the members or the providers.

352.    Because of Defendants' failure to comply with appropriate steps to pursue an adverse benefit determination, their actions in demanding recoupment are invalid and unenforceable, and their coverage determinations should be deemed to be arbitrary and capricious.

353.    Even were Defendants to have complied with their procedural obligations under ERISA, they have no legal right to recoup funds paid to the Individual Plaintiffs or other members of the Class, based on after-the-fact reversals of prior benefit determinations. The recoupment demand issued by BCBSRI is a claim for restitution under ERISA. Yet, ERISA does not permit restitution unless the assets at issue are easily identified and separate from other assets, which these are not. The Individual Plaintiffs obtained the funds in good faith and expended or otherwise acted based on the assumption that such payments were proper. As there is no dispute that the services at issue were provided by the providers, and that they billed and received payment for them in good faith, ERISA does not permit restitution, and equity demands that the providers be entitled to keep such payments. Further, the Individual Plaintiffs have been severely prejudiced by Defendants' actions due, among other things, to the fact that a substantial period of time has passed since the services were provided and the Plaintiffs will have substantial difficulty obtaining payment from their patients for the now-unpaid portion of the bills.

Defendants should therefore be estopped from seeking recoupment or retaining any funds that were paid pursuant to its demands, or should otherwise be found to have waived its ability to collect.

**DEFENDANTS' RICO VIOLATIONS**

**The Recoupment Enterprise**

354.    Defendants and the individuals alleged below are "persons" within the meaning of 18 U.S.C. § 1961(3).

355.    Based upon Plaintiffs' current knowledge, BCBSA and each of the BCBS Entities named as Defendants herein constitute a union or group of individuals associated in fact that Plaintiffs refer to as the "Recoupment Enterprise."

356.    The Recoupment Enterprise consists of the Defendants working together through their respective "Anti-Fraud Departments" or their "Refund Departments" to design and implement a fraudulent scheme to extort millions of dollars from Plaintiffs and the members of the Classes through their improper recoupment demands and forced recoupment payments as detailed herein.

357.    The BCBSA is an association of BCBS Entities that have licensed the BCBS name. The BCBS Entities jointly participate in and fund the activities of the BCBSA, which operates through a series of committees, workgroups and ad hoc councils designed to allow the various BCBS Entities to coordinate their activities and pursue joint aims. The principal governing body of the BCBSA is its Board of Directors, made up of senior executives of the BCBS Entities.

358.    The BCBSA has established a National Anti-Fraud Department ("NAFD") to oversee and operate its activities, which are purportedly designed to combat health care fraud. Rather than being limited to the pursuit of actual fraud, however, the BCBSA uses the NAFD to

117

oversee and implement the activities of similar Anti-Fraud Departments in each of the BCBS Entities for purposes of extorting funds from the Individual Plaintiffs and members of the Classes. It does so through a National Anti-Fraud Strike Force and other committees to allow for the coordination of efforts among members of the Recoupment Enterprise to implement the recoupment scheme.

359.    According to the BCBSA website, the NAFD "works with the Blue Plans, the healthcare community, consumers, and others to prevent improper payments," and its role is as follows:

- Provides healthcare fraud management direction and support to the anti-fraud units employed by the 38 independent Blue Plans;
- Coordinates the BCBSA National Anti-Fraud Strike Force multi-jurisdictional and foreign claims related activities;
- Provides services to the Blue Plans anti-fraud units in detecting, preventing, and investigating healthcare fraud, and recovering improper payments.

360.    The website further describes the "national strategy" adopted by the NAFD, which includes:

- Establishment of a Strike Force to enhance collaboration and multi-jurisdictional coordination among Blue Plan anti-fraud units;
- Improved communication among all Blue Plans' anti-fraud unit staff;
- Improved visibility of and support for anti-fraud activities by BCBS Plan executive staff;
- Better education and media outreach to the public;
- Developing or strengthening relationships with federal, state, and local authorities;
- Increased use of anti-fraud technology.

361.    The NAFD reports directly to the BCBSA Chief Auditor and Compliance Officer, who reports directly to the BCBSA CEO and Audit Committee.

362.    The NAFD provides "direction and support" to the anti-fraud units of each BCBS Entity, to allow for joint and consistent practices. The sharing of information between the SIUs

118

of the various BCBS Entities allows the scheme to function effectively. According to a senior consultant for the NAFD, "information sharing is critical," with "55 SIUs, representing all members' plans, . . . reporting information to the [BCBSA's] anti-fraud department."  The consultant than adds:  "We've increased our staff over the past four years, and individual plans can call us and ask whether other plans have had similar experiences."

363.    Through these efforts, the Recoupment Enterprise is able to develop a strategy for manipulating the post payment audit or refund process to make false fraud claims against the Individual Plaintiffs and Class members, and to allow for forced recoupments and extorted payments.

## NHCAA

364.    In addition to Defendant BCBSA and the other BCBS Entity RICO Defendants, as identified herein, the Recoupment Enterprise further includes the National Health Care Anti-Fraud Association ("NHCAA"), a national organization purportedly focused on "health care fraud" and comprising private healthcare insurers, including Defendants, and International Business Machines Corporation ("IBM"), through which, under IBM's "Fraud and Abuse Management System" ("FAMS"), Defendants share data and develop techniques and methods to perpetuate the fraudulent scheme to deprive Plaintiffs of rightful payments as described above.

