IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PENNSYLVANIA CHIROPRACTIC ASSOCIATION, NEW YORK CHIROPRACTIC COUNCIL, ASSOCIATION OF NEW JERSEY CHIROPRACTORS, FLORIDA CHIROPRACTIC ASSOCIATION and CALIFORNIA CHIROPRACTIC ASSOCIATION, on their own behalf and in a representational capacity on behalf of their members, and GREGORY T. KUHLMAN, D.C., JAY KORSEN, D.C., IAN BARLOW, KENDALL GEARHART, D.C., JEFFREY P. LERI, D.C., MICHELLE M. ASKAR, D.C., MARK BARNARD, D.C., BARRY A. WAHNER, D.C., ANTHONY FAVA, D.C., DAVID R. BARBER, D.C., RYAN S. FORD, D.C., LARRY MIGGINS, D.C., CASEY PAULSEN, D.C., DEAN RENNEKE, D.C., ANDREW RENO, D.C., PERI L. DWYER, D.C., RONALD L. YOUNG, D.C., and ERIC THOMPSON, D.C., on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 09 C 5619 |
| vs. | ) ) | |
| BLUE CROSS BLUE SHIELD ASSOCIATION, BLUE CROSS AND BLUE SHIELD OF RHODE ISLAND, BLUE CROSS AND BLUE SHIELD OF ALABAMA, ARKANSAS BLUE CROSS AND BLUE SHIELD, BLUE SHIELD OF CALIFORNIA, BLUE CROSS AND BLUE SHIELD OF FLORIDA, BLUE CROSS AND BLUE SHIELD OF GEORGIA, HEALTH CARE SERVICES CORPORATION, INDEPENDENCE BLUE CROSS, BLUE CROSS AND BLUE SHIELD OF KANSAS, CAREFIRST, INC., BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, BLUE CROSS AND BLUE SHIELD OF MICHIGAN, BLUE CROSS AND BLUE SHIELD OF MINNESOTA, BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, HORIZON BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, EXCELLUS BLUE CROSS AND BLUE SHIELD, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, HIGHMARK, INC., BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA, BLUE CROSS AND BLUE SHIELD OF TENNESSEE, PREMERA BLUE CROSS, THE REGENCE GROUP, WELLMARK, INC., and WELLPOINT, INC., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case are chiropractic physicians who have provided services to members of health care plans insured or administered by the defendants, and professional associations whose members are chiropractic physicians. The defendants are Blue Cross and Blue Shield of America (BCBSA) and individual Blue Cross and Blue Shield entities (BCBS entities). BCBSA is a national umbrella organization that facilitates the activities of individual BCBS entities. Individual BCBS entities insure and administer health care plans to Blue Cross and Blue Shield customers (BCBS insureds) in various regions.

Plaintiffs' claims all concern actions they allege the defendants took to improperly take money belonging to plaintiffs. They allege that defendants would initially reimburse plaintiffs for services they provided to BCBS insureds and then sometime afterward would make a false or fraudulent determination that the payments had been in error and would demand repayment from plaintiffs. If the plaintiffs refused to return the payment as demanded, defendants would force recoupment by withholding payment on other, unrelated claims for services plaintiffs provided to other BCBS insureds. Plaintiffs contend defendants' actions violated the Racketeer

Influenced and Corrupt Organizations Act (RICO), the Employee Retirement Income Security Act (ERISA), and Florida state law (with respect to plaintiffs and defendants located in Florida). On behalf of themselves, their members, and a putative class of similarly-situated health care providers, plaintiffs seek to recover the money that they allege defendants improperly recouped from them and to enjoin defendants from engaging in similar behavior in the future.

Defendants argue that several plaintiffs have contracts with individual defendants that include agreements to submit disputes to arbitration. They have moved to compel arbitration of those plaintiffs' claims with regard to all defendants and to stay any claims by those plaintiffs until arbitration is completed. They have also moved to stay proceedings regarding all other plaintiffs pending the results of arbitration proceedings.[1] For the reasons stated below, the Court grants the motion in part and denies it in part.

