**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENNSYLVANIA CHIROPRACTIC ASSOCIATION, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 09 C 5619** |
| **BLUE CROSS BLUE SHIELD ASSOCIATION, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY,  District Judge:

Plaintiffs have sued a number of Blue Cross and Blue Shield entities for violations of the Employee Retirement Income Security Act (ERISA) and Florida law. They have moved to certify several classes.  For the reasons stated below, the Court denies plaintiffs' motions.

**Background**

The plaintiffs in this case are chiropractic physicians, an occupational therapist, and a clinical social worker/trauma specialist who have provided services to members of health care plans insured or administered by the defendants; professional associations whose members are chiropractic physicians; and a residential treatment

1

facility.[1]  The defendants are Blue Cross and Blue Shield of America (BCBSA) and individual Blue Cross and Blue Shield entities (BCBS entities).  BCBSA is a national umbrella organization that facilitates the activities of individual BCBS entities.  Individual BCBS entities insure and administer health care plans to Blue Cross and Blue Shield customers (BCBS insureds) in various regions.

Plaintiffs allege that defendants improperly took money belonging to plaintiffs.  They allege that defendants would initially reimburse the provider plaintiffs for medical services they provided to BCBS insureds.  Sometime afterward, plaintiffs allege, defendants would make a false or fraudulent determination that the payments had been in error.  Defendants then would demand that individual plaintiffs repay the supposedly overpaid amounts immediately.  If plaintiffs refused to do so, defendants would forcibly recoup the amounts they sought by withholding payment on other, unrelated claims for services plaintiffs provided to other BCBS insureds.

Plaintiffs allege further that when defendants made these repayment demands, they typically did not provide adequate information regarding available review procedures.  Plaintiffs allege that defendants sometimes failed to offer any appeal process at all.  When an appeal process was available, plaintiffs allege, defendants refused to provide details about which patients, claims, and plans were claimed to be the subject of overpayment or "effectively ignored" plaintiffs' appeals.  Fourth Am. Compl. ¶ 18.  Plaintiffs contend that this conduct deprived them of their right to a "full

---

[1] The Court assumes familiarity with the plaintiffs' allegations in this case and will summarize them briefly here.  A more detailed recounting of the plaintiffs' allegations can be found in the Court's May 17, 2010 decision.  *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010).

and fair review" under ERISA.  29 U.S.C.  § 1133.

Plaintiffs sue on behalf of themselves and, in the case of association plaintiffs, on behalf of their members.  They also sue on behalf of a number of putative classes of similarly-situated individual plaintiffs.

Plaintiffs filed their first amended complaint on November 16, 2009.  In that complaint, plaintiffs alleged that defendants' actions violated the Racketeer Influenced and Corrupt Organizations Act (RICO), ERISA, and Florida law.  On May 17, 2010, the Court granted a motion by defendants to dismiss the RICO claims for failure to state a claim but denied defendants' request to dismiss the ERISA claims.  *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010).

Plaintiffs filed a second amended complaint on June 29, 2010.  The second amended complaint reasserted the RICO and ERISA claims from the first amended complaint.  Plaintiffs also added a claim of RICO conspiracy and an ERISA claim on behalf of a BCBS subscriber, Katherine Hopkins, and the putative class of subscribers she represented.  The Court dismissed the RICO claims as well as Hopkins's ERISA claim against WellPoint, Inc., a BCBS entity.  *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 3940694 (N.D. Ill. Oct. 6, 2010).

Plaintiffs subsequently filed a third amended complaint on January 20, 2011, a corrected third amended complaint on January 27, 2011, and a fourth amended complaint on February 17, 2011.  The corrected third amended complaint amended Hopkins' ERISA claims and added defendants with regard to those claims.

Plaintiffs assert their ERISA claims in three counts in the fourth amended

3

complaint.  In count one, plaintiffs seek to recover the unpaid benefits they allege

defendants improperly recouped.  *See* Fourth Am. Compl. ¶¶ 507–17.  Plaintiffs bring

their claim under section 502(a)(1)(B) of ERISA, which permits a plan participant or

beneficiary to bring a civil action "to recover benefits due to him under the terms of his

plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

In counts two and four, plaintiffs request injunctive and other equitable relief

under section 502(a)(3) of ERISA.  *Id.* ¶¶ 518–25, 531–35.  That provision authorizes a

plan participant, beneficiary, or fiduciary to bring a civil action "(A) to enjoin any act or

practice which violates any provision of this subchapter or the terms of the plan, or (B)

to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce

any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

In count three, certain plaintiffs allege violations of section 627.419 of the Florida

Code, which prohibits insurance plan discrimination against chiropractors.[2]  *Id.* ¶¶

526–30.  Plaintiffs Florida Chiropractic Association and Dr. Peri Dwyer (the "Florida

plaintiffs") bring this claim against defendant Blue Cross Blue Shield of Florida

---

[2] Section 627.419(4) states:

Notwithstanding any other provision of law, when any health insurance policy,
health care services plan, or other contract provides for the payment for medical
expense benefits or procedures, such policy, plan, or contract shall be construed
to include payment to a chiropractic physician who provides the medical service
benefits or procedures which are within the scope of a chiropractic physician's
license. Any limitation or condition placed upon payment to, or upon services,
diagnosis, or treatment by, any licensed physician shall apply equally to all
licensed physicians, without unfair discrimination to the usual and customary
treatment procedures of any class of physicians.

(BCBSF). BCBSF policies cover only a single physical medical modality or procedure code per patient per day and only twenty-six spinal manipulations per calendar year. The Florida plaintiffs contend that these limits discriminate against medical services provided by chiropractors in violation of section 627.419. They seek to recover withheld benefits and request an injunction against future violations.

On March 11, 2011, plaintiffs sought to certify three classes. First, they requested certification of a provider class consisting of all health care providers who had received payment from the defendants before being subject to requests for repayment or offsets. Second, plaintiffs requested certification of a subscriber class, defined as all health care subscribers who had health plans provided by defendant WellPoint and were subject to requests for repayment or received additional bills from providers who had been subject to requests for repayment. Finally, plaintiffs requested certification of a Florida chiropractic discrimination class, which consisted of Florida chiropractors who were denied payment after their patients received more than twenty-six visits in a year or more than one physical therapy modality on the same day. Plaintiffs subsequently amended the definition of their provider class to exclude members of several settlement classes in previous cases with regard to the defendants in those cases.

On December 28, 2011, the Court denied plaintiffs' motions to certify the provider class and the Florida chiropractic discrimination class. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2011 WL 6819081 (N.D. Ill. Dec. 28, 2011). The Court ruled that the provider class did not meet the requirements of any subsection of Federal Rule of Civil Procedure 23(b), though the Court indicated that it

5

was conceivable that separate classes asserting claims against particular defendants might satisfy Rule 23(b). *Id.* at *10–11. The Court also determined that the Florida chiropractic discrimination class did not meet the requirements of Rules 23(b)(1)(A) or 23(b)(2) and noted that plaintiffs did not seek to certify the class under Rule 23(b)(3). *Id.* at *12, 15. The Court deferred ruling on certification of the subscriber class until resolution of defendants' motion for summary judgment against Hopkins. *Id.* at *16.

On January 23, 2012, the Court granted defendants' motion for summary judgment against Hopkins, determining that Hopkins had not provided any evidence that defendants' recoupment of money from a health care provider deprived her of any benefits. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2012 WL 182213, at *6–7 (N.D. Ill. Jan. 23, 2012). Plaintiffs have not sought to replace Hopkins as named plaintiff for the proposed subscriber class.

Plaintiffs now seek to certify thirty-two separate classes. Six of the proposed classes are against individual BCBS entity defendants. A representative proposed definition is:

> All health care providers who, from six years prior to the filing date of this action to the class certification order date (the "Class Period"), provided health care services to patients insured under health care plans governed by ERISA and insured or administered by BCBSRI and who, after having received payments from or on behalf of BCBSRI, were subjected to retroactive requests for repayment of all or a portion of such payments and/or had subsequent payments withheld as an offset against any amounts allegedly owed.

Pls.' Mot. to Certify Blue Cross Blue Shield of Rhode Island (BCBSRI) Provider Class at 1 [docket no. 593]. The proposed definitions of the Independence Blue Cross provider class, WellPoint provider class, Blue Cross Blue Shield of Florida provider class, and

Horizon Blue Cross Blue Shield of New Jersey provider class are identical to the BCBSRI class definitions.  The proposed definition of the Highmark provider class is also the same except that it lacks the parenthetical "(the 'Class Period')."  These proposed classes exclude the members of four previous settlement classes to the extent that those classes relate to the defendants here.

