**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENNSYLVANIA CHIROPRACTIC ASSOCIATION, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 09 C 5619** |
| **BLUE CROSS BLUE SHIELD ASSOCIATION, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY,  District Judge:

Plaintiffs have sued a number of Blue Cross and Blue Shield entities for violations of the Employee Retirement Income Security Act (ERISA) and Florida law. Defendants Anthem Health Plans of Virginia, Inc. and WellPoint, Inc. have moved for summary judgment against plaintiff Andrew Reno.  Defendant Independence Blue Cross has moved for summary judgment against plaintiffs Mark Barnard and Barry Wahner.  Defendants have also moved for judgment on the pleadings against plaintiff Brenda Tomanek.  For the reasons stated below, the Court denies the motion for judgment on the pleadings in part and grants it in part and denies the motions for summary judgment.

### Background

**A.**     **General background**

The plaintiffs in this case are chiropractic physicians, an occupational therapist,

and a clinical social worker/trauma specialist who have provided services to members

of health care plans insured or administered by the defendants; professional

associations whose members are chiropractic physicians; and a residential treatment

facility.[1]  The defendants are Blue Cross and Blue Shield of America (BCBSA) and

individual Blue Cross and Blue Shield entities (BCBS entities).  BCBSA is a national

umbrella organization that facilitates the activities of individual BCBS entities.  Individual

BCBS entities insure and administer health care plans to Blue Cross and Blue Shield

customers (BCBS insureds) in various regions.

Plaintiffs allege that defendants improperly took money belonging to plaintiffs.

They allege that defendants would initially reimburse the provider plaintiffs for medical

services they provided to BCBS insureds.  Sometime afterward, plaintiffs allege,

defendants would make a false or fraudulent determination that the payments had been

in error.  Defendants then would demand that individual plaintiffs repay the supposedly

overpaid amounts immediately.  If plaintiffs refused to do so, defendants would forcibly

recoup the amounts they sought by withholding payment on other, unrelated claims for

services plaintiffs provided to other BCBS insureds.

Plaintiffs allege further that when defendants made these repayment demands,

they typically did not provide adequate information regarding available review

procedures.  Plaintiffs allege that defendants sometimes failed to offer any appeal

process at all.  When an appeal process was available, plaintiffs allege, defendants

---

[1] The Court assumes familiarity with the plaintiffs' allegations in this case and will summarize them briefly here.  A more detailed recounting of the plaintiffs' allegations can be found in the Court's May 17, 2010 decision.  *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010).

refused to provide details about which patients, claims, and plans were claimed to be the subject of overpayment or "effectively ignored" plaintiffs' appeals.  Fourth Am. Compl. ¶ 18.  Plaintiffs contend that this conduct deprived them of their right to a "full and fair review" under ERISA.  29 U.S.C.  § 1133.

Plaintiffs assert their ERISA claims in three counts in the fourth amended complaint.  In count one, plaintiffs seek to recover the unpaid benefits they allege defendants improperly recouped.  *See* Fourth Am. Compl. ¶¶ 507–17.  Plaintiffs bring this claim under section 502(a)(1)(B) of ERISA, which permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

In counts two and four, plaintiffs request injunctive and other equitable relief under section 502(a)(3) of ERISA.  *Id.* ¶¶ 518–25, 531–35.  That provision authorizes a plan participant, beneficiary, or fiduciary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

Although their complaint indicates otherwise, all four plaintiffs involved in the current motions state that they are not seeking final determination that the defendants' repayment requests and recoupments were improper, but only an order "remanding" the claims to the insurance plans so that the plans can provide ERISA-compliant notice and appeal rights.  As part of that remand, however, plaintiffs argue that defendants should be required to return all the money they have received from their repayment

3

demands and recoupments, in order to return the situation to the status quo ante, that
is, the situation as it existed before the repayment requests.

**B.      Facts relating to Reno's claims**

Reno is a chiropractor in Virginia who has a contract with Anthem, a subsidiary
of WellPoint, to provide medical services to participants in Anthem's health plans.  In
2006, Anthem informed Reno that it was conducting a review of payments it had made
to him for services he provided to twenty-four patients.  In 2007, Anthem wrote to Reno
stating that it had found numerous errors after examining the bills for his services.  In
particular, it told Reno that there were 170 claims that had no documentation, fifty-four
claims for services that were not covered, four claims for services that were billed at a
higher level than was supported by documentation, and 133 claims for services that had
not been correctly coded.  Anthem calculated from this that of the original $18,000 it
had paid to Reno for these services, more than $10,000 had been paid wrongfully.
Anthem extrapolated from this survey of twenty-four patients and concluded that during
the period of time covered by the audit, Reno had been overpaid about $110,000 for all
of his Anthem patients.  Anthem demanded that Reno repay the $110,000.

Instead of paying, Reno retained legal counsel to dispute the repayment
demand.  He also made use of a chiropractic claims coding expert, though the parties
dispute whether Anthem considered the expert's report.  After Reno's counsel
exchanged several letters with Anthem, Anthem reduced the amount it was demanding
to $46,000.  It calculated this reduced amount by waiving any claim for repayment on
the coding and documentation mistakes and demanding repayment only for the claims
that it contended were for non-covered services.  The non-covered service was Vax-D,

4

a type of spinal decompression procedure.  Reno Ex. 6; Anthem Ex. I.

Early in 2008, Reno offered to resolve the audit by repaying about $9,000. Anthem rejected that offer.  Reno then offered to pay about $25,000, and Anthem accepted.  Anthem characterizes this as a settlement, but Reno contends that it was calculated as the amount he had actually received for non-covered spinal decompression procedures.  Reno signed a promissory note for the payment and agreed to pay the $25,000 in twenty-four monthly installments.  Reno's attorney mailed the note to Anthem, including with it a letter stating that "[a] properly executed promissory note from Dr. Reno is enclosed.  I'll assume this ends all matters concerning Anthem's audit of Dr. Reno's claims."  Anthem Ex. N.

