**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENNSYLVANIA CHIROPRACTIC ASSOCIATION, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | **Case No. 09 C 5619** |
| | ) | |
| **BLUE CROSS BLUE SHIELD ASSOCIATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case have sued a number of Blue Cross and Blue Shield entities for violations of the Employee Retirement Income Security Act (ERISA). Defendants Anthem Health Plans of Virginia, Inc. and WellPoint, Inc. moved for summary judgment against plaintiff Andrew Reno in May 2012. The Court denied defendants' motion in October 2012. Defendant Independence Blue Cross also moved for summary judgment against plaintiffs Mark Barnard and Barry Wahner in May 2012, and the Court likewise denied that motion. Reno has now moved for summary judgment against Anthem and WellPoint, and Barnard and Wahner have moved for summary judgment against Independence. For the reasons stated below, the Court grants both motions in part and denies both in part.

**Background**

**A.  General background**

The plaintiffs in this case are chiropractors and several associations that represent chiropractors.  The defendants are Blue Cross and Blue Shield of America (BCBSA) and individual Blue Cross and Blue Shield entities (BCBS entities), including WellPoint, Anthem Virginia, and Independence Blue Cross.  BCBSA is a national umbrella organization that facilitates the activities of individual BCBS entities.  Individual BCBS entities insure and administer health care plans for Blue Cross and Blue Shield customers (BCBS insureds) in various regions.

Plaintiffs allege that defendants improperly took money belonging to plaintiffs.  They allege that they provided medical services to BCBS insureds.  Defendants would initially reimburse plaintiffs for these services.  Sometime afterward, plaintiffs allege, defendants would make a false or fraudulent determination that the payments had been made in error.  Defendants then would demand that plaintiffs repay the supposedly overpaid amounts immediately.  If plaintiffs refused to do so, defendants would forcibly recoup the amounts they sought by withholding payment on other, unrelated claims for services plaintiffs provided to other BCBS insureds.

Plaintiffs allege further that when defendants made these repayment demands, they typically did not provide adequate information regarding the reason for the demands or procedures for challenging the demands.  Plaintiffs allege that defendants sometimes failed to offer any appeal process at all.  When an appeal process was available, plaintiffs allege, defendants refused to provide details about which patients, claims, and plans were claimed to be the subject of overpayment or "effectively ignored"

plaintiffs' appeals.  Fourth Am. Compl. ¶ 18.  Plaintiffs contend that this conduct deprived them of their right to a "full and fair review" under ERISA.  29 U.S.C. § 1133.

Plaintiffs assert their ERISA claims in three counts in the fourth amended complaint.  In count one, plaintiffs seek to recover the unpaid benefits they allege defendants improperly recouped.  *See* Fourth Am. Compl. ¶¶ 507–17.  Plaintiffs bring this claim under section 502(a)(1)(B) of ERISA, which permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

In counts two and four, plaintiffs request injunctive and other equitable relief under section 502(a)(3) of ERISA.  *Id.* ¶¶ 518–25, 531–35.  That provision authorizes a plan participant, beneficiary, or fiduciary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

Reno, Barnard, and Wahner each make nearly identical demands for relief.  They request (1) return of the money the defendants recouped from them, with interest; (2) an injunction barring the defendants "from seeking to recover any further funds arising from [the] retroactive benefit denial"; and (3) equitable relief under ERISA, requiring each defendant to reform its policies "to ensure that [the plaintiffs'] rights are not again violated."  Reno Mem. at 2; Barnard & Wahner Mem. at 2.

B.      **Facts relating to Reno's claims**

Reno is a chiropractor in Virginia who has a contract with Anthem VA, a Virginia-

based subsidiary of WellPoint, to provide medical services to participants in Anthem's health plans. During the period relevant to this litigation from 2004 to 2006, Reno provided to patients, among other services, spinal decompression treatment on a machine called the DRX-9000. Such machines fall under the category of "Vax-D" treatment, an acronym for "vertebral axial decompression." Pls.' Joint LR 56.1 Stat. ¶ 39.

In 2006, Anthem informed Reno that it was conducting a review of payments it had made to him for services he provided to twenty-four patients. In 2007, Anthem wrote to Reno stating that it had found numerous errors after examining the bills for his services. In particular, it told Reno that there were 170 claims that had no documentation, fifty-four claims for services that were not covered, four claims for services that were billed at a higher level than was supported by documentation, and 133 claims for services that had not been correctly coded. Anthem calculated from this that of the original $18,000 it had paid to Reno for these services, it had paid more than $10,000 wrongfully. Anthem extrapolated from this survey of twenty-four patients and concluded that during the period of time covered by the audit, it had overpaid Reno about $110,000 for all of his Anthem patients. Anthem demanded that Reno repay the $110,000.

Instead of paying, Reno retained legal counsel to dispute the repayment demand. He also made use of a chiropractic claims coding expert, though the parties dispute whether Anthem considered the expert's report. After Reno's counsel exchanged several letters with Anthem, Anthem reduced the amount it was demanding to $46,000. It calculated this reduced amount by waiving any claim for repayment on

the coding and documentation errors and demanding repayment only for the claims that it contended were for services not covered by Anthem's policies because they were "not medically necessary." *See* Anthem & WellPoint Resp. to Pls.' LR 56.1 Stat. ¶ 47. The non-covered services involved Vax-D treatments.

Early in 2008, Reno offered to resolve the dispute by paying about $9,000. Anthem rejected that offer. Reno then offered to pay about $25,000, and Anthem accepted. Anthem characterizes this as a settlement, but Reno contends that it was calculated as the amount he had actually received for non-covered spinal decompression procedures. Reno signed a promissory note for the payment and agreed to pay the $25,000 in twenty-four monthly installments. Reno's attorney mailed the note to Anthem, including with it a letter stating that "[a] properly executed promissory note from Dr. Reno is enclosed. I'll assume this ends all matters concerning Anthem's audit of Dr. Reno's claims." Anthem & WellPoint Ex. N.

Reno made all of the payments due on the promissory note. At his deposition, Reno testified that he did not seek additional payment from any of the patients from whose services Anthem had recouped money. Thus those patients did not pay any additional amounts out of pocket because of Anthem's recoupment.

Reno's office had at least some patients fill out a chiropractic registration and history form, which included a section under an insurance heading entitled "Assignment and Release." *See, e.g.*, Anthem & WellPoint Ex. U. Patients would sign under a statement in which they agreed to "assign directly" to Reno "all insurance benefits, if any, otherwise payable to me for services rendered." *Id.* The agreement also contained this statement: "I understand that I am financially responsible for all charges

whether or not paid by insurance." *Id.* Reno contends that he obtains such agreements from patients "[a]s a matter of course." Reno LR 56.1 Stat. ¶ 36. Anthem disputes this characterization, citing testimony from one Reno employee who could not remember if Reno had patients execute such agreements and from another, Bernice Castro, who testified that such agreements "were mostly used for Medicare patients." Anthem & WellPoint Ex. I at 28.[1]

At some point during Reno's interactions with Anthem, an Anthem provider agreement was stamped with Reno's name, office address, and phone numbers. This particular copy of the agreement, which Anthem and WellPoint have provided in response to Reno's summary judgment motion, does not include a date or signature page. *See* Anthem & WellPoint Ex. N. During his deposition, Reno was asked about this document:

> Q.  So I'm putting before you this huge document, which you've produced, which has been marked as Exhibit 20. I don't expect you to read the whole thing.
>
> A.  I've tried.
>
> Q.  But do you understand this? I mean you've produced this. This is your provider agreement. Do you see that?
>
> A.  Yes. Yes, it is.
>
> Q.  And you see that it's a provider agreement, it's got your name at the top, HealthSource, Dr. Andrew Reno, D.C.; right?
>
> A.  Yes, it does.

