**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENNSYLVANIA CHIROPRACTIC ASSOCIATION, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **No. 09 C 5619** |
| **BLUE CROSS BLUE SHIELD ASSOCIATION, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

This decision constitutes the Court's findings of fact and conclusions of law following the bench trial held on the remaining claims in this case on December 2, 3, and 4, 2013.

## **Background**

Associations representing the interests of individual chiropractors sued Blue Cross and Blue Shield Association (BCBSA) and a number of Blue Cross Blue Shield (BCBS) entities for violations of the Employee Retirement Income Security Act (ERISA). BCBSA is a national umbrella organization that facilitates the activities of individual BCBS entities, which insure and administer health care plans for Blue Cross and Blue Shield members (BCBS insureds) in various regions.

### **A.    Procedural history involving association plaintiffs**

This case has a long and complex procedural history.  On November 16, 2009,

the association plaintiffs filed a first amended complaint, claiming that BCBSA and BCBS entities violated ERISA, the Racketeer Influenced and Corrupt Organizations Act (RICO), and Florida law. On May 17, 2010, the Court dismissed the RICO claims but declined to dismiss the ERISA claims. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010).

On June 29, 2010, plaintiffs filed a second amended complaint, in which they reasserted their ERISA and RICO claims and added a RICO conspiracy claim and an ERISA claim by a BCBS plan participant, Katherine Hopkins, on behalf of a putative class of BCBS subscribers. The Court dismissed the amended RICO claims as well as Hopkins's ERISA claim. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* No. 09 C 5619, 2010 WL 3940694 (N.D. Ill. Oct. 6, 2010).

In January 2011, plaintiffs filed a third amended complaint, in which they amended Hopkins's ERISA claims and added defendants on those claims. The Court ultimately granted summary judgment for defendants against Hopkins. *See Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2012 WL 182213 (N.D. Ill. Jan. 23, 2012).

On February 17, 2011, plaintiffs filed the current version of their complaint (the fourth amended complaint), in which they asserted ERISA claims in three counts. In count one, they sought to recover unpaid benefits that they contended BCBS entities unlawfully recouped from them. In counts two and four, plaintiffs requested injunctive and other equitable relief under section 502(a)(3) of ERISA. In count three, certain of the plaintiffs alleged that BCBSA and BCBS entities violated section 627.419 of the Florida Code, which prohibits insurance providers from discriminating against

chiropractors.

On March 11, 2011, plaintiffs asked the Court to certify three classes. These included a class of health care providers from whom BCBS had recouped repayments, a class of health care subscribers from whom one of the BCBS entities sought repayments and certain health care providers sought additional payments (due to the repayment demands the providers were facing), and a class of Florida chiropractors from whom BCBS entities withheld payments in certain circumstances. On December 28, 2011, the Court denied plaintiffs' motion for class certification. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* No. 09 C 5619, 2011 WL 6819081 (N.D. Ill. Dec. 28, 2011). Plaintiffs thereafter moved to certify a number of smaller classes. The Court denied these motions as well. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* 286 F.R.D. 355 (N.D. Ill. 2012).

Defendants moved for summary judgment on the grounds that plaintiffs lacked standing to sue and the Court would be unable to grant the injunctive relief that plaintiffs sought. The Court denied defendants' motion, concluding that plaintiffs had associational standing and that there were forms of declaratory and injunctive relief that it could potentially order in the case. Plaintiffs moved for summary judgment on the basis that defendants had uniform practices regarding post-payment audits and repayment demand policies that disregarded ERISA's requirements. The Court denied plaintiffs' motion, finding that genuine factual disputes remained regarding what each entity's policies or approaches were. *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* No. 09 C 5619, 2013 WL 595510 (N.D. Ill. Nov. 7, 2013).

**B.    Procedural history of *PCA v. IBC***

Following the Court's November 2013 summary judgment ruling, nearly all of the remaining claims were settled.  Only one set of claims remains, specifically, the claims of Pennsylvania Chiropractic Association (PCA) against Independence Blue Cross (IBC), a BCBS entity operating in certain parts of Pennsylvania.  PCA alleges that IBC violated, and continues to violate, notice and appeal requirements allegedly owed to PCA members under ERISA.  PCA has asked the Court for prospective injunctive relief, namely requiring IBC to reform its policies in connection with post-payment audits and seeking repayment from chiropractic care providers.

As indicated earlier, on December 2, 3, and 4, 2013, the Court conducted a bench trial on PCA's claims against IBC.  The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).

## Discussion

**A.    Practices of PCA members**

At the bench trial, PCA offered testimony from, among other witnesses, two Pennsylvania chiropractors, Mark Barnard and Barry Wahner.  Both Barnard and Wahner have been chiropractors since 1991, and both are participating providers with IBC.  Wahner is a current PCA member; Barnard was not when he testified at trial but was considering joining the association.  PCA contended, and the evidence shows, that the two chiropractors' dealings with Independence Blue Cross are representative of those of other PCA members.

IBC administers health care benefit plans that are offered through employers and other groups.  The plans typically provide for greater benefits if the plan member is

treated by a health care provider who is part of a network established by IBC. IBC enters into contracts with physicians, chiropractors, and other health care providers to provide services to plan members at established rates.

Both Barnard and Wahner agreed to be participating ("in-network") providers with IBC by signing provider agreements in 1997, and each understood that the agreement governed his arrangement with IBC. They promised "to render Covered Services to Beneficiaries" according to the terms of the agreements as well as IBC's policies as outlined in its Provider Manual, including its grievance and appeals policies. Pl.'s Ex. 15 at IBC0003160; Pl.'s Ex. 16 at IBC0003177. A "Beneficiary" is "[a]n individual who, on the date of service, is eligible to receive Covered Medical Services under a Benefit Program or Benefit Program Agreement." Pl.'s Ex. 15 at IBC0003157; Pl.'s Ex. 16 at IBC0003174. Covered services are those that are "Medically Necessary" and "provided pursuant to a Benefit Program," and "Excluded Services" are those that are not medically necessary or are not covered under the program in question. Pl.'s Ex. 15 at IBC0003158; Pl.'s Ex. 16 at IBC0003181.

The provider agreement says that IBC pays providers directly for covered services: "Unless the claim is disputed, Independence shall make payment on each of Provider's clean, completed, accurate and timely submitted claims for Covered Services rendered to a Beneficiary . . . ." Pl.'s Ex. 15 at IBC0003163; Pl.'s Ex. 16 at IBC0003186. (Elsewhere, IBC is defined as the "Payor." Pl.'s Ex. 15 at IBC0003159; Pl.'s Ex. 16 at IBC0003182.) The agreement also defines "capitation compensation," which is a "per Member per month (PMPM) payment, payable monthly for each Member who has selected or has been assigned to Provider." Pl.'s Ex. 15 at IBC0003158; Pl.'s Ex. 16 at

IBC0003181.  The IBC provider manual lists several services that are "included in the monthly capitation" and therefore "should be provided by the [primary care physician]'s designated physical and occupational therapy provider," among them therapeutic exercise, "[a]ll physical modalities," and occupational therapy.  Def.'s Ex. 54 at IBC0005057.  Further, IBC reimburses certain services, such as electric muscle stimulation, on a capitated basis *only.*  For example, IBC will not pay a provider for having delivered electric muscle stimulation to an insured unless that provider was authorized to receive payment for that service on a capitated basis at the time it was delivered.