365.    NHCAA has 82 designated Member Organizations, of which 25 (or more than 30%) consist of BCBSA and BCBS Entities. As a result, Defendants play a central role in the operation and use of the NHCAA. Defendants use, support and maintain the NHCAA as a vehicle for the communication, exchange, and dissemination of information necessary to effectuate Defendants' fraudulent recoupment scheme. With executive offices in Washington, DC, NHCAA identifies itself as "the leading national organization focused exclusively on the fight against health care fraud."  It claims that it provides "unparalleled learning opportunities

through the NHCAA Institute for Health Care Fraud Prevention." This "Institute" conducts numerous training programs for thousands of Special Investigations Unit personnel, and provides accreditation of these investigators as a Health Care Fraud Investigator ("AHFI"). Each of the RICO Defendants is a member organization of the NHCAA. At least 70 executives from BCBSA or various BCBS Entities received the AHFI designation by the NHCAA. Moreover, BCBS SIU Managers and Executives have, upon information and belief, served the NHCAA directly in a leadership capacity.

366.    Although public law enforcement agencies may be involved in NHCAA, they are not members and are relegated to "liaisons." Only healthcare insurers such as BCBS Entities, self-funded employers, contractors, and third-party administrators may become "member organizations."

367.    The NHCAA Institute Special Training Programs, hosted throughout the year, "provide the invaluable opportunity for health care anti-fraud professionals to network with one another" and "keeping abreast of industry trends." One "learning product" is specifically entitled "Chiropractic Fraud: Schemes and Scoundrels," and is represented "to support and greatly enhance the knowledge of health care fraud investigators and law enforcement personnel charged with investigating chiropractic fraud cases." Other seminars include "Legal Issues for the Health Care Fraud Investigator," and "NHCAA Work Group Update" on the creation of "*industry norms* for the calculation of an investigative unit's return on investment" (emphasis added) and development of "standards for the practice of health care fraud investigations." A special seminar, entitled "The Debate over Pre-Pay Fraud: Told by Those Who Know the Game," highlights the sharing of information concerning "retrospective fraud detection and investigation" and the automated systems needed to implement such programs. The NHCAA

Institute for Health Care Fraud Prevention sponsors an annual training conference, offering

workshops on detection, investigation and prosecution tools.

368.    Of special significance is the seminar on FAMS offered to NHCAA members

entitled "Ending the 10% Debate – Scientifically Measuring the Amount of Fraud and Abuse in

Your Claims," and presented by an executive of IBM. IBM, through its Center for Business

Optimization, is an NHCAA "Premier Supporting Member."   IBM summarized the presentation

as follows:

> Is your organization finding it difficult to measure the amount of claims that are
> fraudulent, wasteful, and abusive? Is your risk exposure increasing or decreasing
> over time? Which medical specialties have greater risk than others? What if you
> could scientifically measure the amount of fraud, waste, and abuse in your claims
> data – across all plans and geographies – without using a complicated tool to find
> the answer?  Now you can! Identify where your exposures are and how your
> organization can direct investigative staff to immediately target leakage with the
> new IBM Fraud and Abuse Management System (FAMS) Dashboard. This new
> enhancement to FAMS measures fraud, waste, and abuse being committed by
> multiple provider types including, institutions, patients, etc. SIU Managers can
> now quickly view the types of schemes that are being perpetrated (overcharging,
> services not rendered, etc.) with one overall view of their claims data across
> multiple plans.

369.    A key component of the NHCAA is the creation of opportunities for member

organizations like the BCBS Entities to share healthcare anti-fraud information with other

members, including dozens of the major commercial healthcare insurers throughout the country.

Indeed, the sharing of information by insurers "is fundamental to NHCAA's mission."

370.    The sharing of anti-fraud information by the NHCAA is facilitated by at least four

internal systems: (a) the Special Investigation Resource and Intelligence System ("SIRIS")

permits members to share information about "potential fraudulent activity" over the Web; (b)

NHCAA hosts "information sharing meetings" where healthcare insurers and others "meet

directly with their industry peers to share specific case information and information about new

fraud schemes"; (c) healthcare insurer members receive case-specific requests for investigation

assistance ("RIA") to "assist in case development" through facsimile, and insurer recipients follow up through telephone calls to the requesting insurer; and (d) the "Peer Experience Resource Center" ("PERC") permits members "to seek input from their industry peers about unusual, pressing or particularly challenging investigations or policy-related issues. PERC offers the ability to reach out to NHCAA's membership quickly and effectively."

371.    The sharing of anti-fraud information by the NHCAA is also facilitated by the NHCAA's e-newsletters, "benchmarking" tools, email "alert service," and legal briefs made available to members.

372.    Numerous examples abound for how NHCAA is used by the RICO Defendants to share information and coordinate their approaches for implementing the Recoupment Enterprise. This November 2009, the NHCAA is holding its 2009 Annual Training Conference in Orlando, Florida, which it says is "recognized industry-wide as the nation's leading health care anti-fraud forum."   Among other things, the Training Conference will include a "Chiropractic Fraud Schemes and Emerging Technology" seminar to be led by representatives from Defendants IBC and Wellpoint. It is designed to "[e]xplore the latest chiropractic specialty emerging fraud schemes . . ."

373.    Other seminars to be led by representatives from BCBS Entities at the 2009 Annual Training Conference include Diagnostic Procedures & Clinical Modalities across Sub-Specialties," where a representative from BSCA will "[e]xplore inappropriate billing of diagnostic procedures and clinical modalities," and "[d]iscuss health care fraud and abuse in various medical technologies and procedures"; "Ask the Coders," where representatives from Defendants Premera and Regence will address "coding questions that arise from recent health care fraud investigations" and "address audience inquiries, as well as share coding questions

from their own investigative experience"; "Ask a Medical Director," where representatives from Defendants BCBSTN, IBC and BCBSNC will respond to "medical questions that arise during case investigations"; "Alternative Care Fraud Schemes," where a representative from Defendant Premera will "[w]ork an alternative care case from start to finish, including data mining tips, methods to identify perpetrators, use of the internet to support the investigation, review of medical records and identification of misrepresented CPT codes"; "Investigating Coding Schemes in Specialty Areas," where representatives from Defendant Highmark will identify "potential schemes, and the investigative processes used by both the SIU and health insurance plan Medical Director to arrive at a successful outcome"; "Strategies for Maximizing Recoveries," where a representative from Defendant Horizon, among others, will "examine the best recovery practices used by health insurance plans" and discuss "approaches to the negotiation and recovery process"; and "SIU Management Panel Discussion," where a representative from Defendant IBC will join others to "[f]ocus on management issues within the SIU including managing case inventory, staffing strategies, supervision, motivation and morale, and building internal relationships."