## Background

BCBSA is a federation of BCBS entities that licenses the use of the BCBS name. The remaining defendants are regional BCBS entities, health care companies that have licenses from BCBSA to use the BCBS name. BCBS entities work together, with the oversight and assistance of BCBSA, to administer health care plans to people insured by BCBS entities.

A number of the plaintiffs, Drs. Kuhlman, Korsen, Gearhart, Leri, Askar, Barnard, Wahner, Fava, Barber, Ford, Miggins, Paulsen, Renneke, Reno, Dwyer, Young, and Thompson, are licensed chiropractors. Plaintiff Barlow is a licensed occupational therapist. For purposes of this decision, the Court refers to these plaintiffs collectively

---

[1] Defendants have also moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court considers that motion in a separate decision.

as the "individual plaintiffs".

During the period when the acts giving rise to plaintiffs' claims took place, each of the individual plaintiffs had a signed contract (a "provider agreement") with at least one BCBS entity in the region where the plaintiff practiced. For purposes of this decision, the Court refers to the BCBS entity with which a plaintiff entered into a provider agreement as that plaintiff's "local BCBS entity." Pursuant to these contracts, plaintiffs agreed to provide covered services to BCBS insureds at agreed-upon discounted rates, in exchange for obtaining access to BCBS insureds of all BCBS entities. Under the terms of the provider agreements, a plaintiff could provide medical services to any BCBS insured and then submit a reimbursement form to the insured's local BCBS entity, which would administer payment to that plaintiff for the services rendered to the BCBS insured.

The provider agreements limit reimbursement to "covered services," as defined in the agreements. If an individual plaintiff provided services to a BCBS insured that did not fall under the "covered services" definition, the plaintiff would not be reimbursed for those services. Typically, plaintiffs have patients sign agreements in advance of treatment stating that it is the responsibility of the patient to pay for any services that are not reimbursed by the insurer.

Plaintiffs' claims stem from what they allege was a practice of defendants to improperly recoup money that had previously been paid to plaintiffs for medical services they had provided to BCBS insureds. Plaintiffs allege that defendants would pay for services and then later would make a false or fraudulent determination that individual plaintiffs had been overpaid for those services. Defendants would demand that

individual plaintiffs immediately repay the supposedly overpaid amounts but would not provide information about which claims, services, or patients were allegedly the subject of overpayment.

Plaintiffs allege that when defendants made these repayment demands, they often offered no appeal process at all.  When an appeal process was available, plaintiffs allege defendants refused to provide specific details about which patients, claims, and plans were affected.  This, plaintiffs allege, made it difficult or impossible for them to challenge the reimbursement demands effectively.  Plaintiffs further allege that defendants threatened to, and in some cases actually did, force individual plaintiffs to repay the amounts they allegedly owed.  Defendants did this by withholding payments to which plaintiffs were otherwise entitled for unrelated claims they had submitted on behalf of other BCBS insureds.

Defendants contend that several individual plaintiffs – Drs. Paulsen, Renneke, Miggins, Gearhart, Ford, Barber, Thompson and Young – signed provider agreements that contained mandatory arbitration or mediation provisions that require the parties to arbitrate or mediate disputes arising out of those agreements.  Defendants have moved to compel arbitration and stay the proceedings in this case pending the outcome of the arbitration.  For the reasons stated below, the Court grants the motion to compel as to all but one of the plaintiffs in question and grants the motion to stay as to those same plaintiffs but denies the motion to stay as to the claims of plaintiffs who have not signed binding arbitration agreements.

## Discussion

### A. The arbitration agreements

The Federal Arbitration Act declares that as a matter of federal law, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a presumption in favor of arbitrability: "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

When one party moves to compel arbitration, a court's first task "is to determine whether the parties agreed to arbitrate that dispute." *Id*. A district court may compel arbitration if there is "a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, [and] a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts. Inds., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). The question of whether a particular issue is subject to arbitration is a matter of contract interpretation. *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999). To evaluate the motion to compel, therefore, the Court must examine the language of the contracts between the defendants and those plaintiffs whose claims defendants contend are subject to binding arbitration agreements.