Plaintiffs also propose twenty-five classes related to the defendants' BlueCard program, under which local BCBS entities (called Host Plans) process claims for the BCBS entity that administered the BCBS insured's insurance plan (called Home Plans). When a provider treats a patient who is insured by an out-of-state BCBS entity, he submits a claim for reimbursement to the host plan for the area where he treated the patient.  The host plan processes the claim and determines the amount of reimbursement due to the doctor.  The host plan then consults with the insured's home plan.  The home plan determines whether the services that were provided to the patient are "covered services" under her health insurance plan.  If the services are covered services, the home plan authorizes the host plan to pay benefits to the doctor.  Plaintiffs proposed class definition in relation to the BlueCard program is:

> All health care providers who, from six years prior to the filing date of this action to the class certification order date (the "Class Period"), provided health care services to patients insured under a health care plan governed by ERISA and insured or administered by Defendants, which health care plan (the "Control/Home Plan") was not the operative plan in the geographic area where the services were provided (the "Host/Par Plan"); and who, after having received payment from Defendants, were subjected to retroactive requests for repayment of all or a portion of such payment, and had subsequent payments withheld as an offset against amounts allegedly owed.

Pls.' Corrected Mot. to Certify BlueCard Classes at 2 [docket no. 606].  Although

7

plaintiffs provide only a single class definition, they seek certification of twenty-five separate classes, each against an individual defendant.

For both the individual defendant class actions and the BlueCard class actions, plaintiffs contend that the only relief they seek is to have the Court order the defendants to provide the ERISA-mandated notice and appeal that defendants allegedly failed to provide plaintiffs. As part of that relief, however, plaintiffs seek return of all the money paid to defendants or offset by them. They characterize return of the money as necessary to return their situation to the status quo ante, that is, to the situation as it existed before the repayment requests.

Finally, plaintiffs seek to certify a Florida discrimination class with two subclasses. The proposed definition is:

> All Doctors of Chiropractic in the state of Florida who, from six years prior to the filing date of this action to the class certification order date (Chiropractic Discrimination Class Period") provided health care services to patients insured under ERISA health care plans insured or administered by BCBS entities and who, after having treated patients for more than 26 visits, were denied payment or who, after having provided more than one physical therapy modality on the same date as chiropractic manipulation, were denied reimbursement based on a determination that the services were not Covered Services.

Pls.' Mot. to Certify Florida Discrimination Class at 1 [docket no. 587]. This definition is identical to the one the Court previously rejected.

## Discussion

A court may certify a class if the party seeking certification meets all the requirements of Federal Rule of Civil Procedure 23(a) and one of the requirements of Rule 23(b). *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Rule 23(a) requires the party seeking certification to demonstrate that the members of the class

are so numerous that joinder of all of them is impracticable (numerosity); there are

questions of law or fact common to the proposed class (commonality); the class

representative's claims are typical of the claims of the class (typicality); and the

representative will fairly and adequately represent the interests of the class (adequacy).

Fed. R. Civ. P. 23(a)(1)–(4).

Rule 23(b) sets forth four circumstances under which a class action may be

maintained.  Rule 23(b)(1)(A) permits class certification if separate actions by class

members risk "inconsistent or varying adjudications with respect to individual class

members that would establish incompatible standards of conduct for the party opposing

the class."  Rule 23(b)(1)(B) permits class certification if separate actions by class

members would, as a practical matter, be dispositive of the interests of nonparty class

members or substantially impair or impede their ability to protect their interests.  Rule

23(b)(2) permits class certification if "the party opposing the class has acted or refused

to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole."  Finally,

Rule 23(b)(3) permits class certification if "questions of law or fact common to class

members predominate over any questions affecting only individual members" and class

resolution is "superior to other available methods for fairly and efficiently adjudicating

the controversy."

Plaintiffs bear the burden of proving they are entitled to class certification.

*Oshana*, 472 F.3d at 513.  The Court is not limited to the allegations in plaintiffs'

complaint when assessing whether to certify a class but instead "should make whatever

factual and legal inquiries are necessary under Rule 23."  *Szabo v. Bridgeport Machs.,*

*Inc.*, 249 F.3d 672, 675–76 (7th Cir. 2001); *accord Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

## A.     Provider classes

Plaintiffs seek to certify thirty-one classes against providers regarding retroactive demands for repayment of funds, six that include all providers who were subject to retroactive demands by particular defendants and twenty-five that include those providers who received retroactive demands for repayment when a defendant was the home plan under the BlueCard program.  Plaintiffs contend that these classes satisfy all the requirements of Rule 23(a) and the requirements of Rule 23(b)(1)(A), (b)(2), and (b)(3).

### 1.     Rule 23(b)(3)

As stated above, a court may certify a class under Rule 23(b)(3) if common questions predominate over individual factual and legal questions and a class action provides a superior vehicle for adjudication of the plaintiffs' claims.

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  In essence, a court must determine "whether plaintiffs can, through their individualized cases, offer proof on a class-wide basis."  *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 329 (N.D. Ill. 2010); *see also Ross v. RBS Citizens, N.A.*, No. 09 C 5685, 2010 WL 3980113, at *6 (N. D. Ill. Oct. 8, 2010) ("the plaintiff must show that common issues not only exist but outweigh the individual questions").  The predominance criterion is "far more demanding" than Rule 23(a)'s commonality

requirement, under which a plaintiff must establish simply that common issues exist.
*Amchem Prods., Inc.*, 521 U.S. at 623–24.

Plaintiffs contend that common issues predominate in this case. They define the
common questions as whether the demands for repayment were adverse benefit
determinations, whether ERISA required full and fair review under the circumstances,
whether the notice and appeal provided by the defendants substantially complied with
the requirements of ERISA, and whether class members have the right to pursue any
ERISA remedies before defendants may seek repayment. Plaintiffs also contend that
for the BlueCard classes, an additional common issue is whether the defendant home
plans improperly delegated coverage decisions to the host plans.

After careful consideration, the Court concludes that individual issues
predominate. Several of the issues that plaintiffs contend are common are in fact
individual. In addition, the Court concludes that plaintiffs' new proposed classes and
relief do not eliminate individual issues related to assignment that it discussed in its
previous class certification decision.

### a.    Adverse benefit determinations

Plaintiffs contend that defendants' demands for repayment were adverse benefit
determinations and thus plaintiffs were entitled to the notice and appeal required by
ERISA and detailed in ERISA regulations. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-
1(g)–(h). Plaintiffs argue that the question of whether the repayment demands were
adverse benefit determinations is a common question. Defendants, however, contend
that this is an individual question.

ERISA regulations define an adverse benefit determination as:

11

> [A] denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including [a decision] . . . that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, [a decision] . . . resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

29 C.F.R. § 2560.503-1(m)(4).  To interpret this definition, both sides cite to a United States Department of Labor (DOL) interpretation of the regulations.  Plaintiffs cite the DOL interpretation for the principle that if a plan pays some but less than all of a claimant's medical bills, the plan has made an adverse benefit determination and must provide the claimant with notice and the right appeal.  *See* FAQs About Benefit Claims Procedure Regulation at C-12, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Oct. 5, 2012).

Defendants, however, cite a section of the DOL interpretation that states:

> The regulation applies only to claims for benefits.  The regulation does not apply to requests by health care providers for payments due them—rather than due the claimant—in accordance with contractual arrangements between the provider and an insurer or managed care organization, where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization.
> The following example illustrates this principle.  Under the terms of a group health plan, participants are required to pay only a $10 co-payment for each office visit to a preferred provider doctor listed by a managed care organization that contracts with such doctors.  Under the preferred provider agreement between the doctors and the managed care organization, the doctor has no recourse against a claimant for amounts in excess of the co-payment.  Any requests by the doctor to the managed care organization for payment or reimbursement for services rendered to a participant is a request made under the contract with the managed care organization, not the group health plan; accordingly, the doctor's request is not a claim for benefits governed by the regulation.
> On the other hand, where a claimant may request payments for medical services from a plan, but the medical provider will continue to have recourse against the claimant for amounts unpaid by the plan, the

12

> request, whether made by the claimant or by the medical provider (e.g., in the case of an assignment of benefits by the claimant) would constitute a claim for benefits by the claimant.

*Id.* at A-8 (citations omitted).  Under the DOL's interpretation of its ERISA regulations, the regulations and the notice and appeal process they prescribe apply only when a claimant stands to be financially liable, not merely when a provider and an insurance company dispute payment.

"[A]n agency's interpretation of its own regulation is . . . controlling unless plainly erroneous or inconsistent with the regulation." *Joseph v. Holder*, 579 F.3d 827, 831–32 (7th Cir. 2009) (internal quotation marks omitted).  "When the agency speaks formally, . . . the agency's interpretation is controlling . . . .  An off-the-cuff response to an interpretive question from the first person who answers the telephone would be quite a different matter." *Id.* at 832; *see Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 774 (7th Cir. 2010) (granting deference to agency interpretation of regulation contained in amicus brief, as long as it was not a post-hoc rationalization of agency action).  The DOL's interpretation at issue here is a written document discussing ambiguities in the agency's own ERISA regulation.  The Court concludes that it is entitled to deference.