Reno made all of the payments due on the promissory note.  At his deposition, Reno testified that he did not seek additional payment from any of the patients from whose services Anthem had recouped money.  Thus those patients did not pay any additional amount out of pocket because of Anthem's recoupment.

## C.    Facts relating to Wahner and Barnard's claims

Wahner and Barnard are chiropractors in Pennsylvania, each with separate practices, who are participating health care providers with Independence. Independence paid both of them for services they rendered to participants in Independence's plans.  It subsequently determined that it should not have paid some of the claims and demanded that Wahner and Barnard repay some of the money they had received.  Independence contends that it recovered no more than $4,950 from Barnard, but Barnard contends that the amount was greater.  Wahner and Independence also disagree about the amount of Independence's demand and recovery from him.

5

Independence has produced a summary of what it contends are all the claims on which it recovered and calculated that they total $4,056. Wahner, however, has presented a letter and an e-mail from Independence in which it demands repayment of $5,110, though he offers no evidence to show that Independence actually recovered this entire amount. Wahner & Barnard Exs. 8–9. It is undisputed that neither Wahner nor Barnard ever attempted to bill their patients to recover any of the amounts they had to repay to Independence, although they contend that they could have done so.

**D.      Facts relating to claims by Tomanek**

For purposes of resolving a motion for judgment on the pleadings, the Court "view[s] the facts in the complaint in the light most favorable to the nonmoving party." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

Tomanek is a chiropractor in Pennsylvania who has a contract to provide services to patients in Highmark's plans. In 2004, a review specialist for Highmark wrote Tomanek and requested that she provide documentation and records for a number of claims. Highmark justified its request by stating that a review of Tomanek's billing had revealed questionable billing and coding practices. Tomanek provided the records and later learned that the records had been forwarded to a chiropractic consultant for review.

In 2006, Highmark told Tomanek that the consultant's review determined that it had overpaid her by more than $97,000 in relation to services provided to 113 patients. Highmark demanded that Tomanek repay that amount. In response, Tomanek sent Highmark letters seeking to exercise the ERISA appeal rights of her patients. Highmark denied that Tomanek or her patients were entitled to any appeal rights.

6

Tomanek then proceeded to appeal the repayment demands through a medical review committee (MRC) that Highmark provided for billing disputes with providers. Tomanek submitted a memorandum to the MRC containing her arguments, as well as the report of a coding expert who disputed Highmark's billing and coding determinations. Shortly before the MRC's hearing in 2007, the consultant retained by Highmark who had concluded that Tomanek made coding and billing errors submitted a supplemental letter to the MRC. The supplemental letter partially repudiated some of the consultant's prior conclusions supporting Highmark's repayment demands and justified other prior conclusions. Tomanek contends that she did not receive a copy of the letter long enough before the MRC hearing to respond to it. Tomanek also contends that the MRC process was flawed because she and her counsel only had a limited amount of time to present her challenge to Highmark's determination to the MRC and because the eleven-member MRC included only one chiropractor.

After the MRC hearing, Highmark reduced its repayment demand to about $48,000. Highmark recouped the money it claimed it was owed by withholding payment due to Tomanek for services provided to other patients.

In June 2007, Tomanek and the entity through which she operated her practice filed suit against Highmark and its consultant in Pennsylvania state court. Highmark Ex. A; *see Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) (court may take judicial notice of public court documents). Tomanek asserted five claims: a claim that Highmark violated her due process rights by providing inadequate review of its repayment demands, three claims that Highmark violated its provider agreement with her, and a claim against Highmark's consultant for tortious interference with contract.

7

Highmark Ex. A.

In March 2008, the Pennsylvania trial court dismissed four of Tomanek's five claims. Highmark Ex. B. The court concluded that Tomanek's due process claim failed because neither the Constitution nor Pennsylvania common law required Highmark to grant Tomanek due process. *Id.* at 11. The court also concluded that two of Tomanek's three breach of contract claims failed because Tomanek lacked the contractual rights she asserted. *Id.* at 10–11, 12. Finally, it determined that Tomanek could not assert a tortious interference claim against the consultant because he was acting as Highmark's agent. *Id.* at 11–13. The court also struck all of Tomanek's requests for injunctive relief and attorney's fees.

After the court's decision, only one of Tomanek's breach of contract claims remained. In February 2011, the court dismissed this claim with prejudice for lack of prosecution. *See* Pa. R. Civ. P. 230.2.

## Discussion

### A.    Summary judgment motion against Reno

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

8

nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Defendants Anthem and WellPoint contend that they are entitled to summary judgment against Reno because he has no right to bring an ERISA claim; his patients would have no right to bring an ERISA claim under the circumstances; Reno already exercised his ERISA appeal rights; and he settled his claims through an accord and satisfaction.

### 1.    Entitlement to ERISA notice and appeal rights

Reno's claims are grounded in his contention that he did not receive appropriate notice and appeal rights under ERISA.  ERISA provides notice and appeal rights to participants and beneficiaries when a plan makes an adverse benefit determination.  29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(a), (g) & (h).  Reno is not a participant as that term is defined in ERISA.  29 U.S.C. § 1002(7).  He may, however, be a beneficiary, defined in ERISA as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may be entitled to a benefit thereunder."  *Id.* § 1002(8); *see Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991).

Defendants appear to concede that Reno is a beneficiary because his patients, the plan participants, assigned him their rights to payment or benefits from their health plans.  Defendants contend, however, that the patients did not assign their notice or appeal rights to Reno.  They also contend that Reno is entitled to notice and appeal rights only if he is an "authorized representative" of the plan participants.