Anthem & WellPoint Ex. C at 151. In another exchange, Reno was asked, "And so your

---

[1] Anthem does not, however, acknowledge other testimony from the same page of that deposition, where Castro testifies that an Anthem patient would be "informed that their insurance didn't cover. And if they chose to proceed, then, you know, they were willing to take responsibility for that." Ex. I at 28.

understanding, this is an agreement between you and Anthem Health Plans of Virginia, doing business as, Anthem Blue Cross and Blue Shield?"  His response was, "Yes, it is."  *Id.* at 152.

The agreement tendered by Anthem and WellPoint contains a section entitled, "What Network Providers Can Collect as Payment."  Anthem & WellPoint Ex. N at RENO003622.  This section states that a network provider can collect payment for non-covered medical services "only if the provider advises the member in writing before the services are rendered that the specific service to be provided will be non-covered and that the member will be responsible for payment."  *Id.*  The section adds that "[a] general statement that the members shall be responsible for all charges not covered by the member's insurance carrier or health maintenance organization is not sufficient."  *Id.*

The parties dispute the role that WellPoint played in the administration of Reno's provider insurance claims as described above.  WellPoint owns health insurance entities in fourteen states, one of which is Anthem Virginia.  An investigator for Anthem named Wendy Bohannon worked on Reno's case.  In addition, Anthem and WellPoint do not dispute that a WellPoint employee named Alanna Lavelle, the company's director of special investigations, reviewed the audit of Reno's insurance claims.  *See* Anthem & WellPoint Resp. to Pls.' LR 56.1 Stat. ¶ 65.  Anthem and WellPoint do not dispute Reno's statement that "the policies applied to Dr. Reno were uniform throughout all of the WellPoint, Inc. subsidiaries," *id.* ¶ 86, although it is unclear whether the policy applied to Reno originated with WellPoint or Anthem.

## C.    Facts relating to Barnard and Wahner's claims

Wahner and Barnard are chiropractors in Pennsylvania, each with separate

practices. Both became participating health care providers with Independence in 1997. Independence paid both of them for services they rendered to participants in Independence's plans.

On December 2, 2008, Independence sent letters to both Barnard and Wahner. Each letter noted that in the past eighteen months, Independence had "issued letters regarding erroneous overpayments that our records show were made to you for physical medicine and rehabilitation services included in the HMO Short Term Rehabilitation Therapy Capitation Program." Pls.' Exs. 49 and 50 at 1. Each letter said that Independence had resolved certain inquiries and that it would now "resume recovery of these overpayments." *Id.* In both cases, Independence attached charts listing patients' names, account numbers, diagnosis codes, dates of service, billed amounts, paid amounts, and estimated overpaid amounts. Independence told Barnard in the letter that the overpayment amount for his practice was less than $500, and it stated that "this letter serves as notice that within the next 30 days we will satisfy this overpayment through a retraction of the overpayment amount from your daily remittance[s] until the balance is satisfied." Pls.' Ex. 49 at 1. The letter to Barnard further stated he could contact his Network Coordinator with "any questions." *Id.* The letter to Wahner was slightly more detailed, as it offered him four options for repayment: the ability to pay in a lump sum, or in installments, or to withhold payments from his remittances over ten months, or to offset the amount against future remittances. Independence asked Wahner to contact a person named Lynada Harmon within ten business days of the date of the letter, but it warned that it would begin subtracting payments from his remittances if he did not respond within thirty days of the date of the

letter.

In February 2009, Wahner faxed a proposed repayment agreement to Linda Paterson of Independence. He wrote that he "concedes under duress to pay" Independence in monthly installments until a lawsuit or the State Insurance Commissioner "determines the legality of IBC's attempted recoupment of funds." Pls.' Ex. 57 at 1. About a month later, Jill Panek of Independence responded by rejecting Wahner's proposal and also informing him that his contract with Independence forbade him from "balance billing your members" for the amounts. Pls.' Ex. 58 at 1. The letter from Panek attached an agreement for Wahner to sign, in which he would agree to pay $340.72 a month for the next fifteen months. In none of these communications did Independence reference its appeal procedure. Wahner responded to Independence's March 2009 communication in an undated letter in which he rejected Independence's proposed contract: "I feel that agreeing to your contract is an admission on my part of errors I made in billing." Pls.' Ex. 59 at 1. In his undated letter, Wahner also referenced prior notices that Independence apparently produced to him, "two letters dated August 2007," neither of which are in evidence here. He told Independence he had seen neither letter before. *Id.* Wahner concluded by "formally requesting an appeal and or arbitration in accordance with my contract with IBC." *Id.* at 2.

In May 2009, DeeDee Fitzgerald of Independence wrote Wahner to inform him that, "[a]fter careful consideration of this appeal and all information provided, we have decided to *uphold* the decision to recover the overpayments." Pls.' Ex. 60. The letter provided a one-paragraph rationale, informing Wahner that he had treated patients under procedure codes that "are not eligible for reimbursement when submitted by a

provider type that does not meet capitation criteria," and that Independence's decision was further supported by earlier communications "advising of our intended recovery effort" about the erroneous overpayment. *Id.* (Those earlier communications are not in evidence here.) Finally, the letter told Wahner he could request a "Second Level Claim Payment Appeal" within sixty days from Independence's Provider Appeal Review Board (PARB). *Id.*

Wahner did request such an appeal in September 2009. He told the PARB that he had not received notice of the recoupment before the December letter, and he asked "that when this review is to be heard, I am notified and a date is set that I may attend with any representatives I may wish to have with me." Pls.' Ex. 61 at 1–2. In April 2010, Wahner received a letter, again from Fitzgerald, informing him that "the PARB has decided to *uphold* the original claim determination." Pls.' Ex. 62. This letter also contained a one-paragraph rationale, reproducing nearly verbatim the four sentences of the original rationale, but changing the word "dispute" to "appeal," deleting the formal title of Independence's medical policy 00.03.03c, and adding "the" in the phrase "does not meet capitation criteria." *Id.* The letter also included three additional sentences. They explained that policy 00.03.03c does not allow "outpatient short-term rehabilitation services" to qualify "for fee-for-service reimbursement consideration," because such services are "reimbursed on a monthly basis," and because certain procedure codes were "not eligible for reimbursement when submitted by a provider type that does not meet the capitation criteria." *Id.* The rationale did not indicate anything specific about Wahner's provider type or the services he provided to his patients. The letter further informed Wahner that "[t]he PARB's decision concludes the appeal process for the

aforementioned claim(s)" and thanked him for his cooperation and participation.  *Id.*

One month later, Tressa Harley, another Independence employee, sent another letter, this time apologizing to Wahner for not addressing his request to attend the PARB meeting on his second-level appeal.  "Because of the nature of this review, Provider participation will not assist in the decision making process," Harley wrote, "and as such, Providers do not participate."  Pls.' Ex. 63.  Harley added that PARB meetings were not recorded, so Independence could not give Wahner notes of the proceeding. Finally, Harley told Wahner that she was enclosing details on Independence's appeal process, and she also provided links to web versions of the process.