If a participating provider like Barnard or Wahner provides a non-covered service to a patient, the provider is required by his contract to provide advance notice to the patient that IBC will not pay for it and that the patient will be liable for the cost.  If the provider does not get this advance permission, he cannot bill the patient, in accordance with the contract's "beneficiary hold harmless" clause.  That provision states that "in no event" may providers charge beneficiaries or subscribers "or have any recourse against" them, "including but not limited to non-payment, insolvency, or breach of this Agreement."  Pl.'s Ex. 15 at IBC0003164; Pl.'s Ex. 16 at IBC0003181.

The provider agreement also contains several provisions relating to the recoupment of funds by IBC from the provider.  In the section entitled "Payment," the agreement states that IBC will pay claims within thirty days but that it has "the right to offset claim payments to provider by any amount owed by provider to Independence."  Pl.'s Ex. 15 at IBC0003163; Pl.'s Ex. 16 at IBC0003180.  Section 3.11 of the document, labeled "Adjustments," notes that "[p]ayments to Providers are subject to retroactive

adjustment by Independence for up to six (6) months." Pl.'s Ex. 15 at IBC0003165; Pl.'s Ex. 16 at IBC0003182. That section allows for such adjustments in two scenarios: when IBC learns that the patient was not actually eligible for coverage when services were provided, or when the patient was not covered at the time of service, but IBC later learns the person was covered.

In 2009, IBC issued a document entitled "Fee Schedule Advisory and Amendment 2009 for Chiropractic Providers." *See* Def.'s Exs. 57, 57.1, 57.2. Among other changes, the document amended section 3.11 of the provider agreement, stating that provider payments are still "subject to retroactive adjustments," but that "recoveries of overpayments or otherwise incorrect, or unwarranted payments" will occur "no more than eighteen (18) months after receipt of payment by Provider." Def.'s Ex. 57 at IBC0001745–46. During her testimony at trial, Linda Paterson, senior director of provider network services for IBC, stated that the eighteen-month period was established because of a "business decision to limit our ability to go back and recover overpayments to 18 months in 2009." Trial Tr. at 442. Though Barnard testified that he had received this document, Wahner said he had never seen it. At trial, Paterson agreed in her testimony that this amendment was not operative during the period when IBC made recoupments from chiropractors for services they provided in 2007 and 2008.

The IBC provider manual includes information on the appeal process afforded to providers. Among the "examples of appealable events" listed in the manual are "coding logic," "application of claim payment policy," and "claims adjudication settlement not consistent with law or contract." Pl.'s Ex. 19 at IBC0005782. The review process does not apply to determinations of medical necessity, "claims for services considered non-

Medically Necessary," or eligibility determinations. *Id.* The manual indicates that a provider can appeal IBC's decisions through two levels. First, a provider may "submit claim inquiries" to an address, and if she is dissatisfied with the initial appeal determination, she may send a second-level appeal to a different address. *Id.* at IBC0005782–83. The second-level appeal "will be reviewed by an internal Provider Appeals Review Board (PARB)" with three members, whose decision "will include a detailed explanation" for the provider and will constitute the final decision on the appeal. *Id.* at IBC0005783.

As participating providers, and as provided under the agreement, both Wahner and Barnard receive payment directly from IBC for services that are covered under their patients' insurance plans. For these covered services, patients are responsible only for co-pay amounts and certain deductibles. The practice in Wahner's office, until such information became available via an online system called NaviNet at an unspecified time in the recent past, was to call the insurance company in advance of providing services to determine the extent of each patient's coverage. Barnard's testimony was in a similar vein: he stated that "[w]ith every patient that comes in with every insurance company," his staff calls the insurance company and fills out "a very detailed form" noting whether the services to be provided are covered." Trial Tr. at 200. If a patient's insurance plan does not cover the service in question, the patients are responsible for the full cost of the service. Both Barnard and Wahner testified credibly that they routinely and regularly discussed this with patients before performing non-covered services.

In addition, Wahner testified credibly that he "always" obtains an assignment of

benefits from his patients, because "[w]e want to be sure that we're paid. We also want the patient to understand who's responsible for the bills and who's responsible for the payments." Trial Tr. at 89–90. Barnard similarly testified, credibly, that for each new patient, "[t]here's an assignment of benefits," *id.* at 194, which he has patients fill out "[u]ltimately to ensure that we get paid." *Id.* at 197. In one sample of an assignment form, a patient of Barnard's "assign[ed] and convey[ed] directly" to Barnard "all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services rendered from such doctor and clinic." Def.'s Ex. 4 at Barnard002361. The assignment further conveyed the patient's claims against the patient's insurer to Barnard. *Id.* A sample assignment from a patient of Wahner's was similar; there, a patient "assign[ed] directly" to Wahner "all insurance benefits, if any, otherwise payable to me for services rendered," and signaled his or her understanding "that I am financially responsible for all charges whether or not paid by insurance." Def.'s Ex. 3 at Wahner 000234. Barnard and Wahner both testified that they typically see or make a copy of a patient's insurance card, but both said that they did not see the patients' actual insurance plans. This testimony was likewise credible.

## B. Recoupment

In late 2006 or early 2007, IBC experienced what it says was a computer glitch that caused it to make erroneous payments to PCA members in the following way. As described above, IBC provides benefit payments to some health care providers on a capitated basis, meaning that it pays them a set fee for each patient to whom they provide certain services. The claimed computer glitch caused IBC to pay PCA members who were not authorized to provide services on a capitated basis for services

that are supposed to be reimbursed on a capitated basis only.

To correct for this, IBC began to recover—recoup—the payments that it says it had made erroneously to PCA members.  In particular, IBC withheld payment for non-capitated services, the services for which providers *were* authorized to receive payment.  Further, IBC retracted and reprocessed PCA members' original claims for the capitated services.  In 2007-2008, IBC recouped a total of $1.3 million from about 472 PCA members.

IBC recoups funds from a provider when it determines that it has paid the provider in error**.**  The Court finds credible Barnard's testimony that recoupment "happened quite frequently" to him, particularly in 2005-2006 and 2007-2008.  Trial Tr. at 203.  The Court likewise finds credible Wahner's testimony that "it's fairly common" for IBC to retroactively deny a claim that it has already paid him.  *Id.* at 96.  Wahner testified that IBC made a recoupment from him just a week before the bench trial due to a purported change in an insured's plan.  IBC representative Paterson conceded that "on a pretty routine basis, there will be an offset taken from a provider claim based on a finding that the member lacked eligibility."  *Id.* at 345.  Other circumstances in which IBC regularly recoups payments involve when an insured does not remit his or her co-pay balance, fails to meet a deductible requirement, exceeds his or her visitation limits, or experiences a plan change.