374. The 2009 Annual Conference will also include IBC, which will host other seminars, including "Profiling Patients to Identify Fraud Schemes," where a representative from IBM will describe how "to create member-focused models and use data mining techniques that highlight clues from the member data that point to provider fraud schemes that might not have been uncovered using traditional methods"; and "Using Maps and Geospatial Analysis to Detect Fraud and Abuse," where IBM representatives will demonstrate how "[m]aps are powerful tools that can be used to detect suspicious behavior and to build fraud cases," and will further describe how "IBM has enhanced its FAMS fraud detection tool to include innovative mapping

techniques and analysis methods."

375.    The seminars that are being presented at the 2009 Annual Training Conference will repeat and expand upon numerous similar seminars and conferences that Defendants have participated in with the NHACC in the past. For example, at the 2008 Annual Training Conference held in November 2008 in Phoenix, Arizona, the seminars included "Diagnostic Procedures & Clinical Modalities across Sub-Specialties," where a representative from Defendant BSCA "explore[d] inappropriate billing of diagnostic procedures and clinical modalities" and "[d]iscuss[ed] health care fraud and abuse in various medial technologies and procedures, and specific CPT and HCPCs codes that can be misused"; "Exploring the Science of Medicine Part I: Evidence-Based Medicine," where a representative from Defendant IBC "demonstrate[d] how evidence-based decisions are made, and the sources of medical science" so that "[i]nvestigators [could] learn how to evaluate a scientific article, and techniques on how to respond to evidence-based challenges"; "Exploring the Science of Medicine Part II:  Utilization Management & Medical Necessity," where a representative from Defendant BCBSNC "explain[ed] the utilization management process and resulting medical necessity determinations"; "Ask a Medical Director," where representatives from Defendants BCBSTN, IBC and BCBSNC responded to "medical questions that arise during case investigations"; "SIU-Medical Director Synergy, Getting the Most from your Medical Director," where representatives from Defendant Highmark provided "examples of successful SIU-Medical Director partnerships and how medical advisors can support an organization's SIU"; "Hospital Audits:  What Every Payer Needs to Know," where representatives from Defendant IBC described "approaches and technologies used to aid in the detection of aberrant hospital billing schemes as well as identification of improper claim payments," and the "tools to determine best practices for

efficient financial recoveries of hospital audits"; "Preparing for Negotiation Part II: Presenting the Evidence," where a representative from Defendant Wellpoint "share[d] tips and techniques gleaned from years of successful negotiations"; "Modifiers 25 & 29," where a representative from Defendant Premera described "the correct use of Modifiers 25 and 29" and how to "recognize instances where these modifiers are misused"; "Onsite Audits," where a representative from Defendant Regence described "how to identify candidates, how to prepare the files to audit, the equipment and staffing needs, and how to successfully write a comprehensive audit findings report"; and "The Debate Over Pre-pay Fraud: Told by Those Who Know the Game," where a representative from Defendant Premera discussed "the issues surrounding prospective versus retrospective fraud detection and investigation," and "how health plan executives are addressing the types of technology tools and automated systems needed in developing, implementing and maintaining high-performance fraud, waste and abuse programs."

376.    The NHACC's 2007 Annual Training Conference, held in Anaheim, California, had numerous comparable seminars, frequently presented by representatives from BCBS Entities. For example, one key seminar entitled "Chiropractic & Pain Management Diagnostic Testing Fraud, Part 1" was presented by representatives from Defendants IBC and Wellpoint to discuss "diagnostic and treatment fraud schemes by chiropractors and pain management providers with tactics for investigators to identify and intervene." This was followed the next day with "Chiropractic & Pain Management Diagnostic Testing Fraud, Part 2," where the IBC and Wellpoint representatives made "a demonstration of chiropractic examinations, treatments and diagnostics with information on medical necessity, coding and how to evaluate appropriate versus fraudulent care and diagnostics."

377.    Among many other seminars at the 2007 Annual Training Conference, an

Investigative Consultant from Defendant BCBSA made a presentation on "Problem CPT Codes," in which she described how "[u]nderstanding the descriptive terms of CPT codes and derivations of established codes will enhance the ability to recognize, monitor and analyze unusual patterns of utilization and identify fraudulent activities of providers through prepayment and post-payment review and investigation."

378.    In addition, a representative from Defendant Regence gave a seminar on "Onsite vs. Desk Audits," to explain how "to identify candidates, how to prepare files to audit, the equipment and staffing needs, and how to successfully write a comprehensive audit findings report," and a representative from Defendant Horizon gave a seminar on "Negotiation and Recovery," where he "[e]xplore[d] best practices when preparing, conducting and closing negotiations, dealing with subject or counsel 'pushback' and successful strategies for following up to ensure and track prompt recovery."  Further, a full day pre-conference program was held by the NHACC in October 2007, in advance of its 2007 Annual Training Conference entitled "Clinical Skills for the Health Care Fraud Investigator," led by representatives from Defendants BCBSTN, IBC, BCBSNC and BSCA, to "introduce non-health care professionals who are working in health care fraud detection and prosecution to basic medical concepts and terminology" and provide "a solid understanding of how the system really operates."