#### 1. "Arising out of or relating to" agreements

Arbitration clauses in contracts often contain language that mandates arbitration for any dispute "arising out of or relating to" the contract. The Seventh Circuit has held that arbitration clauses that contain this language are "broad" and "necessarily create a presumption of arbitrability." *Id. at 910.* The contracts that plaintiffs Renneke, Young,

Barber, Gearhart, and Thompson signed with their local BCBS entities contain this broad "arising out of or related to" language:

- Renneke: "The parties agree that any dispute or controversy which arises on or after the effective date of this Agreement *arising out of or related to* this Agreement that cannot be resolved by other means will be settled by mandatory binding arbitration in Minneapolis, Minnesota." Defs.' Mem. In Supp. of Mot. to Compel Arbitration (Docket No. 132), Ex. A (emphasis added).

- Young: Any dispute *relating to or arising out of* the contracting provider agreement and/or BCBSKS' policies and procedures applicable to such agreement, and that is not or cannot be resolved according to the appeal procedures of this Policy Memo, shall be resolved by binding arbitration." *Id.*, Ex. 5 (emphasis added).

- Barber, Gearhart, and Thompson:[2] "Except for disputes related to claims of provider medical malpractice or to termination without cause or as otherwise provided herein, if any dispute *arises out of or relates to* this Agreement, provider shall follow Anthem's Provider Appeal procedure. In the event such procedure fails to resolve the dispute, Anthem and provider shall meet to attempt to resolve the dispute. If such efforts are unsuccessful, the complaining party shall provide written notice to the other party describing the dispute within twenty (20) days of the meeting. The dispute will be resolved through arbitration." *Id.*, Exs. 6, 8 & 9 (emphasis added).

In *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639 (7th Cir. 1993), the Seventh Circuit noted that "any dispute between contracting parties that is in any way connected with their contract could be said to 'arise out of' their agreement and thus be subject to arbitration." *Id.* at 642 (citing *Schacht v. Beacon Ins. Co.*, 742 F.2d 386, 391 (7th Cir. 1984)). "At the very least," the court continued, "an 'arising out of' arbitration clause would 'arguably cover' such disputes and, under our cases, that is all that is needed to trigger arbitration." *Id.*

Defendants contend that the plaintiffs' RICO and ERISA claims are "connected

---

[2] Though Barber, Gearhart and Thompson practice in different states, their provider agreements were all with affiliates of Anthem Blue Cross and Blue Shield (subsidiaries of defendant WellPoint), and the agreements they signed contained identical arbitration clauses.

with" plaintiffs' contracts with the BCBS entities and are thus subject to arbitration. They contend that the repayment demands and recoupments were made for a variety of reasons, all of which necessarily involve the terms of the defendants' contracts with the plaintiffs. These include: the individual plaintiff used the wrong code when billing for the service provided; the patient was no longer covered by the insurance plan when the service was performed; the patient's claims were covered by another insurer; or the individual plaintiff mischaracterized the service provided as "mechanical traction" when it was not, in an effort to bring the service under the umbrella of "covered services." All of these reasons, defendants argue, arise out of or relate to the plaintiffs' provider agreements, and therefore their claims must be arbitrated.