Plaintiffs do not contend that the interpretation is plainly erroneous.  Furthermore, the DOL's interpretation of the pertinent ERISA regulation is consistent with the regulation.  The regulation defines a claim for benefits as "a request for a plan benefit *made by a claimant*."  29 C.F.R. § 2560.503-1(e) (emphasis added).  Claimant is a term used to mean "participants and beneficiaries"; it does not include providers

13

unless they are also beneficiaries. *Id.* § 2560.501-1(a). The ERISA regulations also make clear that an adverse benefit determination occurs when a claim for benefits is denied. *See id.* § 2560.501-1(f). The Court defers to the DOL's interpretation of the ERISA regulation and concludes that, under the interpretation, many payment disputes between providers and insurance companies in which plan participants will not be liable do not constitute adverse benefit determinations. *Cf. Lone Star OB/GYN Assocs. v. Aetna Health, Inc.*, 579 F.3d 525, 529–31 (5th Cir. 2009) (claim related to amount that provider received from insurance company was not preempted by ERISA because it involved only the rate of payment in provider agreement, not right to payment under employee benefit plan).

The Court's previous decision in this case granting summary judgment on the claims brought by Hopkins illustrates another way in which repayment demands may not constitute adverse benefit determinations. There, the Court held that a defendant's recoupment of a duplicate payment from a provider was not an adverse benefit determination with regard to Hopkins, the plan participant who had received medical care. *Penn. Chiropractic Ass'n*, 2012 WL 182213, at *6. The Court determined that, with regard to that claim, a reasonable fact finder could conclude that the defendant's recoupment of the duplicate payment led to increased financial liability for Hopkins, making the situation different from the one described in the DOL's interpretation discussed above. *Id.* Still, the Court concluded that recoupment of a duplicate payment was not "a denial, reduction, termination, or failure to provide a benefit," as required by the regulation's definition of adverse benefit determination. *Id.* (internal

quotation marks omitted).  The Court further concluded that the definition of adverse benefit determination, with its references to "eligibility, utilization review, and failure to cover an item or service," indicated that the type of decisions that were adverse benefit determinations were "substantive decisions regarding a plaintiff's rights under a particular plan."  *Id.* (internal quotation marks omitted).  The Court concluded that because recoupment of a duplicate payment was not "a decision not to pay a benefit that was arguably due and owing," it was not an adverse benefit determination.  *Id.*

Plaintiffs contend that they have been subjected to repayment demands for benefits arguably due and owing.  Defendants, however, have provided numerous examples of repayment demands involving the named plaintiffs that, if defendants' characterizations are correct, do not constitute adverse benefit determinations.  For example, BCBSF demanded that plaintiffs Peri Dwyer and Extended Care Treatment, Inc., d/b/a Transitions Recovery Program (Transitions) repay duplicate payments that BCBSF had made to each of them.  Defs.' Joint Resp., Exs. 33 & 37.  Similarly, defendant Independence Blue Cross justified two claim recoupments that it received from plaintiff Mark Barnard by stating that they were duplicate payments. Independence Mot. for Sum. Judg., Ex. D at 14, 16.  As previously discussed in relation to the Hopkins claim, recovery of a duplicate payment is not a denial or reduction of a benefit, and thus it is not an adverse benefit determination.

Similarly, defendants have also shown that other repayment demands were not denials of a benefit that was arguably due and owing.  For example, BCBSF demanded repayment from Transitions in situations where the subscriber's policy terminated prior to treatment, a different facility actually provided the services, or Transitions

15

erroneously submitted a claim for a patient other than the one who received the treatment. Defs.' Joint Resp., Exs. 40–42, 45–47. Likewise, defendant Horizon Blue Cross Blue Shield of New Jersey justified several recoupments from plaintiff Anthony Fava, a chiropractor, by claiming that they were surgical procedures that had in fact been performed by George Fava, a surgeon. *Id.*, Ex. 98. As with duplicate payments, in none of these situations did defendants deny a benefit that was arguably due and owing. Further, recoupments justified on the ground that the wrong provider had been paid or the claim had been submitted for the wrong patient could not lead to liability on the part of plan participants, who in those situations did not receive anything from the plaintiff providers. In another case, BCBSF asserted that Dwyer had been paid too much on a claim because the payment had not been reduced to account for the participant's copay. Defs.' BlueCard Resp., Exs. 48–49. Much like the situation with Hopkins, the patient already owed the copay to Dwyer, so BCBSF's effort to reduce its payment to account for the copay did not amount to an adverse benefit determination.

Defendants have also cited sections of their provider agreements with the plaintiffs that in many circumstances prevent plaintiffs from balance billing, which refers to the practice of a provider billing a participant more when an insurer denies payment on a claim. Dwyer's provider agreement with BCBSF, for example, provides that if the insurance plan denies coverage for a service on the ground that it is not covered by the participant's plan, the provider may not bill or attempt to collect from the participant. Defs.' Joint Resp., Ex. 120 ¶ 5.3. As discussed above, under the DOL's interpretation of the regulations, an insurance plan need not provide any notice or appeal under ERISA when payment to the provider is denied but the provider has no recourse

against the plan participant.   Thus, for any provider class member who had an agreement with a defendant similar to Dwyer's, the Court would have to determine whether the language of that provider's agreement prevented balance billing for each particular repayment demand.

Other named plaintiffs have provider agreements that allow balance billing, but only in certain circumstances.  Plaintiffs Brenda Tomanek, Jeffrey Leri, and Michelle Asker have a provision in their agreement with Highmark that allows them to bill a patient for services that Highmark deems not medically necessary only when the patient requests the service, is informed of his financial liability, and still chooses to receive the service.  *Id.*, Exs. 69–71, 72 at 1284.  Even in this instance, the provider must document in her records that the patient received the proper notice.  *Id.*, Ex. 72 at 1284. Even more detailed is plaintiff Andrew Reno's provider agreement.  Under this agreement, Reno can collect payments for non-covered services from a patient who is not a member of an HMO, but, if the services are not covered because they are not medically necessary, he must advise the patient in writing before providing services and have the patient sign a notice acknowledging responsibility for payment.  *Id.*, Ex. 124 at 3622.  If the patient is an HMO member, Reno must provide written notice and collect a signed statement in order to bill the patient for any non-covered service, no matter the reason the service is not covered.  *Id.*

An agreement like Reno's creates a number of individual issues.  The provider agreement may not be similar to the agreements of all the other providers he seeks to represent in the proposed WellPoint Class; the Court has no way of knowing.  The agreement states on its cover that it is a "Chiropractic" agreement, leaving open the

17

question of whether other putative class members who are not chiropractors have a similar or different agreement. *Id.*, Ex. 124 at 3568. Then, for every repayment demand, the Court would have to determine whether the patient was an HMO member or not. If the patient was an HMO member, the Court would have to determine whether the provider had a signed authorization to bill for non-covered services before providing the service, in order to determine whether the provider could balance-bill the participant, such that the repayment demand by WellPoint constituted an adverse benefit determination. If the patient was not an HMO member, then the Court would have to determine the reason for the denial, and depending on that reason the Court might then have to determine whether there was a signed authorization, such that the repayment demand constitute dan adverse benefit determination.

In sum, there are considerable individual questions that determine the issue of whether a repayment demand is an adverse benefit determination. The Court does not decide whether the defendants' characterizations of the reasons for their repayment demands are accurate or whether contractual provisions would prevent providers from billing participants after recoupment. That said, it is apparent that the Court will have to devote considerable time to determining these issues at the merits stage in order to determine whether any given recoupment was an adverse benefit determination. Because some of the named plaintiffs have hundreds of recoupments and repayments demands, it is apparent that the individual issues would predominate over any common issues surrounding the question of whether repayment demands constituted adverse benefit determinations. *E.g.*, Independence Mot. for Sum. Judg., Ex. E at 11–22 (listing more than 200 claim adjustments for Plaintiff Barry Wahner).

18

### b.    Notice and appeal of repayment demands

Plaintiffs contend that for each class, the defendant had a common practice or policy of failing to provide notice and appeal of the repayment demands that complied with ERISA's requirements.  Plaintiffs argues that the issue of violation of ERISA's requirements is a common issue.  Defendants contend that it is an individual issue.

"ERISA sets certain minimum requirements for procedures and notification when a plan administrator denies a claim for benefits."  *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992).  It mandates that:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  "Adequate notice" of an adverse benefit determination includes notice of "[t]he specific reason or reasons for the adverse determination"; "[r]eference to the specific plan provisions on which the determination is based"; "[a] description of any additional material or information necessary for the claimant to perfect the claim"; "[a] description of the plan's review procedures"; and a statement describing any "internal rule, guideline, protocol, or other similar criterion . . . relied upon in making the adverse benefit determination."  29 C.F.R. § 2560.503-1(g).  A "reasonable opportunity . . . for a full and fair review" affords claimants "at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination"; "the

19

opportunity to submit written comments, documents, records, and other information relating to the claim for benefits"; "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits" upon request; and "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." *Id.* § 2560.503-1(h).

The provisions of ERISA and its regulations are obviously common to the class. Plaintiffs have not shown, however, that the question of whether a defendant complied with the regulations is an issue that can be answered in common for all class members. *See Wal-Mart*, 131 S. Ct. at 2551 (stating in relation to commonality requirement that common question "must be of such a nature that it is capable of class resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

"In determining whether a plan complies with the applicable regulations, substantial compliance is sufficient." *Halpin*, 962 F.2d at 690; *accord Ponsetti v. GE Pension Plan*, 614 F.3d 684, 693 (7th Cir. 2010). "The inquiry into whether [denial] procedures substantially complied with the demands of [ERISA] is fact-intensive and guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review." *Ponsetti*, 614 F.3d at 693 (internal quotation marks omitted).