ERISA regulations, however, expressly confer notice and appeal rights upon a

person who is a "claimant." 29 C.F.R. § 2560.503-1(g) & (h). The regulations define claimants as "participants and beneficiaries." *Id.* § 2560.503-1(a). As stated above, the language of ERISA itself defines a beneficiary as a person "who is or may be entitled to a benefit." 29 U.S.C. § 1002(7). Thus the plain language of ERISA and its regulations provides beneficiaries notice and appeal rights. If Reno is a beneficiary, he is entitled to an ERISA-compliant notice and appeal process without regard to whether his patients purported to assign him their notice and appeal rights. Defendants have not offered any authority for the proposition that only persons specifically assigned a participant's notice and appeal rights are beneficiaries or are entitled to notice and appeal rights.

Defendants also contend that Reno is not an authorized representative of his patients and thus is not entitled to the rights of notice and appeal. *See* 29 C.F.R. § 2560-503-1(b)(4) (plan's claim procedures must allow a claimant to have an authorized representative act on his behalf). They note that a Department of Labor (DOL) interpretation of the ERISA regulations states that an assignment of benefits typically does not make a provider an authorized representative of his patient. *See* FAQs About Benefit Claims Procedure Reg. at B-2, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Oct. 9, 2012). Regardless of whether Reno is an authorized representative for his patients, however, he is a beneficiary entitled to notice and appeal rights. Regulations and interpretations concerning authorized representative status are irrelevant here, given that the ERISA regulations expressly provide beneficiaries the right to notice and appeal. 29 C.F.R. § 2560.503-1(g) & (h).

Defendants also contend in their reply brief that Reno did not have assignments of benefits from his patients, after conceding in their opening brief and their statement of undisputed facts that he did. Defendants, however, conflate Reno's status as a beneficiary with his status as an authorized representative. They cite to pages of Reno's deposition in which he indicates that he had never been formally designated as a patient's authorized representative. Anthem Ex. C at 222–23. At the same cited pages, however, Reno also testified that he did obtain assignments of benefits or the right to payment from his patients. *Id.* at 128–30, 221. Defendants' argument lacks merit.

### 2.    Adverse benefit determination

As stated above, ERISA regulations provide for notice and appeal rights to participants and beneficiaries when a plan has made an adverse benefit determination. 29 C.F.R. 7 2560.503-1(g) & (h). The regulations define an adverse benefit determination as:

> [A] denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including [a decision] . . . that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, [a decision] . . . resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

29 C.F.R. § 2560.503-1(m)(4).

Defendants contend that the repayment demands they made on Reno were not adverse benefit determinations because the demands did not deny any specific patients' claims and none of Reno's patients suffered increased financial liability.

11

Defendants base their argument on the DOL's interpretation of the ERISA regulations. The DOL stated:

> The regulation does not apply to requests by health care providers for payments due them—rather than due the claimant—in accordance with contractual arrangements between the provider and an insurer or managed care organization, where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization.

FAQs About the Benefit Claims Procedure Regulation at A-8. Defendants argue that because Reno's patients did not suffer increased financial liability from their repayment demands, there was no adverse benefit determination and neither Reno nor the patients are entitled to ERISA notice and appeal rights.

Defendants' first argument is that they never denied any specific patient's claim for benefits. Defendants took this position during their initial negotiations with Reno, stating "we are not retracting individual claims, so members will not be receiving [explanation of benefits forms] that state the claim has be[en] denied." Anthem Ex. L. In the same correspondence, Anthem stated that all future claims billed with a particular treatment code would be denied and the plan participants would receive explanation of benefits forms. Anthem Ex. L. They also contend that Reno settled with them, so that they did not have to officially deny any claims.

A reasonable fact finder, however, could conclude that Anthem did deny specific claims involving specific patients. As stated above, Reno received a letter from Anthem in 2007 informing him that Anthem had paid him too much. Anthem Ex. F. One of the categories of overpayment listed in the letter was "Vax-D services," referring to a spinal decompression procedure. *Id.* The letter stated "Vax-D services are not covered. . . .

12

Vax-D and similar mechanical traction devices are considered investigational/not medically necessary by Anthem Blue Cross and Blue Shield." *Id.* In a second letter, Anthem indicated that it would not demand repayment for any of the claimed billing errors except those related to Vax-D, stating "**Vax-D services are not covered**." Anthem Ex. I (emphasis in original). In the same letter, Anthem reduced its repayment demand to about $46,000, and a reasonable fact finder could conclude that this amount represented repayment only for the non-covered Vax-D treatments. In a 2008 letter, Anthem acknowledged that spinal decompression was covered under some plans, and it agreed to accept $25,284.48 as the total repayment. Anthem Ex. K. The letter stated that "[a]ccording to the information you have provided Anthem, Dr. Reno indicates that $25,284.48 is the amount paid for the spinal decompression . . . services for Anthem patients. In an effort to resolve this matter Anthem will accept $25,284.48 as the total refund due." *Id.*

A reasonable fact finder could conclude from these exhibits that defendants in fact had denied claims that involved Reno providing spinal decompression to his patients. Contrary to Anthem's claim that it was not rejecting any individual patient's claim, it demanded repayment from Reno for every spinal decompression he had performed on the ground that the service was not covered. Further, Anthem told Reno that Vax-D services were considered not medically necessary, a type of denial specifically mentioned in the definition of adverse benefit determination. 29 C.F.R. § 2560.503-1(m)(4). A reasonable fact finder could conclude that Anthem's repayment demand was an adverse benefit determination, because it denied coverage for every instance of a specific procedure. The mere fact that Anthem stated it was not denying

13

any specific claims does not change the fact that as a result of its actions, Reno received no payment for any instance in which he provided Vax-D to patients under certain benefit plans.  In addition, although Anthem characterizes the reduced amount Reno actually paid as a settlement, a reasonable fact finder could conclude that Reno's repayment to Anthem amounted to repayment for every instance in which he had been paid for a service that Anthem contended was not covered, as the 2008 letter stated.