At some point, Independence issued a document entitled "Professional Provider Agreement" to both Barnard and Wahner.  Barnard signed the execution page for the agreement on June 9, 1997; Wahner did so on June 2, 1997.  Among other provisions, the agreement requires providers to "render Covered Services to Beneficiaries of the Benefit Programs and Benefit Program Agreements, in accordance with . . . grievance, appeals and other policies and procedures of the particular Benefit Program under which the Covered Medical Services, as detailed in the Provider Manual . . . are published."  Independence Ex. A-23 at IBC0003160.  During his deposition, Wahner testified that he signed the agreement; Barnard testified that he "had a provider agreement" with Independence "[a]t least as far as '97."  Independence Ex. A at 174. Wahner also testified that he understood that the contract referred to Independence's provider manual.

The 2007 version of Independence's provider manual includes a ten-page section on appeals, which lists five different categories of appeals and outlines a

"Provider Claim Payment Appeal Process."  Independence Ex. E-6 at IBC0003427.

Before describing the nuts and bolts of this process, the manual states that it "is

available to PA and DE providers who agreed to the court-approved Class Action

settlement in the consolidated cases of Gregg, et al. vs. Independence Blue Cross et al.

Good [sic] vs. Independence Blue Cross, et al. and Pennsylvania Orthopaedic Society

vs. Independence Blue Cross, et al."  Id.  Neither party has stated whether Barnard and

Wahner were among those within this category who are covered by the described

procedures.  The section states that the process applies to payment disputes related to

coding and claims processing issues and provides phone numbers and addresses for

providers to send inquiries and appeals.  Specifically, providers who disagree with a

payment decision can send an appeal as well as a second-level appeal if the first

appeal is denied.  A 2009 version of the manual lacks the proviso about Independence's

class action cases but includes similar language on the two-tier appeal process.

Neither party has offered an earlier version of the manual as evidence.

The provider agreement offered by Independence also covers situations where a

provider "provides a non-Covered Service to Beneficiary."  Independence Ex. A-23 at

IBC0003161.  In these situations, the provider has to tell the beneficiary what the

service is, that Independence will not pay for it, and that the beneficiary will be liable for

doing so.  Id.[2]  It is undisputed that neither Wahner nor Barnard ever attempted to bill

their patients to recover any of the amounts they had to repay to Independence,

---

[2] Independence also cites the provider manual discussed above for a similar provision,
stating that providers have to get "member consent for financial responsibility from a
patient" who wants to receive non-covered services.  Independence LR 56.1 Stat. ¶ 8.
However, the pages Independence cites for this provision are not included in the exhibit
it references.

although they contend that they could have done so.

**D.    The Court's October 12, 2012 ruling**

On May 11, 2012, WellPoint and Anthem moved for summary judgment against Reno, and Independence moved for summary judgment against Barnard and Wahner. The Court issued a decision on October 12, 2012 denying both motions.  *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 903 F. Supp. 2d 604 (N.D. Ill. 2012).

To support their motion, WellPoint and Anthem argued that Reno lacked standing because his patients did not assign him ERISA appellate rights and because he had not suffered an adverse benefit determination.  Defendants further argued that Reno had already "pursued a successful appeal" of Anthem's review of his billing and that he had received an "accord and satisfaction" with Anthem that had settled all issues between the parties.  Anthem Mem. at 1 (docket no. 618).

The Court rejected these arguments.  First, the Court observed that the defendants had apparently conceded that Reno was a beneficiary for purposes of ERISA because his patients, as plan participants, assigned him their rights to payment under their health plans.  Because the plain language of ERISA provides notice and appeal rights to beneficiaries, Reno was entitled to those rights.  The Court proceeded to deny summary judgment to defendants on the question of whether Reno had experienced an adverse benefit determination, because "[a] reasonable fact finder . . . could conclude that Anthem did deny specific claims involving specific patients" and because Reno could have sought to bill his patients for amounts that insurance did not cover.  *Pa. Chiropractic Ass'n*, 903 F. Supp. 2d at 613–14.  Finally, the Court determined that a reasonable fact finder could conclude that Reno did not receive

ERISA-compliant notice and appeal and that defendants failed to show that a Virginia "accord and satisfaction" statute barred Reno's claims.

In Independence's summary judgment motion, it contended that Barnard and Wahner lacked standing on three separate grounds. First, Independence argued that the great majority of Barnard and Wahner's patients had anti-assignment provisions in their health plans, thus preventing them from assigning benefits to Barnard and Wahner and precluding the doctors from having beneficiary status. Second, Independence contended that Barnard and Wahner's patients did not suffer adverse benefit determinations, because the doctors did not bill their patients for Independence's recoupments and their provider agreements did not allow them to do so. Finally, Independence argued Barnard and Wahner lacked ERISA standing because they had not sought "Authorized Representative Status" for any Independence insured. Independence Mem. at 13 (docket no. 626).

In denying Independence's motion for summary judgment, the Court first determined that a reasonable fact finder could conclude that Barnard and Wahner had valid assignments from at least some patients with claims relevant to the case, which would provide the doctors with status as beneficiaries. Thus Independence was not entitled to an overall grant of summary judgment, the only relief it sought. On the adverse benefit determination argument, the Court noted that although Barnard and Wahner did not bill their patients for the recouped amounts, their patients acknowledged in agreements that they were liable for amounts that their insurance plans did not pay. Furthermore, the Court observed that the cited provision of the doctors' provider agreement with Independence related only to "Covered Services," which a reasonable

fact finder could determine did not apply to the services in question. Therefore, a reasonable fact finder could conclude that both Barnard and Wahner could have billed their patients for the services in question, which made Independence's repayment demands adverse benefit determinations under ERISA.

### Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.    Reno's summary judgment motion against Anthem and WellPoint

Reno contends he is entitled to summary judgment against WellPoint and Anthem because he was illegally denied ERISA notice and appeal rights and because the retroactive benefit denial was improper.

#### 1.    Standing

Anthem and WellPoint argue that Reno does not have standing to sue for equitable relief in this case because he is not an ERISA beneficiary "for all purposes under Section 503." Anthem & WellPoint Resp. at 13. They also contend that a Department of Labor Frequently Asked Questions website page does not permit those

providers receiving assignments of benefits from patients to sue on those patients'

behalf.  Reno replies that he is indeed a beneficiary for purposes of ERISA, which

entitles him to full ERISA-compliant notice and appeal rights and confers standing to

sue.

     Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary of a benefits plan

may bring a civil action "to recover benefits due to him under the terms of his plan, to

enforce his rights under the terms of the plan, or to clarify his rights to future benefits

under the terms of the plan."  In *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698 (7th

Cir. 1991), the Seventh Circuit examined the question of whether an assignment of

benefits to a health care provider confers status as a "beneficiary" under ERISA.  The

court examined the plain language of the statute, including the provision defining

"beneficiary" as "a person designated by a participant, or by the terms of an employee

benefit plan, who is or may become entitled to a benefit thereunder."  *Id.* at 700 (quoting

29 U.S.C. § 1002(8)).  In *Kennedy*, the plan participant had assigned to her chiropractor

the right to her benefits.  The court concluded that as a result, the chiropractor qualified

as a "beneficiary."  *Id.*  The court confirmed its approach to the question by citing

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117–18 (1989), in which the

Supreme Court held that a "participant" is "for jurisdictional purposes anyone with a

colorable claim to benefits."  *Kennedy*, 924 F.2d at 700.  The chiropractor had a

colorable claim for benefits that was not frivolous; the court therefore concluded that

"§ 1132(a)(1)(B) supplies jurisdiction when a provider of medical services sues as

assignee of a participant."  *Id; see also Central States, Se. & Sw. Areas Health &*

*Welfare Fund v. Neurobehavioral Assocs., P.A.*, 53 F.3d 172, 173 (7th Cir. 1995) ("A

medical care provider who receives benefits from the fund at the behest of a participant is a beneficiary."); *Se. Decatur Memorial Hosp. v. Conn. Gen. Life Ins. Co.*, 990 F.2d 925, 927 (7th Cir. 1993) ("An assignee of benefits under an ERISA plan becomes a statutory 'beneficiary' and thus may use 29 U.S.C. § 1132(a)(1)(B) to collect.").

WellPoint and Anthem concede that "Dr. Reno may have a colorable basis to receive plan benefits under Section 502(a)(1)(B)." Anthem & WellPoint Resp. at 12. But they argue that the assignments he received from his patients do not entitle him to "receiv[e] notice of an adverse benefit determination or pursu[e] an appeal of such determination" under ERISA section 503, also known as 29 U.S.C. § 1133. *Id.* WellPoint and Anthem contend, based on a Frequently Asked Questions page on the Department of Labor website, that "[a] provider may have a right to receive notice or pursue an appeal on behalf of a patient only if the patient made the provider his or her designated ERISA representative" and that Reno's patients did not give him this designation. *Id.* The FAQ contains a heading in the form of a question, asking, "Does an assignment of benefits by a claimant to a health care provider constitute the designation of an authorized representative?" *FAQs About the Benefit Claims Procedure Regulation* at B–2, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Nov. 5, 2013). Under that heading, the FAQ notes that "[t]ypically, assignments are not a grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination under a plan." *Id.* For his part, Reno argues that the Court's ruling on this question on WellPoint and Anthem's summary judgment motion confirms that he has standing. *See Pa. Chiropractic Ass'n*, 903 F. Supp. 2d at 611–12.

In its October 2012 decision, the Court examined the plain language of sections

502 and 503. It observed that ERISA regulations define "claimants" as "participants and beneficiaries" and "expressly confer notice and appeal rights upon a person who is a 'claimant.'" *Id.* at 611 (citing 29 C.F.R. § 2560.503–1(g) & (h)). The Court also noted that "the language of ERISA itself defines a beneficiary as a person 'who is or may be entitled to a benefit." *Id.* (citing 29 U.S.C. § 1002(7)). Therefore, "the plain language of ERISA and its regulation provides beneficiaries notice and appeal rights." *Id.* At the time, the Court pointed out that Anthem and WellPoint had not presented authority to the effect that a particularized assignment of notice and appeal rights is necessary for a beneficiary to be entitled to such rights.

Little has changed in the parties' arguments since the Court's October 2012 decision. Under 29 U.S.C. § 1132, beneficiaries may sue, and the Seventh Circuit's *Kennedy* decision makes plain that providers such as Reno have status as beneficiaries. Furthermore, under the terms of section 1132(a), beneficiaries may seek equitable relief; the statute entitles beneficiaries to bring a civil action "to enjoin any act or practice" that violates ERISA, and "to obtain other appropriate equitable relief." The Court concludes that Reno is a beneficiary for purposes of ERISA and thus has standing, conferred on him by section 1132, to bring his claims.

### 2.      Denial of notice and appeal rights

Reno argues that Anthem's refusal to cover the Vax-D services he provided to patients was an adverse benefit determination under ERISA, because Anthem informed him the services were not medically necessary and thus not covered under its insurance plans. He argues that such a determination entitled him to notice and appeal rights as an ERISA beneficiary, which he did not receive.

Anthem and WellPoint respond that there was no adverse benefit determination in this case, and thus no right to ERISA notice and appeal, because none of its members "incurred any financial liability as a result of Dr. Reno's repayment of Vax-D claims." Anthem & WellPoint Resp. at 6. That proposition follows from Anthem and WellPoint's contention that ERISA does not apply if a "provider has no recourse against the claimant" for money that the insurer does not pay. *Id.* at 7 (citing *FAQs About the Benefit Claims Procedure Regulation* at A–8).

Though the Court concluded in its October 2012 decision that a reasonable fact finder could conclude Reno could have billed his patients for these amounts, WellPoint and Anthem now contend that "further discovery" has shown he could not have done so. *Id.* at 8. WellPoint points to a claimed admission by Reno during his deposition "that he did not obtain this permission from the patients involved in the audit." *Id.* (citing WellPoint's LR 56.1 Stat. ¶ 6). WellPoint and Anthem also argue that Reno's provider agreement with Anthem forbids him from billing a patient for non-covered services unless he informs the patient in advance about the specific service for which the patient will be financially responsible.

To support their argument that Reno admitted during his deposition that he failed to obtain advance permission from his patients to bill them directly for Vax-D services, WellPoint and Anthem cite paragraph six of their statement of additional facts. However, no deposition is cited in that paragraph; it cites exhibits containing assignment agreements between Reno and patients, and Anthem's provider manual, but not a deposition. *See* WellPoint Exs. U, V, & N. WellPoint and Anthem do, however, cite a deposition of Reno from March 2013 in paragraph nine of their statement of additional

facts. In the cited passage, Reno testified that he did not "go back and charge people" for the payments WellPoint recouped. Contrary to Anthem and WellPoint's contention, however, Reno did not testify that he failed to obtain permission to make such charges. *See* Anthem & WellPoint Ex. W at 29. The excerpt of the deposition in the exhibit makes reference to the fact that Reno had "gotten [an] HS-1 signed," but the excerpt provides no insight regarding what an "HS-1" is. *Id.* Although the Court is required to construe the evidence in the light most favorable to the nonmovants—WellPoint and Anthem in this case—WellPoint and Anthem simply provide no evidence from which a reasonable fact finder could conclude that Reno admitted he failed to seek permission to seek repayment from his patients. Indeed, in light of the assignment agreements in the record where Reno acquired exactly that permission, no reasonable fact finder could conclude on the record before the Court that Reno failed to seek permission to bill his patients. *See* Anthem & WellPoint Exs. U & V (signed agreements where patients agree "that I am financially responsible for all charges whether or not paid by insurance").

WellPoint and Anthem also argue that Reno's provider agreement required him to seek permission in advance from his patients to bill them for non-covered services but that he did not do so. In response, Reno first contends that WellPoint's argument is based on a Department of Labor FAQ, discussed above, that does not apply in his situation, because it refers to contractual disputes and not "conflict[s] over coverage under an ERISA plan." Reno Repl. at 6. WellPoint and Anthem cite a section of the FAQ with this heading: "Do the requirements applicable to group health plans apply to contractual disputes between health care providers (e.g., physicians, hospitals) and

insurers or managed care organizations (e.g., HMOs)?" *FAQs About the Benefit Claims Procedure Regulation* at A–8. The FAQ answers the question in the negative, stating:

> "The regulation does not apply to requests by health care providers for payments due them—rather than due the claimant—in accordance with contractual arrangements between the provider and an insurer or managed care organization, *where the provider has no recourse against the claimant for amounts*, in whole or in part, not paid by the insurer or managed care organization."