## C.    Notice

In February 2007, IBC's Paterson sent a letter to all of the insurer's participating chiropractors.  The letter stated that IBC "may have erroneously reimbursed some providers" for services that are subject to capitation.  Pl.'s Ex. 80.1 at Wahner000099.

Paterson informed the providers that "[t]hese capitated services are not eligible for separate payment to non-capitated providers," and she provided the name and number of an employee to call with any questions. *Id.* As Paterson testified, "'We were basically alerting providers to the fact that we had identified payments in error and reminding providers of the . . . [c]apitated program." Trial Tr. at 350-51.

On August 3, 2007, Paterson sent letters to Barnard, Wahner, and approximately 470 other chiropractors—about one-third of IBC's participating chiropractor providers in Pennsylvania. These were the chiropractors whom IBC deemed it had incorrectly paid for physical therapy services, which it said were subject to capitation. The letter referenced the February 2007 letter. Under a heading, "Where the Errors Occurred," Paterson said "[t]he overpayments were for physical medicine and rehabilitation services included in the HMO Short Term Rehabilitation Therapy Capitation Program." Pl.'s Ex. 25 at IBC0008626. The letter continued: "As a result of a review of services provided by your practice, we have identified overpayments made to your practice." *Id.* The letter, or at least the version in evidence, did not list or detail any of the specific services in question. It did, however, contain another heading, "Repayment Options," under which the providers were told they had "several options for repayment," including the name and number of an IBC employee to whom they could report their repayment plan choice or address "any questions." *Id.* Providers were also told that IBC would "begin adjusting" the providers' claims if they did not contact the employee by September 10, 2007. *Id.*

Less than three weeks later, on August 21, 2007, Paterson sent the providers a third letter relating to the "erroneous overpayments." Pl.'s Ex. 24 at IBC0008625. In the

letter, Paterson indicated that IBC had "received a number of inquiries regarding our overpayment documentation," and that "as a result, we are temporarily suspending our recovery activities until further notice while we look into the questions that have been raised." *Id.* The letter offered the name and phone number of a manager of provider network services, whom providers could contact with "any questions." *Id.*

On December 2, 2008, Paterson sent PCA members letters stating that IBC would be recouping the claimed overpayments. In cases where IBC was seeking the return of more than $500, it offered several options for repayment: offsetting the amount due against future remittances until the balance is zero; withholding payments from remittances over a ten month period; repaying the amount in installments; or repaying in a lump sum. In the letter, Paterson asked the provider to contact IBC within ten business days to select one of the options. Paterson advised in the letter that if the provider did not choose a payment method within thirty days, IBC would begin recouping the amounts due from other remittances until the balance was satisfied. Paterson's letter did not ask for any information or materials about the claims, explain how IBC had determined that the provider owed it the amount indicated, or provide the insurance plans (or relevant language from the plans) of the patients who had allegedly received the non-capitated services inappropriately from the provider.

When recoupment efforts were driven by the claimed computer glitch, IBC notified providers that it would be recovering payments from them, in the manner described above. In other cases, IBC simply begins recouping payments and then sends providers a statement of remittance (SOR). In this regard, Paterson stated that typically, "[t]he sole correspondence relating to the recoupment is in the [SOR] . . . ."

Trial Tr. at 297.  The SOR identifies the claims that IBC has either already adjusted or intends to adjust, primarily by giving the names of the insured patients who received the services in question and the service codes delineating the services.  It also lists a phone number that the provider can call with questions.  The SOR does not, however, identify the provision(s) of the given insured's plan that IBC relied on in making its determination nor does it even provide the reason for the recoupment.  In addition, the SOR does not inform the provider that she has a right to appeal IBC's determination, let alone describe what the appeal process would entail and what it requires the provider to do.  IBC also sends providers an electronic document called an "837," which is simply an electronic version of the SOR.

PCA members have access to NaviNet, an online program that contains information about BCBS insureds, including the medical services for which their providers may be reimbursed, co-pay and deductible requirements, visit limitations, and more.  Paterson acknowledged that NaviNet contains no information regarding recoupment efforts beyond what is in the SOR or 837.  NaviNet does provide access to the provider manuals that BCBS entities issue to providers.  But although these manuals identify general appeals procedures that are available to providers, they do not speak to the ways in which providers can challenge a BCBS entity's recoupment of a supposed overpayment in particular.  And no material provided or made available by IBC in connection with a recoupment directs the provider to the manuals for this purpose.

**D.    Appeal**

The evidence presented at trial establishes that IBC does not provide providers

facing recoupment information about a review of an adverse benefit determination, including the outcome of the review and the evidence that IBC considered in reaching its decision. By way of example, Wahner wanted to challenge IBC's decision to recoup funds that it had paid him due to the alleged computer glitch. In March 2009, he sent a letter to IBC employee Jill Panek, in which he asked how to appeal IBC's determination. He also tried calling IBC. He got no response. A few months later, IBC contacted Wahner and stated that he had lost his appeal, which he was unaware that he had made. IBC instructed Wahner to send any relevant information to a certain address for a second level of appeal if he disagreed with IBC's initial decision. Wahner complied, passing along written notes from earlier calls with IBC. Wahner unambiguously stated that he wished to participate in any appeal that was held.

Sometime later, an IBC employee contacted Wahner to resolve the payments that he allegedly owed to IBC but seemed unaware of Wahner's attempts to appeal IBC's determination. As a result, Wahner re-sent his information to IBC in September 2009 and confirmed that IBC received it. In April 2010, IBC sent Wahner a letter stating that he had lost his second appeal. The letter did not provide an explanation for the denial. Rather, it simply recited the information already found in the SOR that IBC had sent to Wahner. At this point, Wahner asked IBC for any records regarding the hearing, as well as information about who was present. IBC replied that there were no records and that it could not confirm who attended the hearing. When Wahner reiterated that he had wanted to participate in the hearing, IBC replied, "Well, you don't get to be there." Trial Tr. at 113.

In cases where IBC seeks to recoup funds based on a medical necessity

determination, an eligibility determination (whether the patient was authorized to receive covered services from a provider who would then be reimbursed for those services), an audit investigation, or a fee schedule dispute, it is undisputed that IBC does not offer the provider a chance to seek review of its original determination.  Paterson confirmed that IBC recoups payments on the basis that a particular service was not medically necessary or a patient was ineligible to receive a specific service on a routine basis.

Finally, it is undisputed that IBC does not take ERISA into account when adopting, implementing or observing its policies and procedures relating to recoupment. When asked what role ERISA played with regard to her work in this regard, Paterson stated, "It doesn't.  It really doesn't."  Trial Tr. at 319.

**E.    Current status**

At the time of trial, IBC was in the process of changing its recoupment and appeal policies and procedures as the result of a settlement in another lawsuit.  A group of non-chiropractic providers previously filed a class-action lawsuit against IBC seeking to establish certain procedural protections.  These parties and IBC entered into a settlement agreement, known as the "Love-Thomas settlement," which required IBC to alter some of its notice and appeals processes, but only for members of the class in that particular lawsuit.  Upon deciding that certain of the anticipated changes would constitute good business practices, IBC determined to apply those changes to all medical providers, including chiropractors.  One of these changes is to give providers forty-five to sixty days' notice on the SOR of any pending recoupment.