### IBM and FAMS

379.    One of the key underpinnings of the Recoupment Enterprise's work to develop and implement its recoupment scheme is the use of IBM's FAMS, which was developed to identify "abusive behavior" by providers using data mining and other analytic techniques. As IBM states:

> Using a unique combination of data mining capabilities and graphical reporting tools, the system can identify potentially fraudulent and abusive behavior before a claim is paid or *retrospectively analyze providers' past behaviors to flag*

*suspicious patterns.* In either case, the Fraud and Abuse Management System is designed to operate more swiftly and effectively than traditional, manual processes – sorting through tens of thousands of providers and tens of millions of claims in minutes, and then ranking providers as to their degree of potentially abusive behavior. [Emphasis added.]

380.    IBM also stated that FAMS was developed "through collaborations with insurance organizations and through deep involvement in user groups," and it has represented that FAMS has been used by numerous BCBS Entities nationwide. For example, Empire Blue Cross and Blue Shield, a wholly-owned subsidiary of Defendant Wellpoint, has stated:

One year after launching the system, Empire estimates FAMS-drive savings will exceed $4 million each year. IBM is an integral partner in our new, aggressive approach.

Similarly, Defendant HCSC makes extensive use of FAMS as part of its audit program, using seven members of its 40 member SIU staff to focus on "data mining" and fraud-detection software such as FAMS, while Defendants Highmark, Horizon and Excellus, among many other BCBS Entities, use FAMS to assist them in targeting chiropractors and other health care providers for retrospective reviews, repayment demands and forced recoupments.

381.    IBM designed FAMS to permit individual investigators or SIU personnel of the BCBS Entities and other users to manipulate the search data in such a fashion so as to permit targeted investigations of certain CPT codes and Provider billing patterns. Such targeted Provider Profiling is promoted by NHCAA.

382.    While the RICO Defendants participate in and are members and part of the Recoupment Enterprise, they also have an existence separate and distinct from this association-in-fact enterprise.

383.    The Recoupment Enterprise is an ongoing organization that engages in, and whose activities effect, interstate commerce.

384.    The Recoupment Enterprise has and continues to have an ascertainable structure

and function separate and apart from the pattern of racketeering activity in which the RICO Defendants have engaged. The members of the Recoupment Enterprise function as a structured and continuous unit, and perform roles consistent with this structure. The members of the Recoupment Enterprise performed certain legitimate and lawful activities that are not being challenged here. However, recoupment of prior payments was not legitimate when they were part of Defendants' fraudulent scheme in detriment to Plaintiffs and the Class members. The members of the Recoupment Enterprise used the Recoupment Enterprise's structure to carry out the above fraudulent and unlawful activities. In order to successfully recoup monies in the manner set forth above, Defendants needed a system that enabled them to manipulate and control current payments to Class Plaintiffs and conceal the manner in which that was done. The Recoupment Enterprise provided Defendants with that system and ability, and their control of and participation in it was necessary for the successful operation of their scheme. The purpose of the Recoupment Enterprise was to create a mechanism by which BCBS could recoup benefit payments for services, but to do so through a means that providers would be unable to challenge effectively.

385.    The Recoupment Enterprise has successfully recouped millions of dollars from Class members as a result of its operations. On June 30, 2009, the BCBSA announced that its NAFD had "recovered nearly $350 million as a result of the anti-fraud investigations in 2008." This reflected a 7-to-1 return on its investment, whereby for every $1 spent on the NAFD operations, overseeing and coordinating the efforts of the SIUs in the BCBS Entities, it recovered $7. Based on information and belief, a substantial portion of the $350 million is a result of adverse benefit determinations that are in violation of the strict regulatory requirements of ERISA.

## PREDICATE ACTS

386.    18 U.S.C. §1961(1) provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating these laws to effectuate their scheme.

**Violations of 18 U.S.C. §§ 1341 and 1343**

387.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to EOBs, correspondence, recoupment demands and denials of appeals.

388.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire and through other interstate electronic media, matter and things that include but are not limited to recoupment demands, and Defendants' requests for additional information that were communicated by facsimile.

389.    Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

390.    Defendants' misrepresentations, acts of concealment and failures to disclose were made for the purpose of deceiving Plaintiffs and the Class and obtaining their property for the

Defendants' gain.

391.    The Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

392.    As a result, Defendants obtained money and property belonging to Plaintiffs and Class members, who were injured in their business or property by Defendants' overt acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY

393.    The Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, that is, indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, the Defendants have committed numerous acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs.

394.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

395.    A few representative examples of the types of predicate acts committed by Defendants pursuant to their scheme to defraud the Plaintiffs are alleged above and will be supplemented in the Civil RICO Case Statement to be filed by Plaintiffs.

## RICO VIOLATIONS

**18 U.S.C. § 1962(c)**

396.    18 U.S.C. § 1962(c) provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprises affairs through a pattern of racketeering activity…"

397.    Through the patterns of racketeering activities outlined above, the RICO

Defendants have violated 18 U.S.C. § 1962(c), and have also conducted and participated in the

affairs of the Recoupment Enterprise.

398.    Plaintiffs have been injured as a result of the RICO Defendants' RICO violations,

including by having benefits denied based on invalid benefit denials, inappropriate recoupment

demands and improper forced recoupment through the conversion of unrelated benefit payments.

## CLASS DEFINITIONS

399.    Plaintiffs bring this action on their own behalf and on behalf of an "ERISA

Class," defined as:

> All health care providers who, from six years prior to the filing date of this action
> to its final termination ("ERISA Class Period") have provided health care services
> to patients insured under health care plans governed by ERISA which are insured
> or administered by BCBS Entities and who, after having received payments from
> BCBS Entities, have been subjected to retroactive requests for repayment of all or
> some portion of such payments based on a determination that the services were
> not Covered Services or medically necessary.