Plaintiffs argue that despite what defendants say, the repayment demands and subsequent recoupment efforts actually amount to "adverse benefit determinations" – that is, *post hoc* determinations that the services provided were not covered by the terms of the patient's insurance plan. Under ERISA, patients (and, by assignment, their physicians) have certain rights when an insurer makes an adverse benefit determination. These rights include adequate notice and opportunity for a full and fair review of an adverse benefits determination. Plaintiffs allege defendants did not comply with these procedures and that this practice of making *post hoc* adverse benefit determinations without an adequate appeal process violates ERISA, 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. §1132(a)(3). Plaintiffs argue that because "their claims . . . [are] based on their standing, pursuant to assignment from patients, to challenge Defendants' Adverse Benefit Determinations," they do not arise out of or relate to the terms of their provider agreements, and therefore the arbitration provisions do not

apply.  Pls.' Mem. in Resp. to Mot. to Compel Arbitration (Docket No. 145) at 5.

The Court agrees with the defendants that the plaintiffs' claims at least arguably arise out of or relate to the provider agreements they signed with defendants.  Given the broad policy in favor of arbitrability and the Seventh Circuit's instruction that all that is needed to trigger arbitration is a clause that "arguably cover[s]" the disputes at hand, the Court finds that these five plaintiffs should be compelled to arbitrate their claims.[3]  *Sweet Dreams Unlimited*, 1 F.3d at 642.

2. Other arbitration agreements of individual plaintiffs

Defendants identify two other individual plaintiffs whose claims they contend must be arbitrated:  Drs. Ford and Miggins.  The arbitration provisions of the contracts of these two plaintiffs do not contain the broad "arising out of or related to" language of the other five.  The Court therefore considers their contracts separately.

The arbitration provision in Ford's contract reads as follows:

> Any dispute between the parties to this Agreement to enforce or interpret the provisions of this Agreement shall be submitted to arbitration for resolution. Such arbitration shall be (I) final and binding, (ii) conducted in St. Louis, Missouri before an arbitrator selected from the American Arbitration Association, and (iii) conducted in accordance with the American Arbitration Association's then current commercial arbitration rules and regulations.

Docket No. 132, Ex. 7.  By terms of this contract, Ford agreed arbitrate only those disputes "to enforce or interpret the provisions of [the] Agreement."  Ford contends that this does not encompass his claims, which arise under ERISA and RICO.  He asserts that his ERISA and RICO claims "would be valid regardless of the existence of the contracts with Defendants."  Docket No. 145 at 5.

---

[3] Whether these plaintiffs may be compelled to arbitrate their claims against all defendants or only those with whom they had signed agreements is an issue the Court takes up in the next section.

In the complaint, Ford concedes that if his claims involved disputes about the amount he was owed for providing services, they would be governed by the terms of his provider agreement. Compl. ¶ 14. Defendants argue that is precisely what Ford's claims entail. Defendants argue that they recouped funds from plaintiffs based on the use of improper billing codes or fraudulent submissions for payment and that an objection to the recoupment amounts to a dispute about how much the plaintiff was owed for providing services. Ford insists that despite defendants' contentions to the contrary, defendants actually engaged in "adverse benefit determinations," which fall outside of the purview of Ford's contract. Ford argues that disputes over whether a services is a "covered service" or "medically necessary" are not subject to the terms of the contracts but are governed exclusively by ERISA. Compl. ¶ 14. Therefore, Ford maintains, his is not a claim "to enforce or interpret" the terms of their agreement, and the arbitration provision does not apply.

The parties appear to disagree sincerely about whether the plaintiffs' claims involve the terms of their contracts with the BCBS entities (which include provisions for recoupment of benefits and what happens in case of billing errors or fraud) or whether those disputes fall outside the purview of the contract and are governed only by RICO and ERISA. The Court "need not decide which interpretation is correct." *Schacht*, 742 F.2d at 391. If "the arbitration clause arguably covers the dispute" about the forced recoupment, that "terminates [the] inquiry" and the Court should compel arbitration. *Id.* The Court concludes that the arbitration clause arguably covers the disputes Ford has asserted.