In its previous decision denying class certification, the Court stated that substantial compliance with the requirements of ERISA was an individual issue in part because plaintiffs attempted to combine so many health plan defendants into a single

20

class. *Penn. Chiropractic Ass'n*, 2011 WL 6819081 at *8–9. In response, plaintiffs now propose a number of classes, each consisting of only a single defendant health plan. They contend that each defendant had a uniform policy of offering no or very little notice and review. The majority of the evidence plaintiffs provide, however, supports only their contention that defendants violated the provisions of ERISA in their particular cases, not their contention that each defendant had a uniform policy of providing substandard notice and review.

Plaintiffs cite to Highmark's bylaws, which state that all disputes between providers and Highmark will be resolved by a review committee established by the bylaws. Defs.' Joint Resp., Ex. 73 at 1748. Plaintiffs also cite the existence of review committee guidelines establishing some procedures for review of denied claims, albeit procedures they consider inadequate under ERISA. *Id.*, Ex. 73 at 1751–53. Defendants, however, present a letter and contract sent to plaintiff Michelle Asker by Highmark. The letter informs her that some of the repayment demands against her are not governed by the review committee. Highmark Surreply, Ex. A. Highmark contends that under Pennsylvania law, review committee procedures as required for some disputes between the insurance plan and doctors, but not between the insurance plan and hospitals. Plaintiffs also cite Rule 30(b)(6) deposition testimony by a representative of a different defendant, Horizon. The representative stated that Horizon's repayment demands were more or less automated letters that included standardized language. Pls.' Horizon Reply, Ex. 3 at 63–65.

The exhibits cited by plaintiffs provide some evidence that defendants Highmark and Horizon treated denials and appeals in a uniform way and that the sufficiency of

21

their process under ERISA could be a common issue for those particular classes. For the remaining defendants, however, plaintiffs essentially argue–without evidentiary support–that those defendants had a uniform process, or they simply state that defendants have not argued or shown otherwise. It is plaintiffs' burden, however, to show the existence and predominance of common issues. *See Oshana*, 472 F.3d at 513.

In addition, defendants have provided substantial amounts of evidence that each defendant lacked a common notice and review policy. Horizon, despite the testimony of its Rule 30(b)(6) representative, apparently sent different forms of notice for at least some repayment demands. For example, Horizon sent Fava a letter detailing the four claims on which it demanded repayment and a invoice detailing the precise amounts it wanted Fava to repay. Defs.' Joint Resp., Exs. 95–96. The letter to Fava told him that if he had questions he could contact his service representative, and it provided a phone number. *Id.*, Ex. 95. Horizon also sent explanations of benefits (EOBs) to the two plan participants, Fava's patients, whose claims it denied. *Id.*, Ex. 94. These EOBs informed the participants that the claims had been denied and informed them that they or someone acting on their behalf could seek review, although they also indicated that the patients themselves had no additional liability due to the denials. *Id.*; *see* 29 C.F.R. § 2560.503-1(a), (g), & (h) (stating that notice and appeal rights go to claimants, who are defined as participants and beneficiaries). When Horizon requested repayment from Transitions, however, it provided a letter more detailed than the one it sent to Fava, but no invoice and no EOBs. Defs.' Joint Resp., Ex. 100. Transitions was told that if it had questions, it could directly contact the investigator who had determined that

22

some of its bills misrepresented the patient's diagnosis. *Id.*

Defendants also submit evidence that some of the defendant health plans have more than one appeal process. BCBSRI has one appeal process that relates to provider agreement disputes, "including disputes regarding claims payment," and another that relates to denials of coverage on medical necessity grounds. *Id.*, Ex. 60. Plaintiffs contend, without elaboration, that neither of these appeal processes covers repayment demands. The first of the two appeal processes, however, includes claims payment disputes, which the repayment demands undoubtedly are. In addition, if a repayment demand related to medical necessity, it would by the language of the provider agreement be included in the second appeal process.

Similarly, Independence's provider manual states:

There are two broad types of appeals on behalf of Members—Medical Necessity and Administrative.

> Medical necessity appeals or grievances relate to denials based on Medical Necessity, Medical Appropriateness, or clinical issues.

> Administrative appeals or complaints relate to denials or disputes regarding coverage, including contract exclusions, non-covered services, participating or non-participating health care provider statu[s], or other contractual terms of the health plan.

*Id.*, Ex. 108. Defendant Excellus Blue Cross Blue Shield also varies its appeal process depending on whether a particular participant's plan is an administrative services only group, which (according to defendants) means that the plan is self-funded by the participant's employer. *Id.*, Ex. 68.

In addition, the experiences of the named plaintiffs indicate that the review the providers actually received can vary significantly. During his deposition, Reno testified

that he was able to use WellPoint's appeal process to reduce the amount he repaid from the $110,000 that WellPoint's subsidiary initial demanded. *Id.*, Ex. 26 at 159–60. Initially, Reno worked out an agreement with an investigator not to make repayments for any of the disputed claims except those related to a single type of billing error, which reduced the requested repayment amount to $46,000. *Id.*, Ex. 112. In the end, Reno paid $25,000 to settle his claim.

Tomanek testified in her deposition that she was able to appeal Highmark's repayment demands to a medical review committee created by state statute. She stated that this was the only appeal allowed by her provider agreement and that it was what she sought when she requested full and fair review from Highmark. *Id.*, Ex. 29 at 144, 285. The review committee reduced Highmark's repayment demand from $97,000 to $48,000. *Id.* at 396–98.

Plaintiff Michelle Asker requested review by a medical review committee when she received repayment demands from Highmark. *Id.*, Ex. 82. Highmark acknowledged this request and scheduled a hearing before the committee. *Id.*, Ex. 80. Asker testified, however, that on the advice of another doctor, she never went to the committee hearing, because she felt she had not received all of the information she needed for her appeal. The committee ruled against her. *Id.*, Ex. 17 at 296, 301.

Defendants have also provided evidence that Wahner appealed the repayment demand he received from Independence through two different levels of review. Both upheld the initial determination that Wahner could not contractually provide the services for which he had billed. *Id.*, Exs. 128–129. The letter denying the first appeal informed

24

Wahner that he could pursue a second appeal, and the letter denying the second appeal told Wahner that the appeal process had concluded. *Id.*

Defendants have also presented evidence that in some cases plaintiffs' patients were able to appeal the repayment demands. One of Dwyer's patients, for example, appealed a determination by defendant Blue and Cross Blue Shield of Michigan (BCBSMI) that the physical therapy services the patient received from Dwyer were not covered. Defs.' BlueCard Resp., Ex. 32. The patient pursued two levels of appeal, each of which upheld the coverage determination. *Id.*, Exs. 33–35. Because the notice and appeal rights under the ERISA regulations are due to the participant or beneficiary, *see* 29 C.F.R. § 2560.503-1, for some repayment demands the Court might be required to examine the issue of whether the participant received a sufficient notice and appeal even if the provider did not. This would be an individual issue, as far as the Court can determine on the current record.

The Court concludes that the determination of whether defendants substantially complied with ERISA vis-a-vis the class members would involve significant individual issues. Although plaintiffs have provided evidence suggesting that two of the defendants had uniform appeal processes, defendants have provided evidence showing that one of them used at least two different forms of notice in its repayment demands and the other had different appeal processes for some claims. Defendants have also provided evidence that many of the other defendants had more than one appeal process depending on the reason that the claim was denied. In addition, even after addressing which particular notice and appeal process applies to each claim, there would be individual issues regarding whether class members and defendants followed

25

the appeal process or were able to use other less formal methods.  Finally, even if the plaintiff providers did not receive adequate notice and appeal rights, the corresponding plan participants may have.

      **c.**    **BlueCard classes**

As stated above, twenty-five of plaintiffs' proposed classes are related to the BCBS entities' BlueCard program, under which a host plan processes claims for the home plan that administers the participant's insurance.  Plaintiffs contend that each class against a defendant home plan has an additional common issue.  Specifically, plaintiffs argue that each home plan had a uniform policy of improperly permitting host plans to make coverage decisions without any oversight and without considering the terms of the home plans.  BlueCard documents show that home plans are responsible for determining "medical policy," which includes determining whether treatments are medically necessary or experimental and conducting clinical reviews of treatments. Pls.' Mot. to Certify BlueCard Class, Ex. 3 at 12761–62.  Home plans also determine whether a plan participant is eligible to receive benefits.  *Id.* at 12750.  A BCBSA representative testified that the contents of the home plan determine whether a service is covered.  *Id.*, Ex. 2 at 26.  Other parts of the BlueCard manual, however, suggest that host plans can make some adjustments to claims, such as "to correct an erroneous service code submitted by a provider."  Defs.' BlueCard Resp., Ex. 2 at 12784.