Defendants also contend that its repayment demands did not expose Reno's patients to increased financial liability.  As just discussed, however, a reasonable fact finder could conclude that Anthem's repayment demand in fact denied a certain group of claims on the grounds the services were not covered and were not medically necessary.  Reno thus could have sought to bill those patients for the amount not covered by insurance.  Reno's assignment of benefits forms stated that patients were "financially liable for all charges whether or not paid by insurance."  Anthem Ex. Q. Reno also testified that he had the ability to bill his patients for the amounts he repaid to Anthem but chose not to do so out of concern that it would harm his relationship with them.  Reno Ex. 8 at 165–66.  Defendants do not contend that Reno's contractual agreement with them prevented him from billing his patients.

The DOL interpretation of the ERISA regulations cited by defendants provides that a dispute between a benefit plan and a provider can be an adverse benefit determination when "the medical provider will continue to have recourse against the claimants for amounts unpaid by the plan."  FAQs About the Benefit Claims Procedure Regulation at A-8.  Although it is undisputed that Reno did not seek repayment from his patients, a reasonable fact finder could conclude that he had the ability to do so.

14

In sum, a reasonable fact finder could conclude that Reno and his patients suffered adverse benefit determinations when defendants demanded that Reno repay the money he had received for Vax-D services.

### 3. Appeal rights

Defendants contend that Reno actually received appeal rights when he disputed the repayment demands with Anthem and was able to reduce the repayment demand from more than $100,000 to about $25,000.

ERISA requires that employee benefit plans provide adequate notice to participants and beneficiaries when denying their claims as well as a reasonable opportunity for full and fair review of the denial. 29 U.S.C. § 1133. Regulations set out more specifically the requirements for notice and appeal rights. "Adequate notice" of an adverse benefit determination includes notice of "[t]he specific reason or reasons for the adverse determination"; "[r]eference to the specific plan provisions on which the determination is based"; "[a] description of any additional material or information necessary for the claimant to perfect the claim"; "[a] description of the plan's review procedures"; and, for a health care plan, "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment . . . exclusion . . . either an explanation of the scientific or clinical judgment for the determination . . . or a statement that such explanation will be provided free of charge upon request." 29 C.F.R. § 2560.503-1(g). A "reasonable opportunity . . . for a full and fair review" affords claimants "at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination"; "the opportunity to submit written comments, documents, records, and other information relating to the claim for

15

benefits"; "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits" upon request; and "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." *Id.* § 2560.503-1(h). In addition, an appeal of a health care plan's adverse benefit determination may not be decided by the person who made the adverse benefit determination in the first instance, and the benefit plan must consult with an appropriate health care professional when reviewing a decision that a treatment is experimental or not medically necessary. *Id.* § 2560.501-1(h)(3).

The law does not require precise compliance with all of the requirements of the ERISA regulations. "In determining whether a plan complies with the applicable regulations, substantial compliance is sufficient." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992); *accord Ponsetti v. GE Pension Plan*, 614 F.3d 684, 693 (7th Cir. 2010). "The inquiry into whether [denial] procedures substantially complied with the demands of [ERISA] is fact-intensive and guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review." *Ponsetti*, 614 F.3d at 693 (internal quotation marks omitted).

Defendants do not contend that they provided notice that substantially complied with ERISA, and a reasonable fact finder could conclude that the notice they provided did not do so. Although Anthem sent Reno a letter telling him the types of claims on which it demanded repayment, the letter did not contain a reference to specific provisions of the underlying benefit plans justifying its determinations. Anthem Ex. F.

16

The letter also failed to describe any procedure to appeal the repayment demand, stating only that "[w]e will accept a payment of [$110,000] as a means to close this audit and have provided a postage-paid envelope for your refund." *Id.* In addition, as discussed above, Anthem demanded repayment for Vax-D services Reno had provided to patients because it deemed those services not medically necessary. It did not, however, provide an explanation of the clinical judgment supporting this determination, as the regulations require.

Defendants contend that Reno received an appeal, but they provide no explanation for how the process Reno underwent substantially complied with the requirements of ERISA. A reasonable fact finder could determine that the review received by Reno did not substantially comply with ERISA's requirements. The evidence presented by defendants shows that throughout the entire process that resulted in a reduction in the repayment demand, Reno and his counsel dealt with the same person who wrote the initial repayment demand letter, an investigator named Wendy Bohannon. Anthem Ex. F, I, K, L. A reasonable fact finder thus could find that Reno never had the opportunity to have an individual who had not been involved in the initial adverse benefit determination review the repayment demand as required by ERISA regulations. Furthermore, a reasonable fact finder could conclude that when Anthem reviewed its determination that the Vax-D treatments provided by Reno were not medically necessary, it did not consult an appropriate healthcare professional. There is no evidence in the record suggesting that Anthem did consult with any such professional.

In sum, a reasonable fact finder could conclude that Reno never received

17

ERISA-compliant notice and appeal.

### 4.    Accord and satisfaction

Finally, defendants contend that Reno's claims are barred based on their affirmative defense of accord and satisfaction.  Defendants rely upon a Virginia statute governing accord and satisfaction, which provides:

> If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument . . . the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

Va. Code Ann. § 8.3A-311.