*Id.* (emphasis added). Reno contends that the paragraph does not cover the facts of this case, because it refers to "an INET fee schedule in a provider contract." Reno Repl. at 6. He says this case is different because it is "about WellPoint's interpretation of his patients' healthcare plans and their retroactive decision that the services he provided were not covered." Reno Repl. at 6.

Regardless of whether Reno's dispute with Anthem was contractual, the FAQ's provision is operative only in cases "where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization." Anthem and WellPoint argue that Anthem's provider agreement forbade Reno from seeking repayment for non-covered services from his patients. But if they are incorrect, and Reno *was* permitted to seek recoupment against his patients for non-covered services, the FAQ provision by its terms does not apply.[3]

Reno does not dispute the terms of the agreement. He contends, however, that Anthem and WellPoint are estopped from arguing that the agreement governed his conduct. In the relevant time period, Reno argues, "he was paid, in every instance, by

---

[3] WellPoint and Anthem argue that the FAQ is "entitled to deference" based on one of the Court's prior decisions in this case. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 365 (N.D. Ill. 2012) (concluding that the FAQ "is entitled to deference"). Reno does not argue here that the FAQ in question lacks the force and effect of law or is not entitled to deference.

WellPoint" for the disputed Vax-D services.  Reno Repl. at 7.  He therefore "had every reason to believe that these services were covered" and thus had at the time "no reason to inform his patients that such services would, in fact, *not be covered* by insurance." *Id.*  Reno thus contends that the reason he did not seek the advance permission that Anthem and WellPoint argue he was required to get was that he was acting "in direct reliance on WellPoint's conduct" of paying the claims at the time.  *Id.*  Reno's estoppel argument, however, was made only in his reply brief.  Though it is unquestionably a proper and responsive argument, WellPoint and Anthem have not had an opportunity to respond to it.  Given these circumstances, the Court finds it inappropriate to grant Reno summary judgment on this ground.

Reno also contends that Anthem and WellPoint "cannot show that this provision of the provider agreement was effective during the relevant time frame as the evidence already before the Court shows the contrary."  Reno Resp. to Anthem & WellPoint's LR 56.1 Stat ¶ 2.  In the complaint, Reno specified the relevant time frame as the period from January 2, 2004 to April 19, 2006.  If the agreement that Anthem and WellPoint cite in opposing summary judgment was not effective during that period, the agreement is irrelevant and inadmissible and cannot save WellPoint from summary judgment.

As its foundation for the agreement, Anthem and WellPoint cite Reno's testimony, in which he affirmed that the document was his provider agreement.  In a deposition, Reno was asked, "This is your provider agreement.  Do you see that?"  He responded, "Yes.  Yes, it is."  Anthem & WellPoint Ex. C at 151.  He was also asked, whether he saw that the agreement has "got your name at the top, HealthSource, Dr. Andrew Reno, D.C.; right?"  Again, he responded, "Yes, it does."  *Id.*  Finally, he was

asked, "And so your understanding, this is an agreement between you and Anthem Health Plans of Virginia, doing business as, Anthem Blue Cross and Blue Shield?" He responded, "Yes, it is." *Id.* at 152.

"To defeat a summary judgment motion . . ., a party may rely only on admissible evidence." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Only relevant evidence is admissible. Fed. R. Evid. 402. Federal Rule of Evidence 901 governs authentication of evidence, which is "a special aspect of relevancy." Fed. R. Evid. 901 advisory committee's note to subdivision (a). The rule states that the proponent of a piece of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901(a), in this case, the provider agreement in effect at the relevant time. The rule lists several examples of evidence that meet that test, the first of them being "Testimony of a Witness with Knowledge," which is "[t]estimony that an item is what it is claimed to be." *Id.* (b)(1). The accompanying note to the rule states that the example "contemplates a broad spectrum," which includes "testimony of a witness who was present at the signing of a document." Fed. R. Evid. 901 advisory committee's note to subdivision (b), example (1).

The copy of the provider agreement that Anthem and WellPoint submitted as evidence does not contain any dates from the relevant period (nor does it contain a signature page). Five of the excerpt's six pages contain the date April 1, 2008, as the date upon which the excerpted guidelines were revised. *See* Anthem & WellPoint Ex. N at RENO003621–22, RENO003628, RENO003642, RENO003674. By itself, this rather clearly shows that the agreement postdates the relevant period, which was from

January 2004 to April 2006. The pages from the agreement that WellPoint and Anthem have provided in response to Reno's motion do not contain any other dates. Reno refers the Court to a copy of the Anthem provider agreement that he submitted as evidence in June 2012, when he made a similar argument in his response to Anthem and WellPoint's statement of facts supporting its own motion for summary judgment. That copy, unlike the one Anthem and WellPoint have submitted here, features no exhibit tag marking it as "Reno 20" from November 23, 2010. It does, however, feature the same stamp with Reno's name, address, and phone numbers, as well as the same Bates number stamping (starting with page number RENO003568). *See* Reno Resp. to Anthem & WellPoint's LR 56.1 Stat. ¶ 4, Ex. 1 [docket no. 660]. That makes it clear that it is the selfsame agreement that Anthem and WellPoint have offered on the current summary judgment motion. This version of the agreement contains dates on several of its pages: an introductory letter dated August 28, 2009 from John B. Syer, Jr., Anthem's vice president of health services, and a page entitled "Ancillary Professional Provider Agreement" with an August 28, 2009 "package code" and a September 15, 2009 "modification." *Id.* at RENO003569, RENO003577. Many of the pages in the earlier version include dates, such as April 1, 2008 (*id.* at RENO003578), Oct. 19, 2007 (*id.* at RENO003584), and January 2006 (*id.* at RENO003585). Again, these dates, in context, indicate that the agreement postdates the relevant period.

Reno's deposition testimony, in which he responded "Yes it is" when asked whether the agreement was his agreement with Anthem tends to show only that it was an agreement between the parties at that particular point in time, i.e., at the time of the deposition. Indeed, all of the questions were asked at Reno's deposition in 2010, and

all were in the present tense (e.g., "This *is* your provider agreement.  Do you see that?).

This  testimony quite plainly does not permit a finding that the agreement was in effect

during the relevant period.  The Court notes that the need to provide evidence showing

that the agreement in question was in effect at the relevant time should come as no

surprise to Anthem and WellPoint.  Both defendants have been on notice of this since at

least June 2012, when Reno first argued that this provider agreement postdated the

time period cited in the complaint and thus had no bearing on the parties' dispute.

To summarize, WellPoint and Anthem have failed to lay the proper foundation for

the admission of the agreement upon which they rely.  Because WellPoint and Anthem's

argument that Reno had to seek advance permission to bill patients for the services in

question turns on the terms of this irrelevant agreement, the Court concludes Anthem

and WellPoint have failed to show a triable issue on this point.

In sum, there is no admissible evidence before the Court that Reno was bound

during the relevant period to seek advance permission from patients in order to bill them

for non-covered services to them.  Because Reno was able to seek repayment from his

patients for the services in question, they—and he—suffered an adverse benefit

determination for purposes of ERISA.  The Court therefore concludes that Reno is

entitled to summary judgment as to liability on his claim that Anthem denied him the

notice and appeal rights to which he was entitled under ERISA.  The only matter that

remains for determination on that claim is the appropriate relief.