Many of the changes that IBC will be extending to the Love-Thomas class members, however, will not be applied to non-members of that class.  These include the

ability of a provider to appeal an adverse medical necessity determination relating to a patient's care; an eighteen-month limit on recoupment of previous payments; and a third level of appeal, involving external review. IBC will not be introducing any changes to refer specifically to an insured's plan when alerting providers of a retroactive adjustment, describe any additional information or materials that providers can submit to IBC to perfect their claims, specify what information or materials IBC relied on in making an adverse benefit determination so that providers may access that information or materials, or identify in the SOR appeal procedures available to providers. Paterson confirmed that IBC is not taking ERISA into account during its process of modifying its procedures. Highmark, another BCBS entity to whom IBC is outsourcing certain work, has already programmed IBC's system to reflect the changes that IBC will be extending to the Love-Thomas class members. But IBC remains free to make further changes.

**Discussion**

PCA contends that its members are entitled to notice and appeal rights under ERISA when IBC recoups or recovers payments previously made to the members. This requires the Court to assess three questions. The first question is whether PCA members (and thus PCA) have rights under ERISA that entitle them to file suit. The second question is whether the members suffer an adverse benefit determination within the meaning of ERISA regulations when IBC recoups payments from them. The third question is whether IBC gives PCA members adequate notice and appeal rights when an adverse benefit determination is made.

**A.     Whether PCA can sue under ERISA**

Because PCA is suing under ERISA, the Court must first determine if it is entitled

to do so.  This essentially depends on whether PCA's members are considered "beneficiaries" of an employee benefit plan in the circumstances presented.  Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary of an employee benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  The statute also permits participants, beneficiaries, and fiduciaries to sue in order "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan."  *Id.* § 1132(a)(3)(A).

### 1.    Defining "benefit" under ERISA

ERISA defines a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."  29 U.S.C. § 1002(8).  ERISA does not define the term "benefit."  However, several references within the statute's definitions section imply that, in the present circumstances at least, payment of money is a "benefit" under ERISA.  That section refers to "calculating the benefits under the plan," *id.* § 1002(2)(A), as well as "making payments of benefits," *id.* § 1002(2)(B).  That last subsection refers to a related provision of the Internal Revenue Code, which discusses "benefits payable to the participant not in excess of twice the applicable dollar limit determined under subsection (e)(15)."  26 U.S.C. § 457(f)(4)(A).

IBC argued at the bench trial that "benefit" does not necessarily mean a payment.  It contended that the term should be defined "in the broadest sense" and means "a right to receive treatment under the plan."  *See* Trial Tr. at 537–38; *see also, e.g.*, *id.* at 539 ("The contract entitles the participant in an HMO to receive the services

provided by the HMO.  That's the benefit.").  IBC also pointed to the welcome page of

Plaintiff's Exhibit 59, a purported insurance plan, which refers to "rights of a Member to

receive benefits" that cannot be assigned.  *Id.* at 537 (citing Pl.'s Ex. 59 at

IBC0022164).  That same page, however, refers to "benefit *payments*," and this

language is echoed elsewhere in the document.  *See, e.g.*, Pl.'s Ex. 59 at IBC0022197

(emphasis added).  It is clear that IBC does not distribute medical treatment; physicians,

chiropractors, and other medical treatment providers do that.  Instead, IBC provides an

assurance of payment for the treatment, and ultimately actual payment, as well as a

mechanism for payment.  Those payments are the benefits that are provided under the

relevant plans.  The Court concludes that, in the present context, a payment or money

for medical services covered in the relevant insurance plans constitutes a "benefit"

under ERISA.

### 2.     PCA members' status as beneficiaries

Having determined that payments for medical treatment are, in the present

circumstances, "benefits" under ERISA, the Court must decide whether the

chiropractors that PCA represents are beneficiaries—that is, whether they are

"designated by a participant, or by the terms of an employee benefit plan" to receive a

benefit.  29 U.S.C. § 1002(8).  PCA says that its members qualify under both parts of

this test.  First, PCA says, the relevant plans designate the members to receive benefits

directly.  Second, PCA argues, the plan participants (the patients) executed documents

assigning their rights to their chiropractors (the PCA members) and therefore

"designated" the providers to receive benefits under the employee benefit plans

involved.

Before the Court can determine whether the PCA members are designated by the terms of a plan to receive benefits, it must decide a threshold question—what is a "plan"? At the bench trial, the parties disputed whether documents PCA had offered into evidence constituted plan documents that designated PCA members as beneficiaries. The Court addresses that issue first.

### a. Whether PCA's evidence constitutes plan documents

PCA offered in evidence multiple documents that it contends are employee benefit plans for purposes of ERISA. IBC disagrees, arguing that these documents are not employee benefit plans, or at least that PCA failed to show that they are.

ERISA itself is somewhat vague on what constitutes a "plan." It states that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," which "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). Elsewhere, ERISA defines "employee welfare benefit plan" as "any plan, fund, or program . . . to the extent that such plan, fund, or program was established . . . for the purpose of providing . . . through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits." *Id.* § 1002(1)(A). The Supreme Court has noted that this definition "is ultimately circular," and adopted "the common understanding of the word 'plan' as referring to a scheme decided upon in advance." *Pegram v. Herdrich*, 530 U.S. 211, 222–23 (2000). The Court also observed that "[r]ules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan." *Id.* at 223. Though "the provisions of

documents that set up the HMO are not, as such, an ERISA plan," the Court noted that "the agreement between an HMO and an employer who pays the premiums may . . . provide elements of a plan by setting out rules under which beneficiaries will be entitled to care." *Id.*

*Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011), which both parties cite in their post-trial submissions, is not terribly helpful on this point, as the decision declares what an ERISA plan isn't, rather than what it is. In that case, the Solicitor General had proposed that summary plan descriptions in evidence constituted part of a plan. *Id.* at 1877. The Court first observed that a plan administrator is required to issue such summaries under ERISA and that such summaries must advise participants and beneficiaries about their rights and obligations "under the plan," suggesting "that the information *about* the plan provided by these disclosures is not itself *part of* the plan." *Id.* (citing 29 U.S.C. § 1022(a)). PCA contends that *Cigna* means an "evidence of coverage" document, one of which is in evidence here, is the proper plan document for the Court to evaluate, and it cited *Cigna* at the bench trial to distinguish a summary plan document from the documents at issue here. For its part, IBC argued at trial that the lesson of *Cigna* is that "you have to look at the plan document. That controls." Trial Tr. at 570. In its post-trial memorandum, IBC asserts that this passage of *Cigna* means that section 502(a)(1)(B) of ERISA "only allows for enforcement of the terms of an ERISA plan, not other documents published by the administrator of an ERISA plan." Def.'s Post-Trial Statement of Supporting Authority at 9 (dkt. no. 885).

The Seventh Circuit has interpreted *Cigna* to hold "that silence in a summary plan description about some feature of a pension plan does not override language in the

plan itself." *Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553, 557 (7th Cir. 2011). The

relevant passage of *Cigna* merely says that summary plan documents are not plans, but

neither party is arguing otherwise in this case.