400.    Plaintiffs further bring this action against the RICO Defendants on their own

behalf and on behalf of a "RICO Class," defined as:

> All health care providers who, from four years prior to the filing date of this
> action to its final termination ("RICO Class Period") have provided health care
> services to patients insured under health care plans which are insured or
> administered by BCBS Entities and who, after having received payments from
> BCBS Entities, have been subjected to retroactive requests for repayment of all or
> some portion of such payments based on a determination that the services were
> not Covered Services or medically necessary.

401.    Plaintiffs bring claims against Defendants on their own behalf and on behalf of

the ERISA and RICO Classes (1) to enjoin Defendants from continuing to compel return of prior

payments of plan benefits; (2) to order Defendants to return to all Class members all funds, plus

interest, plus trebling of damages under RICO, that Defendants have withheld to offset the amounts demanded or that have been paid by Class members to Defendants in response to such demands; and (3) to declare that any future efforts to recoup payments for errors or mistakes in prior payments must comply with the specific requirements under ERISA for adverse benefit determinations.

## COMMON CLASS CLAIMS, ISSUES AND DEFENSES FOR THE CLASS

402.    The following common class claims, issues and defenses for the Plaintiffs and the Classes arise for the defined Class Periods:

(1)    Whether Defendants' efforts to compel recoupment of previously paid benefits as describer herein violated ERISA, or other applicable law;

(2)    Whether Defendants' determinations that the chiropractic and occupational therapy services detailed herein are excluded from coverage under the terms of its health care plans are in violation of ERISA, or other applicable law;

(3)    Whether ERISA requires each Class member to prove exhaustion or other legal reason excusing exhaustion;

(4)    Whether Defendants' actions with regard to Class members results in a waiver of any objection to the validity of any assignments that may have been given by BCBS Insureds, or whether Defendants are otherwise estopped from asserting such an objection;

(5)    Whether Class members may recover amounts repaid to Defendants or unpaid benefits and if so, the amounts they should receive;

(6)    Whether Defendants' failure to provide accurate plan documents, EOCs, SPDs and other information upon request entitles Class members to any relief;

(7)    Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

(8)    Whether Defendants' claims review procedures comply with ERISA;

(9)    The standard of review applicable to review Defendants' benefit determinations;

(10)    Whether Defendants' forced recoupment, as detailed herein, is in violation of ERISA as it relates to restitution;

132

(11)   Whether Defendants' EOBs and other communications with BCBS Insureds or Plaintiffs and Class members violated ERISA or other applicable law;

(12)   Whether the RICO Defendants' conduct as alleged herein constitutes a violation of RICO; and

(13)   What the applicable statute of limitations periods are for the claims of Class members.

## ADDITIONAL CLASS ACTION ALLEGATIONS

403.   The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the Classes consist of thousands of healthcare providers in commercial group health plans insured, offered, or administered by Defendants. The precise number of members in the Classes is within Defendants' custody and control. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Classes. Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

404.   The Individual Plaintiffs' claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Defendants have breached their statutory and contractual obligations to the Individual Plaintiffs and the Classes through and by uniform patterns or practices as described above, including but not limited to their efforts to compel repayment of prior paid benefits and their forced recoupment through conversion or withholding of unrelated benefit payments.

405.   The Individual Plaintiffs will fairly and adequately protect the interests of the members of the Classes, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA and RICO claims and have no interests antagonistic to or in conflict with those of the Classes.

For these reasons, the Individual Plaintiffs are adequate class representatives.

406.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendants.

407.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable. Further, because the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Defendants maintain computerized claims information that enables them to calculate unpaid amounts resulting from their benefit determinations for Class members. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## COUNT I

### CLAIM FOR BENEFITS UNDER
### GROUP PLANS GOVERNED BY ERISA
**(on behalf of Plaintiffs and the ERISA Class)**

408.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth therein. Count I is brought under 29 U.S.C. § 1132(a)(1)(B).

409.    Defendants must pay benefits to BCBS Insureds, or to their providers pursuant to assignments, that are insured, funded or administered by Defendants pursuant to the terms of their ERISA plans.

410.    To the extent Defendants have determined that charges submitted for reimbursement by Plaintiffs and the members of the ERISA Class are no longer Covered Services under its health care plans, such a finding is an "adverse benefit determination" under ERISA.

411.    Defendants have sought to compel the Individual Plaintiffs and the members of the ERISA Class to repay previously paid benefits without complying with terms and conditions required by ERISA for dealing with adverse benefit determinations.

412.    Defendants violated their legal obligations under ERISA and federal common law each time they denied benefits as detailed herein, including through their correspondence demanding repayment of benefits previously paid, without complying with ERISA's requirements for dealing with adverse benefit determinations.

413.    Defendants' lack of disclosure to the BCBS Insureds and Individual Plaintiffs relating to adverse benefit determinations, as required under ERISA, violated their legal obligations.

414.    Due to Defendants' failure to comply with ERISA in pursuing recoupment efforts, they are estopped from pursuing such efforts and, further, are required to repay any members of the ERISA Class who have paid sums to Defendants in response to its recoupment demands or whose benefits have been unilaterally withheld by Defendants in order to apply them to sums Defendants demanded be repaid.

415.    ERISA precludes Defendants' recoupment efforts, as they do not satisfy the requirements for equitable restitution.

416.    Due to BCBS's failure to comply with ERISA in making the above-detailed adverse benefit determinations, BCBS is estopped from making such findings and precluded from denying coverage without complying with ERISA.

417.    Defendants violated ERISA, section 502, by unlawfully discriminating against the Individual Plaintiffs and the Class members who sought to exercise their rights under ERISA, including by bringing the lawsuit against Plaintiffs Korsen and Barlow in Rhode Island, as

detailed herein.