The arbitration provision in Ford's provider agreement applies any dispute "to

enforce or interpret the provisions of this Agreement." Docket No. 132, Ex 7. The complaint itself refers to several provisions of Ford's agreement with Anthem (his local BCBS entity) and asks the Court to interpret those provisions in Ford's favor. For example, the complaint alleges that "under Dr. Ford's Par contract with Anthem he must submit any claims for benefits within 180 days, or they will be denied." Compl. ¶ 299. Based on this provision, plaintiffs argue that the provider agreement should be read to impose a similar time limitation on any recoupment demand by Anthem. *Id.* The complaint also alleges that Ford only provided services to Anthem patients after first checking with Anthem, per the terms of the provider agreement, to ensure the patient was covered. *Id.* ¶ 295. Therefore, Ford argues, Anthem should not be permitted to recoup funds it paid to Ford for treating the patient, because Ford followed the procedure for determining coverage before providing services. *Id.*

The Court concludes that these references to Ford's agreement with WellPoint (doing business as Anthem) constitute a tacit acknowledgment that his claims involve the terms of his provider agreement. This, along with defendants' insistence that this dispute is governed by the recoupment terms included in Ford's contract, renders the dispute "arguably" covered by the terms of the arbitration agreement. The Court concludes that Ford's claims are subject to arbitration and grants the motion to compel arbitration regarding his claims.

Miggins' contract provides as follows:

If, after the exhaustion of the applicable provider appeals process, either party is dissatisfied with the outcome of the internal provider appeal and wants to further dispute the issue(s), the disputed issue(s) must be submitted to one or more of the processes described below. Any prerequisites to initiating one of the processes described below must be met before the process can be initiated. Alternative dispute resolution, unless so elected by the Clinic as provided herein,

is not required to the exclusion of judicial remedies.

Docket No. 132, Ex. 3. This provision applies to "disputes that may arise between the Clinic and the Company." *Id.* One of the processes that the contract makes available is "judicial remedy and arbitration." *Id.* The contract section on judicial remedy and arbitration states that "if, after exhausting the Company's internal provider appeals process and completing mandatory non-binding mediation, either party is still dissatisfied with the outcome and wants to further dispute the issues," the party may elect to resolve the disputed issue through *either* judicial remedy or binding arbitration. *Id.* (emphasis added).

Taken together, the terms of Miggins' contract provide that for any "dispute that may arise between the Clinic and the Company," he must exhaust provider appeals and then submit to "mandatory non-binding mediation" before he can pursue a judicial remedy. The contract also states that "alternative dispute resolution, unless so elected by the Clinic as provided herein, is not required to the exclusion of judicial remedies." *Id.* Nothing in Miggins' contract suggests that he elected to forego the availability of a judicial remedy. Because the contract expressly says that the alternative dispute resolution mechanisms described are "not required to the exclusion of judicial remedies," *id.*, the Court finds that this does not constitute a binding agreement to arbitrate all disputes. Therefore, the Court denies the motion to compel arbitration with regard to Miggins.[4]

---

[4] The defendants also argue that the arbitration agreements signed by Paulsen, Renneke, and Miggins prohibit them from pursuing claims on a class basis. The Court has already determined that Paulsen and Renneke must arbitrate their claims, and thus need not consider this argument as it concerns them. With regard to Miggins, the prohibition on class claims depends on an enforceable agreement to arbitrate the

(continued...)

3.   California Chiropractic Association

Several plaintiffs in this case are professional associations that bring claims on behalf of their members. These association plaintiffs allege that their members were subjected to repayment demands and forced recoupments similar to those experienced by the individual plaintiffs.[5] Defendants allege that one of these association plaintiffs, the California Chiropractic Association (CCA), must arbitrate its claims. The defendants argue that provider agreements with Blue Cross and Blue Shield of California (BCBSC) (the BCBS entity with which CCA's members would contract) contain a binding arbitration provision, and therefore CCA should be bound by the same arbitration requirements that would apply if its members sued individually.