Plaintiffs have provided evidence showing that the named plaintiffs were subject to recoupment demands generated by host plans instead of home plans.  Plaintiffs Jay Korsen and Ian Barlow had claims denied by BCBSRI, acting as host plan, when the home plans administering the insurance policies were a number of different BCBS

entities. Pls.' BlueCard Reply, Ex. 2. At a previous trial, a BCBSRI witness stated that BCBSRI made the coverage decisions, all of which related to alleged misuse of a single billing code, without consulting the home plans. *Id.*, Ex. 1. The witness stated, however, that under the BlueCard program, the host plan investigated when the services billed did not match the services the patients actually received. *Id.* at 78–79. This is similar to the statement in the BlueCard manual that a host plan can correct use of an erroneous service code by a provider. Defs.' BlueCard Resp., Ex. 2 at 12784. In addition, the parties appear to agree that Highmark, acting as host plan, made a number of repayment demands against Tomanek and that the particular home plans played no part in the decision. *See* Pls.' Mot. to Certify BlueCard Class, Ex. 6.

For other plaintiffs, however, the evidence regarding whether repayment demands came from host plans or home plans is more ambiguous. Transitions was subject to a number of repayment demands for patients it treated under the BlueCard system. Pls.' BlueCard Reply, Ex. 3. Plaintiffs do not present any evidence indicating these decisions were made by BCBSF, the host plan, rather than by the patients' by home plans. Defendants present evidence that in one case, a repayment demand was made by BCBSF after the home plan, defendant Blue Cross Blue Shield of Kansas (BCBSKS), requested it. Defs.' BlueCard Resp., Ex. 62. In addition, defendants justified both the repayment request initiated by BCBSKS and another repayment request Transitions received from BCBSF by claiming they resulted from duplicate payments. *Id.*, Exs. 59, 62. As discussed above, requests for repayment of duplicate payments, if they are indeed duplicates, do not lead to additional liability for plan participants and thus do not constitute adverse benefit determinations. Further,

27

recoupment of duplicate payments does not implicate the medical policy questions the BlueCard program most clearly assigns to home plans.

Likewise, Dwyer asserts that BCBSF demanded repayments from her that related to patients whose home plans were administered by defendants Empire Blue Cross Blue Shield, Independence, Highmark, Health Care Services Corporation (HCSC), Blue Cross and Blue Shield of Alabama (BCBSAL), and BCBSMI. Pls.' BlueCard Reply, Ex. 2. Beyond the allegations in their complaint, however, plaintiffs do not provide any evidence that BCBSF initiated the repayment demands in these cases. Defendants, by contrast, present evidence that for at least some of these claims the home plans initiated the repayment demands. BCBSMI produced documents showing that it determined that a particular claim was not covered, even though BCBSF sent Dwyer the letter telling her the claim had been denied. Defs.' BlueCard Resp., Exs. 25–26, 28. Similarly, BCBSAL, as home plan, initially authorized several payments to Dwyer but then instructed BCBSF to seek refunds of those claims when it received information that Dwyer had not provided the services. *Id.*, Ex. 24-6 at 24–25. BCBSF investigated and determined that Dwyer had in fact provided the services, so BCBSAL reauthorized the claims. *Id.* at 25–26. All determinations regarding coverage of the claims came from BCBSAL, the home plan. Empire also asked BCBSF to initiate a repayment demand on one claim where Empire was home plan, because Dwyer had been paid too much for a claim. *Id.*, Ex. 48. In another case, both HCSC, as home plan, and BCBSF, as host plan, appear to have denied a claim for different reasons at different times. BCBSF initially denied the claim for billing code reasons but then reversed itself, though it stated in a letter that it was doing so on behalf of HCSC. *Id.*,

28

Ex. 40.  HCSC then denied part of the claim, because it exceeded the maximum benefit patient was entitled to per visit.  *Id.*, Ex. 42 at 27651.

In sum, plaintiffs have presented evidence that some of the named plaintiffs had claims denied by host plans, and defendants have presented evidence that in other circumstances claims were denied by home plans.  Plaintiffs contend that defendants have not shown that the majority of claims for the named plaintiffs were denied by home plans.  It is plaintiffs' burden, however, to demonstrate the predominance of common issues.  Plaintiffs have not demonstrated that each BlueCard defendant uniformly (or nearly uniformly) delegated coverage decisions to host plans.

Defendants have also presented testimony from many employees of defendants stating that home plans make coverage decisions in the BlueCard program.  *E.g.*, *id.*, Exs. 4 at 6, 9 (defendant Blue Cross and Blue Shield of Kansas City), 7 at 20–21 (BCBSAL), 8 at 11 (defendant CareFirst, Inc.), 9 at 24–25 (Excellus).  Other employees stated that decisions regarding paying claims could be made by host plans in certain circumstances but that home plans made the decision in other situations.  *E.g.*, *id.*, Exs. 5 at 12–14 (defendant Blue Cross and Blue Shield of North Carolina would make payment determinations as host plan if they related to pricing, but home plan decides when they relate to whether benefits are covered), 6 at 16–17, 22–23 (defendant The Regence Group would look to home plan to determine coverage, but might conduct audits of payments without informing home plans), 10 at 35–36 (Excellus as host plan would make pricing decisions); 13 at 16–17 (defendant Blue Cross and Blue Shield of Minnesota as host plan might deny claim if it was forbidden by contract with provider, but home plan always makes participant coverage decision), 16 at 12–13 (suggesting

29

that in some circumstances defendant Blue Cross and Blue Shield of Tennessee acting as host plan might make decisions about the level of benefits, but in others home plan would).  The testimony of these witnesses further suggests that each defendant lacks a uniform practice of allowing host plans to make all claim decisions.

The Court concludes that the question of whether home plans improperly delegate claim decisions to host plans is not a common question for each class, but a series of individual questions.  Plaintiffs have provided evidence that some repayment demands were made without home plan input, but the evidence does not show that each defendant has a uniform policy.  *See Bolden v. Walsh Constr. Co.*, 688 F.3d 893, at 897–98 (7th Cir. 2012) (existence of a common company-wide policy can be necessary for the existence of common issues).  The Court would have to determine whether each claim was denied by the host plan or the home plan and whether claims that were denied by the host plan by itself violated the provisions of the BlueCard manual, which appears to allow some sorts of adjustments to be made by host plans.  Such individual questions will consume more judicial resources than the question of whether delegating any claim decisions to the host plan violates ERISA.

### d.    Assignment

Defendants contend that the question of whether class members received assignments from plan participants creates a number of individual issues.  They argue that, for each individual claim or participant, plaintiffs would have to show that they have received an assignment, the assignment was not barred by an anti-assignment provision in the participant's plan or the provision was waived, and the assignment covered the rights to ERISA notice and appeal and not merely the right to payment.

30

ERISA provides notice and appeal rights to participants and beneficiaries. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(a), (g) & (h). Plaintiffs are not participants as that term is defined under ERISA. 29 U.S.C. § 1002(7). They may, however, be beneficiaries, who are defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may be entitled to a benefit thereunder." *Id.* § 1002(8); *see Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991). Plaintiffs thus need to show an assignment from the plan participant to be eligible for the notice and appeal rights they seek as relief in their class actions.

The parties have framed the issues related to assignments as affecting the plaintiffs' standing. The Seventh Circuit has held, however, that subject matter jurisdiction exists under ERISA if the plaintiff has a colorable claim to benefits: "[t]he possibility of direct payment is enough to establish subject matter jurisdiction." *Kennedy*, 924 F.2d at 700–01. In the Court's previous decision denying class certification, the Court noted that even if plaintiffs had standing based on a colorable claim to benefits, the question of liability still was not a common one, because the Court would have to determine whether each class member had an assignment entitling it to the relief to which the plan participant was entitled. *Penn. Chiropractic Ass'n* 2011 WL 6819081, at *6; *see Kennedy*, 924 F.2d at 700 ("an assignee cannot *collect* unless he establishes that the assignment comports with the plan" (emphasis in original)). The Court concluded that the question of whether class members had valid assignments required individualized determinations. *Penn. Chiropractic Ass'n*, 2011 WL 6819081, at *6–7.

31

Plaintiffs contend that their new proposed classes avoid this problem. They argue that because they do not seek a final determination that class members are entitled to collect the funds previously recouped by defendants, the Court need not collectively determine whether the defendants' repayment demands violated ERISA and thus need not determine whether any assignments are valid. They contend that the only relief they request is a remand so that the class members can receive the notice and appeal process guaranteed by ERISA. Even plaintiffs' requested remand, however, requires the Court to determine the existence of a valid assignment. The ERISA regulations state that claimants, defined as participants and beneficiaries, are entitled to notice and appeal rights. 29 C.F.R. § 2560.503-1(a), (g) & (h). Thus plaintiffs would not be entitled to a remand for an appeal process unless they qualify as beneficiaries. For this reason, the Court will be required to determine whether class members have received a valid assignment from a participant as a prerequisite to even the more limited relief plaintiffs now request.