It is undisputed that Reno signed a promissory note for about $25,000 to Anthem and that his attorney mailed the promissory note to Anthem along with a letter in which he stated, "I'll assume this ends all matters concerning Anthem's audit of Dr. Reno's claims."  Anthem Ex. N.  As applied here, however, the statute defendants cite would bar further claims by Anthem against Reno, not the other way around.  Reno is the one who tendered an instrument to Anthem, along with a statement that the instrument was tendered to satisfy certain claims.  *See Gelles & Sons Gen. Contracting, Inc. v. Jeffrey Stack, Inc.*, 569 S.E.2d 406, 407–09 (Va. 2002) (determining that statute protected contractor who had sent check to subcontractor as final payment).  Nothing in the language of the statute bars claims when the claimant, in this case Reno, did not receive an instrument from the defendant but instead sent one.  Nor do defendants present any case in which a court applied the statute to bar claims by a party that

18

previously made payment.

Defendants suggest more broadly that Reno settled any ERISA claims when he paid about $25,000 to Anthem. Beyond their citations to the Virginia statute, however, they make no effort to show that a settlement agreement existed under Virginia law or that of any other state that would preclude Reno's ERISA claims. A reasonable fact finder could conclude that Reno did not agree to settle any possible ERISA claims against defendants. *See Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 683 S.E.2d 517, 525 (Va. 2009) (when interpreting contract under Virginia law, courts attempt to determine the intent of the parties, looking primarily at language used by parties in contract). The promissory note signed by Reno states that he agree to pay Anthem in exchange "FOR VALUE RECEIVED," but it does not recite what that value is. Anthem Ex. P. Nothing in the promissory note states that Reno is also giving up any ERISA claims he might have. Reno's attorney's letter, which accompanied the note, states in its entirety "A properly executed promissory note from Dr. Reno is enclosed. I'll assume this ends all matters concerning Anthem's audit of Dr. Reno's claims." Anthem Ex. N. The letter does not state, however, that Reno is settling any claim he might have, much less ERISA claims. From these documents, a reasonable fact finder could conclude that Reno simply paid to end the audit process and Anthem's attempts to recoup larger sums of money, without agreeing to forego bringing his own claims in the future. The same is true of an earlier letter written by Reno's counsel, in which he says that Reno would pay about $9,000 "to resolve all issues raised by Anthem's audit and get this matter behind him." Anthem Ex. J at 2. Moreover, the earlier letter is part of a failed attempt to end the audit for $9,000, and whatever promises Reno might have made if

19

he could have paid only $9,000 are not necessarily promises he made when paying $25,000 later on.

In sum, defendants have failed to show that Reno's claims are barred by the Virginia statute upon which they rely or the doctrine of accord and satisfaction.

### 5. Conclusion

For the reasons discussed above, the Court declines to grant summary judgment in favor of defendants Anthem and WellPoint on Reno's claims.

## B. Summary judgment motion against Wahner and Barnard

Defendant Independence contends that is entitled to summary judgment in its favor on the claims of plaintiffs Wahner and Barnard because plaintiffs cannot have valid assignments from their patients, their patients were not injured by the repayment demands, and plaintiffs are not authorized representatives of their patients.

### 1. Assignment

As discussed above, a healthcare provider is entitled to ERISA-compliant notice and appeal following an adverse benefit determination if the provider is a beneficiary as defined by ERISA. Wahner and Barnard contend that they are beneficiaries because they have valid assignments from the plan participants whose claims Independence denied by demanding repayment from plaintiffs. Independence does not appear to challenge plaintiffs' contention that they have their patients sign assignments "as a matter of course." Fourth Am. Compl. ¶¶ 264, 278. Instead, it contends that plan participants cannot assign anything to plaintiffs because their benefit plans contain anti-assignment provisions.

20

Independence asserts that "at least 34 of 40 healthcare plans" implicated in plaintiffs' claims contain anti-assignment provisions. Independence Memo. in Support of Mot. for Summary Judg. at 9. Plaintiffs dispute the number of health plans and patients that were implicated by Independence's repayment demands. More importantly, however, in deciding Independence's motion for summary judgment, the Court must make reasonable inferences in favor of plaintiffs. In this context, this means that if Independence cannot present anti-assignment provisions for some healthcare plans, the Court must infer that those plans have no anti-assignment provisions.

In particular, Independence concedes that Barnard has an assignment from a patient whose initials are V.P. Independence Ex. F-6. Independence also concedes that it could not find an anti-assignment provision in the patient's plan. Independence Ex. D at 5. Likewise, Independence concedes that Wahner has assignments from two patients whose initials are C.J. and D.D. Independence Exs. G-1, G-14. For both of these patients' plans, Independence likewise states that it has found no anti-assignment provisions. Independence Ex. E at 2, 7.

The Court concludes that a reasonable fact finder could determine that Wahner and Barnard each had valid assignments from at least some of their patients on whose claims Independence demanded repayment. Accordingly, plaintiffs would be beneficiaries entitled to an ERISA-compliant notice and appeal process with regard to those claims. Although anti-assignment provisions conceivably might prevent the Court from remanding some of the disputed claims, the Court declines to grant summary judgment against plaintiffs' claims in their entirety on this ground.

### 2. Adverse benefit determination

Independence contends that none of plaintiffs' patients suffered an adverse benefit determination because plaintiffs did not bill their patients after Independence demanded repayment from them and because their provider agreements prohibited them from doing so. As discussed above, under the DOL's interpretation of the ERISA regulations, a benefit plan's dispute with a provider is not an adverse benefit determination unless the provider has recourse against the plan participant, the patient, for any amount not paid by the plan. FAQs About the Benefit Claims Procedure Reg. at A-8.