### 3. Denial of benefits[4]

Reno's other claim is that Anthem's recoupment of benefit payments from him

was improper under ERISA under either *de novo* or arbitrary and capricious review.

"Judicial review of an ERISA administrator's benefits determination is de novo unless

the plan grants the administrator discretionary authority to determine eligibility for

benefits or to construe the terms of the plan." *Holmstrom v. Metro. Life Ins. Co.*,

615 F.3d 758, 766 (7th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101 (1989)). If the administrator has such authority, review is under an

arbitrary and capricious standard, which is "highly deferential" and looks to ensure

whether the administrator's decision "has rational support in the record." *Jenkins v.*

*Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (internal

quotation marks omitted).

Reno contends that the information required for the Court to decide which

standard to use is unavailable. He argues that "the vast majority of the plans at issue

are unknown," because "WellPoint extrapolated its repayment demand from 24 patients

to Dr. Reno's entire patient cohort." Reno Mem. at 15. It is therefore unclear, Reno

argues, whether the administrators of the plans in question had discretionary authority.

Reno contends that because Anthem and WellPoint could not produce evidence of their

discretion over the plans, the Court should review the benefit denials *de novo*. Reno

then contends that the Court should grant him summary judgment because Anthem and

---

[4] The Court likely it could end its discussion of Reno's claims right here and award him
the recouped payments under *Schneider v. Sentry Group Long Term Disability Plan*,
422 F.3d 621, 629 n. 3 (7th Cir. 2005) (court stating "it is unnecessary for us to
consider" plaintiffs arbitrary-and-capricious denial argument after determining defendant
violated ERISA for failing to give plaintiff adequate notice). For the sake of
completeness, however, the Court will also address Reno's denial of benefits claim.

WellPoint's actions were improper and had "no valid basis" under either standard of review.  Reno Repl. at 11.  Because Anthem and WellPoint "did not reach an individualized determination" on whether Reno's services were medically necessary for each of his patients, he argues, they made an improper blanket determination that was not backed by evidence.  Reno Mem. at 16.

Anthem and WellPoint have not responded to Reno's denial-of-benefits claim, at least not directly.  In a section discussing Reno's reference to a recent decision by another court, *Blue Cross & Blue Shield of R.I. v. Korsen*, C.A. No. 09-317L, 2013 WL 2247460 (D.R.I. May 22, 2013), Anthem and WellPoint argue that "Reno miscoded his claim for Vax-D services."  Anthem & WellPoint Resp. at 16–17.  They contend that "[b]ecause Dr. Reno miscoded his DRX-9000 claims, expert witness chiropractor Dr. Don R. Wakefield concluded that Dr. Reno was not entitled to payment for those claims."  *Id.* at 17 (citing Anthem & WellPoint's LR 56.1 Stat. ¶ 26–27).  Reno responds that any miscoding was "irrelevant," because "Defendants would not have covered his services regardless of which code he used."  Reno Repl. at 12 n.12 (citing Anthem & WellPoint Resp. Reno LR 56.1 Stat. ¶ 49).  In fact, Anthem and WellPoint admitted just this in their response to the plaintiffs' joint statement of facts:  "Anthem Virginia would not pay claims coded as S9090 [the correct code for Vax-D services] as the treatment it describes is not medically necessary."  Anthem & WellPoint Resp. Reno LR 56.1 Stat. ¶ 49.

Reno bases his claim for improper denial of benefits on the defendants' blanket determination that Vax-D services were not medically necessary, arguing such a conclusion was improper because it was not individualized for each patient.  Anthem

and WellPoint have not responded to that contention and have forfeited the point.  The Court therefore grants summary judgment to Reno against Anthem as to liability on this claim as well.

### 4.    Whether WellPoint is a proper defendant

In response to Reno's motion, Anthem and WellPoint argue that WellPoint is not a proper defendant in this case.  Though Anthem and WellPoint do not make a cross-motion for summary judgment, they argue that "WellPoint is entitled to summary judgment rather than Dr. Reno," because "all of the facts underlying Dr. Reno's complaint related to the actions of Anthem Virginia, not WellPoint."  Anthem & WellPoint Resp. at 5–6.  Specifically, Anthem and WellPoint contend that WellPoint is "a holding company, and is not an insurance company and did not contract with Dr. Reno."  Anthem & WellPoint Resp. to Pls.' LR 56.1 Stat. ¶ 4.

Under 29 U.S.C. § 1002(21)(A)(iii), an entity that possesses "any discretionary authority or discretionary responsibility in the administration" of an ERISA plan is an ERISA fiduciary.  WellPoint meets this definition, Reno contends, because it owns Anthem, its director of special investigations Alanna Lavelle reviewed the audit of Reno, and its uniform policy determined Anthem's actions to recoup payment from Reno.  *See* Reno Repl. at 1–2.  To support his argument, Reno cites two Supreme Court cases affirming that entities with discretionary authority over ERISA plans are fiduciaries and also two out-of-circuit cases (one of them not about ERISA) supporting the proposition that a parent company can be sued for the deeds of its subsidiary.

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under

28

a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). To show that an entity meets that standard, the plaintiff "must show that [the entity] was a fiduciary as that term is defined in the statute and that [the entity] was acting in its capacity as a fiduciary at the time it took the actions that are the subject of the complaint." *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471–72 (7th Cir. 2007). Furthermore, a person or entity who is the "ultimate decisionmaker" on whether benefits will be issued "must be a fiduciary" for ERISA purposes. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004).

On the basis of the evidence both parties have presented, summary judgment on the question of WellPoint's status is inappropriate. A reasonable finder of fact could conclude that WellPoint had no discretionary authority over Anthem's recoupment determination over Reno. Given the limited facts the parties have provided, however, a reasonable finder of fact could also find the opposite. WellPoint is incorrect that "all of the facts underlying Dr. Reno's complaint related to the actions of Anthem Virginia, not WellPoint." Anthem & WellPoint Resp. at 5. WellPoint and Anthem have conceded that WellPoint's director of special investigations reviewed the Reno audit and that the same policy applied in Reno's case is operative in each of its subsidiaries. On the current record, there is a genuine issue of material fact on whether WellPoint was the "ultimate decisionmaker" with regard to Anthem's plan.

The Court notes, however, that it has granted summary judgment in Reno's favor on his claims against Anthem, which should result in an award of appropriate relief

irrespective of WellPoint's status as a defendant. The Court questions what more Reno hopes to gain from pursuing his claim against WellPoint and thus whether Reno's claim against WellPoint ought to be the subject of a trial. Reno should be prepared to articulate an answer to this question at the upcoming status hearing.