The Seventh Circuit has expressed frustration with the task of deciding what

constitutes an ERISA "plan." "[C]onfusion is all too common in ERISA land," because

"often the terms of an ERISA plan must be inferred from a series of documents none

clearly labeled as 'the plan.'" *Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d

703, 712 (7th Cir. 1999). Elsewhere, noting that "ERISA is not particularly helpful in

delineating those documents that constitute the plan," the Seventh Circuit has "held that

the underlying insurance policy is a plan document for purposes of determining the

standard of review." *Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 870 (7th Cir.

2006). However, an insurance policy is not the *only* possible plan document. Recently,

the Seventh Circuit said that "[a]n ERISA 'plan' is an unwritten 'scheme' or 'set of rules'

regarding the provision of employee benefits." *Larson v. United Healthcare Ins. Co.*,

723 F.3d 905, 911 (7th Cir. 2013). The court has further stated that *Pegram*, discussed

above, "concluded that a contract of insurance sold to a plan is not itself 'the plan.'"

*Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003). The

Eighth Circuit has appeared to assume that an "evidence of coverage" document is a

"plan document," *see Kitterman v. Coventry Health Care of Iowa, Inc.*, 632 F.3d 445,

448 (8th Cir. 2011), while the Ninth Circuit has said that "there is no requirement that

documents claimed to collectively form the employee benefit plan be formally labeled as

such." *Horn v. Berdon, Inc. Defined Ben. Pension Plan*, 938 F.2d 125, 127 (9th Cir.

1991) (per curiam).

PCA has introduced forty documents in evidence, amounting to thousands of pages, under the label "Plaintiff Health Plan Exhibits." These documents have varying titles and content. Some bear the words "Welcome Kit" on the first page, followed by a booklet apparently designed for consumers that discusses the functioning of the programs of Keystone Health Plan East, a subsidiary of IBC. *See, e.g.*, Pl.'s Ex. 54, 62, 63. Others are labeled "Participant Handbook" and begin with a letter stating, "Welcome to your Health Benefits Plan," *e.g.*, Pl.'s Ex. 61 at IBC0022417, or are a "Group Master Contract" or "Comprehensive Major Medical Group Contract" between Keystone Health Plan East, Inc. or QCC Insurance Company and a specific employer, containing sections such as "Schedule of Eligibility," "Schedule of Benefits," and "Schedule of Copayments & Limitations." *See, e.g.*, Pl.'s Ex. 60 at IBC0022312. Still others are entitled "Personal Choice Benefit Program," but are not labeled as contracts, *e.g.*, Pl.'s Ex. 36 at IBC0013273; Pl.'s Ex. 35 at IBC0013041 (also calling itself "Plan 15"); Pl.'s Ex. 34 at IBC0012914 (also calling itself "Plan 520/80/50").

PCA has not attempted to defend each of these documents individually as a plan for ERISA purposes. Rather, it focused at the trial on just two of them. Plaintiff's Exhibit 59 is marked as "Evidence of Coverage," and Plaintiff's Exhibit 38 has two titles: "Personal Choice Health Benefits Plan" and "A Comprehensive Major Medical Group Contract." Pl.'s Ex. 38 at IBC0013610. At the bench trial, PCA argued that "for healthcare purposes the plan is the EOC, the evidence of coverage." Trial Tr. at 564. It further cited *Cigna* for the proposition that the Court should view the documents in evidence as health plans. As discussed above, *Cigna* is not directly helpful on this question. For its part, IBC said that the documents PCA introduced were merely

"benefit agreement[s] with a plan sponsor," or "the contract between IBC and the company," and that "[w]e don't know" if the documents are employers' plans. *Id.* at 553–54. It also contended that "[y]ou have to have the wrap that puts this thing in context," meaning the disputed documents in evidence; "you still need the employer's plan document that wraps around it." *Id.* at 555, 570. However, IBC also argued that "medical plans often will adopt much of what" is in this type of document, and that a medical plan "may adopt it. It may modify it. It may just provide additional information." *Id.* at 555, 570. There is no basis in the evidence for IBC's argument about what it takes to constitute a plan. The Court further notes that the purported plan documents were admitted into evidence without objection.

The two documents that were given the most attention at trial are instructional, informational documents for participants in a health insurance plan. Each describes a variety of medical services and procedures that are and are not covered for the participant under the insurance plan; each describes the appeal processes members can utilize when they disagree with coverage decisions. In addition, both documents make multiple references to "this plan," as in, "If changes are made to this plan, you will be notified." Pl.'s Ex. 59 at IBC0022164. For these reasons, the Court finds it appropriate to infer that these documents are "plan documents" for purposes of ERISA analysis.

### b. Whether direct payment from IBC makes PCA's members beneficiaries

The next question is whether PCA's members are ERISA beneficiaries because, as PCA argues, IBC pays them directly when they provide covered services to plan participants. Few courts have addressed whether direct payment to a provider makes

the provider a beneficiary for purposes of ERISA, outside the context of an assignment of benefits. For example, the Seventh Circuit concluded, in deciding whether a district court had subject-matter jurisdiction over the claim of a chiropractor suing as an ERISA beneficiary, that "§ 1132(a)(1)(B) supplies jurisdiction when a provider of medical services sues as assignee of a participant." *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991). Despite the fact that the insurer in the case had withheld consent for participants to assign their benefits to a provider, the court held that the district court properly had jurisdiction over the chiropractor's claim because he had at least a colorable claim to benefits, adding that "[t]he possibility of direct payment is enough to establish subject-matter jurisdiction." *Id.* at 701. One district court has noted, however, that *Kennedy*'s mention of direct payment appeared in the context of an assignment of benefits. *See San Ramon Reg'l Med. Ctr., Inc. v. Principal Life Ins. Co.*, No. C 10-02258 SBA, 2011 WL 89931, at *3 (N.D. Cal. Jan. 10, 2011) ("In *Kennedy*, the medical provider was suing as an assignee of a plan participant.").

PCA's primary argument for why its members are ERISA beneficiaries does not depend on assignments by patients.[1] Rather, PCA relies on the fact that IBC pays the members directly for services covered under the plans. This direct payment, PCA argues, makes the members ERISA beneficiaries under the definition in 29 U.S.C. § 1002(8). The direct payment issue is, in the Court's view, relatively simple and straightforward. The plan documents discussed above state unambiguously that participating providers are to be paid directly by IBC when they provide covered services to participants. *See* Pl.'s Ex. 38 at IBC0013692 ("The Carrier is authorized by

---

[1] PCA relies on assignments from patients only as a secondary route to beneficiary status, an argument the Court addresses below.

the Covered Person to make payment directly to the Preferred and Participating Professional Providers furnishing Covered Services for which benefits are provided under this Plan."); Pl.'s Ex. 59 at IBC0022209 ("Covered Services not included under capitation are paid fee-for-service according to the HMO fee schedule.").  Thus under the plain language of the statutory definition of a "beneficiary," PCA's members are "designated . . . by the terms of an employee benefit plan" to receive a benefit under the plan.  29 U.S.C. § 1002(8).