418.    The Individual Plaintiffs, on their own behalf and on behalf of the members of the Classes, seek unpaid benefits, interest back to the date their claims were originally submitted to Defendants, withdrawal of all claims for rescission or other relief against the Individual Plaintiffs or members of the Classes, and repayment of any amounts paid by or withheld from members of the Classes in response to any such letters or demands. All Plaintiffs also sue for declaratory and injunctive relief related to enforcement of plan terms, and to clarify rights to future benefits. They further request attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendants.

**COUNT II**

**FAILURE TO PROVIDE FULL & FAIR REVIEW
AS REQUIRED BY ERISA**
**(on behalf of Plaintiffs and the ERISA Class)**

419.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.

420.    Defendants functioned and continue to function as the "plan administrator" within the meaning of such term under ERISA. During the Class Period, the Individual Plaintiffs – as assignees of the ERISA benefits payable to their patients – were entitled to receive a "full and fair review" of all claims denied by Defendants, and entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

421.    Although Defendants were obligated to do so, they failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for the Individual Plaintiffs and the Classes by making claims denials that are inconsistent with or unauthorized by the terms of Members' EOCs and SPDs, as well as by failing to disclose their methodology and other critical information relating to such claims

136

denials.

422.    By engaging in the conduct described herein, including using improper, invalid and undisclosed policies relating to the specified health care services, making baseless threats regarding overpayments and the pursuit of litigation, withholding payments for properly submitted claims to apply toward the demanded amount, and for effecting other systematic benefit reductions without disclosure or authority under the plans, Defendants failed to comply with ERISA, its regulations and federal common law.

423.    As a result, Defendants failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to its Insureds.

424.    Appeals of the Individual Plaintiffs and members of the Classes should be deemed exhausted or excused by virtue, *inter alia*, of Defendants' numerous procedural and substantive violations.

425.    The failed appeals of the Individual Plaintiffs, as alleged in this Complaint, show the futility of exhausting appeals to Defendants. Exhaustion of internal appeals under ERISA should, therefore, be deemed to be futile.

426.    During the Class Period, the Individual Plaintiffs and the members of the Classes have been harmed by Defendants' failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by their failure to disclose relevant information in violation of ERISA and the federal common law. All Plaintiffs and the members of the Classes are also entitled to injunctive and declaratory relief to remedy Defendants' continuing violation of these provisions.

## COUNT III

## <u>VIOLATIONS OF RICO 18 U.S.C. § 1962(c)</u>
### (On Behalf of Plaintiffs and the RICO Class against the RICO Defendants)

427.    The allegations contained in this Complaint are realleged and incorporated as if

fully set forth herein. This claim is asserted by all Plaintiffs on behalf of themselves and the members of the RICO Class against the RICO Defendants.

428.    The Individual Plaintiffs and the RICO Class have standing to pursue these claims on their own behalf and as assignees of their patients' benefits claims, and the Association Plaintiffs have standing on their own behalf, and due to their direct injury as a result of the RICO Defendants' actions as alleged herein.

429.    At all relevant times, each RICO Defendant was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

430.    At all relevant times, and as described in this Complaint, Defendants carried out their recoupment scheme in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of BCBSA, the other named BCBS Entities, NHCAA and IBM (the "Recoupment Enterprise").

431.    At all relevant times, the Recoupment Enterprise was engaged in, and its activities effected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

432.    As described herein, the Recoupment Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which the RICO Defendants have engaged. In addition, the members of the Recoupment Enterprise function as a structured and continuous unit, and perform roles consistent with this structure. The members of the Recoupment Enterprise perform certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by Defendants, which was done for many claims lawfully and without resort to unlawful practices. However, the recoupment practices alleged herein, whereby the RICO Defendants made retroactive adverse benefit determinations

under the terms and conditions of their health care plans and then pressured Class members to make payments or forcibly recouped such payments, without providing any valid appeals procedures or other due process protections were not legitimate and are in violation of law. Aside from legitimate activities carried out by the members of the Recoupment Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Complaint including, but not limited to, forcibly recouping from Plaintiffs and Class members payments made for valid and appropriate health care services.

433.    The purpose of the Recoupment Enterprise was to create a mechanism by which Defendants could enhance their profits by stealing funds from providers, even when such funds had been paid to providers originally by employers in self-funded plans. They did so in a fashion designed to discourage opposition and to avoid the obligations and duties Defendants otherwise were required to comply with under ERISA. Through their roles in the Recoupment Enterprise, each of the RICO Defendants benefits directly by obtaining funds that did not belong to it.

434.    Through their wrongful conduct as alleged herein, the RICO Defendants, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

435.    The RICO Defendants, acting through officers, agents, employees and affiliates, have committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continue to commit such predicate acts, in furtherance of their recoupment scheme, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

(a)    by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid recoupment demand and denials of appeals, and EOBs which report that benefits have been paid when, in fact, they have been withheld from Class members, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b)    by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false benefit determinations or denials and related explanation of such determinations, by means of telephone, facsimile, and the Internet, in interstate commerce, for the purpose of effectuating the above-described false recoupment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

436.    In furtherance of its recoupment scheme, the RICO Defendants, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional improper recoupments by delivering and/or receiving materials, including EOCs and SPDs, EOBs, appeal determinations, and other materials necessary to carry out the scheme to defraud Plaintiffs and other Class members.

437.    The foregoing communications via U.S. mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's adverse benefit determinations, and/or otherwise were incident to an essential part of the RICO Defendants' scheme to defraud described in this Complaint. Further, they were used to provide the recoupment scheme with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the recoupment scheme, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

438.    The misrepresentations and omissions in these materials have included and include those set forth previously in this Complaint.