In support of this argument, defendants attach an excerpt from a document entitled "Provider Agreement: Allied & Ancillary (Fee for Service)," which presumably contains the boilerplate provisions of the provider agreements that defendants contend would bind CCA's members. Docket No. 132, Ex. 10. The document states:

> If any dispute, controversy, or misunderstanding (other than a claim of medical malpractice or any other dispute with a Member) arises between the parties to this Agreement which exceeds the jurisdiction of Small Claims Court, which was not resolved in the Provider Appeal Resolution Process set forth in Paragraph 8.1, and which may directly or indirectly concern or involve any term, covenant, or condition hereof, the parties shall settle the dispute by final and binding arbitration in San Francisco, Los Angeles, San Diego, or Sacramento, California, whichever city is closest to Provider. . . . The Arbitration decision shall be

---

[4](...continued)
dispute. *Livingston v. Assoc. Fin., Inc.*, 339 F.3d 553, 558-59 (7th Cir. 2003). Because the Court has determined that the arbitration agreement in Miggins' provider agreement does not compel arbitration of his claims in this case, the Court need not consider this argument separately.

[5] The association plaintiffs also contend they have standing to bring claims for injuries they allege they suffered themselves, but the Court has dismissed their individual claims in a separate decision.

binding on both parties.

*Id*. Defendants contend that "an association is bound by the same obligations as those it represents, including the obligation to arbitrate." Docket No. 132 at 10 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977)).

Associations suing in a representative capacity are bound by the same limitations that bind their members. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 65-66 (1997). Therefore, if an association's members are bound to arbitrate, so too is the association when it sues in a representative capacity. *See Klay v. All Defendants*, 389 F.3d 1191, 1202-03 (11th Cir. 2004) (finding that medical association was subject to same reasoning on arbitration as individual doctors; association was not bound to arbitrate because its members were not bound to arbitrate).

In support of their position, all defendants have offered is a very short excerpt of a form document. They have not shown that this document is currently in use by BCBSC or that any of CCA's members signed agreements that incorporate the document. In their response brief, however, plaintiffs do not address the arbitration motion against CCA separately from the motion against the individual plaintiffs, and they do not discuss of whether the excerpt provided in exhibit 10 applies to CCA's members. The Court deems the plaintiffs to have forfeited any argument that CCA's members did not, in fact, agree to this arbitration provision in their provider agreements. *See McHenry v. Ins. Co. of the West*, 438 F.3d 813, 817-19 (7th Cir. 2006) (holding that plaintiff forfeited argument that defendant had waived its right to compel arbitration when plaintiff failed to include the argument in its response to defendant's motion to

dismiss).

The Court therefore turns to the language of the arbitration provision to determine whether the disputes in this case fall within the bounds of the arbitration agreement. The relevant language from the BCBSC document states that any dispute that "may directly or indirectly concern or involve any term, covenant, or condition" of the agreement is subject to binding arbitration. Docket No. 132, Ex. 10. This language is very similar to the "enforce or interpret the provisions of this Agreement" language in the provider agreement signed by Ford. The Court determined above that Ford's claims were subject to arbitration, and it draws the same conclusion with regard to CCA's claims.

The Court acknowledges that its decision with regard to Ford's claims rested in part on the observation that Ford's particular claims as described in the complaint asked the Court to evaluate certain provisions of his agreement with his local BCBS entity. Because the CCA brings claims on behalf of its unnamed members, it is more difficult to evaluate whether those claims "directly or indirectly concern or involve any term, covenant, or condition" of the agreement and therefore trigger the arbitration provision.

This difficulty, however, further supports the Court's view that it is inappropriate to allow CCA to pursue claims on behalf of its members given defendants' claims that they are subject to arbitration. Though defendants call it a motion to compel arbitration, their argument could also be characterized as a contention that CCA lacks standing to bring suit on behalf of its members. Under *Hunt*, an association has standing to sue on behalf of its members if its members would otherwise have standing to sue in their own

right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt*, 432 U.S. at 343.