Plaintiffs cite to *OSF Healthcare Sys. v. Macone Appliance Parts Co. Empl. Benefits Plan*, No. 11-cv-1202, 2012 WL 264197 (C.D. Ill. Jan. 27, 2012), in which the court stated that "a participant or beneficiary includes anyone with a colorable claim to benefits." *Id.* at *2. The court, however, made clear that such a broad definition of beneficiary applied only "[w]hen subject-matter jurisdiction under ERISA is questioned." *Id.* As the Court has discussed, the Court must address individual questions surrounding entitlement to notice and appeal under ERISA, not merely the question of plaintiffs' standing or the existence of subject matter-jurisdiction.

Plaintiffs also cite *Porter v. Anthem Health Plans of Kentucky, Inc.*, Civ. No. 10-8-

HRW, 2010 WL 8685135 (E.D. Ky. Mar. 18, 2010), in which the court stated that the Supreme Court had ruled that "an actual payment to the provider creates an assignment of benefits." *Id.* at *3. The court's holding is distinguishable, because like the courts in *Kennedy* and *OSF Healthcare*, it was discussing whether federal subject-matter jurisdiction existed. *Id.* at *3. More importantly, the Supreme Court decision cited by the district court in *Porter*, *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), says nothing about when a provider may be considered a beneficiary and indeed does not even use the word assignment.

As in its previous decision, the Court concludes that whether each class member has received a valid assignment is an individual issue. Several of the named plaintiffs acknowledge that they did not have assignments of benefits from at least some of the plan participants involved in the repayment demands. Korsen testified that he could not find about twenty assignments from patients in his files and stated that if he did not have a copy, those patients likely had never executed an assignment. Defs.' Joint Resp. Ex. 22 at 331. A representative for Transitions testified that he did not know whether Transitions had assignments related to every recouped claim and that it would require a difficult review of thousands of files to know if it did. *Id.*, Ex. 27 at 166–67, 295. Likewise, Tomanek testified that she did not know whether each of her patients signed an assignment of benefits or was asked to do so. *Id.*, Ex. 29 at 62–64, 70–71. In addition, at least some assignments that named plaintiffs obtained were not assignments to them personally but rather to corporations they used to conduct their businesses. *See id.*, Exs. 130 (assigning benefits to Wahner Chiropractic, not Wahner

33

personally); Pls.' Mot. to Certify Horizon Class, Ex. 1 at 403–04 (assignment of benefits completed by Fava's patients, which appear to assign benefits to Advanced Center for Injury & Wellness Care LLC). This raises additional questions regarding who has a right to receive notice and appeal the repayment determinations, the particular named plaintiff or some other entity entirely.

Plaintiffs contend that they can obtain assignments after the fact. *See, e.g.*, *Physicians Multispeciality Group v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1293, 1296 (11th Cir. 2004) (considering whether anti-assignment language blocked assignment given after treatment); *Lutheran Medical Ctr. v. Contractors Health & Welfare Plan*, 25 F.3d 616, 619 (8th Cir. 1994) (stating that nothing in ERISA prohibits assignment after provider has rendered medical services). Plaintiffs do not explain, however, how they could have been entitled to notice and appeal rights due to beneficiaries if they had not yet become beneficiaries via assignment at the time of the adverse benefit determination.

Moreover, defendants contend that many of their plans prohibit assignments and that any assignments plaintiffs received relating to these plans are invalid. *See Moylan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 615 (7th Cir. 2002) (ERISA allows a benefit plan to prohibit assignments). Defendants have provided anti-assignment provisions for some of the plans at issue in this case. Defs.' Joint Resp., Exs. 36, 49, 92, 115 at 5359. As plaintiffs themselves note, for any given defendant class there may be hundreds of plans or plan documents at issue. The existence and meaning of anti-assignment language in plans is an issue that must be determined on a recoupment by

34

recoupment basis.

Plaintiffs contend that the need to review all of the individual plans to understand the impact of their anti-assignment language demonstrates that defendants violated ERISA. Specifically, plaintiffs argue that defendants never provided them with the relevant plans when making the repayment demands and thus they could not adequately contest the repayment demands. Plaintiffs' argument, however, addresses the merits of the claims. It focuses on whether plaintiffs received sufficient information to challenge the repayment demands, not whether any of the classes will have common issues. Plaintiffs also argue that the defendants should not be able to defeat class certification by assuming the existence of anti-assignment language. It is plaintiffs' burden, however, to demonstrate the existence and predominance of common issues. Defendants' evidence, at a minimum, suggests strongly that the proposed class claims would entail examination of individualized issues regarding the existence and validity of assignments.

Finally, plaintiffs contend that the existence of assignments is irrelevant, because the plaintiffs have the ability to become authorized representatives of the plan participants. ERISA regulations prohibit insurance plans from "precluding an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination." 29 C.F.R. § 2560.503-1(b)(4). Plaintiffs appear to contend that if they were authorized representatives of the participants they would be entitled to notice and appeal rights, although neither ERISA nor its regulations expressly say this. *See Harju v. Olson*, 709 F. Supp. 2d 699, 715–16 (D. Minn. 2010) (union had standing to bring ERISA claim and request records as

35

authorized representative of union members); FAQS About the Benefit Claims Procedure Regulation at B-4 (DOL's understanding of regulations is that plan should communicate only with authorized representative once claimant appoints one). Plaintiffs also contend that a class member can become an authorized representative even after providing services to a participant.

The fact that plaintiffs have the ability to become authorized representatives now, however, does not mean that they are entitled to relief on the question of whether defendants should have provided them with notice and appeal rights at an earlier time. Plaintiffs cannot viably argue that they were entitled to ERISA-compliant notice at the time of the repayment demands simply because they possessed the ability to become authorized representatives if the plan participant consented. Plaintiffs' entitlement to notice and appeal rights at the time of the repayment demand turns on whether they were beneficiaries or authorized representatives then, not whether they could become so now or later.

In addition, ERISA regulations provide that "a plan may establish reasonable procedures for determining whether an individual has been authorized to act on behalf of a claimant." *Id.* In its interpretation of the regulations, the DOL states that this permits plans to require claimants to complete a specific form identifying the authorized representative. FAQS About the Benefit Claims Procedure Regulation at B-1. The DOL emphasized that an ordinary assignment of benefits usually assigns only the right to a benefit payment and does not make the assignee an authorized representative. *Id.* at B-2. The DOL also stated that the designation of an authorized representative can

limit the representative's authority to particular types of claims. *Id.* at B-3.

Defendants have provided examples of benefit plans that require particular procedures to designate authorized representatives. *See* Defs.' Joint Resp., Exs. 49 (plan stating that participant can identify authorized representative in writing to plan), 51 (plan stating there is a process to appoint authorized representative), 58 (plan requiring participant to fill out form obtained from plan to designate authorized representative), 59 (same), 65 (plan requiring designation of authorized representative in writing), 111 (plan requiring completion of form or provision of the information in it), 115 at 5361 (recognizing that authorized representative may be general or only for a certain claim). The questions of compliance with these procedures and whether plaintiffs are authorized to pursue the type of claims they are pursuing for participants would become additional individual issues for the Court to determine.

### e.     Conclusion

For the reasons stated above, the Court concludes that plaintiffs have failed to show that common issues predominate. Certification as a Rule 23(b)(3) class is therefore not appropriate. For this reason, the Court need not consider Rule 23(b)(3)'s superiority requirement.

### 2.     Rule 23(b)(1)(A)

Plaintiffs also contend that their proposed provider classes satisfy Rule 23(b)(1)(A), which applies when "inconsistent or varying adjudications with respect to individual class members . . . would establish incompatible standards of conduct for the party opposing the class." Certification under 23(b)(1)(A) is appropriate when

"individual adjudications would be impossible or unworkable." *Wal-Mart Stores, Inc. v. Duke*, 131 S. Ct. at 2558. "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax) or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997).

Plaintiffs have not shown that separate adjudications against the defendants are likely to lead to incompatible standards of conduct for each individual defendant. The Seventh Circuit's holding in *Spano v. Boeing Co.*, 633 F.3d 574 (7th Cir. 2011), demonstrates that result. There, plaintiffs contended that an ERISA retirement plan contained improper investment options. *Id.* at 586. The Seventh Circuit held that certification as a Rule 23(b)(1)(A) class was not appropriate. The Court concluded that even if some plaintiffs won a judgment that the investment options were improper and others did not, the employer could create sub-plans in its retirement program limiting which participants could invest in the allegedly improper investments. *Id.* at 588. In this way, inconsistent judgments would not subject the defendant to incompatible standards of conduct. Likewise, in this case plaintiffs have not contended that it would be improper for defendants to offer additional notice and appeal rights to some members of the putative class but not others, depending on their circumstances.[3] *See Pipefitters*

---

[3] That said, the Court emphasizes that it makes no determination regarding whether, in the event of an adverse judgment and findings regarding a particular defendant's conduct or procedures, the principles of issue and claim preclusion might bar the defendant from contending otherwise in later litigation involving a different plaintiff.