It is undisputed that neither Wahner nor Barnard billed any of their patients for any additional amount because of Independence's repayment demand. Both plaintiffs, however, have provided documents they had their patients sign in which the patients acknowledged that they were liable for any amount not paid by their insurance plans. Pl. Exs. 6, 7. As discussed above in relation to Reno's claims, the plan participants suffered an adverse benefit determination if providers have the ability to bill them, even if the providers, like plaintiffs here, choose not to do so. *Id.*

Independence contends that, regardless of any agreements plaintiffs had with their patients, plaintiffs were prohibited by the terms of their provider agreements from billing their patients for any amount that Independence did not pay. The provider agreements, which are in relevant part identical, state that plaintiffs "shall accept as payment in full for Covered Services . . . the amounts payable by Independence . . . , less Copayment amounts." Independence Ex. A-23 at 3163. The agreements also contain a provision stating:

> **Beneficiary Hold Harmless**.  Provider agrees that in no event, including but not limited to non-payment, insolvency, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation or reimbursement from, or have any recourse against Beneficiary, Subscriber, enrollees, or persons other than Independence acting on behalf of Beneficiary for Covered Services provided pursuant to this agreement.

*Id.* at 3164 (emphasis in original).  The agreements use "Beneficiary"  to refer to the plan participant or subscriber, not the broader meaning provided in ERISA.  The agreements define "Covered Services" as "The Medically Necessary health care services and supples that are to be provided pursuant to a Benefit Program."  *Id.* at 3158.

Contrary to Independence's argument, the plain language of the provider agreements makes it clear that the agreements do not preclude plaintiffs from billing plan participants in all circumstances.  Instead, the agreements only prohibit billing plan participants for "covered services."  A reasonable fact finder could determine, however, that Independence's repayment demands to Barnard and Wahner amounted to a determination that the services for which they had been paid were *not* covered services.  Thus the provider agreements' bar against billing the patients would not apply.

Independence cites no evidence showing the reasons why it demanded repayment of Barnard's services.  The complaint alleges, however, that some claims were denied because they were not medically necessary.  Fourth Am. Compl. ¶ 268.  Barnard testified at his deposition that the complaint's allegations are accurate, and Independence does not appear to dispute that at least some of the services for which it demanded repayment were services that it deemed not to be medically necessary.  Independence Ex. A at 21.  If Independence determined that the claims were not

23

medically necessary, then they were not covered services under the provider agreement, and Barnard was free to bill his patients for the services. Thus a reasonable fact finder could determine that Barnard had recourse against his patients after the repayment demand.

As to Wahner, it is undisputed that Independence demanded repayment on the ground that the services in question were supposed to be covered in a capitation program. Under the capitation program, providers who participated in the program received fixed monthly payments to provide services to plan participants who participated in the program, rather than a fee for each individual service they provided. It is undisputed, however, that Wahner was not a provider in this program. Thus he was evidently ineligible to be paid in any way for services to the participants who participated in the program. Thus a reasonable fact finder could determine that when Independence demanded repayment on the ground that the services Wahner had rendered were supposed to be provided under the capitation program, it was saying that these were not covered services. Independence does not argue that the capitated services were covered services with regard to Wahner, and it does not contend that the phrase covered services can be interpreted to include services that Wahner was not permitted to provide under the health benefit plans at issue. Accordingly, a reasonable fact finder could determine that Wahner could have billed his patients for the services, making Independence's repayment demands to him adverse benefit determinations under the ERISA regulations.

### 3. Authorized representative

Independence also contends that Wahner and Barnard are not authorized

24

representatives of their patients.  As discussed above in relation to the motion for summary judgment against Reno, however, this is irrelevant.  ERISA regulations require plans to provide notice and appeal to beneficiaries following adverse benefit determinations, not merely to participants and their authorized representatives.  29 C.F.R. 2560.503-1(a), (g), & (h).  A reasonable fact finder could conclude that Barnard and Wahner are beneficiaries and their patients suffered adverse benefit determinations when Independence made repayment demands.

### 4.    Conclusion

For the reasons discussed above, the Court declines to grant summary judgment in favor of Independence on Wahner and Barnard's claims.

### C.    Motion for judgment on the pleadings against Tomanek

When considering a motion for judgment on the pleadings, the Court "view[s] the facts in the complaint in the light most favorable to the nonmoving party and will grant the motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief."  *Buchanan-Moore*, 570 F.3d at 827 (internal quotation marks omitted).  Defendants contend that Tomanek's claims are barred by the doctrine of claim preclusion, also known as res judicata, because she previously brought a similar suit in Pennsylvania state court that was decided on the merits.  *See Hayes v. City of Chicago*, 670 F.3d 810, 812–13 (7th Cir. 2012) (affirming district court grant of judgment on the pleadings on the ground of claim preclusion).

"Claim preclusion . . . prohibits litigants from relitigating claims that were or could have been litigated during an earlier proceeding."  *Id.* at 813.  The Court must

25

determine the preclusive effect of the Pennsylvania court's judgment under Pennsylvania law, even though the parties do not cite any Pennsylvania law on the subject, because "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Id.* (internal quotation marks omitted); *see* 28 U.S.C. § 1738.

Under Pennsylvania law, "[a]ny final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action." *R/S Fin. Corp. v. Kovalchick*, 716 A.2d 1228, 1230 (Pa. 1998).

> Res judicata bars not only the claims that were disposed of via the original judgment, but also those claims that were based upon the same set of facts and could have been asserted in the original proceedings. The courts of [Pennsylvania] have long adhered to the generally accepted view disfavoring the splitting of claims.

*Clark v. Pfizer, Inc.*, 990 A.2d 17, 31 (Pa. Super. Ct. 2010) (citation and internal quotation marks omitted); *accord R/S Fin. Corp.*, 716 A.2d at 1230.