**B. Barnard and Wahner's summary judgment motion against Independence Blue Cross**

In support of their motion for summary judgment, Barnard & Wahner argue that Independence made an adverse benefit determination against them and proceeded to deny them ERISA-compliant notice and appeal rights. They contend that they have standing as ERISA beneficiaries to sue Independence on this claim. Barnard and Wahner also argue that Independence's denial of benefits to them was arbitrary and capricious.[5]

**1. Standing**

Barnard and Wahner contend that they are beneficiaries for ERISA purposes and thus have standing to assert claims that Independence denied them ERISA-compliant notice and appeal. First, they argue that they are beneficiaries with standing under ERISA because the relevant employee benefit plans "each provide that participating providers are paid by the plan directly." Barnard & Wahner Mem. at 8. Therefore, they contend, they are "designated . . . by the terms of an employee benefit plan" as

---

[5] Independence argues in its response to Barnard and Wahner's motion that the motion lacks specifics on several points and that "[t]hese deficiencies mean that their motion should be denied outright" under Local Rule 56.1. Independence Resp. at 3. Barnard and Wahner have adequately responded to this argument. Their factual submission complies with the rule, and the areas where Independence asserts that they lack specificity do not warrant summary rejection of their motion. Any shortcomings of Barnard and Wahner's factual submissions do not resemble those in the cases Independence cites.

individuals "who . . . may be entitled to a benefit thereunder." *Id.* (citing 29 U.S.C. § 1002(8)). This argument is premised on the notion that the payment Independence makes to health care providers "*is* the 'benefit' payable under an insurance plan." Barnard & Wahner Repl. at 6. Second, Barnard and Wahner say that their patients gave them "standard assignments" that "assign them benefits payable for their services." *Id.* Finally, in their reply, Barnard and Wahner argue that Independence has "waived any right to contest Plaintiffs' assignments or to assert anti-assignment clauses," because Independence paid for the claims in contention here, then sought recoupment from Barnard and Wahner, not their patients. Barnard & Wahner Repl. at 8. Citing a previous decision of this Court, they contend that "[a] plan can waive its right to enforce an anti-assignment provision by engaging in conduct inconsistent with the provision." *Id.* (citing *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2011 WL 6819081 at *7 (N.D. Ill. Dec. 28, 2011)).

Independence counters that Barnard and Wahner do not have standing simply "because IBC pays them"; it says that its provider agreements with the plaintiffs define "beneficiary" to mean "a member or a subscriber—not a provider." Independence Resp. at 10. Independence also contends that Barnard and Wahner "twist language of IBC's benefit program agreements" to assert standing as beneficiaries, because employers who contract with Independence for health care "would indeed be surprised to learn" that Barnard and Wahner are also beneficiaries. *Id.* at 11. In response to Barnard and Wahner's argument about their assignments from patients, Independence argues that many of their patients' agreements contain anti-assignment provisions that negate these assignments for all but three of the patient claims at issue, "2 as to Wahner and 1 as to

Barnard—totaling $315.00."  Independence Resp. at 11.  Finally, Independence appears to have anticipated Barnard and Wahner's waiver argument to some extent. Independence contends, citing the same prior decision of this Court reference above, that "direct payment to a provider does not waive reliance on a plan's anti-assignment provision if the plan also authorizes direct payment."  *Id.* at 10 (quoting *Pa. Chiropractic*, 2011 WL 6819081 at *6).

Because the waiver argument, though appropriately responsive to Independence's arguments about anti-assignment provisions, was made only in Barnard and Wahner's reply brief, Independence has not had an adequate opportunity to respond.  The Court therefore concludes that it is inappropriate to grant summary judgment to Barnard and Wahner on this ground, and the issue remains for trial.

### 2.    Adverse benefit determination

Barnard and Wahner argue that they received adverse benefit determinations from Independence that triggered their rights to ERISA-compliant notice and appeal. *See* 29 C.F.R. § 2650.503-1(g)(1).  The Court also concludes that summary judgment is inappropriate on this point.

Similar to Anthem and WellPoint's argument regarding Reno, Independence contends that its interactions with Barnard and Wahner were governed by a provider agreement that prevented them from billing their patients directly for non-covered services, and thus there was no adverse benefit determination.  Barnard and Wahner argue that they had agreements with their patients that permitted them to balance-bill. They also make two arguments similar to those that Reno made on the same question: the Department of Labor FAQ that Independence cites does not apply to this dispute,

and Independence is estopped from arguing the provider agreement required Barnard and Wahner to notify their patients about non-covered services.

The provider agreement in question states that providers must inform beneficiaries in advance of the administration of non-covered services or else hold them harmless from payment for such services. As with Reno's motion, Barnard and Wahner make the estoppel argument about this provision for the first time in their reply brief, in response to Independence's argument about the provider agreement. As was the case with Reno, Barnard and Wahner's estoppel argument was appropriately responsive. Independence, however, has not had an opportunity to respond to the argument. The Court therefore concludes it is inappropriate to grant summary judgment to Barnard and Wahner based on the estoppel argument. That issue will remain for trial.

### 3.     Adequacy of notice and appeal rights and exhaustion

Barnard and Wahner also contend that after Independence made adverse benefit determinations by recouping their benefits, the notice and appeal procedure Independence offered them did not comport with ERISA's requirements. Independence responds that Barnard and Wahner did not exhaust Independence's "internal dispute resolution procedures," as ERISA requires, and that those procedures were adequate for ERISA purposes. Independence Resp. at 4. Barnard & Wahner reply that the procedures Independence did offer "did not substantially comply with ERISA," and for that reason they did not have to utilize them, because inadequate procedures "are deemed to have been exhausted." Barnard & Wahner Resp. at 8. In particular, plaintiffs say that Independence admits its original notice was inadequate and that Independence failed to inform them they had the right to appeal the recoupment

decision.

ERISA requires a denial of benefits to be accompanied by "adequate notice in writing" including "the specific reasons for such denial." 29 U.S.C. § 1133(1). In addition, employee benefit plans must provide participants and beneficiaries with "full and fair review by the appropriate named fiduciary of the decision denying the claim." *Id.* § 1133(2). ERISA regulations likewise require plans to "maintain reasonable procedures governing . . . notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560.503-1(b). The same regulation provides, however, that "a claimant shall be deemed to have exhausted" a plan's administrative remedies if the plan fails "to establish or follow claims procedures consistent with the requirements of this section." *Id.* § 2560.503-1(l).

In interpreting the requirement that plans maintain reasonable notice and appeal procedures, the Seventh Circuit has held that "substantial compliance [with ERISA] is sufficient." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992) (internal quotation marks omitted). A plan administrator may still be in substantial compliance with ERISA even if the administrator "violate[s] a technical rule under ERISA, such as the regulation governing the contents of letters denying claims for benefits." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 361–62 (7th Cir. 2011). This inquiry is "fact-intensive," *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 693 (7th Cir. 2010), and it is "guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003).

The Court notes first that Independence undercuts its non-exhaustion argument with regard to Wahner when it argues that "Wahner exhausted [Independence's] procedures and received a full and fair review of his fees claims."  Independence Resp. at 8.  (It makes no similar argument about Barnard.[6])  The Court accepts that admission and thus need not further address Independence's exhaustion argument with respect to Wahner.

Regardless, whether either plaintiff exhausted Independence's procedures is of no consequence if neither of them received ERISA-compliant notice and appeal rights. *See* 29 C.F.R. § 2560.503-1(l).  The Court will therefore evaluate that question next. Barnard and Wahner argue, and Independence does not dispute, that the notices it sent to both doctors omitted multiple elements that are required by ERISA regulations regarding notice of benefit determinations.  (Independence does dispute that these were demand letters.)  The letters each declared that several of the doctors' insurance claims "require adjustment for overpayment," but they did not say why.  *See* Pls.' Exs. 49 & 50. ERISA requires inclusion of "[t]he specific reason or reasons for the adverse determination," as well as "[r]eference to the specific plan provisions on which the determination is based."  29 C.F.R. § 2650.503-1(g)(i)–(ii).  In addition, each letter informed the recipient that he had thirty days from the date of the letter before Independence would begin recouping payment.  ERISA regulations, however, require "at least 60 days" after notification "within which to appeal the determination."  29 C.F.R.