Consistent with this quoted language from the plan documents is the undisputed evidence from the bench trial that IBC indeed pays participating providers directly when they perform covered services for IBC insureds.  Both Barnard and Wahner testified to this fact, as did IBC representative Paterson:

> Q:   Now, isn't it true, Miss [sic] Paterson, that under the IBC policies the benefit payments issued when services are provided to a member are paid directly to the in-network providers, not the patients?

> A:   We pay—when members receive services from an in-network provider, we reimburse that in-network provider directly.

Trial Tr. at 374.

The Court concludes that under the plan language quoted earlier and the undisputed testimony at trial, PCA's members are beneficiaries for purposes of ERISA. The plan expressly designates them to receive payment directly, and those payments constitute ERISA benefits.

### c.   Whether plaintiffs' assignments from patients make PCA's members beneficiaries

Given the discussion in the previous section, the Court's assessment of the "beneficiary" issue could stop right there.  To ensure a complete record, however, the

Court also addresses PCA's fallback argument. PCA contends that even if its members are not "designated . . . by the terms of an employee benefit plan" to receive benefits, they have been and are "designated by . . . participant[s]" to receive benefits and thus are still beneficiaries for ERISA purposes under 29 U.S.C. § 1002(8). In this regard, PCA relies on Barnard and Wahner's testimony, which the Court has found credible, that they always obtain assignments from their patients at the outset. The Court can and does infer that this is a practice common to other PCA members.

As indicated earlier, the Seventh Circuit has made clear that an assignment of benefits from a plan participant to a medical provider is sufficient to enable the provider to sue under ERISA. Specifically, the court in *Kennedy* decided that section 1132(a)(1)(B) of ERISA "supplies jurisdiction when a provider of medical services sues as assignee of a participant." *Kennedy*, 924 F.2d at 700. The plan participant had assigned to her chiropractor the right to her benefits. The court concluded that as a result, the chiropractor qualified as a "beneficiary." *Id.*

In this case, however, IBC contends that providers' assignments are rendered invalid by virtue of anti-assignment clauses in patients' health insurance plans. *Kennedy* did not deal with the effect of an anti-assignment provision in the applicable plan.

By way of example, one of the anti-assignment provisions cited by IBC states that "[t]he right of a Covered Person to receive benefit payments under this Plan is personal to the Covered Person and is not assignable in whole or in part to any person, Hospital, or other entity." Pl.'s Ex. 38 at IBC0013693. Another says that "[a]ny rights of a Member to receive benefits under the Contract and Handbook are personal to the

Member and may not be assigned in whole or in part to any person, Provider, or entity, nor may benefits be transferred."  Pl.'s Ex. 59 at IBC0022164.  Because these clauses state that patients cannot transfer their rights to receive benefit payments to anyone else, IBC argues that the chiropractors who are members of PCA cannot be considered beneficiaries, because the clauses prevented them from acquiring rights to benefits from their patients.  PCA contends that the anti-assignment clauses do not apply in the case of a participating provider who gives covered services to a patient and is paid directly but rather that they apply only where the patient otherwise would receive the benefit payment directly, such as when the patient is treated by an out-of-network provider.

It is difficult to see what effect an anti-assignment provision has on a payment that the plan itself says is to be made directly by the patient's insurer to the patient's doctor.  In that situation, it does not appear that the anti-assignment provision applies in the first place.  The following colloquy with IBC representative Linda Paterson at the bench trial illustrates this:

> Q:  Isn't it true that when an in-network provider is involved, the covered person does not actually have a right to receive benefit payments because the benefit payment doesn't go to the member, it goes to the provider?
>
> A:  Again, there's a claim payment that goes to the provider.  I'm not sure I would call it a benefit.  It's a claim.  We're paying a claim.
>
> Q:  Isn't it true that for in-network providers the patient doesn't receive the money?
>
> A:  Yes.  That's true.  For in-network providers patients don't receive a payment.
>
> Q:  Okay.  So this provision that says the covered person cannot assign his right to receive benefit payments doesn't really apply to

an in-network provider, does it?

A:      I would agree with that.

Q:      Okay.  So this is designed to really deal with an out-of-network
        provider?

A:      I would agree with that.

Trial Tr. at 384–85.

The chiropractors involved here are in-network, or participating, providers with

IBC.  When they provide covered services to patients, IBC pays them directly.  There is

nothing for the patient to assign.  Thus the anti-assignment clauses do not apply.

Given this seemingly obvious point, it is not entirely clear to the Court exactly

how IBC contends the anti-assignment clauses fit in.  Perhaps IBC is suggesting that

the aforementioned direct-payment provisions in the applicable plans do not involve

payment of "benefits" but rather, as Paterson suggested in her testimony, of "claims."

*Kennedy*, however, indicates otherwise; that case treats an assignment of the right to

be paid under a medical insurance policy as an assignment of the plan benefits.  In any

event, this would appear to be a distinction without a difference.  The benefit here is the

right to or assurance of payment for covered medical services.  The plan says that is to

go straight to the medical provider.  In the Court's view, that is the end of the story with

regard to the anti-assignment clauses.  They have no effect in the present situation.

**B.      Adverse benefit determination**

Having decided that PCA's members are, in the circumstances presented,

beneficiaries who have rights under ERISA, the Court next assesses whether they

suffered adverse benefit determinations within the meaning of ERISA.

To succeed on its claim, PCA must show that the members received adverse

benefit determinations from IBC that entitled them to notice and appeal rights under ERISA. *See* 29 C.F.R. § 2560.503-1(g)(1) ("[T]he plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination."); *id.* § 2560.503-1(h)(1) ("Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination . . . .").

PCA contends that its members suffered adverse benefit determinations when IBC recouped payments from them for services it said were not covered. IBC argues that provisions in PCA members' contracts prevented them from receiving such adverse determinations.

The ERISA regulations define "adverse benefit determination" as any of the following:

> a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

29 C.F.R. § 2560.503-1(m)(4). The Court has already concluded that the direct payments to the chiropractors at issue in this case amount to benefits within the meaning of ERISA. IBC's practice of withholding or reducing payments to a provider when it determines that a previous payment was made incorrectly therefore falls within the applicable regulation's definition of an adverse benefit determination.

IBC contends that the recoupments were not adverse benefit determinations,

because under their agreements with IBC, the chiropractors were not permitted to "balance bill" (seek further payment from) their patients after providing them with services. IBA points to a term in the chiropractors' provider agreements entitled "Beneficiary Hold Harmless," which states that providers cannot bill subscribers for covered services. *See, e.g.*, Pl.'s Ex. 16 § 3.6. Another clause of the agreement says that a provider must inform the subscriber in writing before providing a non-Covered service; if the provider does not do so, she may not later bill the patient for the service in accordance with the "Beneficiary Hold Harmless" clause. *See, e.g., id.* §§ 3.7 & 2.9. IBC argues that even though it recouped money from the chiropractors, because they had no recourse against the patients, there was no adverse benefit determination.