439.    Each such use of the U.S. Mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act.

440.    The above-described acts of mail and wire fraud are related because they each involve common members, common claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitute the usual practice of the RICO Defendants such that they amount to and pose a threat of continued racketeering activity. The RICO Defendants' scheme to defraud is open-ended and not inherently terminable.

441.    The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs, and the members of the RICO Class, against whom the RICO Defendants have improperly recouped funds.

442.    The Individual Plaintiffs and Members of the RICO Class were injured by reason of the RICO Defendants' RICO violations because they directly and immediately were underpaid benefits due to the recoupment scheme. The RICO Defendants further deprived them of the knowledge necessary to challenge their underpayments or recoupments. The Association Plaintiffs were injured as a result of the resources they had to expend in assisting their members who were injured as a result of the RICO Defendants' misconduct, as detailed herein. Plaintiffs' injuries were proximately caused by the RICO Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of the RICO Defendants' RICO violations (and commission of underlying predicate acts) and, but for the RICO Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

443.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and the

members of the RICO Class are entitled to recover threefold their damages, costs and attorneys' fees from the RICO Defendants and other appropriate relief.

## COUNT IV

### VIOLATIONS OF RICO 18 U.S.C. § 1962(c)
**(on behalf of Plaintiffs and the members of
the RICO Class who are also members of the
ERISA Class against the RICO Defendants)**

444.     The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.

445.     This claim for relief arises under 18 U.S.C. § 1964(c).

446.     As set forth above, the RICO Defendants violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Recoupment Enterprise through a pattern of racketeering.

447.     Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under    . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(1)(B). Section 664 of Title 18 provides:

**Theft or embezzlement from employee benefit plan**
      Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

448.     Each of the Defendants' healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision of title I of the Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001, *et seq.*, is included in this Count, including Plaintiffs' plans.

449.     Each of the Defendants' healthcare plans that are subject to ERISA is funded by

insurance coverage Defendants provide or administer. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

450.    The governing plan documents relating to the BCBS Insureds for whom the Individual Plaintiffs and the other Class members have provided health care services warrant that all benefits due under the plans will be paid. By improperly withholding payments, and converting benefits otherwise due to apply toward an invalid alleged debt relating to other, prior services and unrelated BCBS Insureds, the RICO Defendants intentionally caused the Individual Plaintiffs and members of the RICO Class who were **also** members of the ERISA class to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

451.    For fully insured health care plans, where the RICO Defendants both administered the plans and paid the benefits from their own assets, the RICO Defendants benefited from the conversion of assets from their ERISA plans. Whereas these assets should have been held by the RICO Defendants in their fiduciary capacity under ERISA, and paid to their Insureds, the RICO Defendants improperly withheld such funds and maintained them as part of their own assets for the RICO Defendants' own benefit. For self-funded health care plans, the RICO Defendants improperly converted funds from those plans into their own assets, while misrepresenting that they had been paid to BCBS Insureds or their providers.

452.    Defendants acted with specific intent to deprive the Individual Plaintiffs and ERISA Class members of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them by the Individual Plaintiffs and ERISA Class members and the insurers whose plans they were administering.

453.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for the RICO Defendants' direct or indirect benefit.

454.    In furtherance of their fraudulent recoupment scheme, as described herein, the RICO Defendants, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing benefit determinations, appeal determinations, overpayment actions, preauthorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false recoupment scheme.

455.    The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the fraudulent recoupment scheme. They were used to provide the fraudulent recoupment scheme with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaint of the false payment schemes, thereby making the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place. The communications also had the design and effect of preventing a meaningful evaluation and review of the RICO Defendants' recoupment demands and forced recoupments.

456.    Each use by the RICO Defendants of the U.S. Mail and interstate wire facilities constitutes a separate and distinct predicate act of racketeering activity.

457.    The above-described acts of conversion of employee benefit plan funds, and mail

and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of the RICO Defendants such that they amount to and pose a threat of continued racketeering activity.

458.    The purpose of the RICO Defendants' fraudulent recoupment scheme was to recoup improperly the guaranteed benefits to which the Individual Plaintiffs and RICO class members who were also ERISA Class members are entitled to under health group plans, and convert those withheld funds for the RICO Defendants' own direct or indirect financial gain. They created an appearance of regularity and legitimacy by providing false and incomplete information to the Individual Plaintiffs and RICO class members who were also ERISA Class members, in order to increase revenue through their plan and claims administration business.

459.    The direct and intended victims of the pattern of racketeering activity described previously herein are the Individual Plaintiffs and RICO class members who were also ERISA Class members, who the RICO Defendants deprived of the complete guaranteed benefits to which they are entitled for providing health care services to BCBS Insureds.

460.    The RICO Defendants' RICO violations injured the Individual Plaintiffs and RICO class members who were also ERISA Class members by depriving them of or recouping millions of dollars in guaranteed benefits on their claims for reimbursement, as well as the knowledge necessary to challenge the false and manipulative retroactive adverse benefit determinations. Their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of the RICO Defendants' RICO violations (and commission of underlying predicate acts) and, but for

the RICO Defendants' RICO violations (and commission of underlying predicate acts), Plaintiffs and RICO class members who were also ERISA Class members would not have suffered the injuries suffered by them.

461.    As a result of their misconduct, the RICO Defendants are liable to the Individual Plaintiffs and RICO class members who were also ERISA Class members in an amount to be determined at trial.

462.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), the Individual Plaintiffs and RICO class members who were also ERISA Class members are entitled to recover threefold their damages, and costs and attorneys' fees from the RICO Defendants.

## COUNT V

## DECLARATORY AND INJUNCTIVE RELIEF UNDER 18 U.S.C. § 1964(a)

463.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.