If, as defendants contend, at least some of CCA's members signed provider agreements that include arbitration clauses (an assertion that plaintiffs do not dispute), then the participation of individual members is required to determine whether which if any of their claims are subject arbitration, and CCA fails to satisfy the third element of the *Hunt* test. *See Davis Vision, Inc. v. Maryland Optometric Ass'n*, 187 Fed. Appx. 299, 302-03 (4th Cir. 2006) (affirming a decision by the district court that association lacked representational standing because some of its members were bound by arbitration clauses and others were not, thereby necessitating individual participation in the suit). The Court therefore concludes that CCA may not pursue claims on behalf of its individual members.[6]

## B. Scope of arbitration

As discussed above, the Court has determined that the provider agreements signed by Ford, Renneke, Young, Barber, Gearhart, Thompson, and CCA contain arbitration agreements that cover at least some of their claims. The next question is how far that obligation to arbitrate extends. The defendants urge that these plaintiffs should be compelled to arbitrate their disputes against all defendants, not only those with whom they have signed contracts.

---

[6] This ruling does not preclude CCA from seeking to pursue claims on behalf of particular members that it can show doe not have agreements to arbitrate that cover the claims in this case.

A non-signatory to an agreement to arbitrate can compel arbitration when a signatory's claims are grounded in or intertwined with claims under the agreement that subjects the signatory to arbitration. *See Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 838 (7th Cir. 1981). This doctrine recognizes that it would be unfair to allow a plaintiff to "'rely on a contract when it works to its advantage, and repudiate it when it works to [its] disadvantage.'" *Id.* at 839 (quoting *Tepper Realty Co v. Mosaic Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966)).

By plaintiffs' own description of their case, their claims against non-signatory defendants are intertwined with their claims against signatory defendants. In their ERISA claims, individual plaintiffs allege that non-signatory defendants are proper defendants because through the BlueCard program, BCBS entities other than those with which plaintiffs contract actually make adverse benefits determinations that harm plaintiffs, in violation of ERISA. In their RICO claims, plaintiffs allege that the defendants, including non-signatory defendants, manipulated the BlueCard system to improperly recoup money from plaintiffs. Plaintiffs contend that these claims apply equally to signatory and non-signatory defendants. Because plaintiffs argue that their claims against non-signatory defendants are indistinguishable from their claims against signatory defendants, they are estopped from arguing the claims are separate for purposes of avoiding arbitration. The five plaintiffs the Court has held must arbitrate their claims must do so against all defendants.

**C.     Stay of the entire case**

At the end of their brief, defendants argue that the Court should stay this entire

17

action until all arbitration or mediation proceedings are concluded. Docket No. 132 at 17. In support, defendants cite the Supreme Court's recent decision in *Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1899 (2009). In *Arthur Andersen*, the Court held that "a litigant who is not a party to the relevant arbitration agreement may invoke [a stay] if the relevant state contract law allows him to enforce the agreement." *Id*. The Court has already determined that non-signatory defendants can enforce the arbitration agreements against those plaintiffs whose claims are subject to arbitration. *Arthur Andersen* does not, however, suggest that this Court must stay the entire case, including the claims of those plaintiffs who have never agreed to arbitrate anything, simply because some other plaintiffs are being compelled to arbitrate.

The decision to stay the litigation of non-arbitrable claims is "a matter largely within the district court's discretion to control its docket." *Moses H. Cone Mem. Hosp.*, 460 U.S. 1, 20 n. 23 (1983); *see also Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997). The Court declines to exercise its discretion to stay the entire case based on its determination that the claims of a small number of individual plaintiffs are arbitrable.

## Conclusion

For the reasons stated above, the Court grants defendants' motion to compel arbitration [docket no. 126] as to plaintiffs Barber, Gearhart, Thompson, Renneke, Young, Ford, and California Chiropractic Association. These plaintiffs must arbitrate their claims against defendants. The Court denies defendants' motion to compel as to plaintiff Miggins. The Court further denies defendants' motion to stay the entire

proceeding pending the outcome of arbitration.

                                                                              _____
                                                                                MATTHEW F. KENNELLY
                                                                        United States District Judge

Date: May 17, 2010