*Local 636 Ins. Fund v. Blue Cross Blue Shield*, 654 F.3d 618, 632–33 (6th Cir. 2011)
(not enough for Rule 23(b)(1)(A) certification that some plaintiffs may be successful
while others are not); *Bowe Bell + Howell Co. v. Immco Emp. Ass'n*, No. 03 C 8010,
2005 WL 1139645, at *4–5 (N.D. Ill. May 11, 2005) (certification under Rule 23(b)(1)(A)
requires that party opposing the class be at risk of being unable to comply with one
judgment without violating another; not enough that defendant is found liable to some
plaintiffs and not others).

In addition, the wide variety of individual issues present in each proposed class
action make it unlikely that any given defendant could be subject to incompatible
standards of conduct or was obliged to treat all members of the class alike.  *See*
*Amchem Prods.*, 521 U.S. at 614.  "It is fundamental that adjudications cannot be
regarded as inconsistent where the facts are distinguishable from individual to
individual."  *Hylaszek v. Aetna Life Ins. Co.*, No. 94 C 5961, 1998 WL 381064, at *6
(N.D. Ill. July 1, 1998) (Williams, J.) (citation and internal quotation marks omitted);
*accord Doe v. Guardian Life Ins. Co.*, 145 F.R.D. 466, 477 (N.D. Ill. 1992).  As
discussed above, there are numerous, and significant, individual issues inherent in the
claims of each proposed class.  *See Pipefitters Local 636 Ins.*, 654 F.3d at 632–33
(denying Rule 23(b)(1)(A) certification because there was no risk that defendant would
be subject to inconsistent adjudications and conflicting affirmative duties when each
plaintiff's claim was subject to threshold questions of whether defendant acted as a
fiduciary); *Casa Orlando Apartments, Ltd. v. Fannie Mae*, 624 F.3d 185, 198 (5th Cir.
2010) (denying Rule 23(b)(1)(A) certification because preliminary questions of state law

determined whether defendant was a fiduciary to individual plaintiffs, so no risk of dissimilar outcomes creating conflicting standards of conduct).

Plaintiffs cite several cases under which courts, including this one, have certified ERISA class actions under one of the subsections of Rule 23(b)(1). *E.g.*, *Neil v. Zell*, 275 F.R.D. 256, 267–68 (N.D. Ill. 2011); *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 256–57 (N.D. Ill. 2007); *Rogers v. Baxter Int'l Inc.*, No. 04 C 6476, 2006 WL 794734, at *8–12 (N.D. Ill. Mar. 22, 2006); *In re Williams Co. ERISA Litig.*, 231 F.R.D. 416, 424–25 (N.D. Okla. 2005); *In re CMS Energy ERISA Litig.*, 225 F.R.D. 539, 545–46 (E.D. Mich. 2004); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 191 F.R.D. 457, 466 (E.D. Penn. 2000). Each of these cases, however, is distinguishable. They all involved actions to recover money for a pension or retirement plan based on alleged breaches of fiduciary duty that applied to the plan as a whole. Thus, there was in effect only one action, regardless of how many plaintiffs participated. *See Neil*, 275 F.R.D. at 267 ("Essentially, in an ERISA action in which relief is being sought on behalf of the plan as a whole . . . a plaintiff's victory would necessarily settle the issue for all other prospective plaintiffs."). In this case, by contrast, each class member complains about separate alleged misconduct—the failure to provide him with notice and appeal rights—and seeks a separate remedy—a remand of his dispute so that he can receive proper notice and exercise his appeal rights.

In sum, the Court concludes that plaintiffs' proposed provider classes cannot be certified under Rule 23(b)(1)(A).

### 3.    Rule 23(b)(2)

Finally, plaintiffs seek certification of the provider classes under Rule 23(b)(2).

Rule 23(b)(2) certification is appropriate if "the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed.

R. Civ. P. 23(b)(2).  The Supreme Court has clarified that

> [t]he key to the (b)(2) class is the indivisible nature of the injunctive or
> declaratory remedy warranted—the notion that the conduct is such that it
> can be enjoined or declared unlawful only as to all of the class members
> or as to none of them.  In other words, Rule 23(b)(2) applies only when a
> single injunction or declaratory judgment would provide relief to each
> member of the class.  It does not authorize class certification when each
> individual class member would be entitled to a *different* injunction or
> declaratory judgment against the defendant.  Similarly, it does not
> authorize class certification when each class member would be entitled to
> an individualized award of monetary damages.

*Wal-Mart Stores, Inc.*, 131 S. Ct. at 2557 (emphasis in original; citations and internal

quotation marks omitted).  "Rule 23(b)(2) operates under the presumption that the

interests of the class members are cohesive and homogeneous such that the case will

not depend on adjudication of facts particular to any subset of the class nor require a

remedy that differentiates materially among class members."  *Lemon v. Int'l Union of*

*Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000).

Plaintiffs contend that for each class, they seek declarations that the repayment

demands were adverse benefit determinations, class members were entitled to notice

and appeal, and the notice and appeal process they received did not substantially

comply with the requirements of ERISA.  They also seek an injunction returning any

recouped funds and remanding each claim to the defendant benefit plan so that the

41

plan can provide class members with ERISA-compliant notice and appeal rights. *See Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 778–79 (7th Cir. 2010) (remedy for violation of ERISA procedures is to maintain status quo and remand to give adequate procedures). The Court concludes, however, that certification under Rule 23(b)(2) is inappropriate.

First, plaintiffs have not shown that the members of each provider class are cohesive and homogeneous or that the requested declaratory and injunctive relief is of an indivisible nature. *See Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) (proposed class not cohesive when there is no uniform remedy that can redress the injuries of all plaintiffs, or when case depends on adjudicating facts particular to individual members or groups of members); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) (Rule 23(b)(2) classes must be cohesive, and "[t]he disparate factual circumstances of class members may prevent a class from being cohesive" (internal quotation marks omitted)). As discussed above, there are numerous individual issues that determine whether any given class member is entitled to any notice and appeal rights under ERISA.

Even after a determination that class members were entitled to notice and appeal under ERISA, there would remain individual issues concerning whether any notice and appeal rights that particular class members received substantially complied with the requirements of ERISA. *See T.V. v. Smith-Green Cmty. Sch. Corp.*, 267 F.R.D. 234, 237–38 (N.D. Ind. 2010) (noting that class did not comport with Rule 23(b)(2)'s cohesiveness requirement when individual facts were needed to determine

42

defendant's liability to each plaintiff); *Roe v. Bridgestone Corp.*, 257 F.R.D. 159, 170–71 (S.D. Ind. 2009) (denying class certification under Rule 23(b)(2) when defendant's liability to each plaintiff depended on individual facts)*; Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 458–59 (D.N.J. 2009) (denying Rule 23(b)(2) certification in an ERISA case when plaintiffs' claims depended on language of individual insurance plan and provider contracts); *Block v. Abbott Labs.*, No. 99 C 7457, 2002 WL 485364, at *8 (N.D. Ill. Mar. 29, 2002) (factual variations in class members' cases, as well as differences in applicable state law, meant that interests of class members were not cohesive). Resolution of these issues is essential in determining the issue of liability.

In addition, even if some subset of class members were to prevail, the Court might not be able to issue a single declaration or injunction for each class. *Kartman*, 634 F.3d at 893 n.8; *see Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008) (Rule 23(b)(2) certification not appropriate when class is not cohesive, such as when relief must be specifically tailored to individual plaintiffs or requires inquiry into individual circumstances). Plaintiffs request a declaration that the repayment demands were adverse benefit determinations, they were entitled to notice and appeal rights, and the defendants did not provide sufficient notice and appeal under ERISA. For the reasons discussed above, any declaratory judgment necessarily would be dependent upon particular circumstances, such as whether a repayment demand was an adverse benefit determination and whether the defendant failed to provide substantially compliant notice and appeal in particular circumstances. In short, the Court likely would not be able to issue an indivisible declaratory judgment.

43

In addition, the fact that plaintiffs seek monetary relief, through return of the money that defendants recouped or offset from future payments following their repayment demands, likely precludes certification of the class under Rule 23(b)(2), which encompasses only classes seeking injunctive and declaratory relief.  Fed. R. Civ. P. 23(b)(2); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 825 (7th Cir. 2011).  Although plaintiffs contend that the monetary relief they seek is equitable in nature, Rule 23(b)(2) "does not speak of equitable remedies generally but of injunctions and declaratory judgments."  *Wal-Mart*, 131 S. Ct. at 2560 (internal quotation marks omitted).  In this circuit, monetary relief under Rule 23(b)(2) is permitted if it "is merely incidental to the grant of an injunction or declaratory relief:  incidental in the sense of requiring only a mechanical computation."  *Randall*, 637 F.3d at 825 (internal quotation marks omitted); *but see Wal-Mart*, 131 S. Ct. at 2558, 2560 (stating that "individualized monetary claims belong in Rule 23(b)(3)" and declining to decide whether Rule 23(b)(2) permits incidental monetary relief).  Incidental damages cannot "depend in any significant way on the intangible, subjective differences of each class member's circumstances [or] require additional hearings to resolve the disparate merits of each individual's case." *Lemon*, 216 F.3d at 581 (internal quotation marks omitted).