Tomanek contends that her claims are not barred, because she could not bring ERISA claims in Pennsylvania state court. As stated above, Tomanek brings a claim under section 502(a)(1)(B) of ERISA and two claims for relief under section 502(a)(3). *See* 29 U.S.C. § 1132(a). Federal courts have exclusive jurisdiction over most claims brought under ERISA, but state courts have concurrent jurisdiction over claims under section 502(a)(1)(B). 29 U.S.C. § 1132(e)(1). Thus, Tomanek could have brought her section 502(a)(1)(B) claim in Pennsylvania state court, but not her section 502(a)(3) claims.

26

Defendants argue that it is irrelevant whether the Pennsylvania courts had jurisdiction to hear Tomanek's ERISA claims, because Tomanek was the plaintiff in that action and was able to choose whatever forum she wished. Pennsylvania law, however, holds to the contrary. Claim preclusion applies "to claims which could have been litigated during the first proceeding." *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995); *see Hopewell Estates, Inc. v. Kent*, 646 A.2d 1192, 1195 (Pa. Super. Ct. 1994) (court must consider whether parties "actually had an opportunity to appear and assert their rights"). The Third Circuit has concluded that Pennsylvania law limiting claim preclusion to claims that could have been litigated requires the court in which the first action was litigated to have subject matter jurisdiction over the claims on which preclusion is sought. *McCarter v. Mitcham*, 883 F.2d 196, 199, 201 (3d Cir. 1989) (securities claims over which federal courts have exclusive jurisdiction are not barred by previous Pennsylvania judgment).

The Third Circuit has also noted that Pennsylvania courts attempt to follow the Restatement (Second) of Judgments, which holds that claim preclusion does not apply to a claim that the first court had no jurisdiction to consider. *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 550 (3d Cir. 2006) (citing Restatement (Second) of Judgments § 25 cmt. e (1982)); *see McArdle v. Tronetti*, 627 A.2d 1219, 1223 (Pa. 1993) (citing Restatement of Judgments and holding that when court declines jurisdiction over claims, res judicata does not bar later suits bringing those claims). The Court agrees with the Third Circuit and concludes that under Pennsylvania law, claim preclusion does not apply when the first court lacked jurisdiction to hear the claims

made in the second court.  Accordingly, Tomanek's claims under section 502(a)(3) are not barred by claim preclusion.

Defendants contend that even though the Pennsylvania court would have lacked jurisdiction over Tomanek's claims under section 502(a)(3), she could have effectively brought the same claims under section 502(a)(1)(B).  Even if defendants are correct that the entirety of Tomanek's claim could have been brought under section 502(a)(1)(B), they make no argument that Pennsylvania law recognizes this distinction. In *McCarter*, the Third Circuit addressed a similar situation.  There, plaintiffs initially brought claims under Pennsylvania securities laws in Pennsylvania state court, and their claims were dismissed with prejudice.  *McCarter*, 883 F.2d at 198.  The plaintiffs then brought "essentially identical claims" in federal court under federal securities laws. *Id.*  Despite the plaintiffs' evident ability to seek redress for the alleged wrongs committed by defendants in state court through state securities laws, the Third Circuit still concluded that claim preclusion did not bar the later federal claims, because the Pennsylvania courts lacked jurisdiction over the claims when alleged in that manner. *Id.* at 201.  The Court likewise concludes in this case that regardless of Tomanek's ability to seek the relief she desires under a provision of ERISA over which the Pennsylvania court would have had jurisdiction, claim preclusion does not bar her claim under an ERISA provision over which the state court lacked jurisdiction.

Tomanek contends that claim preclusion should not apply even to her section 502(a)(1)(B) claim, because if she had brought that claim in Pennsylvania state court, defendants could have removed the case to federal court.  She offers no authority, however, for the proposition that claim preclusion does not apply in that situation.  The

28

Court rejects her argument.

Having determined that Tomanek could have brought her section 502(a)(1)(B) claim in Pennsylvania state court, the Court must determine whether the claim is part of the same cause of action and based on the same facts as her claims in state court. *R/S Fin. Corp.*, 716 A.2 at 1230; *Clark*, 990 A.2d at 31. "For claim preclusion to apply, Pennsylvania requires that the two actions share the following four conditions:  (1) the thing sued upon or for; (2) the cause of action; (3) the persons and parties to the action; and (4) the capacity of the parties to sue or be sued." *R&J Holding Co. v. Redevelopment Auth. of Cty. of Montgomery*, 670 F.3d 420, 427 (3d Cir. 2011). Tomanek contends that her current claims are not part of the same cause of action as the previous claims.

"As to the identity of causes of action, rather than resting upon the specific legal theory invoked, *res judicata* generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." *McArdle*, 627 A.2d at 1222 (italics in original; brackets and internal quotation marks omitted). "In determining whether res judicata should apply, a court may consider whether the factual allegations of both actions are the same, whether the same evidence is necessary to prove each action and whether both actions seek compensation for the same damages." *Hopewell Estates*, 646 A.2d at 1194–95. "Res judicata will not bar a subsequent action where the damages for which relief was sought in the earlier action were entirely different." *Id.* at 1195.

In the current case, Tomanek asserts claims under ERISA, whereas in the

previous state case she made claims relying on her due process rights and breach of contract. In both cases, however, the underlying facts and injury were the same. In the state case, Tomanek claimed that the MRC appeal process insufficiently protected her rights, particularly her due process and contractual rights. In the present case, Tomanek contends that Highmark's repayment demands and appeal process violated her rights to notice and appeal under ERISA. In both cases, the claims concern the procedures provided during Highmark's MRC hearing. In her state court claims, Tomanek directly challenged the MRC procedures; as part of her ERISA claims, Tomanek must show that her MRC appeal was not substantially compliant with the requirements of ERISA. The complaint in the current case and the one that Tomanek filed in the state case even describe some of the same alleged failings with the MRC process. In both complaints, Tomanek asserts that she did not have enough time to respond to a supplemental letter from Highmark's expert and that the MRC was flawed because only one of its eleven members was a chiropractor. Fourth Am. Compl. ¶¶ 257–59; Highmark Ex. 1 ¶¶ 50–54, 66.