---

[6] Though Independence also argues in its brief that "Barnard resorted to IBC's internal claims procedures regarding his fees and received interim relief," it appears that Independence meant to refer to Wahner.  Five of the seven paragraphs it cites from the plaintiffs' joint statement of facts refer to Wahner only, and not Barnard; the other two refer to neither Barnard nor Wahner.  *See* Independence Resp. to Pls.' LR 56.1 Stat. ¶¶ 138, 142–45 & 155–56.

§ 2650.503-1(h)(2)(i).  The letters also contained no reference to how the recipients might challenge the determination within Independence itself or to their right to file suit in court after using Independence's internal appeal procedures.  But ERISA requires that a benefit determination include "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review."  *Id.* § 2650.503-1(g)(iv).

In defending the notice that Barnard and Wahner were given, Independence argues that "Barnard and Wahner always knew how to identify the applicable ERISA plan for every patient," because they had patients fill out a certain form, and could learn this information from patients' insurance cards.  Independence Resp. at 6.  In other words, Independence contends that its letters provided information from which Barnard and Wahner should have been able to figure out the basis for the denials.  This misunderstands ERISA's requirements.  The statute and regulations put the onus on the plan administrator to provide the required information, not on the beneficiary or claimant to seek it out.  Independence does not cite any authority that holds otherwise.

Indeed, Seventh Circuit authority on what it means to be in "substantial compliance" with ERISA goes the other way, starting with *Halpin*, which Independence itself cites.  In that case, although the Seventh Circuit held that "substantial compliance" with ERISA notice and appeal requirements was sufficient, it also warned that "[b]are conclusions [as reasons for a denial] are not a rationale," as notice must "contain specific reasons" for a denial, and any defects in the initial denial cannot be "cured by the later correspondence."  *Halpin*, 962 F.2d at 693 (citations omitted).  Independence

included no reasons, specific or otherwise, in its letters to Barnard and Wahner. Rather, it merely stated that it would begin recouping payment soon—or, in Wahner's case, offered a choice of ways in which it would recoup payment. The Seventh Circuit has consistently held that such a "statement of reasons" is necessary "to permit effective review." *Schneider*, 422 F.3d at 628. In *Schneider*, the letter the plaintiff received failed to include specific reasons for the termination of her benefits, any "specific plan provision on which the denial was based," or any method of appeal. *Id.* This notice "was indefensible as a matter of statute, regulation and case law." *Id.*

The Court makes a similar determination here. The original notice that Barnard and Wahner received lacked any explanation for Independence's decision, and it gave them next to nothing to go on in the event that they wished to appeal. No reasonable fact finder could conclude that the substantially complied with ERISA. The Court therefore rules, pursuant to Federal Rule of Civil Procedure 56(g), that Barnard and Wahner did not receive adequate notice under ERISA and that Independence's exhaustion defense fails.

### 4. Denial of benefits

In addition to their claim regarding notice and appeal rights under ERISA, Barnard and Wahner claim that the recoupments Independence made were arbitrary and capricious. Like Reno, Barnard and Wahner argue that Independence "made no effort to examine what particular services Drs. Barnard or Wahner had billed" under particular provider codes. Barnard & Wahner Mem. at 17. They contend that this practice "was plainly insufficient," because "IBC determined that virtually every service provided by Drs. Barnard and Wahner was subject to exclusion under a major subset of

IBC's plans, even though Drs. Barnard and Wahner were contracted providers within IBC's network." *Id.* Independence's method, they argue, "simply treats every service billed under a broad swath of CPT codes as 'rehabilitation therapy services'" and thus ineligible for coverage under Independence's policies. *Id.* at 16. Finally, they say that Independence's decision to decide to recoup payments it had already made to Barnard and Wahner "is the epitome of arbitrary and capricious behavior," as it came "after years of inducing doctors to perform services for its members." *Id.* at 17.

As with Anthem and WellPoint's response to Reno's motion, Independence does not directly respond regarding Barnard and Wahner's claim concerning improper denial of benefits. In fact, Independence does not address the claim at all in its response brief. In its response to the plaintiffs' joint statement of facts, Independence does not dispute that it based its decision to recoup payments from Barnard and Wahner on the proposition that they used certain procedure codes that "are not eligible for reimbursement when submitted by a provider type that does not meet capitation criteria." Independence Resp. to Pls.' LR 56.1 Stat. ¶ 142 (citing Pls.' Ex. 60). Independence adds that the same cited exhibit also mentions that its decision was "supported by the communication distributed to the provider community advising of our intended recovery effort due to Independent Blue Cross erroneously remitting payment for the impacted procedure codes." *Id.* Independence says elsewhere in the same response that the plaintiffs relied on only one insurance plan for the fact that certain providers who give specific rehabilitation services are uniformly excluded from payment. *Id.* ¶ 130. In Barnard and Wahner's reply, they argue that Independence nonetheless admits that it based its actions against them "on the uniform policy that the services at

issue were excluded under its plans." Barnard & Wahner Repl. at 13.

Barnard and Wahner are correct to observe that Independence does not answer their primary contention on the denial of their benefits: that Independence unreasonably used a uniform method, rather than an individualized one, to decide that it would recoup payments for certain categories of services. Independence's responses to the plaintiffs' statement of facts confirm that the decision to recoup the funds was based on its coding system and not on the circumstances or purposes of each treatment. It marked as "undisputed" plaintiffs' statement that "[e]ach of the codes included in IBC's Rehabilitation Therapy Capitation program are not eligible for coverage when submitted by a provider, such as Drs. Barnard and Wahner, who are not contracted to receive capitation payment." Independence Resp. to Pls.' LR 56.1 Stat. ¶ 132. Independence also confirmed that the codes came from its own medical policy, as noted in a letter it sent to Wahner. In addition to pointing to its coding, Independence references a passage from that letter noting that its recoupment decision was also supported by some previous "communication" which "advis[ed] of our intended recovery effort due to Independence Blue Cross erroneously remitting payment for the impacted procedure codes." *See* Pls.' Ex. 60. But that passage is not responsive to the plaintiffs' argument that the lack of individualized determination based on those codes was arbitrary and capricious; Independence does not even specify what if any details the previous communication contained. Further, none of these statements in Independence's factual submissions responds to the plaintiffs' other argument on the denial of their claims: that its decision to recoup payment "after years of inducing" the plaintiffs to provide the services in question was itself arbitrary and capricious.

Considering Independence's effective lack of a direct and viable response to Barnard and Wahner's contentions, the Court grants Barnard and Wahner summary judgment as to liability on the claim that Independence's recoupments from them were arbitrary and capricious.

### Conclusion

For the foregoing reasons, the Court grants plaintiff Reno's motion for summary judgment [docket no. 793] on the question of liability as to defendant Anthem Health Plans of Virginia, Inc. but denies the motion with regard to defendant WellPoint, Inc. The Court grants plaintiffs Barnard & Wahner's motion for summary judgment [docket no. 795] as to liability on their claim against defendant Independence Blue Cross for improper denial of benefits but denies in part plaintiffs' motion on their claim that Independence denied them the appropriate notice and appeal rights, while making findings in plaintiffs' favor on certain points pursuant to Rule 56(g). At tomorrow's status hearing, counsel should be prepared to discuss what further proceedings are required on the claims of these plaintiffs.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 7, 2013