To support this argument, IBC cites a page from the Department of Labor website, a Frequently Asked Questions primer about ERISA:

> The regulation does not apply to requests by health care providers for payments due them -- rather than due the claimant -- in accordance with contractual arrangements between the provider and an insurer or managed care organization, where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization. . . . On the other hand, where a claimant may request payments for medical services from a plan, but the medical provider will continue to have recourse against the claimant for amounts unpaid by the plan, the request, whether made by the claimant or by the medical provider (e.g., in the case of an assignment of benefits by the claimant) would constitute a claim for benefits by the claimant.

FAQs About the Benefit Claims Procedure Regulation at A–8, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Mar. 28, 2014). PCA contends that this section should not be accorded the force and effect of law, as it was not adopted in the Department of Labor's ERISA regulations, and that it refers only to contractual disputes between providers and insurers, which PCA contends is not

what this case involves.  PCA further argues that its chiropractors could indeed balance-bill patients in connection with certain types of determinations by IBC, including when the patient is no longer covered by IBC insurance or exceeded a limit on the number of visits allowed under a plan.  PCA also contends that IBC is estopped from advancing this argument, because the chiropractors performed services based on prior advice from IBC that the services *were* covered.

The Court agrees with PCA that the cited FAQ answer, assuming it has legal effect, does not apply to the scenario at issue in this case.  The FAQ answer, by its very language, does not apply to IBC's recoupments of prior payments.  This case does not involve situations in which, in the words of the FAQ answer, the chiropractors made "requests . . . for payments due them."  *Id.*  Rather, the situation was reversed, with IBC taking back payments it had previously made.  That is not what the FAQ answer addresses.

Second, many and perhaps most of the recoupments involved non-covered services.  The beneficiary hold harmless provision in the provider agreements only precluded billing the patient for *covered* services, not non-covered services.  Although the agreements conditioned billing of a patient for non-covered services on an advance warning by the provider to the patient, the credible evidence establishes that Barnard and Wahner routinely did this, and it is reasonable to infer that this is a standard practice common to medical providers, who (like Barnard and Wahner) are quite reasonably interested in assurance that they will be paid by *someone* for their work.

Finally, the evidence sufficiently establishes that IBC is estopped from relying on the provider contract provisions imposing conditions on balance billing for non-covered

services.  *See generally Trustmark Life Ins. Co. v. Univ. of Chi. Hosps.*, 207 F.3d 876, 883-84 (7th Cir. 2000).  Both Wahner and Barnard testified credibly that their offices contact the insurance company of "every patient" before providing a service, to determine coverage.  *See* Trial Tr. at 94–95, 200.  And they routinely advised patients in writing of their financial responsibility to pay for services rendered if their insurance does not pay for it.  *See, e.g.,* Def.'s Exs. 3 & 68.  The evidence is sufficient to permit a finding that in the situations that ended up with the recoupments, they were advised that the services were covered or were given reasonable assurance that this was so.  It is also reasonable to infer that this was and is a matter of routine practice for medical providers, who as indicated earlier are understandably concerned about making sure in advance that they will be paid for their services.

## C.      Notice and appeal requirements under ERISA

PCA contends that IBC has provided PCA's members inadequate notice and appeal measures under ERISA.  ERISA entitles a beneficiary to notice of an adverse benefit determination and an opportunity to appeal it.  Every employee benefit plan must "maintain reasonable procedures governing . . . notification of benefit determinations, and appeal of adverse benefit determinations."  29 C.F.R. § 2560.503-1(b).

Under ERISA, notice of a denial of benefits is inadequate unless it is in writing and includes "specific reasons for such denial," including "[r]eference to the specific plan provisions on which the determination is based."  *Id.* § 2650.503-1(g)(i)–(ii). Notice also must include "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit

determination on review." *Id.* § 2650.503-1(g)(1)(iv).

As for appeal, ERISA requires employee benefit plans to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and adverse benefit determination." *Id.* § 2560.503-1(h)(1). The plan administrator must give the claimant at least sixty days to lodge the appeal and allow him to submit written comments, documents, and records relating to the claim. *Id.* § 2560.503-1(h)(2)(i-ii). Full and fair review also requires the plan administrator to give written or electronic notice of its decision. *Id.* § 2560.503-1(j). The plan administrator must identify the specific reason or reasons for the adverse determination, including the plan provisions on which the determination is based,  and must inform the claimant that he is entitled to "upon request, and free of charge, reasonable access to and copies of all documents, records, and other information" relevant to the claim. *Id.* § 2560.503-1(j)(1-3). The plan administrator also must inform the claimant regarding any appeal procedures the plan offers that are not required by ERISA. *Id.* § 2560.503-1(j)(4).

PCA members who were subjected to recoupments of amounts IBC had previously paid were entitled to notice and appeal procedures that complied with these standards. PCA contends that IBC does not provide ERISA-compliant procedures. IBC asks the Court not to consider this claim on the ground that PCA members failed to exhaust administrative remedies. "An ERISA plaintiff must exhaust all available administrative remedies before filing suit to challenge a denial of benefits." *Zhou v. Guardian Life Ins. Co. of Am.*, 295 F.3d 677, 679 (7th Cir. 2002). But a plaintiff need

not exhaust administrative remedies when "there is a lack of meaningful access to review procedures . . . ."  *Ruttenberg v. U.S. Life Ins. Co. in City of N.Y.*, 413 F.3d 652, 662 (7th Cir. 2005).  The question of whether IBC afforded PCA members meaningful access to review procedures, and thus the question of exhaustion, overlaps with the issue of the adequacy of IBC's notice and appeal procedures under ERISA.  The Court therefore considers the two points together.

The Seventh Circuit has held that "substantial compliance" with ERISA's notice and appeal requirements is sufficient to avoid violating the statute.  *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992).  "In general the doctrine of substantial compliance means that a plan administrator who has violated a technical rule under ERISA . . . may be excused for the breach if the administrator has been substantially compliant with the requirements of ERISA."  *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 361–62 (7th Cir. 2011).

The question of whether a specific form of notice substantially complies with ERISA is "guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review."  *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003).  The Seventh Circuit has distinguished this statement of reasons from "[b]are conclusions," which are "not a rationale."  *Halpin*, 962 F.2d at 693 (citations omitted).  In *Hackett*, the court reiterated that "[c]onclusions without explanation do not provide the requisite reasoning and do not allow for effective review."  *Hackett*, 315 F.3d at 775.

As discussed earlier, the SOR and 837, the sole forms of notice that IBC sends

to a provider from whom it is recouping funds, do not identify the basis for IBC's conclusion that it has overpaid or paid in error. These notices do not meet ERISA's requirements in the way required by *Halpin* and *Hackett.*

Further, and perhaps more importantly in the present situation, the SOR and 837 do not inform providers that they have a right to appeal IBC's determination, let alone describe what the appeal process would entail and what it requires the provider to do if he wishes to appeal. IBC contends that that providers could have, on their own, located and accessed information about available appeal procedures through the provider manuals found on NaviNet. Even if the Court were to overlook the fact that those manuals lack adequate information, ERISA places the burden on the plan administrator to make this information available to the claimant (which IBC failed to do), not on the claimant to seek it out.

For these reasons, this Court finds that the notice that IBC provides to PCA members from whom it is recouping payments does not substantially comply with ERISA.