464.    This claim arises under 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962, and under 28 U.S.C. § 2201, which authorizes associated declaratory relief.

465.    As set forth in Counts III and IV, the RICO Defendants violated 18 U.S.C. § 1962(c) and will continue to do so in the future.

466.    A money judgment in this case will only compensate Plaintiffs and Class members for past losses. It will not stop the RICO Defendants from continuing to confiscate the money earned by, and necessary to maintain the medical practices of, the Individual Plaintiffs and Class members.

467.    No individual provider has a practical or adequate remedy, either administratively or at law, to recover these future losses.

468.    Where multiple lawsuits are required to redress repeated statutory violations, breaches of contract or other wrongs, there is no adequate remedy at law and irreparable harm exists.

469.    Enjoining the RICO Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate as Plaintiffs have no adequate remedy at law, and will, as set forth above, suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

**COUNT VI**

**<u>EQUITABLE RELIEF</u>**

470.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.

471.    Defendants have issued demand letters to the Individual Plaintiffs and other Class members seeking to compel repayment of previously paid benefits, and have forcibly recouped benefits from unrelated claims to apply toward the alleged overpayment, without any authority or validation. In so doing, Defendants have failed to comply with the terms and conditions of its healthcare care plans, both those under ERISA and otherwise, with regard to making adverse benefit determinations.

472.    Defendants have no legal basis upon which to pursue recoupment from the Plaintiffs and other Class members, but are merely seeking to coerce payments for after-the-fact changes in policy by Defendants.

473.    Equity demands that Defendants' recoupment efforts be enjoined. The Individual Plaintiffs and other Class members have previously accepted in good faith benefit payments from Defendants and have foregone pursuing payments of those amounts from patients who are BCBS Insureds. Because of Defendants' after-the-fact adverse benefit determinations, the ability

of Plaintiffs and other Class members to obtain payment from patients who are BCBS Insureds for the amounts Defendants now seek to recoup has been severely prejudiced.

474.    Plaintiffs seek appropriate declaratory and injunctive relief to enjoin Defendants from pursuing their effort to coerce recoupment and, further, to order Defendants to return any funds they have received or withheld from Individual Plaintiffs and members of the Classes as a result of their recoupment efforts.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

A.    Certifying the Classes, as set forth in this Complaint, and appointing the Individual Plaintiffs Class representatives for the respective Classes.

B.    Declaring that Defendants have breached the terms of their EOCs and SPDs and awarding unpaid benefits to the Individual Plaintiffs and the members of the Classes, as well as awarding injunctive and declaratory relief to prevent Defendants' continuing actions detailed herein that are undisclosed and unauthorized by EOCs and SPDs;

C.    Declaring that Defendants have failed to provide a "full and fair review" to the Individual Plaintiffs and the Class members under 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to ensure compliance with ERISA and its regulations;

D.    Declaring that Defendants have violated their disclosure and related obligations under ERISA and federal common law, for which Plaintiffs and Class members are entitled to injunctive, declaratory and other equitable relief;

E.    Declaring that Defendants have violated federal claims procedures, and awarding declaratory and injunctive relief to remedy such violations;

F.    Ordering Defendants to recalculate and issue unpaid benefits to the Individual

Plaintiffs and members of the Classes that were underpaid as a result of Defendants' actions as detailed herein, with interest;

G.      Enjoining Defendants from continuing to pursue their recoupment efforts as detailed herein, and ordering them to pay proper benefits in the form of a return of any sums previously paid by or withheld from Plaintiffs in response to Defendants' recoupment efforts;

H.      Awarding the Individual Plaintiffs and the members of the RICO Class compensatory damages, trebled where required by law;

I.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable counsel fees, in amounts to be determined by the Court;

J.      Awarding interest from the date of initial benefit reductions for the Individual Plaintiffs and members of the Classes for all unpaid amounts; and

K.      Granting such other and further relief as is just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated:   September 10, 2009

Respectfully submitted,


/s/ Patrick V. Dahlstrom
Patrick V. Dahlstrom
POMERANTZ HAUDEK
GROSSMAN & GROSS LLP
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
312.377.1181
312.377.1184 (fax)

D. Brian Hufford
Robert J. Axelrod
Susan J. Weiswasser
POMERANTZ HAUDEK
GROSSMAN & GROSS LLP
100 Park Avenue
New York, New York 10017
212.661.1100
212.661.1373 (fax)

Vincent N. Buttaci
John W. Leardi
BUTTACI & LEARDI, LLC
212 Carnegie Center, Suite 206
Princeton, New Jersey 08540
609.919.6311
609.524.2575 (fax)

*Co-Lead Counsel for Plaintiffs
 and the Putative Classes*

Diane M. Frantell
LAW OFFICES OF DIANE M. FRANTELL
313 Hampton Court, Suite 200
Lake Villa, IL 60046
847.265.0707

Andrew S. Friedman
BONNETT, FAIRBOURN
FRIEDMAN & BALINT, P.C.
2901 N. Central Avenue, Suite #1000
Phoenix, AZ 85012
602.274.1100

James E. Cecchi
CARELLA BYRNE BAIN GILFILLAN
CECCHI STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, NJ 07068
973.994.1700

Jonathan W. Cuneo
David W. Stanley
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
202.789.3960

Michael C. Dodge
GLAST, PHILLIPS & MURRAY, P.C.
2200 One Galleria Tower
13355 Noel Road, L.B. 48
Dallas, Texas 75240-1518
972.419.8300

Bruce D. Greenberg
LITE DEPALMA GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102
973.623.3000

Christopher M. Burke
SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, CA 92101
619.233.4565

Joseph P. Guglielmo
SCOTT + SCOTT LLP
29 West 57th Street, 14th Floor
New York, NY 10019
212.223.6444

*Counsel for Plaintiffs*