Plaintiffs contend that the monetary award here is mechanically computable, but they make no effort to show how the total amount of recouped and offset funds for each class member would be calculated.  Presumably each defendant has a record of the money it pays and receives from each class member and perhaps of every repayment demand it has made.  Plaintiffs do not address, however, how it would be possible to calculate mechanically which repayment demands are associated with adverse benefit

44

determinations for which plaintiffs were entitled to but did not receive ERISA-compliant notice and appeal rights. It is likely that such determinations would require hearings or individualized consideration to ascertain particular class members' circumstances.

Finally, the financial stakes of at least some individual class members in their claims may be significant. For example, some of the named plaintiffs claim more than $100,000 in improper repayment demands. This renders monetary relief too large "to be called incidental" to the requested injunctive and declaratory relief. *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 470–71 (7th Cir. 2004). In such circumstances, class members "may have a constitutional entitlement" to bring their own claims, an option that certification under Rule 23(b)(2) forecloses because it is mandatory. *Id.* at 470; *see Wal-Mart*, 131 S. Ct. at 2558. The Seventh Circuit has suggested that a district court may have authority to provide opt-out rights even in 23(b)(2) classes. *Lemon*, 216 F.3d at 582. More recently, however, the court has stated that district courts should not attempt such a "complicated and confusing" procedure. *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005). In addition, the Supreme Court has expressly stated that 23(b)(2) classes are mandatory and lack the opt-out rights of 23(b)(3) classes. *Wal-Mart*, 131 S. Ct. at 2558. These are additional factors suggesting that certification under Rule 23(b)(2) is inappropriate. *See In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, No. 3:05-MD-527 RM, 2007 WL 3027405, at *27 (N.D. Ind. Oct. 15, 2007) (certifying a class of plaintiffs with ERISA benefits claims under Rule 23(b)(3) instead of Rule 23(b)(2) so that plaintiffs would have opt-out rights).

Plaintiffs cite two Seventh Circuit cases in which the court found that certification under Rule 23(b)(2) was appropriate even though there may have been substantial individual questions of law after the resolution of common questions. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491–92 (7th Cir. 2012); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010). In these cases, however, there was a foundational common question that could be answered independently of the individual issues that might exist. In *McReynolds*, there was a significant common issue regarding whether two company-wide policies of the defendant had a disparate impact on minority employees. *McReynolds*, 672 F.3d at 489–90. A court could determine the effect of these common policies and issue an injunction ordering defendant to change them without considering facts particular to each individual plaintiff. *Id.* at 490–91. In *Pella*, plaintiffs contended that a type of window manufactured by the defendant had a design defect. *Pella*, 606 F.3d at 392. A court could determine whether the design was defective and issue a declaratory judgment to that effect without considering the many individual issues that could arise concerning damages. *Id.* at 394–95. The same is true for three state court cases cited by plaintiffs, in which the courts certified classes under rules similar to Rule 23(b)(2). Each of these cases had common issues that could be resolved without first determining individual issues. *See Diaz v. Blue Cross & Blue Shield*, 267 P.3d 756, 766 (Mont. 2011) (certifying class to examine whether insurer's acknowledged subrogation policy violated Montana law); *Ferguson v. Safeco Ins. Co. of Am.*, 180 P.3d 1164, 1170 (Mont. 2008) (certifying class to examine whether defendant policy violated its contract, no

46

consideration of the facts of any individual case); *Lebrilla v. Farmers Group, Inc.*, 16 Cal. Rptr. 3d 25, 1075 (Cal. Ct. App. 2004) (certifying class to consider whether insurance company's policy of using allegedly inferior parts violated a single insurance contract).

In this case, by contrast, the Court cannot address any alleged common issue concerning whether each defendant violated ERISA's requirement to provide notice and an appeal process without first considering whether particular class members were actually entitled to ERISA notice and appeal rights, not to mention the nature of any notice and appeal they actually received. Unlike the cases cited by plaintiffs, most of which involved a single company-wide policy of the defendant, plaintiffs here have not shown that any defendant has a common policy covering all or nearly all repayment demands.

The Court concludes that certification of the proposed classes under Rule 23(b)(2) is inappropriate.

### 4. Conclusion

Because plaintiffs have failed to establish that the proposed provider classes qualify for class certification under any of the provisions of Rule 23(b), the Court denies certification of those classes. The Court therefore need not address whether the proposed classes are ascertainable and whether they satisfy the requirements of Rule 23(a).

### B. Florida discrimination class

Plaintiffs also seek to certify a class of all chiropractors who were subject to

certain policies of BCBSF.  In 2007, BCBSF rewrote its billing guidelines for chiropractic physicians.  The rewrite included a change called the single modality project, which limited chiropractic physicians' reimbursement to one physical therapy modality on the same day a patient received chiropractic manipulation.  Plaintiffs allege that this in effect required the patient to return to the physician's office the next day for additional modalities—in other words, to visit the office twice for treatment the patient otherwise would have received in a single visit.  Because patients' insurance policies typically limit the number of physician visits for which they are covered, the effect of BCBSF's new policy, plaintiffs allege, was to reduce the amount of care for which patients were covered and, in turn, to reduce the amount that chiropractic physicians were reimbursed by BCBSF.  The policy also precluded full reimbursement if the chiropractor exceeded the "one physical therapy modality" limitation.

Plaintiffs allege that BCBSF's changed practice violated section 627.419 of the Florida Code, which provides that "[a]ny limitation or condition placed upon payment to, or upon services, diagnosis, or treatment by, any licensed physician shall apply equally to all licensed physicians without unfair discrimination to the usual and customary treatment procedures of any class of physicians," including chiropractors.  Fla. Stat. § 627.419(4).  According to plaintiffs, the imposition of the single modality rule unfairly discriminated against the usual and customary treatment procedures of chiropractors as compared with other classes of physicians.  Dwyer, the named plaintiff for this class, seeks to represent two subclasses of Florida chiropractors (1) who, after having treated patients for more than twenty-six visits, were denied payment, or (2) who, after having provided more than one physical therapy modality on the same date as chiropractic

48

manipulation, were denied reimbursement on the ground that the services were not covered by the patient's insurance.

Plaintiffs previously brought a motion for class certification using the same class definition they present now. At the time, they argued for certification under Rules 23(b)(1)(A) and 23(b)(2). The Court denied certification, concluding that damages were not mechanically computable—making certification under Rule 23(b)(2) inappropriate—and that certification under Rule 23(b)(1)(A) was improper because of the significant financial stake each class member had in her damages. *Penn. Chiropractic Ass'n*, 2011 WL 6819081, at *15. Although the Court noted that certification under Rule 23(b)(1)(A) was a close question, the Court did not, as it did when denying the provider class, invite a renewed motion to certify the Florida discrimination class.

Plaintiffs' new motion to certify the Florida discrimination class uses the same class definition as its previous motion and makes few new arguments. As a basis for certifying the class the Court previously declined to certify, plaintiffs cite the recent Seventh Circuit case of *McReynolds*, in which the court certified a Rule 23(b)(2) and (c)(4) class to determine if two of defendant's policies had a disparate impact on minority employees. *McReynolds*, 672 F.3d at 490–92. In doing so, the court acknowledged that after any determination concerning the two company-wide policies, there would have to be individual proceedings to show that each plaintiff had been affected by the common policies. It stated, however, that class certification was appropriate to resolve the predicate issue of the illegality of the defendant's policies. *Id.* at 490–91. *McReynolds*, which only relates to certification under 23(b)(2) and not to

49

certification under 23(b)(1)(A), did not establish new law in the Seventh Circuit. In *Allstate* (decided in 2005), the court stated that a class action could be appropriate to determine if a defendant had a discriminatory policy, before using individual hearings to determine how each class member was affected. *In re Allstate Ins. Co.*, 400 F.3d at 508. In short, plaintiffs could have made this argument in their initial class certification motion.

Plaintiffs also now contend, for the first time, that if certification under Rule 23(b)(1)(A) and 23(b)(2) is not appropriate, then certification under Rule 23(b)(3) or 23(c)(4) is. Plaintiffs could have sought certification under Rule 23(b)(3) or 23(c)(4) in their previous motion to certify the class, but they chose not to do so. In addition, they make no argument showing that either of these types of class action is appropriate. For certification under Rule 23(c)(4), plaintiffs only contend that there are common issues, without elaboration on how Rule 23(c)(4) certification would apply. With regard to certification of a class under Rule 23(b)(3), plaintiffs make no effort to establish that common issues predominate or that class adjudication is superior to other methods of adjudicating the case. Plaintiffs' only argument on these issues is to assert, without elaboration, that common issues predominate and that the class is manageable. The Court concludes that plaintiffs have forfeited these contentions by failing to present them adequately.

The Court declines to certify the Florida discrimination class.

## Conclusion

For the reasons stated above, the Court denies plaintiffs' motions to certify provider classes and their motion to certify the Florida discrimination class [docket nos.

50

581, 584, 587, 590, 593, 595, 597, 599, 602 & 606].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 12, 2012