In addition, in both her state and federal claims, Tomanek sought to remedy the same injury, Highmark's allegedly improper repayment demands. In state court, she asked for return of money Highmark had recouped, as well as injunctive relief. Highmark Ex. 1 at 27. In the present case, Tomanek requests a remand so that Highmark can provide an ERISA-compliant notice and appeal process, and she seeks an order requiring Highmark to return the money it recouped pending the outcome of that process. Although Tomanek couches the remedies differently, in each case she seeks return of the money Highmark recouped, as well as injunctive relief. In addition,

in each case Tomanek seeks a remedy for the same actions by Highmark, specifically, the repayment demands and the alleged failure to provide an adequate notice and appeal.

The Court considers the decision of the Pennsylvania Supreme Court in *Balent* to be instructive regarding the application of claim preclusion in Pennsylvania. In that case, plaintiffs initially filed an claim under Pennsylvania's eminent domain procedures. They claimed that a city's decision to raze a building they owned was a taking for which they were entitled to compensation. *Balent*, 669 A.2d at 312. A state trial court determined that the destruction of the building was an exercise of the city's police power and that plaintiffs were not entitled to compensation. *Id.* Plaintiffs then filed a section 1983 action claiming that their due process rights had been violated because the city had not ensured that they received notice of the fact that their building was to be destroyed because of building code violations. *Id.* at 313.

The Pennsylvania Supreme Court held that the second lawsuit was barred by claim preclusion. It recognized that the plaintiffs' legal theories were different in the two suits and that the first case was an in rem proceeding whereas the second was not. The court held, however, that "[b]oth actions involve compensation for the same property and the same exercise of power by the City." *Id.* at 315. In both cases, plaintiffs effectively asked the courts to determine whether the city had properly exercised its police powers (although the specific aspects of the city's action that they challenged were different) and whether they were entitled to compensation for the destruction of their building. *Id.*

31

The current case is similar to *Balent*. Although Tomanek asserts different legal theories and to a certain extent challenges different aspects of Highmark's actions, in both cases she seeks to reverse Highmark's repayment demands and recoupment of her funds and contends that Highmark did not offer her proper notice and appeal procedures. The Court concludes that Tomanek's section 502(a)(1)(B) claim is barred by claim preclusion because the Pennsylvania courts would hold the claim precluded.

Tomanek contends, in a footnote, that the Pennsylvania court's disposition of her claims was not a final judgment. This argument is forfeited. *See Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) (undeveloped argument in footnote is forfeited). That aside, Tomanek's argument appears to contradict Pennsylvania law. Rule 230.2 of the Pennsylvania Rules of Civil Procedure allows a court to terminate a case when there has been no activity for two or more years. Pa. R. Civ. P. 230.2(a). To do so, the court must give notice to the parties and give them sixty days to file a "statement of intention to proceed." *Id.* 230.2(b) & (c). "If no statement of intention to proceed has been filed, the prothonotary shall enter an order as of course terminating the matter with prejudice for failure to prosecute." *Id.* 230.2(c). The Pennsylvania court dismissed Tomanek's case with prejudice, stating that the time to file a statement of intention to proceed had expired without any statement being filed. Highmark Ex. 4. Tomanek contends that she "did not voluntarily dismiss her action by not taking action pursuant to [Rule] 230.2." Tomanek Resp. to Mot. for Judg. on the Pleadings at 15 n.6. Tomanek does not argue, however, that she filed a statement of intention to proceed. But even if Tomanek did file a statement of intention to proceed

32

and the court wrongfully dismissed her claim with prejudice, "[a]n erroneous adjudication is [still] res judicata in the absence of an appeal." *Tulewicz v. Se. Pa. Transp. Auth.*, 606 A.2d 427, 433 (Pa. 1992). In addition, Rule 230.2 is not a rule dealing with voluntary dismissal of a claim. Rather, the state court dismissed Tomanek's suit with prejudice.

Tomanek also contends that claim preclusion is an equitable doctrine and that equity requires that her section 502(a)(1)(B) claim be allowed to proceed. She cites only a single case applying federal claim preclusion law to support this argument. Tomanek does offer any support for the proposition that Pennsylvania courts ever ignore the rule of claim preclusion when generalized considerations of fairness might suggest it is appropriate.

In addition, Tomanek suggests that defendants will not be prejudiced by allowing her claim to proceed, because claim preclusion operates to bar duplicate claims, and Highmark did not previously have to defend against her ERISA claims. Under Pennsylvania law, however, what matters is that Tomanek previously brought claims relating to the same underlying facts and general cause of action as her section 502(a)(1)(B) ERISA claim and could have brought that claim at the same time.

### Conclusion

For the reasons stated above, the Court denies Anthem and WellPoint's motion for summary judgment against Reno and Independence's motion for summary judgment against Wahner and Barnard [docket nos. 617 and 625]. The Court also grants defendants' motion for judgment on the pleadings against Tomanek in part and denies it in part [docket no. 621]. Specifically, the Court grants judgment in favor of

defendants on Tomanek's claim under section 502(a)(1)(B) of ERISA and otherwise

denies the motion.

_____
　　　　MATTHEW F. KENNELLY
　　　　United States District Judge

Date: October 12, 2012