In addition, IBC does not offer providers any chance to appeal an adverse benefit determination when it is based on an eligibility determination (whether the patient was authorized to receive covered services from a provider who would then be reimbursed for those services), an audit investigation, a fee schedule dispute, or a medical necessity determination, the last of which is a relatively common occurrence. Although IBC offers providers a chance to appeal an adverse benefit determination in other circumstances, Wahner's testimony about his attempt to challenge an adverse determination reflects that IBC lacks a regular or established process for administering

appeals.  As discussed earlier, no records were kept of the review proceedings in Wahner's case.  In addition, IBC does not set forth in the materials that it disseminates to providers a procedure for appealing an adverse benefit determination.

Furthermore, IBC does not regularly inform a provider of the decision that it has reached on review of an earlier adverse determination.  Wahner, for example, did not even know that he had lost his first appeal until he himself reached out to IBC.  And IBC never identified the reason(s) why it believed that the adverse benefit determination in Wahner's case was correct.  Rather, it simply rehashed the information found on Wahner's SOR, which was itself inadequate to help him understand the basis for the determination.  Moreover, IBC flatly denied Wahner's request for access to records of the second hearing and even basic information about who attended the hearing.

The Court finds that these deficiencies preclude full and fair review as required by ERISA and also make it virtually impossible to ascertain whether IBC satisfies other requirements for full and fair review.  For instance, ERISA prohibits plan administrators from involving in the appeal any representatives who participated in the initial decision.  Due to the lack of information about the proceedings, however, neither Wahner nor the Court can assess whether IBC complied with that requirement.

For these reasons, the Court concludes that IBC's practices come nowhere near substantial compliance with ERISA's notice and appeal requirements.

**D.      Permanent injunction**

PCA has asked the Court for a permanent injunction to address IBC's inadequate notice and appeal procedures and practices regarding recoupments of paid benefits from providers.  Section 502(a)(3) of ERISA enables a plan participant, beneficiary, or

fiduciary to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan . . . to obtain other appropriate equitable relief to redress such violations or . . . to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  This provision allows a beneficiary to seek an injunction against practices that violate the statute.  In *Smith v. Med. Benefits Admin. Grp.*, 639 F.3d 277, 284 (7th Cir. 2011), the court concluded that ERISA authorized it to require a plan administrator to modify its practices "so as to bring them into conformity with the governing regulations as well as its broader fiduciary obligations to plan participants."  The court added that this "might be an entirely appropriate form[] of relief if . . . what happened to [the plaintiff] was not an isolated occurrence but was consistent with [the plan's] routine . . . practices . . . ." *Id.*

The right to injunctive relief under ERISA is determined based on the traditional standards for such relief, as "[t]here are no specific procedures under ERISA . . . which cover the issuance of injunctions."  *Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1217 (7th Cir. 1989).  Under traditional standards, a plaintiff seeking a permanent injunction must show that:  1) it suffered an irreparable injury; 2) remedies available at law, such as damages, cannot compensate for that injury; 3) the balance of hardships between the plaintiff and defendant warrants injunctive relief; and 4) an injunction would not disserve the public interest.  *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010).[2]

---

[2]  The first two of these factors are often two sides of the same coin and thus are sometimes considered together.  *See, e.g., Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011) ("This case cannot satisfy the basic requirements for an injunction.  First, the plaintiffs have not suffered irreparable harm.  Their injury—the

In *Monsanto*, the Supreme Court indicated that, in addition to considering whether the plaintiff suffered an irreparable injury in the past, courts should take into account whether the plaintiff will suffer one in the future. In deciding that respondents were not entitled to relief enjoining petitioner from deregulating the planting of a certain plant, the court noted that "respondents cannot show that they will suffer irreparable injury if [petitioner] is allowed to proceed with any partial deregulation . . . ." *Id.* at 2759. The Supreme Court further indicated that to be considered, future harm should be imminent rather than likely to occur at some undefined point down the road. *Id.* at 2760. In *Gould*, the Seventh Circuit likewise assessed whether the plaintiffs faced irreparable harm in the near future. *Gould*, 870 F.2d at 1217.

Finally, the balance of hardships factor "takes on heightened importance when the plaintiff requests a mandatory injunction; that is, an injunction requiring the defendant to perform an affirmative act." Such an injunction "imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Kartman*, 634 F.3d at 892.

The evidence showed that it has been IBC's usual course of business to provide inadequate notice and appeal rights in connection with recoupments of payments from PCA's members. The injuries at issue are irreparable, and PCA's members lack an adequate remedy at law to redress them. In recouping payments from PCA members without adequate notice or appeal, IBC certainly deprives them of monetary benefits (the payments), but it also deprives them of something intangible, specifically, the

underpayment of their insurance claims—is easily remedied by an award of money damages, a fully adequate remedy.")

information supporting the adverse determination and the right to be heard in opposition. In addition, the evidence established that providing inadequate notice and appeal procedures is IBC's routine practice even now. Thus PCA's members are likely to continue to suffer the same injuries over and over again, in the near and not-so-near future. Redressing those injuries would require repeated future lawsuits on a claim-by-claim basis. This is not an adequate remedy for the future harm, including the intangible harm of being deprived of money without an explanation and without, practically speaking, any real ability to challenge the deprivation. As the Seventh Circuit stated in *Kartman*, "[m]onetary damages, if awarded, would compensate the [plaintiffs] for the discrimination they had already suffered . . . . An injunction, on the other hand, would require the employer to cease its discriminatory conduct, providing a final *prospective* remedy for ongoing and future discrimination." *Kartman*, 634 F.3d at 894. The need to file a multiplicity of lawsuits in the future tends to render legal remedies inadequate. *See Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1012 (7th Cir. 2013) (discussing *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004)).

There is no indication that an order requiring IBC to modify its notice and appeal procedures would impose an undue burden that would outweigh the hardship to PCA members if an injunction is denied. Indeed, IBC already offers enhanced notice and appeal procedures to some providers, in particular those who were part of the Love-Thomas settlement. There is nothing that suggests this is unduly burdensome to IBC or that extending similar rights to other providers entitled to ERISA-compliant notice and appeal procedures would be unduly burdensome. The Court concludes that PCA has satisfied the balance of hardships factor.

Finally, requiring a plan administrator to afford notice and appeal rights that comply with ERISA serves the public interest in enforcing duly enacted national legislation whose purpose is to protect workers who are the direct beneficiaries of employer-provided health and welfare benefit plans.

## Conclusion

For the reasons stated above, the Court finds in favor of PCA on its claims against IBC and concludes that PCA is entitled to an appropriate permanent injunction. Because the parties have not yet briefed the question of the precise contours the injunction should take, the Court orders further briefing in that regard. Plaintiff is to submit a proposed form of injunction and a supporting memorandum by no later than April 11, 2014; defendant is to reply by no later than April 21, 2014. The case is set for a status conference, to be conducted by telephone, on April 24, 2014 at 8:45 a.m. Plaintiff's counsel is to get defendant's counsel on the telephone and then call chambers (312-435-5618).

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 28, 2014